**NEWMAN, WILLIAMS, MISHKIN, CORVELEYN, WOLFE & FARERI, P.C.**
A PROFESSIONAL CORPORATION

BY: GERARD J. GEIGER, ESQUIRE
IDENTIFICATION NO. PA 44099
LAW OFFICES
712 MONROE STREET
P.O. BOX 511
STROUDSBURG, PA 18360-0511
(570) 421-9090 (voice)
(570) 424-9739 (fax)
ggeiger@newmanwilliams.com  (email)

ATTORNEY FOR: Monroe County, Monroe County
Correctional Facility, Donna M. Asure, Rich Cuth,
George Kumburis, J. Parker, G. Mowry, Norma L.
Elmore, E. Devers, Sergeant Haidle

---

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Peter Ponzini, Esq. and Miryem Barbaros, as Co-Administrators of the Estate of Mumun Barbaros, deceased,<br><br>　　　　　Plaintiffs,<br><br>v.<br><br>Monroe County et al.,<br>　　　　　Defendants | 3:11–CV–0413<br><br>Judge Mariani<br><br>Jury Trial Demanded |

## Monroe County Defendants' Brief
## in Support of Motion for Summary Judgment

# Table of Contents

Page

Table of Citations                                                              i

I.    Procedural History                                                        1

II.  Facts

    1.  County Commissioner Donna Asure                               6

    2.  Work Release Coordinator Richard Cuth                         7

    3.  Correctional Officer James Parker                             7

    4.  Officer Robert Overfield                                      7

    5.  Officer Norma Elmore                                          8

    6.  Officer Erin Devers                                           8

    7.  Sgt. Gary Haidle                                              8

    8.  Officer Gary Mowery                                           8

       Other County Defendants                                     9

III.  Issues Presented                                                         11

IV.  Argument                                                                  12

V.   Conclusion                                                                19

Certificate of Word Count                                                      20

Certificate of Service                                                         21

# Table of Citations[1]

<u>Cases</u>

Anderson v. Liberty Lobby, Inc.,  477 U.S. 242, 106 S.Ct. 2505,
   91 L.Ed.2d 202 (1986).................................................................13

Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir.1996) ...........................18

Brown v. Muhlenberg Twp., 269 F.3d 205 (3d Cir.2001).......................17

Bucano v. Sibum, 2013 WL 2456009 (M.D. Pa. June 6, 2013)...............17

Buffington v. Baltimore County, 913 F.2d 113 (4th Cir.1990),..............15

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548,
   91 L.Ed.2d, 265 (1986) ................................................... 12, 13

City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197,
   103 L.Ed.2d 412 (1989).................................................................18

Colburn v. Upper Darby Township, 946 F.2d 1017 (3d Cir. 1991) .......... 14, 15, 16

Gottlieb ex. rel. Calabria v. Laurel Highlands Sch. Dist.,
   272 F.3d 168 (3d Cir.2001) .................................................18

Lynch v. Johnston, 463 A.2d 87 (Pa. Cmwlth. 1983) .............................19

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).....................13

Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018,
   56 L.Ed.2d 611 (1978).......................................................17

Orson v. Miramax Film Corp, 79 F.3d 1358 (3d Cir. 1996) ...................13

---

[1] All reported cases cited in this brief include hyperlinks to Westlaw.

Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986) ...........15

Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860 (3d Cir. 1986) ...........13

Taylor v. Phoenixville Sch. Dist., 184 F.3d 296 (3d Cir. 1999)............................12

Valentin v. Cartagena, 375 Pa. Super. 493, 544 A.2d 1028 (1988) ......................17

Wargo v. Schuylkill County,
    No. 3:06-CV-2156, 2008 WL 4922471(M.D. Pa. Nov. 14, 2008)......................18

Wolosyzn v. County of Lawrence, 396 F.3d at 320 (3d Cir. 2005) ......................14

**Rules**

Fed. R. Civ. P. 56 ............................................................................. 12, 13

# I.     Procedural History

This is an inmate suicide case plaintiffs filed on March 3, 2011 (Doc. 1).

