IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PETER PONZINI and             :
MIRYEM BARBAROS, as           :
Co-Administrators of the Estate of   :
MUMUN BARBAROS, Deceased,     :
                              :
          Plaintiffs,         :
     v.                       :     3:11-CV-00413
                              :     (JUDGE MARIANI)
MONROE COUNTY, et al.,        :
                              :
          Defendants.         :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On March 3, 2011, Plaintiffs initiated this action by filing a complaint alleging

violations of 42 U.S.C. § 1983 and Pennsylvania state law. (Doc. 1). Plaintiffs subsequently

filed an Amended Complaint (Doc. 43) on June 23, 2011. Plaintiffs' claims stem from

circumstances surrounding the death of their Decedent, Mumun Barbaros. Barbaros, a

pretrial detainee, committed suicide while incarcerated at the Monroe County Correctional

Facility in March 2009. Plaintiffs sued numerous defendants including the corporate entity

and individuals contracted to provide medical care within the facility. These Defendants,

referred to here as the "PrimeCare Defendants," are: the corporate entity PrimeCare

Medical, Inc., and the individuals Deborah Wilson, Christina Rowe, Patricia Bauer, Wendy

Johnson, Paul James, and Grace Ramos. With respect to the individual PrimeCare

1

Defendants, Plaintiffs allege liability for Barbaros's death under Fourteenth Amendment (Count I) and medical negligence (Count IV) theories. (Doc. 43 at 15, 17-18). Plaintiffs further allege that the individual PrimeCare Defendants intentionally inflicted emotional distress on Barbaros (Count II). *Id.* at 15-16. With respect to PrimeCare Medical, Inc., Plaintiffs allege liability for a violation of Barbaros's Fourteenth Amendment rights (Count III) and on the basis of *respondeat superior* for the negligence of the individual PrimeCare Defendants (Count IV). *Id.* at 16-18. Plaintiffs allege that all PrimeCare Defendants are liable to Barbaros's survivors for his wrongful death (Count V) and are liable under the Pennsylvania Survival Act, 42 Pa. Cons. Stat. Ann. § 8302 (West), for his alleged pain and suffering and for his loss of earning capacity (Count VI). (Doc. 43 at 16, 18-20). By Memorandum (Doc. 64) and Order (Doc. 65) dated September 19, 2012, this Court denied the PrimeCare Defendants' Motion to Dismiss the Amended Complaint (Doc. 50).

Presently pending before the Court are the PrimeCare Defendants' Motion for Summary Judgment (Doc. 124) and the PrimeCare Defendants' Supplemental Motion for Summary Judgment (Doc. 160). The PrimeCare Defendants' have moved for summary judgment on all counts against them and the Court will consider the two motions as one. The parties have briefed the motions and they are ripe for disposition. For the reasons set forth below, the motions will be denied.

## II. Factual Background

### A. Statement of Undisputed Material Facts

In accordance with Local Rule 56.1, the PrimeCare Defendants have submitted a Statement of Undisputed Material Facts (Doc. 126 and Doc. 161) ("SMF") as to which they submit there is no genuine issue for trial. Plaintiffs subsequently submitted their response to the PrimeCare Defendants' Statement of Material Facts (Doc. 139 and Doc. 172). Except where expressly noted as disputed, the following facts of record are undisputed.

Barbaros was arrested and brought to the Monroe County Correctional Facility ("MCCF") at approximately 2:45 a.m. on March 18, 2009. (SMF, Doc. 126 at ¶2; Answer to SMF, Doc. 139 at ¶2). Nurse Paul James conducted a medical intake screening shortly thereafter, at approximately 3:00 a.m. *Id.* at ¶3. Barbaros told James that he had a history of ulcers and was currently taking the prescription medication Trazadone. *Id.* at ¶4. James also wrote down on the intake screening documents that Barbaros was currently taking the prescription medication Prozac. *Id.* at ¶6. James documented on an "Intake Dispensary Note" that Barbaros's prescriptions were not verified due to the late hour of the intake. *Id.* at ¶8. On the Intake Dispensary Note, James also placed Barbaros on the "provider line" for his ulcers and made a referral to "Psych."[1] *Id.* James conducted a Suicide Screening, on

---

[1] Plaintiffs respond to SMF ¶8 as follows: "It is admitted that the documents referenced in paragraph 8 of the PrimeCare Defendants' statement of facts is [sic] a written document and speaks for itself." (Answer to SMF, Doc. 139 at ¶8). The Court does not consider this a denial. Furthermore, the Court has reviewed the Intake Dispensary Note (Doc. 126, Ex. 5 at 2) in question and finds that it supports Defendants' assertions in SMF ¶8. Given the absence of specific denials and supporting evidence from Plaintiffs, the Court deems SMF ¶8 admitted.

which he scored Barbaros as meeting two or three of the listed criteria. (Doc. 126 at ¶7; Doc. 139 at ¶7). If an inmate met eight criteria on the Suicide Screening, the form required the inmate to be placed on suicide watch.[2] *Id.* The medical record reflects that Nurse Patricia Bauer attempted to verify Barbaros's prescriptions at around 2:00 p.m. on March 18, 2009 and that CVS denied that Barbaros was a customer. *Id.* at ¶10. Bauer also "note[d] . . . Barbaros was placed on the list to be seen by psych."[3] *Id.*

The following day, March 19, 2009, Barbaros filled out and submitted a Sick Call Request form seeking medication for a headache and a stomach ulcer. *Id.* at ¶12. Nurse Christina Rowe met with Barbaros on March 20, 2009 at approximately 10:30 a.m. *Id.* at ¶13. Barbaros presented with headaches, which the medical record reports began the night before the visit. (Doc. 126 at ¶13; Doc. 139 at ¶13). The medical record from this visit does not reflect that Barbaros asked Rowe for psychiatric medications. *Id.* As a result of the visit, Rowe called an on-call provider about Barbaros's blood pressure. The on-call provider gave Rowe verbal orders around 2:00 p.m. that day. *Id.* at ¶14. The provider prescribed the medication Lopressor, which Barbaros was to take two times a day for thirty days, ordered

---

[2] Plaintiffs deny this proffered fact as stated. (Answer to SMF, Doc. 139 at ¶7). The Court has reviewed Plaintiffs' response and finds that there is no genuine issue of material fact with respect to this statement. Plaintiffs specifically admit "that according to the form titled 'Suicide Screening' if an inmate scores 8 points, he is placed on a suicide watch." *Id.* Plaintiffs go on to deny that this is the *only* time that an inmate should be placed on suicide watch. *Id.* The PrimeCare Defendants, however, have made no such assertion. The fact that the form requires an inmate to be placed on suicide watch if he scores eight points is not denied and is not genuinely in dispute. As to Barbaros's recorded score of two or three criteria, the Plaintiffs offer no response. *Id.* The Court deems that fact admitted.

[3] Because Plaintiffs do not expressly deny this contention or otherwise address it (Answer to SMF, Doc. 139 at ¶10), the Court deems it admitted.

4

daily blood pressure checks for the next five days, and ordered that Barbaros be placed on a list to see a doctor at the facility. *Id.*

After meeting with Rowe on March 20, 2009, Barbaros went to court for a second arraignment on additional charges. At court, Barbaros complained to the judge that he was not receiving his psychiatric medications at MCCF. *Id.* at ¶15. Barbaros arrived back at MCCF at 5:00 p.m. *Id.* Having been notified of Barbaros's courtroom complaint, Defendant Wendy Johnson reviewed Barbaros's medical chart and asked another nurse to verify the psychiatric medications that had been reported in it.[4] *Id.* at ¶16. Later that night, around 9:40 p.m., Nurse Ramos verified Trazodone and Paxil prescriptions for Barbaros filled at CVS Pharmacy. (Doc. 126 at ¶17; Doc. 139 at ¶17). The CVS prescriptions were listed under the name "Martin Barbaros." *Id.* at ¶18. Ramos then obtained verbal orders for Paxil and Trazadone from Dr. Alex Thomas.[5] *Id.* at ¶17.

