IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PETER PONZINI and                          :
MIRYEM BARBAROS, as                        :
Co-Administrators of the Estate of         :
MUMUN BARBAROS, Deceased,                  :
                                           :
              Plaintiffs,                  :
      v.                                   :    3:11-CV-00413
                                           :    (JUDGE MARIANI)
MONROE COUNTY, et al.,                     :
                                           :
              Defendants.                  :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

On March 3, 2011, Plaintiffs initiated this action by filing a Complaint alleging

violations of 42 U.S.C. § 1983 and Pennsylvania state law. (Doc. 1). Plaintiffs subsequently

filed an Amended Complaint (Doc. 43) on June 23, 2011. Plaintiffs' claims stem from the

circumstances surrounding the death of their Decedent, Mumun Barbaros. Barbaros, a

pretrial detainee, committed suicide while incarcerated at the Monroe County Correctional

Facility in March 2009. Plaintiffs sued numerous defendants including Monroe County, a

county commissioner, and individuals employed at the Monroe County Correctional Facility.

These Defendants, referred to here as the "County Defendants," are: Monroe County, the

Monroe County Correctional Facility, and the individuals Donna Asure, Rich Cuth, Erin

Devers, Norma Elmore, Gary Haidle, Gary Mowry, and James Parker. With respect to the

1

individual County Defendants, Plaintiffs allege liability for Barbaros's death under § 1983 for violations of Barbaros's Fourteenth Amendment rights (Count I). (Doc. 43 at 15). Plaintiffs further allege that the individual County Defendants intentionally inflicted emotional distress on Barbaros (Count II). *Id.* at 15-16. Count II also contains an allegation that the County Defendants engaged in a conspiracy to violate the United States Constitution and state law, to conceal their unlawful conduct, and to deny Barbaros due process of law. *Id.* at 16. Plaintiffs allege that Monroe County is liable under § 1983 for violations of Barbaros's Fourteenth Amendment rights (Count III) and on the basis of *respondeat superior* for the negligence of the medical providers (Count IV). *Id.* at 16-18. Plaintiffs allege that all County Defendants are liable to Barbaros's survivors for his wrongful death (Count V) and are liable under the Pennsylvania Survival Act, 42 Pa. Cons. Stat. Ann. § 8302 (West), for his alleged pain and suffering and loss of earning capacity (Count VI). (Doc. 43 at 16, 18-20).

Presently pending before the Court are the County Defendants' Motion for Summary Judgment (Doc. 127) and the County Defendants' Supplemental Motion for Summary Judgment (Doc. 154). The County Defendants have moved for summary judgment on all counts against them and the Court will consider the two motions as one. The parties have briefed the motions and they are now ripe for disposition. For the purposes of clarity and expediency, the Court will dispose of all claims against Defendants Rich Cuth, James Parker, Robert Overfield, Gary Mowery, Norma Elmore, and Erin Devers at the outset of this opinion. Plaintiffs do not oppose the dismissal of these individual defendants from the case.

(Brief in Opposition to Motion for Summary Judgment, Doc. 143 at 5). Thus, the Court will dismiss each of them with prejudice. The Monroe County Correctional Facility is also hereby dismissed from this action with prejudice.[1] The Court will also dismiss the six Doe Defendants listed in Plaintiffs' Complaint under Federal Rules of Civil Procedure 21, 4(m), and 12(b)(5). *See DeJohn v. Pitt Ohio Exp., LLC*, No. 3:13-1417, 2015 WL 4356064, at *7 (M.D. Pa. July 14, 2015) (citing *Blakeslee v. Clinton Cnty.*, 336 Fed. App'x. 248, 250 (3d Cir. 2009)) (dismissing Doe Defendants at summary judgment stage after plaintiff failed to identify them and serve them with the complaint). For the reasons set forth below, the Court will grant the County Defendants' summary judgment motions with respect to Donna Asure and Gary Haidle and will deny it in part and grant it in part with respect to Monroe County.

## II. FACTUAL BACKGROUND

In accordance with Local Rule 56.1, the County Defendants have submitted a Statement of Undisputed Material Facts (Doc. 128 and Doc. 155) ("SMF") as to which they submit there is no genuine issue for trial. Plaintiffs subsequently submitted their response to the County Defendants' Statement of Material Facts (Doc. 145 and Doc. 168). Monroe

---

[1] It is well established law that a county correctional facility such as MCCF "is not a person capable of being sued within the meaning of § 1983." *Lenhart v. Pennsylvania*, 528 F. App'x 111, 114 (3d Cir. 2013). Nonetheless, Plaintiffs named MCCF as a defendant in their original complaint in this matter. (Doc. 1). Plaintiffs now admit that "[c]ounty jails, including the MCCF in particular, are not legal entities that may be sued." (Answer to Statement of Facts, Doc. 145 at ¶50; Statement of Facts, Doc 128 at ¶50). In their Brief in Opposition (Doc. 143) to the County Defendant's motion, Plaintiffs contend that MCCF is not a party to this action because they did not list it within their Amended Complaint or its caption. *Id.* at 6. While Plaintiffs may not consider MCCF a party to this action at this stage, a formal order of dismissal is still necessary for the sake of clarity and thoroughness.

3

County's Statement of Material Facts focuses in the main on facts related to the conduct of MCCF correctional officers. The majority of those facts, whether disputed or not, are not material to the resolution of the claims against the remaining County Defendants. This case turns upon the actions of the PrimeCare Defendants and upon Monroe County's relationship to PrimeCare. In determining whether there are triable issues of facts with respect to the Monroe County Defendants' Motions (Docs. 127, 154), the Court has of necessity reviewed the entirety of the summary judgment record before it, i.e., the Statements of Material Facts and the responses thereto submitted in connection with the motions for summary judgment by the PrimeCare Defendants (Docs. 124, 160) and Defendant Thomas (Docs. 121, 157). The Court has done so because the relationship between the Defendants, as well as the theories of liability advanced by the Plaintiffs, are sufficiently intertwined to make treatment of each Defendant or set of Defendants' motions as independent and unrelated to the others an unworkable exercise.

Thus, the material facts at issue are those outlined in the Court's Memorandum Opinion (Doc. 175) denying the PrimeCare Defendants' Motion for Summary Judgment and their Supplemental Motion for Summary Judgment. For ease of reference, we restate them here. Any material facts from the County Defendants' Statement of Facts and the Plaintiffs' Response have been incorporated and noted below.