On September 19, 2012, in response to a motion for judgment on the pleadings, the Court dismissed all claims against defendant, MCCF Correctional Officer Jessie Cleare (Doc. 64), holding that Cleare could not have subjectively known that Barbaros was a suicide risk because PrimeCare never placed Barbaros on a suicide watch:

> "Deliberate indifference requires that Cleare have subjective knowledge of a "particular vulnerability" of the Decedent to commit suicide. Although Cleare likely had such subjective knowledge concerning the vulnerability of Decedent's neighbor, the Amended Complaint does not adequately allege that Cleare had such knowledge with regard to Decedent. Cleare had no heightened responsibility to ensure Decedent's safety because the prison medical staff did not place Decedent on suicide watch and Cleare was not the guarantor of Decedent's safety. See Wargo, 348 F. App'x at 759."

Doc. 64.

On October 25, 2012, upon stipulation of the parties, the Court dismissed all claims against defendant, Correctional Officer George Kumburis (Doc. 70) after defendants advised plaintiffs that Kumburis was not even employed at the MCCF until after Barbaros' death.

The deadline for dispositive motions and supporting briefs  is December 12, 2014 (Doc. 116).

1

On December 12, 2014, the Monroe County defendants moved for summary judgment and filed a Statement of Facts pursuant to LR 56.1 concurrently with this supporting brief.


## II.    Facts

Mumun Barbaros committed suicide at the Monroe County Correctional Facility (MCCF) on March 22, 2009.  Barbaros was confined to the MCCF after being arrested on March 18, 2009 by the Barrett Township police department for burglary and criminal trespass. Statement of Facts ("SF"), at ¶ 1.

Barbaros told no one that he was contemplating suicide. SF, at ¶ 90. He never threatened suicide in the past. Id. He was never under the care of a psychiatrist or psychologist prior to his commitment to the MCCF. SF, at ¶ 91.

Barbaros had been taking Trazadone and Paxil upon his arrival at the MCCF. These medications were prescribed, not by a psychiatrist, but by Barbaros' family doctor, Richard Katz, D.O., an internist:

> "23:9   Q.    Did Dr. Katz prescribe both
> 23:10         Paxil and trazodone?
> 23:11   A.   That's what I know."

Miyrem Barbaros deposition, p. 23; exhibit A, at p. 96.

Trazadone and Paxil are used to treat depression.

Correctional Officer Gary Mowery processed Barbaros' admission to the MCCF. SF, at ¶ 6. Officer Mowery completed am intake form which required him to assess Barbaros' risk for suicide. SF, at ¶ 6. After speaking with Barbaros, Officer Mowery concluded that Barbaros was a "normal guy" who was not suicidal and who had no mental health issues that caused him concern. SF, at ¶ 8.

Barbaros was then turned over to PrimeCare Nurse Paul James, R.N., who completed a suicide screening form. SF, at ¶ 10.  Nurse James was an employee of PrimeCare Medical, Inc.  Id.  PrimeCare is under contract with Monroe County to provide medical services to inmates at the MCCF. Barbaros told Nurse James that he had been prescribed Prozac and Trazadone and received his medications from a CVS pharmacy in Mountainhome, Pennsylvania. SF, at ¶ 13. After completing a suicide screening form, Nurse James concluded that Barbaros was not suicidal and was not in any danger of harming himself.  SF, at ¶ 14. Nurse James declined to place Barbaros on a suicide watch.  Id.

PrimeCare Nurse, Patricia Bauer, called the CVS pharmacy in Mountainhome to confirm Barbaros' prescription. SF, at ¶ 16. CVS advised her they had no record of a prescription for Mr. Barbaros. Id. As a result, PrimeCare Nurse Bauer placed Barbaros on a list to see a psychiatrist because "we cannot give [inmates] medications on their say-so." SF, at ¶ 17.

Barbaros attended a bail hearing before District Magistrate Judge Daniel Whitesell. Barbaros complained to Judge Whitesell at the hearing that he was not receiving his prescribed medications. SF, at ¶ 18. Judge Whitesell told the officers accompanying Barbaros to tell the MCCF about his complaint, which they did. SF, at ¶ 19. MCCF intake officers relayed Judge Whitesell's message to the PrimeCare staff. Id. Upon learning of the complaint, PrimeCare nurse Grace Ramos-Huertas called CVS again and this time confirmed Barbaros' prescriptions of Trazadone and Paxil, not Trazadone and Prozac, as Barbaros initially reported. SF, at ¶ 20, 21.