On either March 20, 2009 or March 21, 2009, Barbaros met with William Buffton, a mental health worker. *Id.* at ¶20. Buffton referred Barbaros to a prison psychiatrist to "rule

---

[4] Plaintiffs deny the PrimeCare Defendants' SMF ¶16 as stated. The Court has reviewed the admissions contained in Plaintiffs' response. The facts related here reflect the portions of ¶16 about which there is no genuine issue of material fact based on Plaintiffs' response, except with respect to proffered fact that Johnson was notified of Barbaros's complaints to the criminal court. Because Plaintiffs do not expressly deny this contention or otherwise address it, the Court deems it admitted.

[5] In their SMF, the PrimeCare Defendants claim that Dr. Wilson gave the verbal orders to prescribe Trazadone and Paxil. (Doc. 126 at ¶17). Plaintiffs deny this and assert that Dr. Thomas gave the orders. (Doc. 139 at ¶17). The PrimeCare Defendants' statement is the only time in this case of which the Court is aware that Dr. Wilson is alleged to have given these orders. At all other times, Plaintiffs and Defendants, including the PrimeCare Defendants, name Dr. Thomas as the prescriber. (*See, e.g.*, PrimeCare Medical Defendants' Brief in Support of Supplemental Motion for Summary Judgment, Doc. 162 at 2 ("Dr. Thomas then reinstated Decedent's full Paxil dosage . . . .")). The Court deems it admitted by both Plaintiffs and the PrimeCare Defendants that Dr. Thomas gave the verbal orders for Trazadone and Paxil after Ramos verified the prescriptions.

out adjustment disorder" and "rule out depression." *Id.* As to prescription medications administered to Barbaros during the time he was incarcerated at MCCF, the Parties agree that he received: "Lopressor at approximately 9:00 a.m. and 9:00 p.m. on March 20 and 21, 2009;" "Trazadone at approximately 9:00 p.m. on March 20, 2009;" and "Paxil at approximately 9:00 a.m. on March 21, 2009." *Id.* at ¶19. Barbaros was found unresponsive in his cell at about 6:00 a.m. on March 22, 2009 and was subsequently declared dead. (Doc. 126 at ¶21; Doc. 139 at ¶21).

The parties agree that Plaintiffs have offered two experts, Paul Adler and Erik Roskes, who have opined, in part, that certain medical policies in place at MCCF at the time of Barbaros's incarceration and suicide were adequate.[6] *Id.* at ¶¶25-26.

## B. Plaintiffs' Version of the Facts

At this stage, it appears that Plaintiffs' theory in this case is essentially this: with respect to Barbaros's prescription medications and related medical care, 1) the individual PrimeCare Defendants acted (or failed to act) in contravention to PrimeCare policy and the relevant standard of care; 2) this was a result of a failure by PrimeCare Medical, Inc. to adequately train and supervise its employees and contractors; 3) these actions or inactions

---

[6] Plaintiffs deny the PrimeCare Defendants' SMF ¶¶25-26 as stated. (Doc. 139, Answer to SMF at ¶¶25-26). The Court has reviewed Plaintiffs' responses, where they admit that Paul Adler and Erik Roskes have each "authored an expert report in which he notes that the PrimeCare defendants appear to have policies and procedures in place that appear to comport with the applicable standard of care." *Id.* Plaintiffs objection to the PrimeCare Defendants' proffered statements appears to be that they ignore other relevant parts of their experts' opinions. While this may be true, the Court finds that there is no genuine issue of material fact in dispute with respect to the fact that each expert opined, in part, that some relevant policies of were themselves adequate.

6

resulted in a denial of Paxil for several days; and 4) that this denial and subsequent restart of Paxil at Barbaros's pre-incarceration dosing level caused his suicide. Plaintiffs' version of facts with respect to the actions and inactions of the PrimeCare Defendants is as follows.

Plaintiffs assert that the handling of Barbaros and his medical care was deficient from his first interaction with a PrimeCare Defendant onward. (*See* Wild Report, Doc. 138, Ex. 5 at 33) (referring to Barbaros's interaction with the intake nurse as the start of "a downward spiral of medical care"). Plaintiffs claim that, upon intake at MCCF, Barbaros told Defendant James he was taking Trazadone and *Paxil*, but that James "mistakenly" or "negligently" wrote down Trazadone and Prozac. (Doc. 139 at ¶¶4, 6, 23). In support of this claim, Plaintiffs point to the deposition testimony of Barbaros's criminal co-defendant who was with him in the intake area at the time, (Edgu Deposition, Doc. 138, Ex. 3 at 23), as well as an expert opinion that patients with a history of taking a certain medication for as long as Barbaros had taken Paxil do not forget the name of that medication, (Wild Report, Doc. 138, Ex. 5 at 29). Plaintiffs also point to the incompletely and inaccurately filled-out intake form as another consequential deficiency in James's handling of Barbaros, *id.*, which they further contend is a violation of PrimeCare policy, (Johnson Deposition, Doc. 138, Ex. 4 at 27). Plaintiffs' expert Kathryn Wild specifically notes that James failed to indicate the last time Barbaros took his prescription medications, failed to place him on the "mental health line" despite noting Barbaros's self-reported mental health treatment history, and spelled his name incorrectly and inconsistently throughout. (Wild Report, Doc. 138, Ex. 5 at 26).

Next, Plaintiffs claim that Defendant Bauer should have done more in her attempt to verify Barbaros's prescriptions and that she failed to do so in contradiction to applicable policies and procedures; Plaintiffs point to deposition testimony of Todd Haskins, which gives other methods with which to verify a prescription besides calling a pharmacy. (Doc. 139 at ¶¶5, 10) (referencing Haskins Deposition, Doc. 138, Ex. 4 at 56-57). Plaintiffs also claim that a failure to verify via any method should have triggered additional steps to ensure adequate care, citing to deposition testimony that if psychiatric medications for arriving inmates cannot be verified, a prison psychiatrist should be contacted by the end of the next business day. (Doc. 139 at ¶5) (referencing Doc. 138, Ex. 4 at 58). (*See also* Wild Report, Doc. 138, Ex. 5 at 30).

With respect to Defendant Rowe, Plaintiffs claim numerous deficiencies in her handling of Barbaros and his sick call request. (Doc. 139 at ¶13). Plaintiffs claim that Rowe did not review Barbaros's medical records in preparation for treating Barbaros, in contradiction to applicable policies and procedures. *Id*. Though the medical records show that Rowe wrote down that Barbaros's headache began the night before the 10:30 a.m. appointment, Plaintiffs assert that such a timeline would be impossible based on the time Barbaros submitted the sick call request complaining of headaches; Plaintiffs claim the headache must have been going on for longer than what Rowe wrote down. *Id*. This is important given Plaintiffs' expert opinion evidence that headaches and high blood pressure are symptoms of withdrawal/SSRI discontinuation syndrome. (Wild Report, Doc. 138, Ex. 5

at 31). Plaintiffs also deny the PrimeCare Defendants' assertion that Barbaros did not speak to Rowe about his psychiatric prescriptions, pointing in part to his complaint to a criminal court judge later the same day about his failure to receive them. (Doc. 139 at ¶13).