## A. Statement of Undisputed Material Facts

Barbaros was arrested and brought to the Monroe County Correctional Facility ("MCCF") at approximately 2:45 a.m. on March 18, 2009. (PrimeCare SMF, Doc. 126 at ¶2; Doc. 139, Answer to PrimeCare SMF at ¶2). Monroe County has contracted PrimeCare Medical, Inc. to provide medical services to the inmate population at MCCF. (County SMF, Doc. 128 at ¶89; Answer to County SMF, Doc. 145 at ¶89). PrimeCare nurse Paul James conducted a medical intake screening shortly thereafter, at approximately 3:00 a.m. (Doc. 126 at ¶3; Doc. 139 at ¶3). Barbaros told James that he had a history of ulcers and was currently taking the prescription medication Trazodone. *Id.* at ¶4. James also wrote down on the intake screening documents that Barbaros was currently taking the prescription medication Prozac.[2] *Id.* at ¶6. James documented on an "Intake Dispensary Note" that Barbaros's prescriptions were not verified due to the late hour of the intake. *Id.* at ¶8. On the Intake Dispensary Note, James also placed Barbaros on the "provider line" for his ulcers

---

[2] According to both Plaintiffs and the County Defendants, Barbaros reported to the PrimeCare medical staff that he was taking Paxil and Trazodone, prescriptions that he filled at the CVS in Mountainhome, Pennsylvania. (County SMF, Doc. 128 at ¶15; Answer to SMF, Doc. 145 at ¶15). Given the nature of this case, however, it would be imprudent for the Court to end its treatment of this proffered fact here. First, the record evidence offered by the County Defendants does not support the entirety of the statement; rather, it supports only the statement that Barbaros filled his prescriptions at the Mountainhome CVS. (*See* Doc. 128 at ¶ 7 (citing James Deposition, Doc. 128, Ex. 1 at 16)). Second, whether Barbaros told the PrimeCare intake nurse that he was taking Paxil and Trazodone or Prozac and Trazodone is a factual issue hotly contested by the Plaintiffs and the PrimeCare Defendants. Indeed, the County Defendants themselves state that Nurse Paul James, the PrimeCare staff person who performed the medical intake, wrote down on the intake documents that Barbaros reported taking Prozac and Trazodone. (Doc. 128 at 6).

and made a referral to "Psych."[3] *Id.* James conducted a Suicide Screening, on which he

scored Barbaros as meeting two or three of the listed criteria. *Id.* at ¶7. If an inmate met

eight criteria on the Suicide Screening, the form required the inmate to be placed on suicide

watch.[4] (Doc. 126 at ¶7; Doc. 139 at ¶7). The medical record reflects that Nurse Patricia

Bauer attempted to verify Barbaros's prescriptions at around 2:00 p.m. on March 18, 2009

and that CVS denied that Barbaros was a customer. *Id.* at ¶10. Bauer also "note[d] . . .

Barbaros was placed on the list to be seen by psych."[5] *Id.*

The following day, March 19, 2009, Barbaros filled out and submitted a Sick Call

Request form seeking medication for a headache and a stomach ulcer. *Id.* at ¶12. Nurse

Christina Rowe met with Barbaros on March 20, 2009 at approximately 10:30 a.m. *Id.* at

¶13. Barbaros presented with headaches, which the medical record reports began the night

before the visit. *Id.* The medical record from this visit does not reflect that Barbaros asked

Rowe for psychiatric medications. (Doc. 126 at ¶13; Doc. 139 at ¶13). As a result of the

---

[3] Plaintiffs respond to SMF ¶8 as follows: "It is admitted that the documents referenced in paragraph 8 of the PrimeCare Defendants' statement of facts is [*sic*] a written document and speaks for itself." (Answer to SMF, Doc. 139 at ¶8). The Court does not consider this a denial. Furthermore, the Court has reviewed the Intake Dispensary Note (Doc. 126, Ex. 5 at 2) in question and finds that it supports Defendants' assertions in SMF ¶8. Given the absence of specific denials and supporting evidence from Plaintiffs, the Court deems SMF ¶8 admitted.

[4] Plaintiffs deny as stated this fact proffered by the PrimeCare Defendants. (Doc. 139 at ¶7). The Court has reviewed Plaintiffs' response and finds that there is no genuine issue of material fact with respect to this statement. Plaintiffs specifically admit "that according to the form titled 'Suicide Screening' if an inmate scores 8 points, he is placed on a suicide watch." *Id.* Plaintiffs go on to deny that this is the *only* time that an inmate should be placed on suicide watch. *Id.* The PrimeCare Defendants, however, have made no such assertion. The fact that the form requires an inmate to be placed on suicide watch if he scores eight points is not denied and is not genuinely in dispute. As to Barbaros's recorded score of two or three criteria, the Plaintiffs offer no response. *Id.* The Court deems that fact admitted.

[5] Because Plaintiffs do not expressly deny this contention or otherwise address it (Answer to SMF, Doc. 139 at ¶10), the Court deems it admitted.

visit, Rowe called an on-call provider about Barbaros's blood pressure. The on-call provider

gave Rowe verbal orders around 2:00 p.m. that day. *Id.* at ¶14. The provider prescribed the

medication Lopressor, which Barbaros was to take two times a day for thirty days, ordered

daily blood pressure checks for the next five days, and ordered that Barbaros be placed on

a list to see a doctor at the facility. *Id.*

 After meeting with Rowe on March 20, 2009, Barbaros went to court for a second

arraignment on additional charges. At court, Barbaros complained to the judge that he was

not receiving his psychiatric medications at MCCF. *Id.* at ¶15. Barbaros arrived back at

MCCF at 5:00 p.m. *Id.* Having been notified of Barbaros's courtroom complaint, Defendant

Wendy Johnson reviewed Barbaros's medical chart and asked another nurse to verify the

psychiatric medications that had been reported in it.[6] (Doc. 126 at ¶16; Doc. 139 at ¶16).

Later that night, around 9:40 p.m., Nurse Ramos verified Trazodone and Paxil prescriptions

for Barbaros filled at CVS Pharmacy. *Id.* at ¶17. The CVS prescriptions were listed under

the name "Martin Barbaros." *Id.* at ¶18. Ramos then obtained verbal orders for Paxil and

Trazodone from Dr. Alex Thomas.[7] *Id.* at 17.

---

[6] Plaintiffs deny the PrimeCare Defendants' SMF ¶16 as stated. The Court has reviewed the admissions contained in Plaintiffs' response. The facts related here reflect the portions of ¶16 about which there is no genuine issue of material fact based on Plaintiffs' response, except with respect to proffered fact that Johnson was notified of Barbaros's complaints to the criminal court. Because Plaintiffs do not expressly deny this contention or otherwise address it, the Court deems it admitted.

[7] In their SMF, the PrimeCare Defendants claim that Dr. Wilson gave the verbal orders to prescribe Trazodone and Paxil. (Doc. 126 at ¶17). Plaintiffs deny this and assert that Dr. Thomas gave the orders. (Doc. 139 at ¶17). The PrimeCare Defendants' statement is the only time in this case of which the Court is aware that Dr. Wilson is alleged to have given these orders. At all other times, Plaintiffs and Defendants, including the PrimeCare Defendants, name Dr. Thomas as the prescriber. (*See, e.g.,* PrimeCare Medical Defendants' Brief in Support of Supplemental Motion for Summary Judgment, Doc. 162 at 2 ("Dr. Thomas

On either March 20, 2009 or March 21, 2009, Barbaros met with William Buffton, a mental health worker. *Id.* at ¶20. Buffton referred Barbaros to a prison psychiatrist to rule out adjustment disorder and depression. *Id.* As to prescription medications administered to Barbaros during the time he was incarcerated at MCCF, the Parties agree that he received: "Lopressor at approximately 9:00 a.m. and 9:00 p.m. on March 20 and 21, 2009;" "Trazodone at approximately 9:00 p.m. on March 20, 2009;" and "Paxil at approximately 9:00 a.m. on March 21, 2009." (Doc. 126 at ¶19; Doc. 139 at ¶19). *Id.* at ¶19. Barbaros was found unresponsive in his cell at about 6:00 a.m. on March 22, 2009 and was subsequently declared dead. *Id.* at ¶21. At the time of his death, Barbaros was not on suicide watch and no PrimeCare employee or contractor had alerted MCCF correctional staff that he was a suicide risk. (County SMF, Doc. 128 at ¶¶37, 42; Answer to County SMF, Doc. 145 at ¶¶37,

---

then reinstated Decedent's full Paxil dosage . . . .")). The Court deems it admitted by both Plaintiffs and the PrimeCare Defendants that Dr. Thomas gave the verbal orders for Trazodone and Paxil after Ramos verified the prescriptions.