The PrimeCare nursing staff called PrimeCare physician, Dr. Alex Thomas, M.D., who ordered that Barbaros receive Trazadone and Paxil, as prescribed by Dr. Katz. SF, at ¶ 22. Although Barbaros had not received the medications prescribed by his internist, Dr. Katz, for several days, Dr. Thomas was not concerned about the brief time that Barbaros was off his medications.  Dr. Thomas explained that because Paxil remains in a person's "system" for several days, there was no need to worry about withdrawal symptoms. SF, at ¶ 23.

PrimeCare Mental Health worker, William Buffton, also saw and evaluated Barbaros' mental condition during his brief stay at the MCCF. Buffton is a master's level clinician whose role was to screen inmates and provide them with counseling when appropriate. SF, at ¶ 24.  After meeting with Barbaros, Buffton

4

concluded that Barbaros posed no danger to himself and declined to place him on a suicide watch, which was within his power if he thought it appropriate. SF, at ¶ 25.

The MCCF requires that during the first four days of incarceration, its officers monitor the behavior of its inmates to decide not just how to classify those inmates into different units within the jail but to flag those inmates who might be in need of medical and psychiatric care. SF, at ¶ 26, 27. The jail created a "Behavioral Observation Form" which officers on each shift complete after observing newly committed inmates. The only potential "red flag" on the form completed by the officers was a notation made by Correctional Officer Jonathan Ryan on the 4th day of Barbaros' confinement. Ryan noted that Barbaros exhibited "bizarre behavior." SF, at ¶ 28. Officer Ryan was initially unsure whether he should even make this notation. SF, at ¶ 29. He explained at his deposition that he noted bizarre behavior because he saw Barbaros in his cell dressed only in his underwear. MCCF Officer Kramer noted this was common behavior because the cells in B-unit are hot. SF, at ¶ 30.  Officer Ryan explained that he did not believe this was a sign that Barbaros would harm himself.  SF, at ¶ 28. In fact, when he learned that Barbaros committed suicide, it was a complete shock to him because Barbaros had recently offered to make him a pizza after he was released from the MCCF. SF, at ¶ 32, 33.

Finally, Barbaros' widow, Miryem Barbaros, was in almost daily contact with her husband and knew him better than any of the MCCF staff. SF, at ¶ 34. His suicide was a complete shock to her because he sounded so well during their conversations. SF, at ¶ 35.

The plaintiffs produced no evidence that Barbaros told anyone he was contemplating suicide. Similarly, there is no evidence any of the Monroe County defendants, or even the PrimeCare defendants, thought Barbaros was suicidal and then ignored his vulnerability.

The plaintiffs named many Monroe County employees as defendants but discovery has revealed their complete non-involvement.

### 1.    County Commissioner Donna Asure

Donna Asure is currently the MCCF warden. However, when Barbaros committed suicide she was a Monroe County Commissioner. She did not become the warden of the MCCF until November 19, 2009, eight months <u>after</u> Barbaros died. SF, at ¶ 51. She never met Mr. Barbaros and only became aware of his existence after the MCCF staff called to report his suicide. SF, at ¶ 56. Plaintiffs name no other County Commissioners and offer no explanation why any Commissioner, including Asure, would have been deliberately indifferent to Barbaros' serious medical needs when she was not even aware of his existence.

### 2.     Work Release Coordinator Richard Cuth

Richard Cuth was the work release coordinator at the time of Barbaros' death. SF, at ¶ 57. Work release is available only to sentenced inmates and not pretrial detainees. SF, at ¶ 60. Cuth had no role in caring for Barbaros, a pretrial detainee awaiting trial.

### 3.     Correctional Officer James Parker

Officer James Parker never met Mr. Barbaros during his lifetime. SF, at ¶ 65. Parker rushed to B-Unit and administered CPR to Barbaros in an attempt to save his life. SF, at ¶ 66. Plaintiffs allege that Barbaros was already dead by this time. SF, at ¶ 67. Plaintiffs sued Parker despite his best efforts to save Mr. Barbaros' life.