Plaintiffs next take issue with Defendant Johnson's handling of Barbaros's complaints made in court. *Id*. at ¶16. Plaintiffs assert that while Johnson asked a nurse to verify the medications after being notified of the complaints, she failed to note to that nurse or anyone else that, if subsequently verified, there would have been at least a "couple"-day delay in administering the medications to Barbaros. *Id*. According to Plaintiffs' expert Kathryn Wild, Johnson should also have taken "immediate action" rather than pass the task of verification on to someone else. (Wild Report, Doc. 138, Ex. 5 at 32). There is also a disputed issue of material fact as to whether there was suicide prevention training for PrimeCare employees and whether Johnson provided that training, based on Plaintiffs' perceived inconsistencies in Johnson's deposition testimony. (Doc. 139 at ¶30) (referencing Johnson Deposition I, Doc. 138, Ex. 4 at 24-25; Johnson Deposition II, Doc. 138, Ex. 5 at 65).

With respect to Defendant Ramos, Plaintiffs claim that her actions in verifying Barbaros's medications and reporting them to Dr. Thomas were deficient. (Doc. 139 at ¶17). According to Plaintiffs, Ramos did not review Barbaros's medical file, missing critical information such as the last time Barbaros had taken his medication (itself undocumented by Defendant James). *Id*. at ¶17 (referencing Doc. 138, Ex. 4 at 45). Plaintiffs also claim

that Dr. Thomas's one-minute interaction with Defendant Ramos was deficient. (Plaintiffs' Response to Defendant Alex T. Thomas, M.D.'s Statement of Undisputed Material Facts, Doc. 141 at ¶8). While Dr. Thomas is not addressed in this opinion, he too is a Defendant in this case and has moved for summary judgment on the claims against him. (*See* Docs. 121, 157, 177). His conduct is noted here because it sheds light on Defendant Ramos's role in Barbaros's medical care and because it has relevance with respect the motion for summary judgment filed by PrimeCare Medical, Inc.[7] Relatedly, while William Buffton is no longer a defendant in this case, (*see* Doc. 106), his conduct is also relevant with respect to PrimeCare Medical, Inc.. Plaintiffs and their experts claim that Buffton's visit with Barbaros was deficient in numerous ways, including Buffton's failure to review medical records. (Doc. 139 at ¶20) (referring to Doc. 138, Ex. 4 at 35); (*see also* Wild Report, Doc. 138, Ex. 5 at 33).

　　With respect to PrimeCare Medical, Inc., Plaintiffs have produced expert evidence that PrimeCare Medical, Inc.'s policies and procedures in place at MCCF at the time "for the most part seem to be within the applicable standard of care," (Adler Report, Doc. 138, Ex. 5 at 50), but that there was "clear and continuous," *id.*, disregard for these policies and procedures. Plaintiffs also claim that PrimeCare Medical, Inc.'s staffing levels were inadequate, pointing to deposition testimony that PrimeCare nurses requested extra nursing staff on the night shift, that a "backlog" of inmates would accrue over the course of the week

---

[7] According to Dr. Thomas's deposition testimony, he is an independent contractor of, rather than an employee of, PrimeCare Medical, Inc. (Doc. 122 at 40).

since doctors were only in the facility "at the beginning of the work week," and that on-call doctors never came into MCCF during their on-call periods, (Ramos Deposition, Doc. 138, Ex. 4 at 49), as well as expert opinion evidence that there was not "adequate physician coverage to meet the needs of inmates including Mr. Barbaros," (Roskes Report, Doc. 138, Ex. 5 at 43).

## C. Defendants' Version of the Facts

The PrimeCare Defendants characterize the events leading up to Barbaros's suicide very differently. They position the care they provided as only one piece of the puzzle of Barbaros's death and shift responsibility for the missteps in this case to Barbaros's alleged failure to accurately report what medications he was taking upon intake, his failure to request his medications during subsequent interactions with PrimeCare employees, and the MCCF correctional staff's failure to report any "odd behavior" potentially exhibited by Barbaros and to conduct rounds in the hours before his death. (Brief in Support of Motion for Summary Judgment of PrimeCare Medical Defendants, Doc. 125 at 9). The PrimeCare Defendants further claim "Barbaros was offered continuous medical treatment," including evaluations, medications, and scheduled follow-up care. Id. at 5. The PrimeCare Defendants describe themselves as having "made reasonable efforts" to confirm Barbaros's prescription the day of his intake and having taken appropriate follow-up steps when the medications could not be verified. Id.

From this version of events, the PrimeCare Defendants argue that Plaintiffs cannot make out a claim of deliberate indifference to serious medical needs. *Id*. at 4. To the extent that Plaintiffs' characterize the evidence of record as indicating widespread disregard of policies and procedures, Defendants claim Plaintiffs' evidence does not support the contention that PrimeCare Medical, Inc. had actual knowledge of any practice among its employees of failing to comply with applicable policies. *Id*. at 7-8. As for Plaintiffs' state law tort claims, the PrimeCare Defendants also argue that their conduct did not fall below the standard of care. *Id*. at 8.

Additionally, the PrimeCare Defendants dispute Plaintiffs' theory that their actions (or inactions) in this case caused Barbaros's suicide. They also dispute whether or not the expert report and deposition testimony of Dr. Erik Roskes and the expert report of Kathyrn Wild are sufficient to establish causation such that Plaintiffs can survive summary judgment. (Doc. 160 at 2-4).

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A grant of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the

12

governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## IV. ANALYSIS

## A. Section 1983 Claim (Count I) against Individual PrimeCare Defendants

To establish liability under 42 U.S.C. § 1983,[8] a plaintiff must prove that: (1) he was deprived of a federal right; and (2) the person who deprived him of that right acted under color of state law. *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007). Section 1983 is not an independent source of substantive rights, but merely "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws." *Kopec v. Tate*, 361 F.3d 772, 775–76 (3d Cir. 2004). In evaluating a § 1983 claim, a Court must first "identify the exact contours of the underlying right said to have been violated" and determine "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

### 1. Persons Acting Under Color of State Law

The individual PrimeCare Defendants acted under the color of state law for purposes of Plaintiffs' § 1983 claim. It is a long standing aspect of § 1983 law that performance of a traditionally and exclusively public function renders otherwise private actors "persons acting under the color of state law." *See, e.g., Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974); *Leshko v. Servis*, 423 F.3d 337, 341 (3d Cir. 2005). Furthermore, the Supreme

---

[8] Section 1983 provides in part: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" 42 U.S.C. § 1983 (West).

Court has specifically held that health care providers under contract with the State to provide medical care in correctional facilities can be state actors for purposes of § 1983. *See West v. Atkins*, 487 U.S. 42, 55-56 (U.S. 1988) ("It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the State."); *see also Donnell v. Corr. Health Servs., Inc.*, 405 F. App'x 617, 621 n.5 (3d Cir. 2010) (noting that whether District Court believed Correctional Health Services Defendants were not state actors under § 1983 because they were private entities or because they were not acting under the color of state law when they provided medical services in county correctional facility, District Court's belief was clearly erroneous).[9]

## 2. Deprivation of a Federal Right

Here, Plaintiff alleges that Barbaros received inadequate medical care at MCCF. Because Barbaros was a pretrial detainee at the time of his incarceration and death, as opposed to a convicted prisoner, Plaintiffs allege a deprivation of Barbaros's due process rights under the Fourteenth Amendment. "While the Eighth Amendment prohibits the infliction of cruel and unusual punishment upon prisoners, it applies only 'after [the State] has secured a formal adjudication of guilt in accordance with due process of law.'" *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

---

[9] The Court further notes that there has been no challenge in this litigation to the individual PrimeCare Defendants' status as actors subject to potential § 1983 liability.