42).[8] The County Defendants and Plaintiffs agree that no County Defendant "subjectively believed that Barbaros was suicidal" before his death. *Id.* at ¶43.[9]

Monroe County Commissioner Donna Asure was called to MCCF following Barbaros's death. (County SMF, Doc. 128 at ¶¶51, 55; Answer to County SMF, Doc. 145 at ¶¶51, 55).[10] As a county commissioner, Defendant Asure was required by law to sit on the county's Prison Board. *Id.* at ¶54. The parties agree that Defendant Asure did not know that Barbaros existed prior to being called to MCCF after his death. *Id.* at ¶56. Defendant Asure later became the warden of MCCF in November 2009. *Id.* at ¶¶51, 53.

Defendant Gary Haidle was employed as a sergeant at MCCF at the time of Barbaros's death. (County SMF, Doc. 128 at ¶85; Answer to County SMF, Doc. 145 at ¶85). Defendant Haidle's responsibilities included "being in charge of the shift." *Id.* at ¶86.[11]

---

[8] Defendants cite no record evidence in support of these statements. (County SMF, Doc. 128 at ¶¶37, 42). Despite this, Plaintiffs admit to these statements in their response (Answer to County SMF, Doc. 145 at ¶¶37, 42). Plaintiffs later deny the County Defendants' Statement ¶93, which reads "[t]he PrimeCare medical staff . . . never informed any Monroe County official that Barbaros was vulnerable to suicide." (Doc. 128 at ¶93; Doc. 145 at ¶93). Statement 93 has virtually the same meaning as Statement 42, to which the Plaintiffs earlier admitted. The reason given by Plaintiffs for their denial of Statement 93 is as follows: "[a]s there is no citation for this statement, it is an improper statement of fact." Plaintiffs cannot have it both ways. Because the Plaintiffs admit to Statement 42 and the only reason given for denial of Statement 93 is the lack of supporting citation, the Court will take as undisputed the fact that no PrimeCare staff person informed any member of the correctional staff that Barbaros was a suicide risk.

[9] Defendants cite no record evidence in support of this statement. (County SMF, Doc. 128 at ¶43). Because Plaintiffs admit to this statement in their response (Answer to County SMF, Doc. 145 at ¶43), and because the Court has seen nothing to contradict it in the record, it will deem this statement admitted.

[10] Plaintiffs deny the County Defendants' Statement 55 as stated. The Court has included here only the portion of Statement 55 that the Plaintiffs go on to specifically admit in their response. (Answer to County SMF, Doc. 145 at ¶55).

[11] Plaintiffs deny this proffered statement as stated. (Answer to County SMF, Doc. 145 at ¶86). The Court has reviewed Plaintiffs' response and finds that there is no genuine issue of material fact with respect to this statement. Plaintiffs specifically admit that Defendant "Haidle was in charge of the shift he was assigned to." *Id.* Plaintiffs seem to deny any statement that Defendant Haidle met his supervisory

## B. Plaintiffs' Version of the Facts

Plaintiffs have two overarching theories of this case with respect to the remaining

County Defendants: one based off the actions of the MCCF correctional staff and another

based off the actions of the PrimeCare medical staff at MCCF. First, Plaintiffs argue that

Monroe County is liable for a

> clear custom and practice that existed in March 2009 not to supervise
> MCCF's correctional staff and to allow them to violate the existing policies
> and procedures with such frequency and reckless abandon that the
> correctional officers did not fear any discipline at all should they get caught.

(Doc. 143 at 27-28). Relatedly, they argue that Defendant Haidle failed to supervise

Correctional Officer Cleare and Correctional Officer Overfield, *id*. at 24, who were on duty in

the hours leading up to Barbaros's death, *id*. at 10. They argue that this failure in

supervision led, at least in part, to Barbaros's death. *Id*. at 21. Second, Plaintiffs argue that

Monroe County is liable for its failure "to supervise the private contractor it . . . retained to

provide medical services at MCCF." *Id*. at 27. Related to their second theory, Plaintiffs

argue that Defendant Asure, as a member of the county prison board, failed to supervise

PrimeCare Medical, Inc.'s provision of medical care to MCCF inmates.[12] *Id*. at 25.

---

responsibilities. *Id*. The County Defendants, however, have made no such assertion. (*See* County SMF, Doc. 128 at ¶86).

[12] Plaintiffs make a passing reference to a potential failure of Defendant Asure to supervise the correctional staff. (Doc. 143 at 37). However, the Court has reviewed the record evidence cited to by Plaintiffs in support of this allegation and finds that it does not stand for the proposition that Defendant Asure "chose not to look for policy violations [committed by the correctional staff] because of grief [the county or prison administration] would receive from the union." *Id*. (citing to Frable Deposition, Doc. 143, Ex. 5 at 31). Thus, there is no triable issue of fact as to whether Defendant Asure failed to supervise the correctional staff at MCCF and the Court will treat this allegation no further.

With respect to Plaintiffs' first theory, regarding the supervision of correctional staff, Plaintiffs draw heavily on the report regarding Barbaros's suicide (Doc. 143, Ex. 3 at 24-31) completed by MCCF Lieutenant Daniel Frable and on Frable's deposition (Doc. 143, Ex. 5 at 25-34) taken in the course of this litigation. (See Doc. 143 at 30-37). From this, Plaintiffs argue that Monroe County failed to train correctional officers, failed to supervise them, and failed to enforce applicable policies and procedures. Id. at 30.

With respect to Plaintiffs' second theory, Plaintiffs argue that there was "a complete lack of supervision over PrimeCare [on behalf of Monroe County] which led to PrimeCare's deliberate indifference to Mr. Barbaros' serious medical needs." (Doc. 143 at 38). Plaintiffs also contend that Defendant Asure, as a member of the County's Prison Board, failed to supervise PrimeCare Medical, Inc. in the execution of its contract with the County. Id. at 25. Plaintiffs point to testimony from Defendant Asure's deposition that, if proven at trial, suggests the Prison Board provided no direct supervision of PrimeCare Medical, Inc. and relied on the warden of MCCF to report any issues concerning medical care to the Board. Id. at 25-26. Because so much of this theory is bound up with the actions of the PrimeCare Defendants, the Court will restate here its explication of Plaintiffs' version of the facts as originally set forth in its Memorandum Opinion (Doc. 175) denying the PrimeCare Defendants' summary judgment motion.

Plaintiffs' theory of the PrimeCare Defendants' involvement in this case is essentially this: with respect to Barbaros's prescription medications and related medical care, 1) the

individual PrimeCare Defendants acted (or failed to act) in contravention to PrimeCare policy and the relevant standard of care; 2) this was a result of a failure by PrimeCare Medical, Inc. to adequately train its employees and contractors; 3) these actions or inactions resulted in a denial of Paxil for several days; and 4) that this denial and subsequent restart of Paxil at Barbaros's pre-incarceration dosing level caused his suicide. Plaintiffs' version of facts with respect to the actions and inactions of the PrimeCare Defendants is as follows.