### 4.     Officer Robert Overfield

Although the County's attorney does not represent Mr. Overfield, the County asks that he be dismissed as a defendant. Officer Overfield and his wife died in a tragic motorcycle accident on May 15, 2009 when they were run over by a cement truck. SF, at ¶ 70. This was less than two months after Barbaros' death. Plaintiffs never served Overfield and he was dead when they filed their lawsuit. MCCF records reflect that Overfield had no involvement with Mr. Barbaros other than trying to save his life.

### 5.    Officer Norma Elmore

Officer Elmore never met Barbaros.  SF, at ¶ 80. She does not know what he looked like and was not assigned to his unit. Id. Plaintiffs offered no evidence even suggesting she was responsible for his death.

### 6.    Officer Erin Devers

Officer Devers was called to B-Unit in response to reports of Barbaros' suicide. She never met him during his life and never even worked on the unit where he was incarcerated prior to his death. SF, at ¶ 82.

### 7.    Sgt. Gary Haidle

Sgt. Haidle never met Barbaros. SF, at ¶ 87. Although plaintiffs' theory in discovery was that he might have seen Officer Ryan's bizarre behavior report (the underwear observation), the completed behavioral observation form was forwarded to Karl Abel (not a defendant). SF, at ¶ 88. It was not picked up by Gary Haidle. Id.

### 8.    Officer Gary Mowery

Officer Mowery processed Barbaros on the day he was committed to the MCCF. He observed no signs of suicidal ideation and did not believe that Barbaros posed any danger to himself.

**Other County Defendants**

Plaintiffs also name Monroe County as a defendant. As noted in the County's statement of facts, the County has a suicide policy that provides for multiple screenings of inmates with a vulnerability to suicide. Inmates are screened during intake. They are observed and their actions documented. Monroe County provides annual suicide training to its staff to train them in how to spot inmates who are a risk to themselves.

Inmates are immediately referred to the PrimeCare medical staff which is medically trained to evaluate inmates' vulnerability to suicide. In Barbaros' case, that included:

    (a)    a trained nurse who evaluated him on admission;

    (b)    nursing staff that saw him daily;

    (c)    a mental health worker who interviewed him;

    (d)    a physician who prescribed him medications.

The MCCF staff that did interact with Barbaros all stated their subjective belief that Barbaros was not at risk of harming himself. Barbaros even told Officer Ryan what a good person he was and how he had plans for making him a pizza when he was released.

In addition to what we do know, here is what discovery shows has no factual support:

(1)     Barbaros never expressed a desire to hurt himself to anyone at the MCCF or anyone outside the jail for that matter;

(2)     Barbaros' physician, who prescribed him Trazadone and Paxil, was an internist. Apparently, Barbaros had never even been under the care of a psychiatrist or psychologist prior to his commitment to the MCCF.

(3)     Barbaros has no history of suicide or making threats of suicide.

(4)     Barbaros' own wife, who knows him better than the MCCF staff, saw no signs he would harm himself.

(5)     The physicians and nursing staff of PrimeCare, who were privy to his confidential medical information that correctional staff did not have access to, never alerted the MCCF staff that Barbaros was at risk of suicide.

(6)     No one at the MCCF, either officers or PrimeCare staff, subjectively believed that Barbaros was in danger.

## III.    Issues Presented

1.      Are the Monroe County defendants entitled to summary judgment because there is no evidence of record that there was a strong likelihood of suicide and no evidence that these Jail officials were deliberately indifferent to any such need?

**Suggested answer: Yes.**

2.      Has plaintiff stated a Monell claim against Monroe County?

**Suggested answer: No.**

3.      Is the MCCF an entity subject to suit?

**Suggested answer: No.**

4.      To the extent that the plaintiffs assert claims under Pennsylvania state law, whether the immunity provisions contained in the Political Subdivision Tort Claims Act bar such claims?

**Suggested answer: yes.**

## IV.   Argument

### A.   Standard of Review

Under Fed. R. Civ. P. 56, a court may grant a motion for summary judgment if there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56. In determining whether the entry of summary judgment is proper, a court is to consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." Fed. R. Civ. P. 56(c).