Plaintiffs correctly point out that the Supreme Court has held that the due process

rights of pretrial detainees "are at least as great as the Eighth Amendment protections

available to a convicted prisoner." *City of Revere*, 463 U.S. at 244. Plaintiffs go on to critique

Defendant Thomas for relying on cases that "deal solely with claims arising under the Eighth

Amendment" right to adequate medical care as laid out in *Estelle v. Gamble*, 429 U.S. 97,

103-04 (1976). (*See* Doc. 138 at 23). Plaintiffs argue that a less stringent standard than that

under the Eighth Amendment should be applied to pretrial detainees. *Id*. at 22-24.

While Plaintiffs' points are well-taken, neither the Supreme Court nor the Third

Circuit has "yet determined the precise standard that applies to medical-treatment claims

when brought by pretrial detainees." *Batts v. Giorla*, 550 F. App'x 110, 113 n.2 (3d Cir.

2013). This Court declines Plaintiffs' invitation to opine on the nature of this standard.

Instead, the Court will use the Eighth Amendment standard in addressing the PrimeCare

Defendants' motions. See *Natale*, 318 F.3d at 582 ("We therefore evaluate the Natales'

Fourteenth Amendment claim for inadequate medical care under the standard used to

evaluate similar claims brought under the Eighth Amendment . . . ."); *Avila v. Michael Ott*,

No. 3:CV-14-2119, 2015 WL 3620655, at *2 (M.D. Pa. June 9, 2015) ("Courts assess

inadequate medical care claims [under the Fourteenth Amendment] under the familiar

'deliberate indifference' test set forth in *Estelle v. Gamble*."). In order to establish an Eighth

Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or

omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318

F.3d at 582. *See also Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). The Court finds

Plaintiffs have produced enough evidence to create material issues of fact for trial under the

Eighth Amendment deliberate indifference standard. Because Plaintiffs survive the

summary judgment stage of this litigation under this standard, it is not necessary to resolve

here the exact nature of the relationship between Eighth and Fourteenth Amendment

medical care claims.

### 3. Serious Medical Need

A "serious medical need" is "one that has been diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would easily recognize the

necessity for a doctor's attention." *Monmouth County Correctional Institutional Inmates v.*

*Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citation omitted). Additionally, if the delay or

denial of adequate medical care results in the unnecessary and wanton infliction of pain or

causes an inmate to suffer a life-long handicap or permanent loss, the medical need is

"serious." *Id.* "[A] mental illness may constitute a serious medical need." *Torres v. Yocum*,

No. 3:11-CV-1582, 2014 WL 2459676, at *5 (M.D. Pa. May 30, 2014) (citing *Goodrich v.*

*Clinton County Prison*, 214 Fed. App'x. 105, 110–11 (3d Cir. 2007); *Inmates of Allegheny*

*County Jail v. Pierce*, 612 F.2d 754, 763 (3d Cir. 1979)). The Court finds that Barbaros's

medical needs with respect to his mental health and the appropriate management of his

psychiatric prescriptions were serious.[10]

### 4. Deliberate Indifference

A prison official acts with deliberate indifference to an inmate's serious medical

needs when he "knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Farmer v.

Brennan*, 511 U.S. 825, 837 (1994); *see also McCullon v. Ebbe*, No. 3:15-CV-1205, 2015

WL 4412805, at *3 (M.D. Pa. July 17, 2015). Deliberate indifference has been found "where

the prison official (1) knows of a prisoner's need for medical treatment but intentionally

refuses to provide it; (2) delays necessary medical treatment based on a non-medical

reason; or (3) prevents a prisoner from receiving needed or recommended medical

treatment." *Rouse*, 182 F.3d at 197; *see also Peterson v. Knauer*, No. 03-CV-5368, 2008

WL 509207, at *3 (E.D. Pa. 2008) (explaining that the "the refusal to administer pain

medication contrary to a surgeon's orders" may constitute deliberate indifference).

Deliberate indifference is a standard that requires factual findings with respect to a

state actor's motivation. *Farmer*, 511 U.S. at 842 ("Whether a prison official had the

requisite knowledge of a substantial risk is a question of fact subject to demonstration in the

usual ways, including inference from circumstantial evidence."). The Court cannot say at

---

[10] Furthermore, the PrimeCare Defendants do not challenge whether Barbaros had a serious medical need.

this stage that, as a matter of law, the individual PrimeCare Defendants did not act with deliberate indifference to Barbaros's serious medical needs. Plaintiffs have adduced sufficient evidence from which a jury could reasonably conclude that the individual PrimeCare Defendants knew of Barbaros's need for medical treatment and intentionally refused to provide adequate care. Plaintiffs have put forth expert testimony that "[a]ll Primecare [sic] staff involved in the care and treatment of Mr. Barbaros were deliberately indifferent . . . in failing to review the patient medical record each time they encountered the patient" (Wild Report, Doc. 138, Ex. 5 at 33); that "[a]ll Primecare [sic] personnel that were involved in Mr. Barbaros' care from intake on failed to properly communicate with each other to ensure proper continuity of care," id. at 33-34; and that "the custom and practice of the Primecare [sic] medical staff . . . to not fully treat patients as described throughout [Wild's] report . . . amounts to deliberate indifference . . . .," id. at 34. The Court finds that there is evidence in the record to support the expert's opinions. Thus, viewing the factual evidence adduced in the light most favorable to Plaintiffs, the Court finds that a reasonable jury could conclude that these defendants were each aware of a substantial risk of serious harm to Barbaros and disregarded that risk. The following actions or inactions of each individual support the denial of summary judgment:

### a. Paul James

Plaintiffs have put into the record evidence that Defendant James failed to completely and accurately fill out the intake screening documents with respect to mental

health information, that this was in violation of PrimeCare policy, that he wrote down "Prozac" despite Barbaros telling him he took "Paxil," and that he spelled Barbaros's name incorrectly throughout the intake documents. *See supra* Part II(B). Plaintiffs have also produced expert opinion evidence that James's "careless completion of the receiving screening documents was unacceptable and started a downward spiral of medical care that caused a delay in treatment." (Wild Report, Doc. 138, Ex. 5 at 33). Thus, there is a triable issue of fact as to whether Defendant James acted with deliberate indifference to Barbaros's serious medical needs.

### b. Patricia Bauer

Plaintiffs have put into the record evidence that Defendant Bauer failed to attempt other PrimeCare-recognized methods of medication verification and that she failed to follow up with respect to Barbaros's care after she could not verify his medications by calling CVS. *See supra* Part II(B). Plaintiffs have also produced expert opinion evidence that "at minimum [Bauer] should have re-checked with the patient, called the psychiatrist on call, or called Mr. Barbaros' treating physician directly." (Wild Report, Doc. 138, Ex. 5 at 33). Thus, there is a triable issue of fact as to whether Defendant Bauer acted with deliberate indifference to Barbaros's serious medical needs.

### c. Christina Rowe

Plaintiffs have put into the record evidence that Defendant Rowe failed to review Barbaros's medical records, that this was a violation of policy, and that she failed to act with

respect to his need for his psychiatric prescriptions. *See supra* Part II(B). Plaintiffs have also produced expert opinion evidence that "Rowe failed to give the on-call provider complete information regarding the patient when she called for the high blood pressure" issue. (Wild Report, Doc. 138, Ex. 5 at 33). Thus, there is a triable issue of fact as to whether Defendant Rowe acted with deliberate indifference to Barbaros's serious medical needs.