Plaintiffs assert that the handling of Barbaros and his medical care was deficient from his first interaction with a PrimeCare Defendant onward. (See Wild Report, Doc. 138, Ex. 5 at 33) (referring to Barbaros's interaction with the intake nurse as the start of "a downward spiral of medical care"). Plaintiffs claim that, upon intake at MCCF, Barbaros told Defendant James he was taking Trazadone and Paxil, but that James "mistakenly" or "negligently" wrote down Trazadone and Prozac. (Doc. 139 at ¶¶4, 6, 23). In support of this claim, Plaintiffs point to the deposition testimony of Barbaros's criminal co-defendant who was with him in the intake area at the time, (Edgu Deposition, Doc. 138, Ex. 3 at 23), as well as an expert opinion that patients with a history of taking a certain medication for as long as Barbaros had taken Paxil do not forget the name of that medication, (Wild Report, Doc. 138, Ex. 5 at 29). Plaintiffs also point to the incompletely and inaccurately filled-out intake form as another consequential deficiency in James's handling of Barbaros, id., which they further contend is a violation of PrimeCare policy, (Johnson Deposition, Doc. 138, Ex. 4 at 27). Plaintiffs' expert Kathryn Wild specifically notes that James failed to indicate the last time

12

Barbaros took his prescription medications, failed to place him on the "mental health line" despite noting Barbaros's self-reported mental health treatment history, and spelled his name incorrectly and inconsistently throughout. (Wild Report, Doc. 138, Ex. 5 at 26).

Next, Plaintiffs claim that Defendant Bauer should have done more in her attempt to verify Barbaros's prescriptions and that she failed to do so in contradiction to applicable policies and procedures; Plaintiffs point to deposition testimony of Todd Haskins, which gives other methods with which to verify a prescription besides calling a pharmacy. (Doc. 139 at ¶¶5, 10) (referencing Haskins Deposition, Doc. 138, Ex. 4 at 56-57). Plaintiffs also claim that a failure to verify via any method should have triggered additional steps to ensure adequate care, citing to deposition testimony that if psychiatric medications for arriving inmates cannot be verified, a prison psychiatrist should be contacted by the end of the next business day. (Doc. 139 at ¶5) (referencing Doc. 138, Ex. 4 at 58); (*see also* Wild Report, Doc. 138, Ex. 5 at 30).

With respect to Defendant Rowe, Plaintiffs claim numerous deficiencies in her handling of Barbaros and his sick call request. (Doc. 139 at ¶13). Plaintiffs claim that Rowe did not review Barbaros's medical records in preparation for treating Barbaros, in contradiction to applicable policies and procedures. *Id.* Though the medical records show that Rowe wrote down that Barbaros's headache began the night before the 10:30 a.m. appointment, Plaintiffs assert that such a timeline would be impossible based on the time Barbaros submitted the sick call request complaining of headaches; Plaintiffs claim the

headache must have been going on for longer than what Rowe wrote down. *Id.* This is important given Plaintiffs' expert opinion evidence that headaches and high blood pressure are symptoms of withdrawal/SSRI discontinuation syndrome. (Wild Report, Doc. 138, Ex. 5 at 31). Plaintiffs also deny the PrimeCare Defendants' assertion that Barbaros did not speak to Rowe about his psychiatric prescriptions, pointing in part to his complaint about his failure to receive them made to a criminal court judge later the same day. (Doc. 139 at ¶13).

Plaintiffs next take issue with Defendant Johnson's handling of Barbaros's complaints made in court. (Doc. 139 at ¶16). Plaintiffs assert that while Johnson asked a nurse to verify the medications after being notified of the complaints, she failed to note to that nurse or to anyone else that, if subsequently verified, there would have been at least a "couple"-day delay in administering the medications to Barbaros. *Id.* According to Plaintiffs' expert Kathryn Wild, Johnson should also have taken "immediate action" rather than pass the task of verification on to someone else. (Wild Report, Doc. 138, Ex. 5 at 32). There is also a disputed issue of material fact as to whether there was suicide prevention training for PrimeCare employees and whether Johnson provided that training, based on Plaintiffs' perceived inconsistencies in Johnson's deposition testimony. (Doc. 139 at ¶30) (referencing Johnson Deposition I, Doc. 138, Ex. 4 at 24-25; Johnson Deposition II, Doc. 138, Ex. 5 at 65).

With respect to Defendant Ramos, Plaintiffs claim that her actions in verifying Barbaros's medications and reporting them to Dr. Thomas were deficient. (Doc. 139 at ¶17).

14

According to Plaintiffs, Ramos did not review Barbaros's medical file, missing critical information such as the last time Barbaros had taken his medication (itself undocumented by Defendant James). *Id.* at ¶17 (referencing Doc. 138, Ex. 4 at 45). Plaintiffs also claim that Dr. Thomas's one-minute interaction with Defendant Ramos was deficient. (Plaintiffs' Response to Defendant Alex T. Thomas, M.D.'s Statement of Undisputed Material Facts, Doc. 141 at ¶8). While Dr. Thomas is not addressed in this opinion, he too is a Defendant in this case and has moved for summary judgment on the claims against him. (*See* Docs. 121, 157, 177). His conduct is noted here because it sheds light on Defendant Ramos's role in Barbaros's medical care and because it has relevance with respect the motion for summary judgment filed by PrimeCare Medical, Inc. Relatedly, while William Buffton is no longer a defendant in this case, (*see* Doc. 106), his conduct is also relevant with respect to PrimeCare Medical, Inc. Plaintiffs and their experts claim that Buffton's visit with Barbaros was deficient in numerous ways, including Buffton's failure to review medical records. (Doc. 139 at ¶20) (referring to Doc. 138, Ex. 4 at 35); (*see also* Wild Report, Doc. 138, Ex. 5 at 33). As noted in the Memorandum Opinion on the PrimeCare Defendants' summary judgment motions, there is also some evidence of record to create triable issues of fact as to Defendant Deborah Wilson's role in the case, particularly with respect to whether she complied with PrimeCare Medical, Inc.'s policy directives, and if not, the nature of her failure to do so. (*See* Doc. 175 at 22-23) (citing Wild Report, Doc. 138, Ex. 5 at 30).

With respect to PrimeCare Medical, Inc., Plaintiffs have produced expert evidence that its policies and procedures in place at MCCF at the time "for the most part seem to be within the applicable standard of care," (Adler Report, Doc. 138, Ex. 5 at 50), but that there was "clear and continuous," *id.*, disregard for these policies and procedures. Plaintiffs also claim that PrimeCare Medical, Inc.'s staffing levels were inadequate, pointing to deposition testimony that PrimeCare nurses requested extra nursing staff on the night shift, that a "backlog" of inmates would accrue over the course of the week since doctors were only in the facility "at the beginning of the work week," and that on-call doctors never came into MCCF during their on-call periods, (Ramos Deposition, Doc. 138, Ex. 4 at 49), as well as expert opinion evidence that there was not "adequate physician coverage to meet the needs of inmates including Mr. Barbaros," (Roskes Report, Doc. 138, Ex. 5 at 43).