Summary judgment is proper against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d, 265 (1986). A moving party is entitled to summary judgment as a matter of law if the non-moving party fails to establish an essential element of his or her case due to the fact that such party has failed to present a genuine issue of material fact. Celotex, 477 U.S. at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275. A moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999). Once the moving party has satisfied this initial burden, the opposing party must establish that a genuine issue exists by supplying

"specific facts which demonstrate that there exists a genuine issue for trial." Orson v. Miramax Film Corp, 79 F.3d 1358, 1366 (3d Cir. 1996).

Not every issue of fact will be sufficient to defeat a motion for summary judgment; issues of fact are only genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Further, the non-moving party cannot rest upon mere allegations but must present actual evidence that creates a genuine issue of material fact. See Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 249, 106 S.Ct. 2505, 91 L.Ed 2d 202.

The Court must draw all reasonable inferences in the non-moving party's favor, and must accept the party's evidence when considering the merits of the summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Pollock v. American Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986). The party moving for summary judgment need only point out to the court that there is an absence of evidence to support the non-moving party's claims; it need not support its motion with affidavits or similar materials that regulate the opposing party's claims. Celotex Corp., supra.

13

Here, the plaintiffs have failed to produce, and cannot produce, evidence necessary to support their claims against these defendants. Summary judgment is therefore appropriate.

**B.    The Record Evidence Is Insufficient For A Reasonable Jury To Find The Monroe County Prison Defendants Liable For Mr. Barbaros' Suicide.**

The suicide of a pretrial detainee can support a recovery in a section 1983 action only under particularly egregious circumstances. A plaintiff in a prison suicide case has the burden of establishing the following: 1) that the detainee had a particular vulnerability to suicide; 2) the custodial officer or officers knew or should have known of that vulnerability; 3) those officers acted with reckless indifference to the detainee's particular vulnerability. Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991).

To establish that the decedent represented a "particular vulnerability to suicide, the plaintiff must demonstrate "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur.' " Wolosyzn, 396 F.3d at 320; Wargo v. Schuylkill County, No. 3:06-CV-2156, 2008 WL 4922471, at *5 (M.D. Pa. Nov. 14, 2008) aff'd, 348 F. App'x 756 (3d Cir. 2009).

Even where a strong likelihood of suicide exists, it must be shown that the custodial officials "knew or should have known" of that strong likelihood. . .

[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide. . ." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991).

Custodians have been found to "know" of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities. See, e.g., Buffington v. Baltimore County, 913 F.2d 113 (4th Cir.1990), cert. denied, ⸺ U.S. ⸺, 111 S.Ct. 1106, 113 L.Ed.2d 216 (1991); Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir.1986); Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991).

As for "should have known", it was described as a phrase of art with a meaning distinct from its usual meaning in the context of the law of torts. It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence. It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something less then subjective appreciation of that risk. The "strong likelihood" of suicide must be "so obvious that a lay person would easily recognize the necessity for "preventative action." Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991). The risk of self-inflicted injury must be not only great, but also sufficiently apparent

that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges. Colburn v. Upper Darby Twp., 946 F.2d 1017, 1025 (3d Cir. 1991).

Discovery is now complete. There is no evidence upon which a reasonable jury could conclude that Mr. Barbaros had a strong likelihood of suicide of which these defendants were aware or should have been aware.

At the inception of this case, this Court dismissed Officer Cleare as a defendant. It was Cleare who was on duty when Barbaros committed suicide. The Court noted that Cleare did not have the subjective knowledge of a risk because Barbaros was not on a suicide watch. Barbaros was a man who never saw a psychiatrist, never threatened suicide before and even advised Officer Ryan of his plans on release. That conversation with Officer Ryan took place shortly before Barbaros took his own life. If the medical professionals, who had complete information about Barbaros' medical history and who had training in mental health and the effects of drug withdrawal, did not spot Barbaros' vulnerability, MCCF officers certainly could not.

There is simply no evidence that any of these defendants were deliberately indifferent to Barbaros' serious medical needs.