### d. Wendy Johnson

Plaintiffs have put into the record evidence that Defendant Johnson failed to take "immediate action" when notified of Barbaros's complaint in court and that this caused additional delay in administering the prescription medications. Thus, there is a triable issue of fact as to whether Defendant Johnson acted with deliberate indifference to Barbaros's serious medical needs.

### e. Grace Ramos

Plaintiffs have put into the record evidence that Defendant Ramos failed to review Barbaros's medical record when verifying his prescription medications and when notifying the on-call provider of that verification. According to expert opinion evidence, as a result she "failed to inform the on-call psychiatrist that the patient had been off his antidepressants for three days and was exhibiting symptoms of SSRI withdrawal." (Wild Report, Doc. 138, Ex. 5 at 33). Thus, there is a triable issue of fact as to whether Defendant Ramos acted with deliberate indifference to Barbaros's serious medical needs.

### f. Deborah Wilson

At the outset of its discussion of Defendant Wilson, the Court notes that the parties

have shared very little about their respective understandings of her role, or lack thereof, in

the events leading up to Barbaros's suicide. There is evidence in the record that Defendant

Wilson is PrimeCare Medical, Inc.'s Medical Director at MCCF. (Wild Report, Doc. 138, Ex.

5 at 31). While she was apparently deposed during the course of this case's lengthy

litigation history, neither party saw fit to put her deposition into the record. From the

scattered references in the record, Plaintiffs paint Defendant Wilson as having knowledge of

and acquiescing in Defendants James, Bauer, Rowe, and Ramos's "abrupt[]" cessation of

Barbaros's mental health medications. (Doc. 138 at 13). They also point to her alleged lack

of awareness of SSRI Discontinuation Syndrome as information relevant to their municipal

liability claim against PrimeCare Medical, Inc. *Id.* at 39-40. In their submissions, Defendants

write only that, with respect to the state law negligence claims against her,

> Dr. Wilson prescribed medication for Mr. Barbaros' high blood pressure
> following an examination by Nurse Rowe. At the time the medication was
> prescribed it was not known that Mr. Barbaros had been taking Paxil.[11]

---

[11] Even with respect to Barbaros's blood pressure medication alone, there is a potentially disputed issue of fact as to Defendant Wilson's role. Plaintiffs characterize the medical record as stating that physician assistant Jen Mroz gave the order for the blood pressure medication. (Doc. 138 at 10). Both women's names are noted on the relevant page of the medical record. (*See* Doc. 138, Ex. 3 at 42). Thus, there is a factual issue as to whether Dr. Wilson was directly involved with issuance of the blood pressure prescription or functioned only in some sort of a supervisory capacity with respect to the physician assistant, in accordance with applicable state regulations. *See* 49 Pa. Code § 18.151.

(Doc. 124 at 11). Defendants argue that from this "treatment rendered," Plaintiffs "cannot establish that [Defendant Wilson's] actions fell below the standard of care and proximately caused Mr. Barbaros' death." *Id.* at 10.

Though not cited in the parties' briefs, Plaintiffs' expert Kathryn Wild also makes some individual reference to Defendant Wilson. (Doc. 138, Ex. 5 at 31). Of particular note is the portion of her opinion discussing PrimeCare Medical, Inc.'s "Medication Services" policy. Wild describes the policy as stating

> that all inmates/patients entering the facility on prescription medication are reviewed by the Medical Director to ensure continuity of care, and if clinically indicated, the medication is continued or an acceptable alternative is prescribed.

(Wild Report, Doc. 138, Ex. 5 at 30). While she does not mention Defendant Wilson by name, Wild then writes that "[n]either the Medical Director, nor any other prescriber a [MCCF] took any steps to review Mr. Barbaros' records to ensure continuity of care." *Id.* By the very language of the policy, as described by Wild, there is an issue of fact as to the role of Defendant Wilson in this case, particularly with respect to whether she complied with PrimeCare Medical, Inc.'s policy directives, and if not, the nature of her failure to do so. Based on this and the other allusions and references to Defendant Wilson in the record, this Court simply cannot say that, as a matter of law, Defendant Wilson is entitled to summary judgment in her favor on Plaintiffs' deliberate indifference claim. Though the parties give Defendant Wilson short shrift in their submissions, this fact only lends further support to this Court's conclusion that dismissal would be inappropriate at this stage.

*f. Defendants' Arguments Cannot Resolve the Outstanding Issues of Fact at the Summary*

*Judgment Stage*

The PrimeCare Defendants' arguments for a grant of summary judgment in their

favor are, at bottom, arguments that this Court should accept one party's version of the facts

over the other's. This is true of what seems to be the PrimeCare Defendants' main

argument that their motions should be granted: that Plaintiffs cannot prove causation, an

argument advanced in their supplemental summary judgment motion and related briefing.

According to all Defendants in this litigation, the need for supplemental summary judgment

motions arose as the result of the deposition testimony of Plaintiffs' expert, Dr. Erik Roskes,

taken after the original motions had been filed. (Doc. 150 at 4; Doc. 151 at 1-2). In their

supplemental summary judgment briefing, the individual PrimeCare Defendants claim that

Dr. Roskes has "cannot testify to a reasonable degree of medical certainty that Decedent's

death would not have occurred but for the alleged wrongful conduct of the PrimeCare

Medical Defendants" and it is on this basis that they move for an entry of judgment in their

favor on the § 1983 claims made against them. (Doc. 162 at 9). The PrimeCare Defendants

further argue that Kathryn Wild's expert report is based on Roskes's theories, that she offers

no independent theory of causation, and that she is in fact not qualified to offer an opinion

as to causation. (Doc. 160 at 3-4).

The Court has reviewed Dr. Roskes's deposition testimony and finds that the

individual PrimeCare Defendants have mischaracterized and overstated the degree to

which Dr. Roskes equivocates on his positions. Furthermore, the issues that these Defendants raise with respect to Dr. Roskes's opinions on causation are questions of fact that it would be improper for the Court to decide at this stage. The facts asserted in PrimeCare Defendants' Statement of Facts and Plaintiffs' response to them serve as a prime example of the factual issues that remain in this case; while Parties agree on the words uttered in Dr. Roskes's testimony, Parties interpret those words very differently and draw different inferences from them. "Questions about credibility and weight of expert opinion testimony are . . . for the trier of facts since such testimony is ordinarily not conclusive." *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 689 (E.D. Pa. 2001).

With respect to Plaintiffs' § 1983 claims specifically, the PrimeCare Defendants rely on the unpublished Middle District case *Miszler v. Shoemaker*, 04-CV-1756, 2009 WL 790139 (M.D. Pa. March 20, 2009), to argue that "Dr. Roskes' testimony cannot support Plaintiffs' § 1983" claim. (Doc. 162 at 7-9). *Miszler*, however, is factually distinguishable from this case in several important regards. In *Miszler*, the plaintiff's expert was unable to localize the source of his medical troubles to the failure to administer antibiotics in the jail, leaving open the possibility that the source of his infection occurred either before or after his relevant jail stint. *Id*. at *6. Here, Dr. Roskes has opined and testified repeatedly that a cluster or chain of events of inadequate medical care at MCCF caused Barbaros to commit suicide. (*See, e.g.*, Doc 161, Ex. 1 at 41-42, 44, 70). Kathryn Wild has also identified the individual PrimeCare Defendants as integral actors in the medical care, or lack thereof,

administered to Barbaros prior to his suicide, describing it as "a downward spiral." (Wild Report, Doc. 138, Ex. 5 at 33). There is a difference between an expert acknowledging that a defendant's conduct may have had nothing to do with a plaintiff's injury (*Miszler*) and an expert's inability to explain the precise way in which each part of a series of events created or contributed to a suicidal mental state. Furthermore, the district court judge entered judgment against the plaintiff in *Miszler* as a matter of law after the close of the expert's testimony *at trial*. At that point, the plaintiff had had full opportunity to lay the foundation for the expert's testimony and to convince the court of its relevance to the case.[12] As such, the differences between the facts and posture of *Miszler* persuade this Court that *Miszler* is not a basis for granting summary judgment to the PrimeCare Defendants. Plaintiffs have raised triable issues of fact as to whether the actions or inactions of these defendants rose to the level of deliberate indifference and causation is simply one of those issues.[13]

---

[12] To the extent the PrimeCare Defendants hold the view that Dr. Roskes lacks the requisite qualifications to offer expert opinion testimony under Federal Rules of Evidence 702 and 703, that issue has not been raised. Furthermore, the Court notes that nothing in the record supports a finding that Dr. Roskes is not qualified to offer such an opinion.