## C. County Defendants' Version of the Facts

With respect to Defendants Asure and Haidle, the County Defendants argue that Plaintiffs cannot meet the requirements for liability in a § 1983 prison suicide case, citing *Colburn v. Upper Darby Township*, 946 F.2d 1017 (3d Cir. 1991). (Doc. 129 at 19-20). The County Defendants make little argument with respect to these individual defendants themselves and instead fall back on this Court's reasoning in its Order (Doc. 65) and Memorandum Opinion (Doc. 64) entering judgment on the pleadings in favor of correctional officer Jesse Cleare. (Doc. 129 at 20). The County Defendants contend that, just as Plaintiffs' case against Defendant Cleare was deficient at the pleadings stage, Plaintiffs

have adduced no evidence at the summary judgment stage from which a jury could

reasonably conclude that "Barbaros had a strong likelihood of suicide of which [Defendants

Asure and Haidle] were aware or should have been aware," as required by the *Colburn*

standard. *Id.*; (*see also* Doc. 156 at 7).

The County Defendants' argument with respect to Monroe County itself seems to be

that because an inmate's medical care "is turned over to trained healthcare providers

employed by PrimeCare" at intake, Plaintiffs can prove neither the requisite level of

knowledge nor the requisite level of causation for a § 1983 municipal liability claim. The

County Defendants argue that even if the actions of PrimeCare Medical, Inc. and its staff did

cause "withdrawal from psychotropic medications," "this information was not shared with the

County." *Id.* at 22-23. The County Defendants contend that Plaintiffs cannot prove causation

in part because PrimeCare Medical, Inc. and its staff did not alert the correctional staff to his

withdrawal systems or suicide risk, *id.* at 23, and because they believe Plaintiffs' expert Dr.

Erik Roskes "is unable to testify within a reasonable degree of medical certainty that

Barbaros killed himself because of something the defendants failed to do or failed to

recognize," (Doc. 156 at 6).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). A grant of

summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." *Id*. "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. Rather, the opposing party must point to a factual dispute requiring trial and the district court "may limit its review to the documents submitted for the purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030-31 (9th Cir. 2001); *see also* Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

## IV. ANALYSIS

## A. Deliberate Indifference (Counts I and III)

### 1. Defendant Donna Asure

Defendant Donna Asure was a Monroe County Commissioner at the time of

Barbaros's death and only became Warden of MCCF months later. Plaintiffs have made no

argument for her § 1983 liability in this matter other than her mere status as a member of

the Monroe County Prison Board. Plaintiffs have not pointed to any facts of record that she

had any duties or responsibilities or specially-conferred authority to act on behalf of the

prison board or the County Commissioners. Absent such evidence, this Court cannot find a

triable issue of fact as to whether she was deliberately indifferent. Defendant Asure was

only a single member of the prison board, a body that, by law, is made up of at least the

county district attorney, the county sheriff, the county controller, and the county

commissioners, and potentially a judge from the county court of common pleas. 61 Pa.

Cons. Stat. Ann. § 1731 (West). Furthermore, any action taken by the board requires "the

approval of a majority of all the members of the board." 61 Pa. Cons. Stat. Ann. § 1732

(West). Defendant Asure's "actions alone could not have formed and do not constitute a

controlling majority that could take any action [on behalf of the county prison board],

constitutional or otherwise." *Watson v. Borough of Susquehanna*, No. 3:09-CV-294, 2012

WL 5249551, at *4 (M.D. Pa. Oct. 23, 2012) *aff'd*, 532 F. App'x 233 (3d Cir. 2013) (holding

that an individual decision maker could not be held liable for retaliation unless a majority of

the council was held liable); *see also*, *Coogan v. Smyers*, 134 F.3d 479, 485 (2d Cir. 1998).

Additionally, Plaintiffs have not created a record with regard to any other non-named

member of the Prison Board that, if proven, would subject the Prison Board to constitutional

liability. Defendant Asure's motion for summary judgment with respect to Count I shall be

granted.

## 2. Defendant Gary Haidle

"To hold a supervisor liable for such an Eighth Amendment violation, the plaintiff

must identify a supervisory policy or procedure that the supervisor defendant failed to

implement, and prove that: (1) the policy or procedures in effect at the time of the alleged

injury created an unreasonable risk of a constitutional violation; (2) the defendant-official

was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to

that risk; and (4) the constitutional injury was caused by the failure to implement the

supervisory procedure." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 330 (3d Cir. 2014),

*rev'd on other grounds sub nom. Taylor v. Barkes*, 135 S. Ct. 2042 (2015). Here, Plaintiffs'

supervisory liability claims against Defendant Haidle must fail because, as a matter of law,

they cannot prove the fourth enumerated element necessary for supervisory liability under §

1983 in the Third Circuit.

This case turns upon the constitutional injury potentially suffered by Barbaros with

respect to the handling of his prescription medication needs at MCCF. While Plaintiffs have

in part framed this case a prison suicide case, it is better characterized as a prison medical

care case that tragically ended with a suicide. Plaintiffs have failed to provide facts from which a reasonable jury could conclude that the County Defendants, or, for that matter, any of Defendant Haidle's supervisees, named or unnamed, violated Barbaros's constitutional rights under the standard for evaluating prisoner suicide cases in this circuit, set out in *Colburn v. Upper Darby Township*, 838 F.2d 663 (3d Cir. 1988). In order to succeed in such a case, Plaintiffs must establish three elements: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. *See Wargo v. Schuylkill County*, 348 Fed. App'x. 756, 759 (3d Cir. 2009) (citing *Colburn*, 946 F.2d at 1023). The Third Circuit has repeatedly affirmed that "'a prison custodian is not a guarantor of a prisoner's safety,' and, therefore, the fact that a suicide took place is not enough on its own to establish that prison officials were recklessly indifferent in failing to take reasonable precautions to protect prisoners entrusted to their care." *Wargo*, 348 Fed. App'x. at 759 (quoting *Freedman v. City of Allentown*, 853 F.2d 1111, 1115 (3d Cir. 1988)).

In the present matter, Plaintiffs have failed to put forth evidence from which a reasonable jury could conclude that an individual correctional officer or other individual county employee violated Barbaros's constitutional rights by acting with reckless indifference to Barbaros's particular vulnerability to suicide of which that individual either knew or should have known. Indeed, Plaintiffs *admit* that "[n]o PrimeCare physician, nurse,

21

or mental health counselor alerted MCCF staff that Barbaros was a suicide risk." (SMF, Doc. 128 at ¶42; Answer to SMF, Doc. 145 at ¶42). "[P]rison officials cannot be required to second guess the medical judgment of the [staff] physician." *Ellison v. Scheipe*, 570 F. Supp. 1361, 1363 (E.D. Pa. 1983). Plaintiffs have not pointed to evidence from which a reasonable jury could conclude that any individual MCCF staff person had any reason to know that Barbaros had a "particular vulnerability" to commit suicide. The record evidence shows that medical personnel undertook Barbaros's medical care, and it was not the job, or place, of the correctional staff to question the recommendations of the medical personnel. Given this, Plaintiffs cannot prove a constitutional injury resulting from Defendant Haidle's alleged failure to implement any supervisory procedure with respect to the correctional officers at MCCF. Given this, the Court sees no reason to evaluate the other elements of a § 1983 supervisory liability claim and will grant summary judgment to Defendant Haidle on the § 1983 deliberate indifference claim (Count I) against him.