### C.    Monroe County Correctional Facility

Plaintiffs sued the Monroe County Correctional Facility.  County jails, including the MCCF in particular, are not legal entities that may be sued. They are merely buildings. *See, e.g.*, Bucano v. Sibum, 3:12-CV-606, 2013 WL 2456009 (M.D. Pa. June 6, 2013) (Conaboy, J.) ("With regards to MCCF, the law is well-settled that a prison is not a "person" that is subject to suit under § 1983"). Thus, the MCCF should be dismissed as a defendant.

### D.    Robert Overfield

Plaintiffs sued Correctional Officer Overfield after he died. They did not substitute, as a plaintiff, his estate. Their claims against Overfield should be dismissed because a lawsuit filed against a dead person is a nullity. Valentin v. Cartagena, 375 Pa. Super. 493, 544 A.2d 1028, 1029 (1988).

### E.    Monell Claims against Monroe County

Plaintiffs sue Monroe County but they identified no policies in discovery that caused Barbaros' death. Plaintiffs fail to state a Monell claim against the County.

A local government entity may be held liable under § 1983 only when the plaintiff demonstrates that the government entity itself caused the plaintiff's injury through the implementation of a policy or custom. Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A policy is an official

proclamation or edict of a municipality while a custom is a practice that is so permanent and well settled as to virtually constitute law. Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir.1996) (citations omitted). The plaintiff must also show that "there is a direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation." Brown v. Muhlenberg Twp., 269 F.3d 205, 214 (3d Cir.2001) (quoting City of Canton v. Harris, 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). It must be the policymaker's actions that "directly caused constitutional harm." Gottlieb ex. rel. Calabria v. Laurel Highlands Sch. Dist., 272 F.3d 168, 175 (3d Cir.2001); Wargo v. Schuylkill Cnty., 348 F. App'x 756, 760 (3d Cir. 2009).

As the County notes in the factual section of this brief, it has an established suicide policy and that policy was followed. Its Officers receive annual suicide training and its policies and its practices provide for multiple levels of review and observation to ensure that inmates who are vulnerable to suicide are cared for.

An MCCF officer evaluates an inmate upon admission and then that inmate is turned over to trained healthcare providers employed by PrimeCare. Nurse James did a suicide screen. PrimeCare's mental health counselor met and evaluated Barbaros. A PrimeCare physician prescribed medications and the PrimeCare staff saw him daily. While plaintiffs' theory is that Barbaros became suicidal because of

withdrawal from psychotropic medications, even if true, this was not information

shared with the County.

Barbaros' death, while tragic, was not caused by any of the Monroe County

defendants.

### F.   Immunity for State Law Claims under Political Subdivision Tort Claims Act

To the extent that plaintiffs claim that the moving defendants are negligent

under state law, the claims are also barred by the Political Subdivision Tort Claims

Act since the claims do not fall within one of the exceptions in which liability

claims are permitted.  *See* Lynch v. Johnston, 463 A.2d 87 (Pa. Cmwlth. 1983).

## V.   Conclusion

For the foregoing reasons, the Monroe County defendants ask that summary

judgment be granted in their favor and against the plaintiffs.

Respectfully submitted,

NEWMAN, WILLIAMS, MISHKIN,
CORVELEYN, WOLFE & FARERI, P.C.

By: /s Gerard J. Geiger, Esq.
    Attorney I.D. No. PA 44099

Date: December 12, 2014

**Certification of Word Count**

Pursuant to LR. 7.8(b)(2), I hereby certify that in accordance with Microsoft Word's "Word Count" feature, that the total number of words contained in this brief, excluding the tables of contents and citations amounts to 4,119 words. This amount is within the 5,000-word limit imposed by LR 7.8(b)(2).

NEWMAN, WILLIAMS, MISHKIN,
CORVELEYN, WOLFE & FARERI, P.C.

By: /s/ Gerard J. Geiger, Esq.
        Attorney I.D. No. PA 44099

Date: December 12, 2014

20

## Certificate of Service

I hereby certify that on this date, the parties' attorneys were served with a copy of the foregoing document via ECF.

NEWMAN, WILLIAMS, MISHKIN,
CORVELEYN, WOLFE & FARERI, P.C.

By: /s/ Gerard J. Geiger, Esq.
     Attorney I.D. No. PA 44099

Date: December 12, 2014

21