[13] Additionally, application of *Miszler* to the federal § 1983 claim in this case is far from required. While a Middle District case, *Miszler* itself is not controlling authority in the Middle District. And, while *Miszler* was a § 1983 case, much of the analysis in it centers upon questions of Pennsylvania *state* law and the requirement in state law medical negligence cases that expert testimony on the issue of causation be offered "to a reasonable degree of medical certainty." It is true that *Miszler* does go on to state that "a § 1983 plaintiff may only recover damages for injuries that would not have occurred 'but for' the alleged wrongful conduct." *Id.* at *5. Judge Vanaskie notes that "independent research [at the time] has not identified any controlling authority from the Court of Appeals for the Third Circuit" with respect to the causation standard in Eighth Amendment deliberate indifference cases and cites only persuasive authority for the proposition that but-for causation is required. *Id.* As a matter of law, it is not clear that a but-for causal relationship is necessary for Plaintiffs to prevail in this case and the Court declines to adopt such a standard. *See Heath v. Shannon*, 442 F. App'x 712, 715 (3d Cir. 2011) (remarking that the "'causal relationship' theory" relied upon in medical defendant's summary judgment motion "was based on two not

The individual PrimeCare Defendants make numerous additional legal arguments as to why no deliberate indifference can be found in this case. But the applicability of these arguments to the current case depends on issues of fact unresolvable by this Court at the summary judgment stage. For instance, the individual PrimeCare Defendants argue that "Plaintiff's [sic] allegations in this matter amount to nothing more than a difference of opinion as to whether the proper medical treatment was rendered, not deliberate indifference." (Doc. 125 at 4). But, as noted above, whether deliberate indifference exists in this case is a question for the jury. Defendants' legal argument that "[a] delay in treatment only amounts to deliberate indifference when a prison official intentionally denies or delays a prisoner's access to medical care," (Doc. 125 at 5), is similarly disposed of.

## B. Intentional Infliction of Emotional Distress Claim (Count II) against Individual PrimeCare Defendants

Plaintiffs do not oppose these Defendants' motion with respect to claims for intentional infliction of emotional distress. (Doc. 138, Plaintiffs' Brief in Opposition at 31). Thus, the Court will dismiss Plaintiffs' claims of intentional infliction of emotional distress against the individual PrimeCare Defendants.

---

precedential district court cases" [*Miszler* and *Walthour v. Tennis*, No. 06–0086, 2009 WL 2957742 (M.D. Pa. Sept.9, 2009)]).

## C. Section 1983 Claim (Count III) against PrimeCare Medical, Inc.

Though Plaintiffs argue otherwise,[14] PrimeCare Medical, Inc. "cannot be held responsible [under § 1983] for the acts of its employees under a theory of respondeat

---

[14] Plaintiffs spill much ink in their Opposition Brief (Doc. 138) advancing the argument that a private corporation contracted to provide medical services within a correctional facility *can* face § 1983 liability for the acts of its employees under a theory of *respondeat superior.* This argument is quite frankly baffling in light of the precedential Third Circuit case *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) and subsequent circuit case law. *See, e.g., Defreitas v. Montgomery County Correctional Facility*, 525 Fed. App'x. 170, 176 (3d Cir. 2013). Plaintiffs argue that *Natale* "did not address . . . whether a private contractor should be considered a governmental agency for purposes of <u>Monell</u>." (Doc. 138 at 35). In support of their argument, Plaintiffs point to the introductory paragraph of the opinion in which the Court framed the issues before it. (Doc. 138 at 35). The Court describes the relevant question presented as follows: "whether the Natales provided sufficient evidence of a governmental policy or custom for their claim under 42 U.S.C. § 1983 to survive the motion of Prison Health Services ("PHS") for summary judgment." *Natale*, 318 F.3d at 577. From this, Plaintiffs claim that "the plain language of the <u>Natale</u> decision itself makes clear that the applicability of <u>Monell</u> to private contractors was not even an issue presented to the court." This argument evidences a failure on behalf of Plaintiffs to read beyond the first sentence of the *Natale* opinion. Had Plaintiffs done so, they would have realized that *Natale* deals *only* with the liability of a private contractor and its employees for an alleged civil rights violation and that it clearly addresses whether, as Plaintiffs put it, "a private contractor should be considered a governmental agency for purposes of <u>Monell</u>." (Doc. 138 at 35).

The *Natale* Plaintiffs appealed a federal district court's dismissal of their state law medical malpractice claim and grant of summary judgment in favor of defendant Prison Health Services. *Id.* at 577-78. The Third Circuit described PHS as "a private company that provides health services to [Camden County Correctional Facility] inmates." *Id.* at 578. The procedural history of the case laid out in the *Natale* opinion makes clear that the only matters on appeal related to PHS; the County defendants had already been either dismissed from the case or had already received a grant of summary judgment. *Id.* at 578-79. *See also, id.* at 584 n.8 ("[T]he Natales have not appealed the dismissal by the District Court of their claims against any defendants except PHS."); Brief and Appendix Volume I on Behalf of Appellants at 4, *Natale*, 318 F.3d, 2002 WL 32129324 at *4 ("Camden County filed a motion for Summary Judgment which was returnable on July 26, 2000. At that time Summary Judgment was entered in favor of the County of Camden. No appeal of that Order is taken hereunder."). Thus, implicit in the Third Circuit's framing of the question before it as "whether the Natales provided sufficient evidence of a governmental policy or custom for their claim under 42 U.S.C. § 1983 to survive the motion of Prison Health Services ("PHS") for summary judgment," *Natale*, 318 F.3d at 577, is the assertion that private companies performing the governmental function of providing medical care in correctional facilities are held to the same standard under § 1983 as governmental entities. Any other reading of the case is untenable.

But Plaintiffs do not stop there; they go on to claim that they "can point to cases in this District where this very argument was present and accepted." (Doc. 138 at 35-36). In support of this proposition, Plaintiffs cite *Cortlessa v. County of Chester*, No. CIV.A. 04-1039, 2006 WL 1490145 (E.D. Pa. May 24, 2006). First, the Court notes that it sits in the *Middle* District of Pennsylvania and that, as such, Plaintiffs have not "point[ed] to cases in this District where this very argument was present and accepted." Second,

superior or vicarious liability." *Natale*, 318 F.3d at 583. Entities such as PrimeCare Medical, Inc. are held to the same standards for liability as a municipality, which do not allow for liability based on such a theory. *See id.*; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Instead, a municipality may be held liable under § 1983 when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," including "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690-91. "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

---

the Court has reviewed the discussion of *Natale* in *Cortlessa* and has found that that court, and the plaintiffs in that case, fell prey to the same failure to recognize *Natale* as a case dealing solely with the liability of PHS – a private company. *See Cortlessa*, 2006 WL 1490145, at *4 ("the issue of whether immunity from *respondeat superior* liability under Section 1983 extends to private contractors was not one of the two issues presented to the *Natale* Court.") The *Cortlessa* court cites to the introductory paragraph of *Natale* and characterizes it as "explicitly stating the only two issues decided by the Court." *Id.* Again, the use of the word "governmental" in the Third Circuit's framing of the issue in *Natale* does not change the fact that *Natale* dealt only with a *private* company that performed a *governmental* function.