In granting summary judgment to Defendant Haidle, the Court should not be construed as condoning the way in which Defendant Haidle and his supervisees carried out their job duties at MCCF. There is evidence of record that would create issues of fact for trial with regard to how MCCF was run at the time of Barbaros's incarceration and death if they were material to the claims of the Plaintiffs which will survive summary judgment. For instance, Plaintiffs have put into evidence a report on Barbaros's suicide in which Lieutenant Daniel Frable found that Jesse Cleare, a correctional officer on duty at the time of

22

Barbaros's death, "did not tour or conduct bed checks as per policy," (Frable Report, Doc. 143, Ex. 3 at 30). There is also testimony of record that Cleare was "notorious" for sleeping on the job and for not doing tours, as well as testimony that MCCF correctional officers had a culture of covering for each other. (Frable Deposition, Doc. 143, Ex. 5 at 30-31). Though Plaintiffs argue that their claims against Defendant Haidle should go forward on this basis, (see Doc. 142 at 21-24), these issues of fact are simply not material to the constitutional violation upon which Plaintiffs' § 1983 claim must rest. From the outset, those charged with the responsibility of making the non-medical staff of MCCF aware of any vulnerability to suicide on the part of Barbaros did not do so. The standard for a constitutional violation founded on Defendant Haidle's failure to supervise presupposes that the correctional officers and Haidle himself were made aware of the suicide risk, a fact that is undisputedly lacking in this case.

### 3. Monroe County

A municipality such as Monroe County "cannot be held responsible [under § 1983] for the acts of its employees under a theory of respondeat superior or vicarious liability." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003). Instead, a municipality may be held liable under § 1983 when the alleged unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," including "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received

formal approval through the body's official decision-making channels." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Monroe County has a constitutional obligation to "provide food, clothing, shelter and medical treatment for inmates." *White v. Napoleon*, 897 F.2d 103, 113 (3d Cir. 1990). At the time of Barbaros's death and incarceration, it is undisputed that Monroe County had chosen to fulfill its medical treatment obligation to the inmate population of MCCF by contracting with a third-party medical provider. Its duty, however,

> is not absolved by contracting with an entity such as [PrimeCare Medical, Inc.]. Although [PrimeCare] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of [PrimeCare]. In that sense, the county's duty is non-delegable.

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985). In this case, PrimeCare Medical, Inc. has potential liability with respect to Barbaros's death, (*see* Memorandum Opinion, Doc. 175); such liability concerns the appropriateness of its policies for handling the medical issues and medication requirements of newly incarcerated detainees, as well as its alleged failure to train and supervise its staff in the execution of these policies. It follows, then, that Monroe County also has potential liability stemming from

24

its own, independent obligation to police its medical services contract[13] with PrimeCare Medical, Inc.

The Plaintiff has put into the record evidence that the County left supervision of the contract to the warden of MCCF and left medical decisions to PrimeCare Medical, Inc. In her deposition in this matter, Defendant Donna Asure, then a Monroe County Commissioner and member of the county's prison board, testified as follows:

> Functioning properly, the warden would know if there were . . . major medical issues, at the time, things like that, in order for the medical department to get what they need and move forward and make sure that the contract is being gone through correctly. But other than that, you leave the medical to the medical professionals.

(Asure Deposition, Doc. 143, Ex. 3 at 48-49).[14] Indeed, the County's briefing in this litigation describes inmates' medical care as being "turned over to trained healthcare providers employed by PrimeCare" upon admission. (County Defendants' Brief in Support of Motion for Summary Judgment, Doc. 129 at 22). While the Court recognizes that "prison officials cannot be required to second guess the medical judgment of the [staff] physician," *Ellison*, 570 F. Supp. at 1363, Monroe County's contractual position vis-à-vis PrimeCare Medical,

---

[13] The Court notes that it has not been provided with the contract between Monroe County and PrimeCare Medical, Inc. that was in place at the time of Barbaros's incarceration and death in March 2009. The contract attached to the Plaintiffs' Brief in Opposition to Monroe County's Motion for Summary Judgment (Doc. 143) was signed in January 2010, *id*. at 40, and includes an addendum signed in early 2012, *id*. at 42. As such, it was not considered by the Court in its analysis.

[14] Defendant Asure further testified that "if a warden had concerns about the PrimeCare employees and the contract, that it would have been their job to bring it to the attention of the Prison Board." (Asure Deposition, Doc. 143, Ex. 3 at 49).

Inc. is an altogether different type of relationship than that between an on-the-ground medical provider and a correctional officer working in MCCF.

In the County Defendants' Reply Brief (Doc. 149), the County argues that Plaintiffs' have no claim against it because the Monroe County Prison Board, not the County itself, is the proper party to this suit. *Id.* at 5. The County's argument is unpersuasive: "[t]he County cannot immunize itself from constitutional harm that its policies cause merely by delegating the authority to create the policy to an independent board," such as the Monroe County Prison Board. *Barry v. Luzerne Cnty.*, 447 F. Supp. 2d 438, 451 (M.D. Pa. 2006). It likewise follows that Monroe County cannot immunize itself from liability for constitutional harm merely by delegating the provision of medical care in its correctional facility to the independent entity PrimeCare Medical, Inc. There remain material, disputed questions of fact about Monroe County's vigilance in supervising its contract with PrimeCare Medical, Inc. and a grant of summary judgment to the County would be inappropriate in light of these questions. Whether PrimeCare Medical, Inc.'s particular actions in this case subject the County to liability under § 1983 (Count III) is a question for the jury to decide on the basis of a fully developed record.[15]

The County's argument that "plaintiffs have inadequate proof [of causation] to submit this case to a jury," (Doc. 156 at 12), does not alter the Court's conclusion that the County's

---

[15] The Court's reasoning does not run afoul of the United States Supreme Court's holding that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Monroe County's potential liability arises from its policy of contracting away of a nondelegable duty coupled with its (yet unproven) failure to ensure that the contract was properly carried out and the nondelegable duty met.

motion should be denied with respect to Plaintiffs' § 1983 claim. According to all Defendants in this litigation, the need for supplemental summary judgment motions arose as the result of the deposition testimony of Plaintiffs' expert, Dr. Erik Roskes, taken after the original motions had been filed. (Doc. 150 at 4; Doc. 151 at 1-2). The Court has reviewed Dr. Roskes's deposition testimony and finds that the County has mischaracterized and overstated the degree to which Dr. Roskes equivocates on his positions. Furthermore, the issues that the County raises with respect to Dr. Roskes's opinions are questions of fact that it would be improper for the Court to decide at this stage. The facts asserted in the County Defendants' Statement of Facts and Plaintiffs' response to them serve as a prime example of the factual issues that remain in this case; while Parties agree on the words uttered in Dr. Roskes's testimony, Parties interpret those words very differently and draw different inferences from them. "Questions about credibility and weight of expert opinion testimony are also for the trier of facts since such testimony is ordinarily not conclusive." *Drysdale v. Woerth*, 153 F. Supp. 2d 678, 689 (E.D. Pa. 2001).