This Court is bound to apply *Natale* to the instant case: PrimeCare Medical, Inc. cannot be held liable under § 1983 on a theory of *respondeat superior*.

Though Plaintiffs' briefing on the matter is somewhat confused,[15] the Court understands Plaintiffs' main argument to be that PrimeCare Medical, Inc.'s involvement in this case amounts to a § 1983 violation under a "failure to train" theory. (Doc. 138 at 36). *See City of Canton v. Harris*, 489 U.S. 378, 380 (1989) (holding that "under certain circumstances" a municipality can be liable under "§ 1983 for constitutional violations resulting from its failure to train municipal employees"). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," *Connick v. Thompson*, --- U.S. ---, 131 S.Ct. 1350, 1359-60 (2011), and thus "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty Com'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 405 (1997). Thus, any such failure to train "must amount to 'deliberate indifference to

---

[15] Plaintiffs briefing on the issue of PrimeCare Medical, Inc.'s § 1983 liability contains references to a 'failure to train' throughout. (*See, e.g.*, Doc. 138 at 37 ("PrimeCare can . . . be held liable under § 1983 based on its failure to train its employees."); Doc. 138 at 38 ([P]laintiffs' prison psychiatry expert[] further details the numerous deficiencies in the training provided to the medical providers at MCCF . . . .")). There are, however, occasional references to a failure to "enforce" policies and procedures, *id.* at 41, and "reprehensible" "supervision of medical providers," *id.* at 44. Thus, while Plaintiffs' main theory of liability seems to be based on a failure to train, Plaintiffs at times seem to suggest that liability may be premised on theories of inadequate supervision and discipline or acquiescence in unconstitutional practices *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989); *Beck v. City of Pittsburgh*, 89 F.3d 966 (3d Cir. 1996). Furthermore, Plaintiffs' Complaint (Doc. 43 at 17) alleges that PrimeCare Medical, Inc. may be held liable because of its "encouragement, tolerance, ratification of, and/or deliberate indifference . . . to[] policies, practices and/or customs of refusing, delaying, failing to coordinate, or otherwise interfering with inmates' necessary treatment with medical specialists" and because of PrimeCare Medical, Inc.'s deliberately indifferent failure "to develop and implement policies, practices, and procedures to ensure that inmates receive proper follow-up medical care or medical care from medical specialists to ensure that inmates are placed on a suicide watch when necessary." While the Complaint does not specifically mention a failure-to-train theory, it can be read broadly to encompass such a theory. The Court finds that there is sufficient evidence for Plaintiffs to survive summary judgment under a single-incident failure-to-train theory. It further recognizes at this stage that there are also triable issues of fact as to the knowing failure on the part of PrimeCare Medical, Inc. to enforce those policies and procedures officially adopted by the corporation, if not actually adhered to by the individual PrimeCare Defendants.

30

the rights of persons with whom the [untrained employees] come into contact'" in order to "'be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Connick*, 131 S.Ct. at 1359-60 (quoting *City of Canton*, 489 U.S. at 388-89). However, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 1360. "Actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitution rights" is required in order to deem a municipality deliberately indifferent. *Id.* As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.*

Plaintiffs have adduced no evidence in this case that there was a pattern of similar constitutional violations that had occurred at MCCF prior to Barbaros's incarceration and suicide.[16] Plaintiffs, therefore, must show that this case fits the so-termed "'single-incident' failure-to-train" theory of § 1983 municipal liability. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 (3d Cir. 2014). Single-incident liability reflects the commonsense notion that, "in certain situations, the need for training can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights even without a pattern of constitutional violations." *Id.* (internal quotation omitted) (citing *City of Canton*, 489 U.S. at 390 n.10). Only a "narrow range" of circumstances will result in single-

---

[16] Plaintiffs' evidence of disregard of the policies is not enough; a pattern of actual constitutional violations must be show to have resulted from that disregard.

incident liability. *Connick*, 131 S.Ct. at 1361. The canonical example of single-incident

liability is drawn from *Canton*. There, the Court opined that, because a municipality knows

with certainty that its police officers will be called upon to arrest fleeing individuals and

because it has armed them, in part, to further this task, a failure to provide training on the

use of deadly force could be deemed deliberate indifference. *City of Canton*, 489 U.S. at

390 n.10.

More recently, the Supreme Court has provided an example of what conduct will *not*

create liability under the single-incident theory. In *Connick*, the Supreme Court held that a

pattern of *Brady* violations similar to the one that resulted in the plaintiff's conviction was

necessary in order to hold a district attorney's office liable under § 1983 on a failure-to-train

theory. The need for training on *Brady* obligations was not "so obvious" as to rise to the

level of deliberate indifference under the single-incident theory because, unlike police

officers, prosecutors receive job-independent professional legal training and have job-

independent ethical responsibilities. *Id.* at 1363. Moreover, the prosecutors received on-the-

job training and supervision from more senior staff, *id.* at 1362, and were generally familiar

with prosecutorial *Brady* obligations, *id.* at 1363. Thus, absent a specific reason for the

district attorney to believe otherwise, it was not "highly predictable" that a lack of training on

the particular nuances of *Brady* relevant to the plaintiff's case would result in constitutional

violations. *Id.* "[S]howing merely that additional training would have been helpful in making

difficult decisions [about specific *Brady* questions] does not establish municipal liability." *Id.*

There is a "spectrum" "between the *Canton* and *Connick* goalposts" and this Court's
task at this stage is to determine where on that spectrum the failures in training alleged in
Plaintiffs' case fall. *Lemar v. City of Philadelphia*, 14-CV-7102, 2015 WL 4450976, at *5
(E.D. Pa. July 20, 2015). While this Court is conscious of the fact that medical professionals
are subject to outside training and professional responsibilities as were the prosecutors in
*Connick*, this case is, on the whole, closer to *Canton* for reasons related to the peculiar
nature of correctional facilities. "Running a prison is an inordinately difficult undertaking."
*Turner v. Safley*, 482 U.S. 78, 84-85 (1987). While "protecting prison security . . . is central
to all other corrections goals," *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989), a
correctional facility must be operated – and inmates must be overseen – in accordance with
constitutional bounds. A correctional facility "must provide food, clothing, shelter and
medical treatment for inmates; it must also provide secure and safe conditions of
confinement to protect society from the prisoners and the prisoners from one another."
*White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990).