In advancing its argument with respect to causation, the County relies heavily on the unpublished Middle District case *Miszler v. Shoemaker*, such that a short description of the facts of that case is warranted. No. 3:04-CV-1756, 2009 WL 790139 (M.D. Pa. Mar. 20, 2009). Miszler was incarcerated at the Susquehanna County Correctional Facility when he received an injury requiring surgery and hospitalization. *Id.* at *1. Miszler was prescribed antibiotics at the hospital, though there was a 36-hour period during his hospitalization in

which he did not receive the antibiotics. He was then returned to the correctional facility for 48 hours, in which he alleged he did not receive any antibiotics. *Id*. Miszler was then released on medical furlough and filled the prescription on his way home. *Id*. Two weeks later, possible signs of infection were noted and Miszler was ultimately readmitted to the hospital. *Id*. At trial against the warden of the correctional facility on a § 1983 claim, Miszler offered the expert testimony of Dr. Metzger. *Id*. Dr. Metzger was unable to testify that the infection would have been avoided had the correctional facility administered the antibiotics, testifying instead that it was "reasonable to assume that the appropriate administration of antibiotics would have minimized the likelihood of . . . infection." *Miszler*, 2009 WL 790139 at *3.

Then-District Court Judge Vanaskie granted the defendant warden's motion for judgment as a matter of law and subsequently denied Plaintiff's motion for a new trial. *Miszler*, 2009 WL 790139 at *2. Judge Vanaskie concluded that

> [t]he evidence in this case was not sufficient to enable a jury to determine that Warden Brennan's alleged deliberate indifference to Mr. Miszler's serious medical need was a proximate cause of the infection that first manifested itself more than two weeks after Mr. Miszler's release from custody. Civil rights liability may not be based upon conjecture or speculation. Furthermore, Dr. Metzger's testimony did not establish a proper foundation for a causation finding under Pennsylvania law. Under these circumstances, the entry of judgment as a matter of law was fully warranted . . . .

*Id*. at 6. Here, the County argues that Dr. Roskes's testimony at trial would be "speculative," (Doc. 156 at 8), and thus that this Court should follow *Miszler* and refuse to submit the case to a jury.

28

The County misapplies *Mizsler* to this case, which is factually distinguishable in important respects. Dr. Metzger was unable to localize the source of Miszler's troubles to the failure to administer antibiotics in the jail, rather than to the lapse in antibiotics at the hospital or to events in the two weeks between his release and signs of infection, all of which Judge Vanaskie recognized. *Id.* at *6. Here, Dr. Roskes has opined and testified repeatedly that a cluster or chain of events of inadequate medical care at MCCF caused Barbaros to commit suicide. (*See, e.g.*, Roskes Deposition, Doc 161, Ex. 1 at 41-42, 44, 70). He has also identified Defendant Thomas as a critical piece of the proverbial puzzle of Mr. Barabaros's suicide, identifying the "higher than recommended dose" of Paxil prescribed by Defendant Thomas as the "the precipitant" to Mr. Barbaros's suicide. *Id.* at 41. Kathryn Wild has also identified the individual PrimeCare Defendants as integral actors in the medical care, or lack thereof, administered to Barabaros prior to his suicide, describing it as "a downward spiral." (Wild Report, Doc. 138, Ex. 5 at 33). There is a difference between an expert acknowledging that a defendant's conduct may have had nothing to do with a plaintiff's injury (*Miszler*) and an expert's inability to explain the precise way in which each part of a series of events created and contributed to a suicidal mental state. Furthermore, Judge Vanaskie entered judgment against Miszler as a matter of law after the close of Dr. Metzger's testimony *at trial*. At that point, Miszler had had full opportunity to lay the foundation for Dr. Metzger's testimony and to convince the Court of its relevance to the

case.[16] As such, the differences between the facts and posture of *Miszler* persuade this

Court that *Miszler* is not a basis for granting summary judgment to Monroe County. Plaintiffs

have raised triable issues of fact as to whether Monroe County's actions in administering its

contract with PrimeCare Medical, Inc. subject it to § 1983 liability and causation is simply

one of those issues.[17]

## B. State Law Claims:

### 1. Negligence (Count IV), Wrongful Death (Count V), and Survival Action (Count VII)

In their Amended Complaint (Doc. 43), Plaintiffs allege that Monroe County is liable

for negligent actions or inactions of PrimeCare's employees and contractors on the basis of

*respondeat superior* (Count IV). (Doc. 43 at 17-18). They further allege that all remaining

County Defendants – Monroe County, Defendant Asure, and Defendant Haidle – are liable

under their wrongful death (Count V) and survival action (Count VI) claims. *Id.* at 18-20. The

---

[16] To the extent the County holds the view that Dr. Roskes lacks the requisite qualifications to offer expert opinion testimony under Federal Rules of Evidence 702 and 703, that issue has not been raised. Furthermore, the Court notes that nothing in the record supports a finding that Dr. Roskes is not qualified to offer such an opinion.

[17] Additionally, application of *Miszler* to the federal § 1983 claim in this case is far from required. While a Middle District case, *Miszler* itself is not controlling authority in the Middle District. And, while *Miszler* was a § 1983 case, much of the analysis in it centers upon questions of Pennsylvania *state* law and the requirement in state law medical negligence cases of expert testimony on the issue of causation offered "to a reasonable degree of medical certainty." *Miszler* does go on to state that "a § 1983 plaintiff may only recover damages for injuries that would not have occurred "but for" the alleged wrongful conduct." *Id.* at *5. Judge Vanaskie notes that "independent research [at the time] has not identified any controlling authority from the Court of Appeals for the Third Circuit" with respect to the causation standard in Eighth Amendment deliberate indifference cases and cites only persuasive authority for the proposition that but-for causation is required. *Id.* As a matter of law, it is not clear that a but-for causal relationship is necessary for Plaintiffs to prevail in this case and the Court declines to adopt such a standard. *See Heath v. Shannon*, 442 F. App'x 712, 715 (3d Cir. 2011) (remarking that the "'causal relationship' theory" relied upon in medical defendant's summary judgment motion "was based on two not precedential district court cases" [*Miszler* and *Walthour v. Tennis*, No. 06–0086, 2009 WL 2957742 (M.D. Pa. Sept.9, 2009)]).

County Defendants argue in response that they are immune from suit under the Political

Subdivision Tort Claims Act ("PSTCA"), 42 Pa. Cons. Stat. Ann. § 8541, *et seq.* (West).

(Doc. 129 at 23). Pursuant to the PSTCA, a local agency cannot be held "liable for any

damages on account of any injury to a person or property caused by any act of the local

agency or an employee thereof or any other person." 42 Pa. Cons. Stat. Ann. § 8541

(West). The Act provides for eight exceptions to this rule: (1) vehicle liability; (2) care,

custody or control of personal property; (3) real property; (4) trees, traffic controls and street

lighting; (5) utility services facilities; (6) streets; (7) sidewalks; and (8) care, custody or

control of animals. 42 Pa. Cons. Stat. Ann. § 8542(b) (West). Additionally,

> [m]unicipal employees . . . are generally immune from liability to the same
> extent as their employing agency, so long as the act committed was within the
> scope of the employee's employment. 42 Pa. Cons.Stat. § 8545. However,
> there is an exception to this general rule: Employees are not immune from
> liability under § 8545 where their conduct amounts to "actual malice" or "willful
> misconduct".

*Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006). The Pennsylvania Supreme Court has

recognized willful misconduct as requiring a demanding level of fault. *Id.* "Willful misconduct

has been defined by the Pennsylvania Supreme Court as 'conduct whereby the actor

desired to bring about the result that followed or at least was aware that it was substantially

certain to follow, so that such desire can be implied.'" *Id.* (quoting *Renk v. City of Pittsburgh*,

641 A.2d 289, 293 (Pa. 1994)). "Otherwise stated, 'the term "willful misconduct" is

synonymous with the term "intentional tort."'" *Id.*

31

As pled in Plaintiffs' Amended Complaint (Doc. 43), the conduct upon which Plaintiffs' wrongful death claim (Count V) rests are the "negligent acts and/or omission of defendants resulting in Mr. Barbaros' death . . . ." (Doc. 43 at 18). The conduct upon which the survival claim (Count VI) is premised is also described by Plaintiffs as "the defendants' negligence." *Id.* at 19. Thus, Plaintiffs' wrongful death and survival claims are predicated solely on a theory of negligence. The facts of this case, however, dictate a finding that any potential negligence that occurred in this case falls plainly outside of the eight enumerated exceptions to the PTSCA. *See* 42 Pa. Cons. Stat. Ann. § 8542(b) (West). Thus, as a matter of state law, Monroe County is immune from liability for any of its own or its employees' "negligent acts and/or omissions" in this case and is entitled to summary judgment with respect to Plaintiffs' wrongful death and survival claims. *Id.* Likewise, Monroe County is also entitled to summary judgment in its favor on Plaintiffs state law negligence/*respondeat superior* claim (Count IV).

Under the PSTCA, Defendants Asure and Haidle are liable "only to the same extent as [their] employing local agency." 42 Pa. Cons. Stat. Ann § 8545 (West). The PTSCA does abrogate official immunity for willful misconduct, as described in 42 Pa. Cons. Stat. Ann. § 8550 (West), but as Counts V and VI are predicated solely on a negligence theory, this provision of the PTSCA has no effect on the analysis here. Defendants Asure and Haidle are entitled to summary judgment with respect to Plaintiffs' wrongful death and survival claims because those claims are predicated on a negligence theory and the conduct at

issue in this case does not fall into one of the eight enumerated exceptions to the PSTCA. *See* 42 Pa. Cons. Stat. Ann. § 8542(b) (West). Plaintiffs have not sued Defendants Asure and Haidle for state law negligence under Count IV. (Doc. 43 at 17-18).

## 2. Intentional Infliction of Emotional Distress (Count II)

Plaintiffs allege in their Amended Complaint that "the correctional officer defendants and medical defendants intentionally inflicted emotional distress upon Mr. Barbaros." (Doc. 43 at 16). By the very nature of the tort, it is a claim of willful misconduct, and would thus operate to deprive these Defendants of immunity under the PSTCA. Assuming that the allegations of the tort of IIED are synonymous with an allegation of willful misconduct, such that Asure and Haidle are alleged to have acted with "actual malice" or "willful misconduct", thereby preventing immunity from attaching, for Plaintiff to prevail on her claim for intentional infliction of emotional distress, she must show that the conduct of these Defendants was "intentional, outrageous or extreme conduct" and caused Barbaros severe emotional distress. *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005). "Outrageous or extreme conduct has been defined by the appellate courts of this Commonwealth as conduct that is so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Id.* (internal quotation marks omitted). "With regard to the element of outrageousness, it is for the court to determine in the first instance whether the

defendant's conduct may reasonably be regarded as so extreme and outrageous to permit

recovery." *Id.* at 1231.

> Cases which have found a sufficient basis for a cause of action of intentional
> infliction of emotional distress have . . . presented only the most egregious
> conduct *See[,] e.g., Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970)
> (defendant, after striking and killing plaintiff's son with automobile, and after
> failing to notify authorities or seek medical assistance, buried body in a field
> where discovered two months later and returned to parents (recognizing but
> not adopting section 46)); *Banyas v. Lower Bucks Hospital*, 293 Pa.Super.
> 122, 437 A.2d 1236 (1981) (defendants intentionally fabricated records to
> suggest that plaintiff had killed a third party which led to plaintiff being indicted
> for homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3d
> Cir. 1979) (defendant's team physician released to press information that
> plaintiff was suffering from fatal disease, when physician knew such
> information was false).

*Hoy v. Angelone*, 720 A.2d 745, 754 (1998). Furthermore, a plaintiff must demonstrate

physical injury or harm to sustain a cause of action for intentional infliction of emotional

distress. *Fewell v. Besner*, 664 A.2d 577, 582 (1995) (citing *Kazatsky v. King David Mem'l*

*Park, Inc.*, 527 A.2d 988, 995 (1987) ("Those truly damaged should have little difficulty in

procuring reliable testimony as to the nature and extent of their injuries . . . . [A]t the very

least, existence of the alleged emotional distress must be supported by competent medical

evidence.")); *Crivellaro v. Pennsylvania Power and Light Co.*, 491 A.2d 207 (1985) (finding

that symptoms of depression, nightmares, anxiety requiring psychological treatment, and

. . . ongoing mental, physical and emotional harm sufficiently stated physical manifestations

of emotional suffering to sustain a cause of action).

Plaintiffs in this case have failed to put forth sufficient evidence from which a reasonable jury could conclude that Defendants Asure or Haidle's conduct rises to the requisite level of "outrageous or extreme." While the factual evidence in the record suggests that Asure and Haidle could have performed each of their respective jobs differently, or perhaps better, than they actually did, this is not enough for the Court to find that their conduct may reasonably be considered so outrageous or extreme as to permit recovery at trial.

### 3. Conspiracy (Count II)

The conspiracy claim contained within Count II of Plaintiffs' Amended Complaint is the only count, or portion of a count, left as to Defendants Asure and Haidle. To the extent that Plaintiffs allege a conspiracy under § 1983, their claim must fail. Section 1983 is not an independent source of substantive rights, but "provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996). "[Section] 1983 does not provide a cause of action *per se* for conspiracy to deprive one of a constitutional right. Without an actual deprivation, there can be no liability under § 1983." *Holt Cargo Sys. Inc., v. Delaware River Port Auth.*, 20 F. Supp. 2d 803, 843 (E.D. Pa. 1998). To the extent Plaintiffs are alleging a conspiracy under state law, their claim also must fail. Like conspiracy under § 1983, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act" under state law. *McKeeman v. Corestates Bank, N.A.*, 751 A.2d 655, 660 (Pa. Super. Ct.

2000) (quoting *Pelagatti v. Cohen*, 536 A.2d 1337, 1342 (Pa. Super. Ct. 1987). Because the only remaining claims against Defendants Asure and Haidle are for conspiracy (Count II), and because a conspiracy count cannot stand alone as a cause of action under § 1983 or state law, the Court will grant Defendants' motion for summary judgment with respect to Asure and Haidle on the conspiracy claim (Count II) and will dismiss them as parties from the case.

## V. CONCLUSION

Based on the foregoing, the County Defendants' motions for summary judgment will be denied in part and granted in part.

A separate Order follows.

Robert D. Mariani
United States District Judge