In such a system, an "inmate must rely on prison authorities to treat his medical
needs; if the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103.
Here, Plaintiffs have put forward evidence which, if proven to be true, shows that PrimeCare
Medical, Inc. set up a system of medical care reliant on nurses and other non-physician staff
as the first line of care in MCCF. Plaintiffs have put forth evidence that it could be days
before a newly-incarcerated inmate would see a physician in person, (*see* Ramos

Deposition, Doc. 138, Ex. 4 at 64), and that on-call physicians relied on the judgment of this front-line staff in their provision of services to inmates, (*see* Thomas Deposition, Doc. 138, Ex. 4 at 64). Given such a system, it is vital that the front-line staff have training adequate to meet the demands placed upon them. Failure to do so makes it "highly predictable" that constitutional violations would occur as a result.[17]

Plaintiffs have put forward evidence that PrimeCare staff members repeatedly disregarded PrimeCare policies, not just in their handling of Barbaros, but in general. This evidence, while insufficient to establish a pattern of constitutional violations, is relevant to whether this case may proceed based on a single-incident liability theory. *See Thomas*, 749 F.3d at 225 (noting that evidence of regularly-occurring fights in a prison was relevant to question of single-incident liability). Given the constitutional obligation to provide medical care in correctional facilities and the relative frequency with which those facilities must provide prescription medication to meet this obligation, a reasonable jury could conclude that "the lack of training here is akin to 'a failure to equip [PrimeCare employees] with specific tools to handle recurring situations.'" *Thomas*, 749 F.3d at 225 (quoting *Bd. of Cnty*

---

[17] Again, the Court readily acknowledges the job-independent training and professional responsibilities of nurses and other medical providers. But working within a correctional facility as a medical professional comes with a set of challenges not duplicated in other settings. For instance, Bauer testified about the perceived frequency of drug-seeking behavior in MCCF and how this influenced placement decisions for new inmates whose medications could not be verified. (Bauer Deposition, Doc. 138, Ex. 4 at 9 ("That's very common for inmates to come in and say they take all these drugs. And then you call the pharmacy and the pharmacy says, no, and then they go into their regular area where they're supposed be and they are fine")). Prison combines medical judgment, risk assessment, and potential consequences in a unique manner such that constitutional violations are a highly predictable result of a failure to train medical staff on these matters.

*Com'rs of Bryan Cnty v. Brown*, 520 U.S. 397, 409 (1997)). Upon careful review of the

record before it, the Court finds that there is sufficient evidence to create a triable issue of

fact as to whether PrimeCare Medical, Inc. acted with deliberate indifference.

In addition to deliberate indifference, Plaintiffs must show that "the deficiency in

training . . . actually cause[d] the constitutional violation" at issue in order for PrimeCare to

be held liable under § 1983. *Thomas*, 749 F.3d at 222 (citing *Canton*, 489 U.S. at 391)

(internal quotation omitted). Thus, § 1983 failure-to-train municipal liability requires more

than a showing that better or additional training would have reduced the overall risk of

injury. *See Thomas*, 749 F.3d at 226. Plaintiffs have adduced evidence that there were

repeated incidents of disregard for PrimeCare policies amongst PrimeCare employees and

contractors. Plaintiffs have further offered expert opinion evidence that actions of the

PrimeCare Defendants' that were inconsistent with PrimeCare policies and procedures were

part of the chain of events leading to Barbaros's death. As discussed above with respect to

the individual PrimeCare Defendants, causation is an issue of fact for the jury. Plaintiffs'

theory in this case is that a cluster or chain of events of inadequate medical care at MCCF

caused Barbaros to commit suicide. Given this theory of causation,

> predicting how a hypothetically well-trained officer would have acted under
> the circumstances may not be an easy task for the factfinder, particularly
> since matters of judgment may be involved . . . . But judge and jury, doing
> their respective jobs, will be adequate to the task.

*Canton*, 489 U.S. at 391. Here, this Court has reviewed the record before it and, drawing all

inferences in favor of the Plaintiffs as required at this stage, finds that there is sufficient

evidence to send the question of causation in this case on to the ultimate factfinder. A reasonable jury could conclude that had PrimeCare Medical, Inc.'s training been adequate with respect to executing policies and procedures, Barbaros's death could have been avoided. PrimeCare Medical, Inc.'s motion on Plaintiffs' § 1983 claim will be denied.

### D. State Law Negligence Claim (Count IV) against All PrimeCare Defendants

Under Pennsylvania law, "[f]or a party to prevail in a negligence action, ordinary or professional, the elements are identical: the plaintiff must establish [1] the defendant owed a duty of care to the plaintiff, [2] that duty was breached, [3] the breach resulted in the plaintiff's injury, and [4] the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 980 A.2d 502, 506 (Pa. 2009). Although the basic elements of both ordinary and professional negligence are the same, a medical malpractice claim is further defined as an "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Id.* (quoting *Grossman v. Barke*, 868 A.2d 561, 566 (Pa. Super. Ct. 2005)).

Plaintiffs have produced sufficient evidence to create a triable issue of fact as to whether each of the individual PrimeCare Defendants was negligent. The alleged actions and inactions of each Defendant – and their potential implications – have already been laid out in this opinion. *See supra* Parts II(B), IV(A)(4)(a)-(f). From this set of disputed facts, Kathryn Wild has offered her expert opinion that "the care provided to Mr. Mumun Barbaros

while incarcerated [MCCF] under the care of PrimeCare Medical, Inc. personnel did not

meet the standard of care required in an adult detention facility in . . . Pennsylvania." (Wild

Report, Doc. 138, Ex. 5 at 29). Thus, there is a triable issue of fact as to whether the

individual PrimeCare Defendants acted with deliberate indifference to Barbaros's serious

medical needs. Because there is a triable issue of fact as to this issue, Plaintiffs' negligence

claim against PrimeCare Medical, Inc. also survives under the common law doctrine of

*respondeat superior*, particularly where the PrimeCare Defendants have raised no argument

that under Pennsylvania state law, the PrimeCare entity cannot be held liable for the

conduct of its individual employees.

## E. State Law Wrongful Death and Survival Claims (Counts V and VI) against all PrimeCare Defendants

Pennsylvania law provides that an "action may be brought . . . to recover damages

for the death of an individual caused by the wrongful act or neglect or unlawful violence or

negligence of another . . . ." 42 Pa. Cons. Stat. Ann. § 8301 (West). "The purpose of the

Wrongful Death Statute is to compensate the decedent's relatives for their loss." *Gillette v.*

*Wurst*, 937 A.2d 430, 436 (Pa. 2007). "To recover from a wrongful death action, the plaintiff

must demonstrate that (1) a family relation existed, and (2) a pecuniary loss occurred."

*Smith v. Sandals Resorts Int'l, Ltd.*, 437 F. App'x 178, 182-83 (3d Cir. 2011) (citing *In re*

*Estate of Wolfe*, 915 A.2d 1197, 1200 (2006)). Plaintiffs in wrongful death actions may

recover damages "includ[ing] the present value of the services the deceased would have

rendered to the family, had she lived, as well as funeral and medical expenses." *Kiser v. Schulte*, 648 A.2d 1, 4 (1994).

"A survival action,[18] on the other hand, is not a new cause of action but one which 'merely continues in [the decedent's] personal representatives the right of action which accrued to the deceased at common law because of the tort.'" *Tulewicz v. Se. Pennsylvania Transp. Auth.*, 606 A.2d 427, 431 (Pa. 1992). Damages awarded under a survival action may include damages for "the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power—less personal maintenance expenses, from the time of death through his estimated working life span." *Smith v. Sandals Resorts Int'l, Ltd.*, 437 F. App'x at 184. These damages accrue to a decedent's estate. *Id.* "Pennsylvania policy favors wrongful death beneficiaries over estate beneficiaries." *Id.* at 185.

For the reasons set forth above in Part IV(D), which addresses Plaintiffs' state law negligence claims (Count IV) against the PrimeCare Defendants, Plaintiffs' wrongful death (Count V) and survival (Count VI) claims must likewise survive summary judgment. There exist genuine issues of material fact as to whether the actions or inactions of the PrimeCare Defendants were the cause of Babaros's suicide.

---

[18] "All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants." 42 Pa. Cons. Stat. Ann. § 8302 (West).

## V. Conclusion

Based on the foregoing, the PrimeCare Medical Defendants' motions for summary judgment will be denied.

A separate Order follows.

Robert D. Mariani
United States District Judge