## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PETER PONZINI, ESQUIRE and    :
MIRYEM BARBAROS, as    :
Co-Administrators of the Estate of    :
Mumun Barbaros, Deceased,    :
    :
    Plaintiffs,    :
    v.    :    3:11-CV-00413
    :    (JUDGE MARIANI)
PRIMECARE MEDICAL, INC, et al.,    :
    :
    Defendants.    :

## MEMORANDUM OPINION

# TABLE OF CONTENTS

I.      INTRODUCTION AND PROCEDURAL HISTORY ...................................................................2

II.     STATEMENT OF FACTS ...........................................................................................................5

    A.  PrimeCare Medical, Inc. ......................................................................................................5

    B.  March 18, 2009 – March 22, 2009 .....................................................................................13

        1.   Paul James..............................................................................................................13

        2.   Patricia Bauer .........................................................................................................16

        3.   Christina Rowe .......................................................................................................19

        4.   Wendy Johnson.......................................................................................................22

        5.   Grace Ramos ...........................................................................................................25

        6.   Dr. Alex Thomas .....................................................................................................28

        7.   William Buffton ......................................................................................................31

        8.   Correctional Officers Cleary and Ryan ..................................................................34

    C.  Expert Witnesses ................................................................................................................36

        1.   Kathryn Wild ..........................................................................................................36

        2.   Dr. Peter Breggin ....................................................................................................40

        3.   Dr. Lorne Sheren ....................................................................................................43

        4.   David Hopkins .........................................................................................................44

        5.   Terry Fillman ..........................................................................................................45

        6.   Dr. Lawrence Mendel ..............................................................................................49

        7.   Dr. Lawrence Guzzardi............................................................................................51

        8.   Dr. Cheryl Wills ......................................................................................................52

        9.   Dr. Susan Rushing ..................................................................................................56

III.    STANDARD OF REVIEW........................................................................................................59

    A.  Motion for Judgment as a Matter of Law ...........................................................................59

    B.  Motion for a New Trial; Remittitur ....................................................................................62

IV.     MOTION FOR JUDGMENT AS A MATTER OF LAW ........................................................64

    A.  42 U.S.C. § 1983 – Adequate Medical Care .......................................................................64

        1.   The Individual PrimeCare Defendants....................................................................65

            a.   Paul James..................................................................................................75

            b.   Patricia Bauer.............................................................................................80

|   |   | c. | Christina Rowe ................................................................ 84 |
|   |   | d. | Grace Ramos ................................................................... 90 |
|   |   | e. | The Individual PrimeCare Defendants Did Not Violate Mr. Barbaros' Constitutional Right To Adequate Medical Care ................................................. 94 |
|   | 2. |   | Dr. Alex Thomas ........................................................................ 99 |
|   | 3. |   | PrimeCare Medical, Inc. ............................................................ 108 |
|   |   | a. | PrimeCare's Policy, Practice, or Custom ................................ 111 |
|   |   |   | i. Failure to Adopt Needed Policy ............................ 113 |
|   |   |   | ii. Failure to Train/Supervise ................................. 115 |
|   |   | b. | Section 1983 Causation ............................................... 122 |
|   | 4. |   | Conditional Ruling on Motion for New Trial .............................. 124 |
| B. | Negligence ........................................................................................ 126 |
|   | 1. |   | The PrimeCare Defendants ......................................................... 127 |
|   | 2. |   | Dr. Alex Thomas ........................................................................ 138 |
| C. | Punitive Damages ........................................................................... 142 |
| V. | MOTION FOR NEW TRIAL ............................................................... 154 |
| A. | The PrimeCare Defendants ............................................................. 154 |
|   | 1. |   | Jury Instructions ....................................................................... 158 |
|   |   | a. | Negligence *Per Se* Jury Instruction and Argument ................... 158 |
|   |   | b. | Direct Causation and Increased Risk of Harm ......................... 167 |
|   |   | c. | Unpreserved Claims of Error ........................................... 172 |
|   |   |   | i. Inconsistent Verdicts ........................................ 173 |
|   |   |   | ii. Double Recovery .............................................. 175 |
|   |   |   | iii. Vicarious Liability – Punitive Damages .................. 177 |
|   | 2. |   | Evidentiary Rulings .................................................................. 183 |
|   |   | a. | The Criminal Charges Filed Against Barbaros ......................... 183 |
|   |   | b. | Preclusion of Alleged Statement Made to Correctional Officer Ryan .................... 190 |
|   |   | c. | Permitting Evidence of the Misspelling of Mr. Barbaros' First Name ..................... 195 |
|   |   | d. | Permitting Mumtaz Barbaros to Testify ................................ 199 |
|   |   | e. | Preclusion of Testimony Regarding Alleged Misconduct of Correctional Officer Jesse Cleare ................................................................. 205 |
|   |   | f. | Unpreserved Claims of Error ........................................... 206 |

   3.  Weight of The Evidence ............................................................................................208

     a. The Individual PrimeCare Defendants...........................................................210

     b. William Buffton ............................................................................................222

     c. PrimeCare Medical, Inc...............................................................................224

       i.  Respondeat Superior .......................................................................225

       ii.  Liability for Negligence of Independent Contractors ...................225

       iii. Corporate Negligence......................................................................231

 B. Dr. Alex Thomas ...................................................................................................................237

  1.  Permitting Dr. Breggin to Testify ..............................................................................238

  2.  Failure to Include Agency Question on Verdict Sheet ............................................244

  3.  Weight of the Evidence ...........................................................................................246

VI.  MOTION FOR NEW TRIAL – DAMAGES/REMITTITUR .......................................................249

 A. Wrongful Death Damages ...................................................................................................251

 B. Survival Action Damages.....................................................................................................256

 C. New Trial – Compensatory Damages .................................................................................259

VII.  MOTION FOR DELAY DAMAGES ........................................................................................259

VIII.  CONCLUSION .......................................................................................................................267

**THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PETER PONZINI, ESQUIRE and** | : | |
| **MIRYEM BARBAROS, as** | : | |
| **Co-Administrators of the Estate of** | : | |
| **Mumun Barbaros, Deceased,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **3:11-CV-00413** |
| | : | **(JUDGE MARIANI)** |
| **PRIMECARE MEDICAL, INC, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

**<u>MEMORANDUM OPINION</u>**

Presently before the Court are several post-trial motions filed by Defendants PrimeCare

Medical, Inc., Paul James, Patricia Bauer, Christina Rowe, Wendy Johnson, and Grace

Ramos (collectively, the "PrimeCare Defendants") and Dr. Alex Thomas ("Dr. Thomas").

(Docs. 354, 366). The Court notes at the outset that its decisions stated in this opinion were

arrived at with little assistance from the submissions of the parties. In particular, the

submissions of the PrimeCare Defendants and Dr. Thomas were consistently made without

citations to the record and in many instances without supporting arguments or references to

the applicable law. Nevertheless, and for the reasons set forth below, the PrimeCare

Defendants and Dr. Thomas' motions will be granted in part and denied in part.

# I.  INTRODUCTION AND PROCEDURAL HISTORY

This case arises from the circumstances surrounding the death of Mumun Barbaros, a pretrial detainee at the Monroe County Correctional Facility (the "MCCF").  Plaintiffs Peter Ponzini and Miryem Barbaros, as Co-Administrators of the Estate of Mumun Barbaros ("Plaintiffs"), commenced this action on March 3, 2011 pursuant to 42 U.S.C. § 1983 and Pennsylvania's Wrongful Death and Survival statutes, 42 PA. CONS.STAT.ANN. §§ 8301, 8302.  (Doc. 1).  The amended complaint alleged that the PrimeCare Defendants, Dr. Thomas, and Monroe County and various County officials violated Mr. Barbaros' Fourteenth Amendment right to adequate medical care.  The amended complaint also alleged, *inter alia*, that the PrimeCare Defendants and Dr. Thomas were negligent in their treatment of Mr. Barbaros, and that their negligence caused Mr. Barbaros' death.  (Doc. 43).

Following the conclusion of discovery, the PrimeCare Defendants, Dr. Thomas, and Monroe County moved for summary judgment.  The Court granted in part and denied in part the motions.  (Docs. 174, 176, 178).

An eight day jury trial was held September 6, 2016 through September 15, 2016.[1]  At the close of Plaintiffs' case-in-chief, the PrimeCare Defendants orally moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) on Plaintiffs' § 1983 claim, arguing that there was insufficient evidence as a matter of law to find any of the PrimeCare

---

[1] One week before trial, Defendant Monroe County settled with Plaintiffs.  (Doc. 305).  After the parties informed the Court of the settlement, it issued an Order directing the parties to present their positions as to whether Monroe County should remain on the verdict sheet or caption.  (Doc. 307).  The parties stipulated that Monroe County "should not be identified in the caption on the verdict slip and should not be named in the body of the verdict slip."  (Doc. 308).

Defendants liable. Defendant Paul James moved pursuant to Rule 50(a) and sought a directed verdict on Plaintiffs' negligence claim. Dr. Thomas also moved for judgment as a matter of law on Plaintiffs' § 1983 claim. The Court deferred ruling on the motions.

At the close of the evidence, the PrimeCare Defendants, Paul James, and Dr. Thomas renewed their motions and the Court again deferred ruling on the motions. The day after the closing of the evidence and the charge conference, but before the case was submitted to the jury, PrimeCare Medical Inc. ("PrimeCare") moved for judgment as a matter of law, seeking dismissal of Plaintiffs' claim for punitive damages. The Court deferred ruling on the motion and the case was submitted to the jury.

The jury returned a verdict in favor of Plaintiffs, finding that Dr. Thomas and the PrimeCare Defendants, with the exception of Wendy Johnson, violated Mr. Barbaros' Fourteenth Amendment right to adequate medical care and that these deprivations caused him harm. The jury awarded compensatory damages in the amount of $1,057,344 and apportioned liability as follows: 7% to Paul James, 7% to Patricia Bauer, 7% to Christina Rowe, 7% to Grace Ramos, 20% to Dr. Alex Thomas, and 52% to PrimeCare.

The jury also found that the PrimeCare Defendants and Dr. Thomas were negligent, and that each of the Defendants' negligence was a factual cause of Mr. Barbaros' death. The jury awarded compensatory damages in the amount of $2,000,000 under the Wrongful Death Act and $800,000 under the Survival Act. The jury found that 4% of the causal negligence was attributable to Paul James, Patricia Bauer, Christina Rowe, Grace Ramos,

and Wendy Johnson each (for a total of 20%), 5% attributable to William Buffton, 20% to Dr. Alex Thomas, and 55% to PrimeCare.[2]  The jury also imposed $8,000,000 in punitive damages against PrimeCare on Plaintiffs' negligence claim only.  On September 16, 2016 the Court entered judgment in the total amount of $11,857,344.  (Doc. 338).

The PrimeCare Defendants subsequently filed various post-trial motions.  (Doc. 366). Specifically, the PrimeCare Defendants renewed their motions pursuant to Rule 50(b), asserting that the evidence presented at trial was insufficient, as a matter of law, for a reasonable jury to find any of them liable under § 1983.  PrimeCare also claimed there was insufficient evidence, as a matter of law, for the jury to award punitive damages. Additionally, the PrimeCare Defendants alleged that the evidence presented at trial was insufficient, as a matter of law, for a reasonable jury to find each of them liable for negligence. In the alternative, the PrimeCare Defendants requested a new trial pursuant to Federal Rule of Civil Procedure 59 and/or remittitur.[3]

---

[2] On June 23, 2011, Plaintiffs filed an amended complaint naming William Buffton as a defendant. (Doc. 43).  The summons was issued to Mr. Buffton on July 24, 2013, (Doc. 78), and service was effected on August 1, 2013, (Doc. 79) – 771 days after Plaintiffs filed their Amended Complaint.  Mr. Buffton subsequently filed a motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(4) and 12(b)(5). (Doc. 82).  The Court found that Plaintiffs had failed to demonstrate good cause for their failure to effectuate service nearly two years after the deadline set forth in Federal Rule of Civil Procedure 4(m). Although dismissing Mr. Buffton as a defendant would constitute a dismissal with prejudice due to the expiration of the statute of limitations, the Court could find "no cases in this Circuit or elsewhere in which delay of anything approximating 771 days was excused solely on the basis of a resulting expiration of the statute of limitations when the serving Plaintiff was represented by counsel."  (Doc. 102, at 6).  The Court thus granted Mr. Buffton's motion and dismissed him from the case.

[3] On November 17, 2016, PrimeCare, as principal, and Ironshore Indemnity, Inc., as surety, posted a supersedeas bond in the amount of $13,303,050.  (Doc. 367).

Dr. Thomas also sought post-trial relief. (Doc. 354). He renewed his motion for judgment as a matter of law on Plaintiffs' § 1983 claim and also filed a Rule 50(b) motion with respect to the negligence claim. Alternatively, Dr. Thomas requested a new trial and/or remittitur.

## II.   STATEMENT OF FACTS

In the early morning hours of Wednesday March 18, 2009, Mr. Barbaros was arrested and transported to the MCCF, a correctional facility in Monroe County, Pennsylvania, housing approximately 350 inmates. He was held in the segregated housing unit without a cellmate and confined to his cell 22 hours per day. On the morning of March 22, 2009, Mr. Barbaros was found dead in his cell. An autopsy was performed and a fifteen centimeter long object consisting of tightly rolled remnants of a t-shirt that had been fabricated into the shape of a tubular plug was found wedged in Mr. Barbaros' posterior oropharynx. The cause of death was listed as "choking on a foreign object" and "suicide".

### A.  PrimeCare Medical, Inc.

PrimeCare is a for-profit corporation that contracts with state and local governments to provide correctional healthcare services, including nursing, physician, and mental health services. Sept. 8, 2016 Trial Tr. at 91:16-94:24. It was incorporated in Pennsylvania and provides services throughout Pennsylvania, Maryland, New Hampshire, New York and West Virginia. *Id.* at 99:5-22. It was founded by Dr. Carl Hoffman, PrimeCare's Corporate Medical Director and former President. Dr. Hoffman and his wife, who also serves as

Executive Vice President, are the sole shareholders. In 2009, approximately 1200 employees and/or independent contractors worked for or on behalf of PrimeCare throughout 74 prison facilities. *Id.* at 99:24-12. More than half of all county inmates in Pennsylvania receive their healthcare through PrimeCare. Sept. 15, 2016 Trial Tr. at 85:11-16.

At the MCCF, the only individuals who can determine whether an inmate will receive medical care are PrimeCare employees or agents. *Id.* at 111:23-112:1. It is PrimeCare's responsibility to supervise its employees and agents to ensure that they are complying with its policies and procedures. *Id.* at 128:25-129:3.

Todd Haskins is the Vice President of Operations for PrimeCare. *Id.* at 101:1-9. In that capacity, he has "clinical oversight and operational oversight" over Central and Eastern Pennsylvania and Maryland. *Id.* Among his responsibilities, he writes and reviews PrimeCare's policies and procedures annually.[4] *Id.* at 102:3-103:6. Mr. Haskins "did not have absolute operational oversight" at the MCCF but "did oversee the facility." *Id.* at 101:8-12; 103:7-10. He was not, however, involved in the day-to-day care provided to inmates at the MCCF. *Id.* Rather, Dr. Deborah Wilson, PrimeCare's Medical Director at the MCCF,

---

[4] Plaintiffs presented little, if any, evidence of PrimeCare's corporate structure. In 2009, Mr. Haskins was "two levels from the top of PrimeCare" – below President and Corporate Medical Director Dr. Carl Hoffman and Mrs. Hoffman, PrimeCare's Executive Vice President. On the same level as Mr. Haskins were several unidentified Vice Presidents. Defendants elicited testimony that serving beneath Mr. Haskins were various Junior Vice Presidents and, beneath the Junior Vice Presidents were Regional Managers. Sept. 8, 2016 Trial Tr. at 102:1-103:19. Finally, beneath the Regional Managers were the Medical Directors and Health Services Administrators (*i.e.*, Dr. Deborah Wilson and Wendy Johnson). *Id.* It is the Medical Directors and Health Services Administrators who are in charge of the medical treatment and day-to-day operations of the facilities.

and PrimeCare's Health Services Administrator Wendy Johnson were responsible for day-to-day operations.  *Id.* at 102:16-19.

Dr. Wilson has been employed by PrimeCare since 2005.[5]  *Id.* at 71:21-22.  She is the Medical Director at the MCCF and at Schuylkill and Pike County Correctional Facilities.  *Id.* at 72:23-73:1.  In 2009, Dr. Wilson was the only medical doctor at the MCCF.  *Id.* at 78:17-79:1.  As the Medical Director and the only medical doctor at the MCCF, she treated patients once a week from 9:00 a.m. to 1:15 p.m.  *Id.* at 78:17-80:10.  If she did not get through the list of patients to see she would not stay to finish.  *Id.*  The nursing staff at the MCCF complained to PrimeCare about the lack of physicians in the facility and the need for a doctor to be present more than four hours per week.  *Id.* at 12:23-16:4.

Dr. Wilson testified that her role as Medical Director "pretty much" involves nothing other than being a physician.  *Id.* at 73:2-8.  She does not attend any meetings, does not participate in quarterly meetings with the warden, and does not participate in death summaries or mortality reviews.  *Id.* at 73:9-16.  None of the medical staff at the MCCF report to her and she does not consider herself to be anyone's supervisor or boss.[6]  *Id.* at 74:21-75:6.  Rather, it is the responsibility of Wendy Johnson, a licensed practical nurse

---

[5] Dr. Wilson was initially a named Defendant in this case.  On the first day of the trial, however, the parties stipulated to the dismissal of all claims against her.

[6] In 2009, PrimeCare also employed a Physician's Assistant at the MCCF, Jennifer Mroz.  Ms. Mroz, like Dr. Wilson, came into the MCCF once per week.  The Court previously noted on summary judgment that there was a dispute of fact of whether Dr. Wilson was directly involved in Mr. Barbaros' care and, if not, whether she functioned in a supervisory capacity "in accordance with applicable state regulations."  (Doc. 175, at 14 n.11) (citing 49 Pa. Code § 18.151).

("LPN") and PrimeCare's Health Services Administrator, to supervise the nursing staff at the MCCF. *Id.* at 90:4-10.

Dr. Wilson is not involved in the creation or implementation of PrimeCare's policies and procedures. *Id.* at 75:11-76:8. Rather, PrimeCare sends her the policies and procedures it wants implemented at each facility and then she signs off on the policies and procedures, on behalf of PrimeCare, without reading them in any detail. *Id.* She testified that she signs whatever PrimeCare wants her to sign and implements whatever PrimeCare wants her to implement. *Id.* at 77:13-16. Dr. Wilson could not recall ever speaking with any individual at PrimeCare's corporate offices regarding policies and procedures. *Id.* at 76:12-18. She acknowledged that, in 2009, for individuals like Mr. Barbaros who arrived at the MCCF on a Wednesday, the first time they would have been able to see a doctor or a physician's assistant would be the following Monday – five days later. *Id.* at 79:11-17.

Wendy Johnson is a LPN and PrimeCare's Health Services Administrator at the MCCF. She has been employed by PrimeCare since 2002. Mrs. Johnson was hired by Todd Haskins, who is both a Registered Nurse ("RN") and PrimeCare's Vice President of Operations. Mr. Haskins was Wendy Johnson's supervisor but he was not involved in day-to-day operations or medical care. Wendy Johnson's responsibilities included, among other things, acting as the liaison between PrimeCare's medical department at the MCCF and Monroe County. *Id.* at 162:19-22; Sept 7, 2016 Trial Tr. at 165:20-166:24. She was also responsible for training and supervising the nursing staff, quality assurance, and the overall

workings of the medical department at the MCCF.  Sept. 8, 2016 Trial Tr. at 165:15-166:24.

PrimeCare trains its nursing staff in various areas, including suicide prevention, recognition

of withdrawal, and National Commission on Correctional Healthcare ("NCCHC") standards,

among other things.  All of the nurses employed by PrimeCare at the MCCF were LPNs.  *Id.*

at 162:19-22.

There are important distinctions between a LPN and a RN.  A LPN is qualified to

undertake "the performance of selected nursing acts under the direction of a Licensed

Professional Nurse, a Licensed Physician, or Licensed Dentist which do not require

specialized skill, judgment and knowledge required in Professional Nursing."  *Id.* at 155:9-

158:2.  In contrast, a RN, also known as a Licensed Professional Nurse, "assesses human

responses and plans, implements, and evaluates nursing care for individuals."  *Id.* at

149:10-150:11.  In order to become a RN, an individual is required to engage in more

training and schooling than a LPN.  *Id.* at 153:23-154:6.  Thus, if an individual is going to

provide nursing care as a LPN, that individual is required to be supervised by either a RN,

licensed physician, dentist, or psychiatrist.  *Id.* at 160:14-18.  At the MCCF, however, a LPN

was supervising other LPNs.

PrimeCare, through independent contractors, also provided psychiatric and mental

health services for inmates at the MCCF.  PrimeCare contracted with Dr. Thomas, a

psychiatrist, to provide psychiatric services to inmates at the MCCF on its behalf.  Sept. 9,

2016 Trial Tr. at 4:1-12.  Dr. Thomas provided on-call psychiatric services and also came

into the facility for a few hours per week every other week.  PrimeCare also contracted with

Forensic Counseling Services to provide psychological services to inmates at the MCCF on

its behalf.  Sept. 8 2016 Trial Tr. at 166:7-11.  William Buffton, a master's level psychologist

and employee of Forensic Counseling Services, was given the title "Mental Health Worker"

by PrimeCare and was at the facility each week for approximately twelve hours.  *Id.* at

166:22-167:2.  Mr. Buffton testified that while working at MCCF he was acting as a

psychologist and providing psychological services to inmates.  As such, he was required to

work under the supervision of a licensed and doctoral level psychologist or psychiatrist.

Sept. 9, 2016 Trial Tr. at 56:10-62:8.  However, he was not supervised by either a licensed

doctoral level psychologist or psychiatrist.  *Id.*  Instead, he was supervised by a Licensed

Social Worker at Forensic Counseling Services.  Mr. Buffton was required to conduct

suicide assessments of patients he met with at the MCCF and had the ability to place

inmates on suicide watch or monitoring, but the decision was not his final call.  *Id.* at 64:24-

65:5.  He did not receive any suicide prevention training from PrimeCare.  *Id.* at 77:12-14.

PrimeCare's policies and procedures mimic the minimum standard of care for a

correctional environmental as set forth by the NCCHC.  Sept. 8, 2016 Trial Tr. at 110:8-14.

These policies and procedures include, among other things, monitoring and suicide watch.

It is a "very easy process" to place an inmate under observation. Sept 8, 2016 at 30:14-31:4

PrimeCare also has policies and procedures for verification of medications, which

provide for four ways a patient's medication can be verified: calling the patient's pharmacy,

contacting the prescribing doctor, calling a family member and asking them to bring in the medication, or if the inmate simply brings the prescriptions with him into the facility. Sept. 8, 2016 Trial Tr. at 116:20-119:13. If a nurse makes only one of these efforts (such as only calling the pharmacy), cannot verify the medication, and makes no attempt to obtain the medication using the alternative methods, he or she has failed to comply with the policies and procedures of PrimeCare. *Id.* at 124:16-23. If a nurse is unable to verify a medication, he or she is required to contact the on-call medical provider to let them make the final determination. *Id.* at 118:25-119:4.

PrimeCare's policies and procedures require that the medical staff must document all efforts to verify medications and provide that medications should be verified by the end of the next business day following admission. *Id.* at 119:8-16. If an individual comes into the MCCF and indicates that he or she takes psychiatric medications, such as Paxil or Prozac, and the nursing staff cannot verify the medication, PrimeCare's policies require the on-call psychiatrist to be called and have the patient placed on the provider line.[7] *Id.* at 119:21-120:21; 124:3-23.

PrimeCare expects that if the nursing staff is unfamiliar with a particular medication or its side effects, the nurse should research the medication. It does not, however, provide any training regarding different types of medications or the impact they have on the body. *Id.* at 126:9-127:23. PrimeCare's policies and procedures also require that all employees and

_____

[7] The provider line "is where the doctor comes in, if one of the nurses or anyone in the building recommends that the patient be seen by a provider, a doctor, a dentist, or psychiatrist." Sept. 7, 2016 Trial Tr. at 193:10-18. It is the nursing staff's responsibility to place a patient's name on the provider line.

agents review a patient's medical file before rendering treatment and completely and accurately fill out medical forms, including documenting when the last time a patient has taken his or her medication. *Id.* at 130:14-17. If information is missing from a patient's intake form and medical chart, the nurses have a duty to investigate and obtain the missing information. *Id.* at 21:8-14.

To ensure adequate supervision of its employees and agents, PrimeCare utilizes a Continuous Quality Improvement ("CQI") program. Sept. 8, 2016 Trial Tr. at 130:14-131:10. In general, CQI consists of pulling approximately 5% of medical charts at random and reviewing those charts to see if there any mistakes the nursing staff is making and, if so, to implement a corrective plan of action. At the MCCF, CQI was Wendy Johnson's responsibility. At the corporate level, PrimeCare also utilizes a "peer review process" where individuals not associated with the facility conduct a mock NCCHC audit. *Id.* at 131:11-17. In addition, approximately every three years the NCCHC sends a team of doctors and nurses to conduct a complete review of the medical department. *Id.* Both the CQI program and the peer review process are the tools PrimeCare utilizes to "know… what's going on in [its] facilities." *Id.* at 131:18-20. When asked about PrimeCare's CQI program, Dr. Wilson testified that nobody from PrimeCare or anywhere else comes into the facility to supervise her work or the work of the physician's assistant. *Id.* at 77:23-78:16. She testified that she believes "there is a quality control that goes on, but I don't really know who does it or when

it's done." *Id.* It is the responsibility of Wendy Johnson, as Health Services Administrator, to oversee the CQI process.

## B.  March 18, 2009 – March 22, 2009

### 1.    Paul James

Shortly after Mr. Barbaros was arrested, Paul James, a LPN employed by PrimeCare at the MCCF, conducted an intake medical screening.  In 2009, Nurse James was the only medical personnel at the MCCF during the overnight shift and testified it was "very busy at night."  Sept. 7, 2016 Trial Tr. at 61:23-62:5.  While conducting the intake, Nurse James made numerous mistakes and violated several policies and procedures.  For example, he listed Mr. Barbaros' first name as "Nunuun" and took no steps to verify the correct spelling of his name.  *Id.* at 32:12-19.  On another form, he spelled Mr. Barbaros' first name as "Munmum."[8]  *Id.* at 45:5-13.  Nurse James indicated on the intake form that Mr. Barbaros was taking the prescription medications Trazodone and Prozac.  He also documented that he had a history of ulcers.  *Id.* at 38:16-41:2.  Mr. Barbaros, however, had been prescribed Paxil, not Prozac.  Because Mr. Barbaros had a history of ulcers, Nurse James placed him on the provider line to see a medical doctor.

---

[8] There are several forms in the intake packet that inform detainees that "PrimeCare Medical, Inc. provides the medical care for this facility."  Sept. 7, 2016 Trial Tr. at 32:20:33:18. Mr. Barbaros signed a form indicating that he understood that medical services were available and being provided by PrimeCare. Nurse James described this process as: "generally, we tell that it's provided by PrimeCare Medical, and that if they need to see medical, they fill out a sick call request, put it in the box marked, Medical, in the unit, and they'll be seen probably the next day, because they're picked up every night, which is another one of my jobs."  *Id.* at 69:2-10.

Nurse James also obtained the name of Mr. Barbaros' prescribing physician, Dr. Richard Katz, as well as the name of the pharmacy where Mr. Barbaros filled his prescriptions – the CVS in Mountainhome.  *Id.* at 39:16-22.  He correctly documented Mr. Barbaros' address, date of birth, and social security number.  *Id.*  Due to the late hour, however, Nurse James could not verify Mr. Barbaros' medications.  *Id.* at 51:3-10.  Instead, he passed the information he collected to the nurse on the morning shift.

Nurse James did not obtain and document all of the information required on the intake form, including whether Mr. Barbaros was a pretrial detainee or sentenced prisoner.  *Id.* at 35:21-36:2.  Although Nurse James noted that Mr. Barbaros was taking psychiatric medications, he did not document why Mr. Barbaros took these medications, the dosages, or the last time he took these medications.  *Id.* at 38:20-39:15; 49:9-50:5.  PrimeCare's policies require that when an incoming patient is taking psychiatric medications, like those taken by Mr. Barbaros, the patient should be placed on the psychologist's list to be seen the next day. *Id.* at 43:19-25.  Nurse James did not place Mr. Barbaros on the "psych list."  *Id.* at 44:7-13.  He acknowledged that, in accordance with PrimeCare's policies and procedures, he should have placed Mr. Barbaros on a list to see a mental health professional the next day.  He testified that he did not know at the time that "our mental health or psychologist was part time."  *Id.* at 43:6-44:10.

During the intake, Nurse James checked Mr. Barbaros' vital signs, which were found to be normal.  *Id.* at 46:15-47:5.  He also completed an intake suicide screening.  *Id.* at 53:13-

21.  Based on Mr. Barbaros' answers to his questions, Nurse James determined that Mr.

Barbaros did not warrant observation.[9]  *Id.* at 53:13-21.  The parties agree that Mr. Barbaros

was not suicidal at the time of the intake.  Sept. 8, 2016 Trial Tr. at 33:24-5.  Nurse James

had no other interactions or involvement in the care of Mr. Barbaros.

At trial, Nurse James testified that he knew it was important to accurately and completely

fill out the intake forms in order to ensure proper medical treatment is rendered to patients.

*Id.* at 29:20-30:10. He acknowledged that if information necessary for diagnosis or treatment

of a patient is missing from an intake form that the nursing staff should investigate.  *Id.* at

31:4-8. He testified that he was aware that if an individual like Mr. Barbaros did not promptly

receive his medications, he could potentially suffer from withdrawal.  *Id.* at 57:11-14.  He

further acknowledged that he knew errors on an intake form can put a patient at risk of

physical harm.  *Id.* at 81:5-17.  Nurse James testified that when an individual comes into the

MCCF with psychiatric issues and on psychiatric medications he considers this a serious

medical need.  *Id.* at 81:5-17.

---

[9] On the suicide assessment Mr. Barbaros scored a total of two points, based on his history of mental health treatment. PrimeCare's policies require that if an individual scores eight points or higher they are placed on monitoring. If a person is showing signs of withdrawal, it is an automatic eight and they will be placed on a watch.  When that happens, most of the individual's clothing would be taken away, he would be placed in a suicide smock, and somebody would check on the inmate every fifteen minutes. Sept. 7, 2016 Trial Tr. at 53:13-66:18.

## 2.     Patricia Bauer

The next person involved in Mr. Barbaros' care was Patricia Bauer.[10]  Nurse Bauer is a LPN and had been working for PrimeCare only for a few months.  She received her nursing degree in 2008 and this was her first permanent nursing job.  She described the training she received from PrimeCare as consisting of shadowing other nurses and learning the job "as you go." *Id.* at 127:4-10.  She could not recall very much, if any, formal training she received from PrimeCare.  *Id.* at 128:6-13.

Using the information communicated to her by Nurse James earlier that day, she made a telephone call to CVS at approximately 2:00 p.m. and attempted to verify Mr. Barbaros' medications.[11]  *Id.* at 134:8-18.  For unknown reasons, Nurse Bauer could not verify Mr. Barbaros' prescriptions.  She testified that she called multiple CVS pharmacies in the area but they were all unable to verify his medications.[12]  She indicated on Mr. Barbaros' medical chart that "CVS denies customer" and "may put on the psych list."  *Id.* at 134:15-18.  Although Nurse Bauer made a notation that "CVS denies customer" she neglected to fill out the section requiring her to state "If not verified, please explain."  *Id.* at 51:25:52:14.

---

[10] Because of a medical issue, Nurse Bauer was unable to testify at trial and was also unable to sit for a videotaped trial deposition.  Instead, the transcript of her discovery deposition was read to the jury.

[11] She described the verification process as: "it's just, call the pharmacy when you get a chance and see if the pharmacy can back them up."  Sept. 7, 2016 Trial Tr. at 137:12-145:13.

[12] Nurse Ramos, however, testified that if you call one CVS, they have a database and would be able to search all of their branches' records.  Therefore, she said there would be no need to call multiple CVS pharmacies.  Sept. 8, 2016 Trial Tr. at 19:24-20:5.

Nurse Bauer placed Mr. Barbaros on the "psych list" to meet with a mental health professional. *Id.* at 134:24-135:6. She did not, however, contact Mr. Barbaros' prescribing physician or call his wife and ask her to bring the medications (despite having this information). *Id.* at 145:25-148:8. Nor did she speak with Mr. Barbaros in an attempt to obtain more information that could assist with the verification of his medications. She also did not contact the on-call psychiatrist. Her acts and omissions violated PrimeCare's policies and procedures.

Nurse Bauer testified that she would never call an inmate's physician for medication verification. *Id.* at 145:146:20. When asked if it was that much extra effort to call the inmate's prescribing physician she testified: "Do we have a phone number for the doctor? Do we have an address for the doctor? Is he even telling the truth? Do I have 15 other intakes that I have to get through and it's 2 p.m. in the afternoon already?" *Id.* at 147:10-21. She said "you do the best you can with the time you have with the amount of inmates you're dealing with." *Id.* at 147:22-148:2.

Nurse Bauer then described her experiences with inmates lying about being on medications and other types of drug seeking behavior. She testified that an inmate seeking an SSRI ("Selective Serotonin Reuptake Inhibitor") medication like Paxil could be among those inmates lying about their medication to obtain mind altering drugs, but did not recall that ever having occurred. *Id.* at 137:12-145:13. When asked whether an individual coming into the MCCF reporting depression and that he or she is taking psychiatric medications

"raises any kind of red flag" she said, "At the jail?  No. So many of them will say that because they want that drug.  They walk in the doors, they say, Hi, you're the nurse, put me on the psych list."  *Id.* at 148:3-8.

Nurse Bauer testified that she knew it was important that complete and accurate information is documented on the intake forms because it affects her ability to verify medications.  *Id.* at 129:17-130:4; 138:4-139:2.  She was also aware that if a patient is without medications, including psychiatric medications like Paxil, there is a possibility that patient can suffer from withdrawal.  When confronted with Nurse James' intake forms she testified:  "I don't know what happened with the man that did this intake, why he would do this.  I'm sure it was just trying to be fast."  *Id.* at 137:13-141:12.  Nurse Bauer's only other involvement in the care of Mr. Barbaros lasted "seconds" when she gave him his Paxil and Lopressor on the morning of March 21.  *Id.* at 130:5-132:12.

On March 19, 2009 (the day after Nurse Bauer attempted to verify Mr. Barbaros' medications), Mr. Barbaros was not seen by any medical staff and there is no record that anyone made an attempt to verify and obtain his medications.  Later that day, he developed a headache and submitted a sick call slip that stated: "I'm experiencing headaches.  Could I get something to relieve the pain?  Also, I have a stomach ulcer.  Would it be possible for me to get something for this as well?"  Rowe Dep. Tr. at 14:14-19.

### 3.    Christina Rowe

At 10:30 a.m. on March 20, 2009, Mr. Barbaros was seen by Christina Rowe, a LPN employed by PrimeCare at the MCCF.[13]  Working for PrimeCare at the MCCF was Nurse Rowe's first nursing job.  *Id.* at 7:6-22.  She, like Nurse Bauer, testified that the extent of the training she received from PrimeCare was being paired with another nurse and following them around.  *Id.*  Nurse Rowe nevertheless testified that she still received "a lot of training" from PrimeCare but did not recall the specifics.  *Id.*  She also did not recall if she received suicide prevention training, but said there "probably was" suicide prevention training.  *Id.* 61:3-24.

Nurse Rowe assessed Mr. Barbaros in response to his sick call request.  She did not, however, review his medical chart prior to performing the assessment and providing treatment.  *Id.* at 16:20-18:3.  Performing an assessment and providing treatment without accessing or reviewing a patient's medical chart is a violation of PrimeCare's policies and

---

[13] Nurse Rowe was unable to testify at trial and her videotaped trial deposition was played to the jury. Before her deposition was played to the jury, the parties had raised, and the Court resolved, several objections. Sept. 7, 2016 Trial Tr. at 148:20-162:15. Due to a mistake arising from oversight or omission, the transcript was never made part of the record in this case.  After becoming aware of the missing transcript, the Court's Courtroom Deputy contacted counsel for Plaintiffs and the Defendants and obtained the missing transcript from both counsel for the Plaintiffs and counsel for Dr. Thomas.

Pursuant to Federal Rule of Civil Procedure 60(a), "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice."  Fed. R. Civ. P. 60(a). Consistent with this authority, the Court will issue a separate Order directing the Clerk of Court to make Nurse Rowe's deposition transcript part of the record in this case in order to correct a mistake arising from oversight or omission found in the record.  *See* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2854 (3d ed. 2017) ("A document that inadvertently was omitted from the record may be added" pursuant to Rule 60(a)) (citing *United States v. Stuart*, 392 F.2d 60 (3d Cir. 1968)).

procedures.  *Id.*  However, Nurse Rowe testified it was "very normal" not to have an inmate's medical file at her disposal while performing sick call assessments.  *Id.* at 19:8-24.  On the assessment forms, Nurse Rowe identified Mr. Barbaros as a "female" and also spelled his name incorrectly. *Id.* at 79:14-89:4. She also made several other mistakes on the forms, and conceded she did not obtain complete and accurate information.  *Id.* at 79:14-80:4.

During the assessment, Mr. Barbaros described his headache to Nurse Rowe as moderate, frontal, and constant and stated that nothing made the pain better.  *Id.* at 22:21-23:4.  Nurse Rowe took Mr. Barbaros' vital signs and noted he had high blood pressure that was clinically significant.  *Id.* at 23:5-16.  Specifically, Mr. Barbaros' blood pressure was 170/105 (a significant increase from his blood pressure at intake).  Nurse Rowe ordered and provided Mr. Barbaros with Acetaminophen 325 mg for his headaches, to be taken twice daily for five days.  *Id.* at 31:18-21.  She, like Nurse James, placed Mr. Barbaros on a list to see a medical provider because of his ulcer.  *Id.* at 32:2-6.  Nurse Rowe acknowledged that when performing an assessment on a patient complaining of a headache and with irregular vital signs, it would be important to know what medications the patient had been taking. She conceded that it would have been helpful if she had Mr. Barbaros' medical files with her at the time of her assessment.  *Id.* at 26:25-28:6.

At 2:00 p.m., Nurse Rowe spoke with Jennifer Mroz, the on-call physician's assistant at the MCCF.  She did not inform Ms. Mroz that Mr. Barbaros claimed he was on medications and they had not been verified.  Ms. Mroz verbally ordered 50 milligrams of Lopressor, a

blood pressure medication, to be given to Mr. Barbaros twice a day for thirty days. *Id.* at 36:6-14. She also ordered daily blood pressure checks for the next five days. *Id.* Nurse Rowe documented this information on Mr. Barbaros' medical chart and would or should have known at this time that his medications had not been verified in over 48 hours. Despite receiving medical orders to check Mr. Barbaros' blood pressure daily, there is no record that his blood pressure was ever checked again by any member of the nursing staff.[14] *Id* at 37:5-15. This, too, was a violation of PrimeCare's policies and procedures. Nurse Rowe acknowledged that if a physician or physician's assistant orders blood pressure checks they must be performed, and that failing to do so puts the patient at risk of harm.[15] *Id.* at 38:24-39:3. She conceded that she took no steps to verify Mr. Barbaros' medications and acknowledged that her failure to do so could put a patient at risk of harm. *Id.* at 41:22-43:5; 47:5-10; 52:20-53:16.

On the afternoon of March 20, 2009, Mr. Barbaros was transported from the MCCF to Court for his arraignment. During the arraignment, he learned he would face additional charges and his bail would be increased. While in court, Mr. Barbaros complained to the Judge that he was not receiving his medications. The Judge asked the police officers escorting Mr. Barbaros back to the MCCF to relay Mr. Barbaros' concerns to the appropriate personnel.

---

[14] It is generally accepted that if a nurse or doctor does not document something on a patient's medical chart, it is considered to have never happened.

[15] It was Nurse Rowe's responsibility to ensure Mr. Barbaros was placed on a list so others would know to check his blood pressure the following day. Rowe Dep. Tr. at 36:3-37:4.

At the arraignment, Howard Frank, a staff reporter for the Pocono Record, observed Mr. Barbaros from the time he arrived in Court until the time he left. *Id.* at 163:8-10. Mr. Frank observed Mr. Barbaros with his shoulders slumped and head down. *Id.* at 163:11-12. He also confirmed that Mr. Barbaros complained to the Judge about not receiving his medications.[16] *Id.* at 163:18-19.

### 4. Wendy Johnson

Mr. Barbaros returned to the MCCF at approximately 5:00 p.m. Shortly after his arrival, Wendy Johnson, a LPN and PrimeCare's Health Services Administrator at the MCCF, was notified that Mr. Barbaros complained about not receiving his medications. *Id.* at 168:1-10. It is Wendy Johnson's responsibility to, among other things, supervise and train the nursing staff on behalf of PrimeCare and act as a liaison between Monroe County and the PrimeCare staff at the MCCF. *Id.* at 165:20-166:24.

Wendy Johnson reviewed Mr. Barbaros' medical chart and saw that his prescriptions had not been verified and was aware that important information was missing from his forms.

---

[16] Plaintiffs served a subpoena on Mr. Frank to testify at trial. Mr. Frank's counsel, as well as counsel for the Defendants, raised objections to his testimony. Sept. 7, 2016 Trial Tr. at 96:1-120:21. Specifically, Mr. Frank's counsel sought to quash the subpoena on the theory that a reporter like Mr. Frank could not, consistent with the First Amendment, be compelled to testify under the circumstances of this case. Counsel for the PrimeCare Defendants and Dr. Thomas, in turn, objected to Mr. Frank's testimony on the grounds that if he was permitted to testify about Mr. Barbaros' demeanor on the day in question, then they should be permitted to introduce video of Mr. Barbaros' "perp walk." The video in question was the subject of a pretrial motion *in limine* filed by Plaintiffs, (Doc. 227), which the Court deferred ruling on. (Doc. 276). The video Defendants sought to introduce showed Mr. Barbaros shackled and in a prison jumpsuit walking into the courthouse as he was being questioned by reporters. The parties eventually reached a stipulation and approximately three sentences of Mr. Frank's testimony were read to the jury. *Id.* at 118:15-120:21. At no time did counsel for the Defendants ever ask the Court to rule on the pending motion, nor did they move to introduce to "perp walk" video into evidence.

She then called Grace Ramos, another LPN employed by PrimeCare at the MCCF, and instructed her to try to verify his medications. *Id.* at 170:10-16. She did not, however, tell Nurse Ramos to report back to her. Nor did she inform Nurse Ramos about the deficiencies in Mr. Barbaros' forms or ask her to obtain the missing information. *Id.* at 179:9-23. Mrs. Johnson acknowledged that after reviewing the medical chart and seeing that Mr. Barbaros' medications had been denied and that no further efforts to verify the medications had been documented, she should have investigated to make sure further efforts were taken to verify the medications.[17] *Id.* at 183:3-9.

Todd Haskins echoed much of Wendy Johnson's testimony. Mr. Haskins is a RN, PrimeCare's VP of Operations, and Wendy Johnson's supervisor. He testified that if Wendy Johnson reviewed Mr. Barbaros' chart and saw that the last time he had taken his medication was unknown, PrimeCare's policies required her to communicate this information to the nursing staff. Sept. 8, 2016 Trial Tr. at 132:22-133:6. Mr. Haskins also testified that, as the nursing supervisor, Wendy Johnson should have investigated the failures of the nursing staff in connection with Mr. Barbaros' treatment. *Id.* at 135:11-23. Despite these obligations, at no time did Wendy Johnson communicate to Nurse Ramos or any other medical provider or member of the nursing staff that there had been a delay in Mr. Barbaros receiving his psychiatric medications. Nor did Mrs. Johnson speak with Mr. Barbaros to inquire into his well-being.

---

[17] Mrs. Johnson testified that, in her experience, calling the pharmacy was the easiest way to verify medications. She testified that calling the inmate's physician was a slow process because they would not release any information without a signed HIPAA form. Sept. 7, 2016 Trial Tr. at 196:8-19.

At trial, Mrs. Johnson testified that it is important to know the last time a patient took his or her medications and the proper dosage because, among other things, it is possible that a patient without their medications could go through withdrawal. She acknowledged that when an intake nurse fails to accurately and completely fill out the intake form they could potentially be putting the patient's safety at risk. *Id.* at 173:2-12; 173:20-23. She testified that she was aware that failure to record this information was a violation of PrimeCare's policies and procedures. *Id.* at 173:13-19. She acknowledged that a nurse performing an assessment of a patient should obtain and review the patient's medical records prior to assessing the patient. *Id.* at 182:6-15. She also conceded that she knew that if medications are denied to a patient, and nothing is done to investigate, then there is a risk that the patient could suffer side effects from being without those medications. *Id.* at 184:7-18.

Wendy Johnson testified that PrimeCare trains its employees and agents on recognition of withdrawal symptoms. *Id.* at 175:19-21. She acknowledged that symptoms such as a headache and high blood pressure could be symptoms of withdrawal. *Id.* at 175:22-25. She also conceded that, when reviewing Mr. Barbaros' records, she would have seen that he had been prescribed Lopressor earlier that day, was suffering from high blood pressure that he did not experience upon intake, and had not received his medications in at least three days. *Id.* at 177:6-10. Despite this knowledge, she did not make any efforts to

investigate, or ask any staff member to research possible side effects of Paxil withdrawal.[18]
*Id.* at 178:19-179:5.

### 5. Grace Ramos

Nurse Ramos was the only member of the medical staff at the MCCF on the evening of March 20, 2009. She testified that she and the other nurses complained to PrimeCare about lack of staffing and that the nurses needed extra help to complete tasks during their shifts. PrimeCare, however, felt that one LPN per shift was appropriate. *Id.* at 12:23-16:4. Nurse Ramos also testified that she and the nursing staff complained to PrimeCare about the lack of physicians in the facility, and that they needed access to a doctor more than four hours per week. *Id.* Specifically, she testified the reasons for the complaints were "because the doctors would come in at the beginning of the week, and by the time they did all the sick calls from Wednesday through the weekend, the nursing staff would have a backlog of patients to see." *Id.* at 16:9-14. She then noted that Dr. Wilson's sick call list "would be around 20 patients or more." *Id.* at 16:15-19. Although they had access to on-call providers, she testified that none of the providers would actually review medical records.[19]

---

[18] Following Mr. Barbaros' death, Mrs. Johnson did not review the mistakes with any of the nursing staff involved in Mr. Barbaros' care. Sept. 8, 2016 Trial Tr. at 206:25- 207:5.

[19] Counsel for the PrimeCare Defendants objected to this line of testimony on several grounds. He noted that any staffing issues are a "product of the contract that is established with Monroe County. Monroe County is actually the one who establishes the level of staffing, because that's what they contract for with PrimeCare. So if there's a complaint about the level of staffing, the complaint should be as to Monroe County, because they're the ones to say, this is level of staffing that we want." Sept. 8, 2016 Trial Tr. at 13:24-14:5.

After receiving a call from Wendy Johnson apprising her of Mr. Barbaros' complaints, Nurse Ramos called CVS pharmacy at approximately 9:35 p.m. on the evening of March 20. Nurse Ramos, using the same information obtained and documented by Nurse James, successfully verified his medications with CVS. She did not review Mr. Barbaros' medical chart and was unaware when he had last taken his medications. *Id.* at 20:23-21:1. Nurse Ramos acknowledged that if she had reviewed the file she would have learned that important information was missing and she would have had a duty to investigate or communicate this information to the medical provider. *Id.* at 21:8-14. She also acknowledged she knew one of the reasons to conduct such an investigation would be to determine whether a patient was suffering from any withdrawal or side effects, and that she should have looked into potential side effects related to abrupt discontinuation of Paxil. *Id.* at 21:23-26:9. She testified, however, that her "main goal was to verify his meds and get it to him as soon as possible." *Id.* at 25:5-7.

After verifying Mr. Barbaros' medications with CVS, Nurse Ramos called Dr. Thomas, an independent contractor and PrimeCare's on-call psychiatrist. She spoke to him over the telephone for approximately one minute. *Id.* at 27:14-19. Nurse Ramos could not recall whether Dr. Thomas asked her to review Mr. Barbaros' medical records, asked her to check the last time he took his medications, or asked about his physical condition and vital signs. *Id.* at 28:2-19.

Nurse Ramos acknowledged that PrimeCare's policies require the medical staff completing intake paperwork to verify the spelling of the patient's name and to take steps to ensure the intake paperwork is fully and completely filled out. She conceded that if a patient says he is taking medications, a nurse must find out when they were last taken and why they were taken. *Id.* at 5:9-23. She also acknowledged that when a nurse does not complete the paperwork properly, they are potentially putting their patient at risk. *Id.* at 6:15-18. Nurse Ramos testified that if a nurse is having trouble verifying a patient's medication with a pharmacy, they could call the patient's physician to verify the medication, but that she never did this. *Id.* at 6:19-7:20.

Nurse Ramos was trained to recognize withdrawal symptoms. She testified that among the symptoms to look for are fluctuations in vital signs. *Id.* at 9:5-10. She acknowledged that signs of withdrawal may include a headache, high blood pressure, and pacing. She said it is the responsibility of the medical staff to recognize someone suffering from withdrawal. *Id.* at 9:16-10:1. Finally, she acknowledged that it is a very easy process to put someone on a watch or under observation and that it is better to err on the side of caution and put someone on watch when in doubt.[20] *Id.* at 30:14-31:4.

---

[20] Nurse Ramos testified about monitoring and suicide policies in place at the MCCF as follows:

> When we get a new commit, based on their charges, their psychiatric history, if they have one, if they score an automatic 8, then, we would put them on level 1 watch. Sometimes we will get a person who will score a level 8, but it's all based on a total of 1 point on the scale, which it could – you easily score an 8, if you're worried about your family, never been in jail before, you're under the influence of drugs or alcohol, all these are 1s and can easily get to a 8, but it doesn't necessarily mean you're suicidal, so we have to take that

### 6.    Dr. Alex Thomas

Upon receiving the call from Nurse Ramos that Mr. Barbaros' prescriptions had been verified by CVS, Dr. Thomas (who had no information about Mr. Barbaros other than the fact his prescriptions had been verified) verbally prescribed Paxil and Trazodone in the same doses he had been prescribed by Dr. Katz, Mr. Barbaros' physician.  Before prescribing the medications, Dr. Thomas did not: (1) ask Nurse Ramos any questions about Mr. Barbaros' condition or history; (2) review his medical charts or ask Nurse Ramos to review his medical charts; (3) ask if Mr. Barbaros had a history of mental illness; (4) ask when Mr. Barbaros had last taken his medications; or (5) ask if Mr. Barbaros was exhibiting any signs or symptoms associated with withdrawal.  Sept . 9, 2016 Trial Tr. at 16:25-18:1; 18:22-19:7; 29:16-32:12.  Dr. Thomas testified that it was his usual practice to speak with the nurse about the medications the inmates were taking and that most of the time he would have asked these questions.  However, his primary and immediate concern was that Mr. Barbaros receive the medications he had been taking prior to his incarceration and then note that he needed to be re-evaluated.  *Id.* at 18:8-18.

---

into consideration. Sometimes a person will deny that they have any psychiatric histories, issues, but their demeanor… or you could get a feeling that something is not quite right, you would put them, either on level 1 or level 2, until they're seen by a mental health provider or psychiatrist.

Sept. 8, 2016 Trial Tr. at 31:5-21. She described level one is a detox watch as "a 15-minute watch, and the inmate is placed in a day room, and they're observed by the corrections officer on the unit every 15 minutes, watch to make sure they're breathing, that they're not agitated, that they're not having difficulty sleeping, things like that, so there are eyes on the unit, and if somebody is throwing up excessively, they'll call and let us know."  *Id.* at 39:5-40:2.

Dr. Thomas acknowledged that he was at fault for neither asking for nor obtaining any information about Mr. Barbaros prior to prescribing him psychiatric medications.  *Id.* at 31:6-7.  He agreed that, as a physician, he had an obligation to investigate to find out why a patient is taking a medication like Paxil and the last time they took the medication prior to prescribing them medication.  *Id.* at 32:24-33:5.  He acknowledged that, in some instances, when a patient has been off their medications for a number of days and the medication has a short half-life (like Paxil), a patient may be exhibiting signs and symptoms of withdrawal.  *Id.* at 33:6-10.

Dr. Thomas acknowledged that he could have come into the MCCF that evening.  However, he did not believe it was necessary because it was not an emergency situation and he was scheduled to come into the MCCF on Sunday.[21]  *Id.* at 39:13-16.  He testified that he could have put Mr. Barbaros on suicide watch or monitoring but that, in his clinical judgment, he did not believe it was necessary.  *Id.* at 49:8-21.  Dr. Thomas acknowledged that he knew nothing about Mr. Barbaros other than that a previous physician had prescribed him Paxil and Trazodone.

At trial, Dr. Thomas acknowledged that certain prescription medications can cause withdrawal and pose a risk of suicide when started or restarted, including Paxil.  *Id.* at 9:16-22.  Specifically, he testified that he was aware that one of the risks of prescribing Paxil is that the drug itself may cause suicidal ideations.  *Id.* at 14:12-18.  He agreed that an

---

[21] Dr. Thomas provided in-person psychiatric services to the inmates at the MCCF once every other week.  Dr. Thomas' partner came into the facility on his off weeks.

individual starting on SSRI medications like Paxil should be monitored and observed closely, *id*. at 14:21-15:3, and that the only way to communicate information about these risks is to speak with the patient or with the patient's family. *Id.* at 15:4-7. However, he stated that because these medications had already been prescribed by someone else he has "to assume that the patient has been educated about the potential side effects and things to watch for." *Id.* at 15:18-19.

When asked by Plaintiffs' counsel whether he was subjectively aware, at the time he prescribed Paxil to Mr. Barbaros, that when starting a patient on medications like Paxil there was a tendency that the patient could become suicidal, Dr. Thomas testified: "[o]nly if somebody is started for the first time, not once it is resumed within a few days, no." *Id.* at 41:14-22; 44:3-8. However, Dr. Thomas acknowledged that because he did not ask for any information about Mr. Barbaros' history, he had no way of knowing how long Mr. Barbaros had been off his medications.

Dr. Thomas acknowledged the importance of early recognition and diagnosis of a deteriorating mental condition, and also acknowledged that early recognition increases the likelihood of avoiding injury to a patient. *Id.* at 21:25-22:8. He testified that without having a complete picture of a patient's background and condition, a doctor would not be in a position to properly evaluate the patient to make a determination as to the proper course of treatment and therapy, and that this could increase the risk of harm to a patient. *Id.* at 24:5-12. Dr. Thomas also testified that, in certain cases, a patient who is incarcerated for the first

time like Mr. Barbaros is at an increased risk of suicide. *Id.* at 24:16-22. He conceded that

when a patient has been off a medication like Paxil for several days or a week there is a

chance of suicide. *Id.* at 26:12-18. Finally, Dr. Thomas acknowledged that he should have

asked how long Mr. Barbaros had been off his medication because certain actions might

need to be taken until the medication is further built up in the patient's system. *Id.* at 44:12-

17. For example, in certain circumstances, the patient should be placed under observation

until Dr. Thomas was able to come into the facility to meet with that patient. *Id.* at 38:8-39:2.

On the evening of March 20, 2009, Mr. Barbaros received his first (and only) dose of

Trazodone while at the MCCF. Sept. 8, 2016 Trial Tr. at 44:12-17. This was slightly less

than 72 hours after he first entered the MCCF at 3:00 a.m. on March 18.

On March 21, 2009, Mr. Barbaros received his first and only dose of Paxil at

approximately 9:00 a.m. He did not receive Paxil the evening before because it is a

medication prescribed to be taken in the mornings. Despite medical orders from a

physician's assistant, there is no record that any medical personnel at the MCCF checked

Mr. Barbaros' blood pressure this day. That morning Mr. Barbaros also spoke with his wife,

Plaintiff Miryem Barbaros. He informed her that he would make bail and would be able to

leave the MCCF on Thursday March 26. Sept. 6, 2016 Trial Tr. at 203:21-23-204:1-4.

### 7. William Buffton

When Nurse Bauer was unable to verify Mr. Barbaros' medications on Wednesday

March 18, she placed him on line to see a psychologist. On the afternoon of Saturday

March 21, Mr. Barbaros met with William Buffton, a psychological services associate.  Sept.

9, 2016 Trial Tr. at 55:10-12.  Mr. Buffton is a Psychological Services Associate, which is a

Civil Service Master's Level Psychologist.  He is not a licensed doctoral psychologist.  *Id.*

Mr. Buffton previously worked for over ten years at the Pennsylvania State Department of

Corrections as a Psychological Services Specialist, a Grade 8 Master's Level position.  He

testified that when he is functioning as a Psychological Services Associate he is required to

work under the supervision of a licensed and doctoral level psychologist.  *Id.* at 56:10-14.

   Mr. Buffton was employed by Forensic Counseling Services, an independent contractor

hired by PrimeCare to provide psychological services to inmates at the MCCF.  He was

given the title "Mental Health Worker" by PrimeCare, ostensibly obviating the need for

PrimeCare to supervise him.  *Id.* at 56:15-21.  However, Mr. Buffton testified that he was

acting as a psychologist and providing psychologist services at the MCCF without any

supervision from a licensed psychologist or psychiatrist.[22]  *Id.* at 57:8-15; 59:21-23; 62:8-11.

He testified that, as he himself contracted with Forensic Counseling Services, he did not

concern himself with who supervised him.  *Id.* at 62:3-20.

---

[22] Forensic Counseling Services is owned by Carol Haught.  Mrs. Haught is not a licensed doctoral
psychologist.  Mr. Buffton testified that she was either a Licensed Professional Counselor or a Licensed
Social Worker.  Mr. Buffton considered Mrs. Haught his supervisor, but she did not review his therapy notes
and did not sit in with him during sessions.  Rather, her role was to set up appointments.  After objecting to
questions about PrimeCare's supervision of Mr. Buffton, counsel for the PrimeCare Defendants indicated
that it was not and cannot be PrimeCare's responsibility to make sure he is properly supervised in
accordance with the law because he was employed by another entity.  The Court sustained his objection.
Sept. 9, 2016 Trial Tr. at 61:20-62:2.

As a Mental Health Worker at the MCCF, Mr. Buffton worked approximately 12.5 hours per week at the MCCF. He also possessed the ability to place inmates on suicide watch or monitoring. *Id.* at 64:24-65:5. The decision, though, was not his final call. *Id.* He did not receive any training from PrimeCare on suicide prevention and was unfamiliar with PrimeCare's policies and procedures on suicide watch and monitoring. He testified he was unfamiliar with the policies and procedures because PrimeCare did not require him to be familiar with those policies and procedures. *Id.* at 77:12-14.

On the afternoon of March 20, 2009, Mr. Buffton briefly met with Mr. Barbaros for approximately ten to eighteen minutes (at most). His notes from the meeting described Mr. Barbaros as a recently arrested first-time inmate acting timid, subdued, emotional, and with a history of treatment for anxiety and depression for which he took Paxil and Trazodone. *Id.* at 68:6-10; 73:14-20. Throughout the meeting, Mr. Barbaros was turned away from Mr. Buffton, staring at the floor and not making any eye contact. *Id.* at 81:8-83:2. Mr. Barbaros only responded to Mr. Buffton's questions with short answers and mumbling. *Id.* At his deposition, Mr. Buffton described Mr. Barbaros as "looking like a cornered rat" and appearing "very, very fearful." *Id.* at 67:15-18. Although he acknowledged that many of these behaviors indicate suicidal tendencies, Mr. Buffton noted that Mr. Barbaros became more relaxed and animated as time went by.[23] *Id.* at 68:11-13; 88:23-6.

---

[23] When asked why he did not place Mr. Barbaros on suicide watch despite his symptoms, Mr. Buffton testified that although these could have been signs of suicidal ideation, they also could have been signs that he was from Eastern Europe and spoke English as a second language and therefore these symptoms did not prove anything. Sept. 9, 2016 Trial Tr. at 85:17-86:3.

Like the other medical staff at the MCCF, Mr. Buffton did not review Mr. Barbaros' medical chart and did not discuss his physical condition with anyone. *Id.* at 70:8-72:15. He testified he did not do this because in the limited time he had to meet with Mr. Barbaros he understood his role as simply assessing whether Mr. Barbaros required further services. *Id.* at 72:6-15. Mr. Buffton's notes stated "rule out depression and rule out adjustment disorder." This meant that he suspected Mr. Barbaros was suffering from depression and/or adjustment disorder. *Id.* at 67:24-68:5. Mr. Buffton intended to refer Mr. Barbaros to a psychiatrist. *Id.* at 68:14-15.

Mr. Buffton's notes contain no record that he conducted a suicide assessment of Mr. Barbaros and did not document any information indicative of suicide risks. Despite this lack of documentation, Mr. Buffton testified that he conducted a suicide assessment and that Mr. Barbaros' symptoms and conduct "did not scream suicide." *Id.* at 85:17-86:3. Instead, they "indicated that he was under a lot of pressure, they indicated he was anxious, they indicated he was fearful." *Id.* at 85:17-86:3.

Mr. Buffton's meeting with Mr. Barbaros is his last known interaction with any of the medical staff at the MCCF. On the evening of March 21, he was scheduled to receive his Trazodone. The medical records, though, indicate he was never provided this medication.

### 8. Correctional Officers Cleary and Ryan

Two MCCF correctional officers, Christine Cleary and Jonathan Ryan, testified at trial. *Id.* at 109:25-157:7. In 2009, Officer Cleary worked the second shift from approximately

7:20 a.m. to 5:20 p.m.  *Id.* at 113:18-25.  In March, she was stationed in the B Unit at the

MCCF (also known as the segregated housing unit).  *Id.* at 11:2-119:18.  She had observed

and recorded Mr. Barbaros' behaviors over the course of three days and did not document

any unusual behaviors.  *Id.* at 118:12-122:4-7.  However, on the afternoon of March 21 she

observed Mr. Barbaros pacing in his cell and documented this on a behavioral observation

form.  She testified this would have been out of character for Mr. Barbaros which is why she

made a notation.  *Id.* at 121:25-126:2.

In 2009, Officer Ryan was also stationed in the B Unit.  He worked the third shift

between approximately 4:40 p.m. and 12:40 a.m.  *Id.* at 142:10-143:10.  Officer Ryan did

not identify or document any unusual behaviors exhibited by Mr. Barbaros during the prior

days he had observed and recorded his behaviors.  *Id.*  On the evening of March 21, he

observed and documented that Mr. Barbaros was exhibiting "bizarre behavior."  *Id.* at

146:20-148:16.  The "bizarre behavior" was that Mr. Barbaros had removed all of his

clothing and was in his underwear.  *Id.*  Officer Ryan recalled briefly speaking to Mr.

Barbaros that evening.  He testified that at no time did he believe that Mr. Barbaros should

have been monitored or was a suicide risk.  *Id.* at 152:23-153:2.  Officer Ryan's final note

observed that at 11:21 p.m. Mr. Barbaros was alive.

For the next seven hours Mr. Barbaros was not monitored or observed by any

correctional officer or medical staff.  On Sunday March 22, at approximately 6:19 a.m., he

was found dead in his cell.  An autopsy was performed and a fifteen centimeter long object

consisting of tightly rolled remnants of a t-shirt that had been fabricated into the shape of a tubular plug was found wedged in Mr. Barbaros' posterior oropharynx. The cause of death was identified as "choking on a foreign object" and "suicide."

## C. Expert Witnesses

At trial Plaintiffs called four expert witnesses: Kathryn Wild, Dr. Peter Breggin, David Hopkins, and Dr. Lorene Sheren. The PrimeCare Defendants and Dr. Thomas also presented expert testimony from: Terry Fillman, Dr. Lawrence Mendel, Dr. Lawrence Guzzardi, Dr. Cheryl Wills, and Dr. Susan Rushing.

### 1. Kathryn Wild

Kathryn Wild was offered, and accepted, as an expert in nursing and correctional health care. Nurse Wild is a RN and Certified Health Care Professional. Sept. 8, 2016 Trial Tr. at 199:9-201:14. She previously worked as Senior Nurse at the Orange County Correctional Facility in California and as the Health Services Administrator of the San Bernadino Sheriff's Department for fifteen years. *Id.* at 200:16-201:17. In her capacity as Health Services Administrator of the San Bernadino Sheriff's Department, she oversaw the health care program for four prison facilities with an inmate population of approximately 6,000 and also supervised the nursing staff. *Id.* at 201:19-203:7.

After leaving this position, Nurse Wild worked as Deputy Director in charge of Correctional Health Care for Orange County. *Id.* at 204:9-25. She is also the former President of the California Chapter of the American Correctional Health Services

Association. *Id.* at 208:20-209:11. She has received training and is familiar with the standard of care for nursing in correctional healthcare and has experience treating patients on psychiatric medications. She is also familiar with the appropriate policies and procedures in the correctional healthcare setting and withdrawal symptoms and has received training in these respects. *Id.* at 211:9-216-13.

Nurse Wild testified, to a reasonable degree of nursing certainty, that the care rendered by each of the individual PrimeCare Defendants (Paul James, Patricia Bauer, Christina Rowe, Grace Ramos, and Wendy Johnson) fell below the applicable standard of care for nurses and healthcare professionals in a correctional setting. *Id.* at 227:6-12; 258:4-10. She also testified that all of the individual PrimeCare Defendants were subjectively aware that delaying or denying Mr. Barbaros his medications could cause him to suffer withdrawal or some other risk of harm. *Id.* at 258:25-259:7.

With respect to Nurse James, Nurse Wild opined his handling of Mr. Barbaros' intake fell below the applicable standard of care and was neither sufficient nor complete. *Id.* at 227:15-228:8. She testified the failure to obtain accurate and complete information about a patient's psychiatric medications puts a patient at risk of harm. *Id.* at 228:11-229:9. She described Nurse James' multiple misspellings of Mr. Barbaros' name as "careless and sloppy." *Id.* at 285:1. She also explained that with medications like Paxil there is a risk to stopping a patient "cold turkey." *Id.* at 229:8-17. In her opinion, Nurse James' failure to

properly conduct the intake screening "set the stage, if you will" for the substandard care received by Mr. Barbaros and the MCCF placed him at risk of harm. *Id.* at 229:22-230:12.

Nurse Wild referred to the acts and omissions of Nurse Bauer as "well outside the standard" of care. *Id.* at 230:16-232:25. She opined that Nurse Bauer's single attempt to verify Mr. Barbaros' medications and her lack of follow up "very much" puts a patient like Mr. Barbaros at risk of harm. *Id.* at 231:7-8. As for Nurse Rowe, it was Nurse Wild's opinion that her handling of Mr. Barbaros' sick call was insufficient, inappropriate, and breached the standard of care and put Mr. Barbaros at risk of harm. *Id.* at 233:8-240:6.

She also testified that Wendy Johnson, after reviewing Mr. Barbaros' medical chart and knowing that he had not received his medications in over 48 hours, "at a minimum, she should have called him down to see how he's doing, and then call a provider with that information." *Id.* at 240:7-22. She also said that Wendy Johnson at least should have communicated this information to Nurse Ramos. *Id.* at 241:9-13. These acts and omissions, among others, led Nurse Wild to conclude that Wendy Johnson's acts and omissions were a breach of the standard of care and increased the risk of harm to Mr. Barbaros. *Id.* at 243:5-6.

Nurse Wild conceded that Nurse Ramos "did a good job on calling CVS and getting the information that Nurse Bauer couldn't get with the same information." *Id.* at 243:11-16. It was her opinion, however, that Nurse Ramos should have reviewed Mr. Barbaros' medical

chart and informed the on-call psychiatrist about the length of time Mr. Barbaros had been off

his medications and whether he had any signs or symptoms of withdrawal. *Id.* at 244:1-11.

   Nurse Wild opined that each of the individual PrimeCare Defendants were subjectively

aware that not having medications like Paxil or Prozac could cause withdrawal, and that

denying or delaying Mr. Barbaros access to his psychiatric medication was a delay in the

treatment of his serious medical need. *Id.* at 244:12-245:2. She also testified that the

symptoms Mr. Barbaros was exhibiting, including headaches, high blood pressure, fear, and

anxiety, suggested withdrawal and that "those are all red flags that something is going on

with our patient." *Id.* at 249:8-18. According to Nurse Wild, the combination of Mr. Barbaros'

symptoms and his failure to receive his medications meant that "he should have been put on

some type of observation or some type of watch, where people were monitoring these

symptoms" and that the individual PrimeCare Defendants' failure to do so breached the

standard of care and placed Mr. Barbaros at an increased risk of harm. *Id.* at 250:1- 253: 19.

   Nurse Wild conceded that the policies and procedures PrimeCare had in place in 2009

met the appropriate standard of care. She testified, however, that this was not the issue. *Id.*

at 250:8-11. Rather, she opined that the issue was the lack of supervision of the medical

staff and the lack of follow-through to ensure the staff followed the policies and procedures

in place at the facility. *Id.* at 250:12-19. When asked whether PrimeCare and Wendy

Johnson were properly supervising the staff at the MCCF she said "obviously not," and

referred to, among other things, Nurse Rowe's statement that it was "very common" to

assess patients without reviewing their medical charts.  *Id.* at 250:20-251:2.  Nurse Wild also testified that in certain respects PrimeCare's LPNs were acting outside the scope of their authority.  *Id.* at 235:15-25.  According to Nurse Wild, the acts and omission of each of the PrimeCare Defendants increased the risk of harm to Mr. Barbaros and contributed to his death.  *Id.* at 251:12-253:12.

## 2.  Dr. Peter Breggin

Plaintiffs also offered Dr. Peter Breggin as an expert.  Dr. Breggin was offered, and accepted, as an expert in psychiatry, psychopharmacology, and Paxil.  Sept. 9, 2016 Trial Tr. at 226:9-10.  Dr. Breggin received his undergraduate degree from Harvard College and his medical degree from Case Western Medical School.  After medical school he interned at SUNY Upstate Medical Center in Syracuse.  *Id.* at 192:4-23.  He ran a private psychiatry practice in Maryland for over forty years.  Since 2002, he has been in private practice in Ithaca, New York.  He is licensed to practice in New York State.  *Id.* at 194:4-9.

Dr. Breggin is the author of numerous peer-reviewed articles and books, including books on the adverse effects of psychiatric drugs on the brain and psychiatric drug withdrawal.  *Id.* at 195:7-196:10; 198:9-18; 199:6-23; 200:5-23.  He has taught graduate level courses in counseling and psychological services at the University of Maryland, Johns Hopkins, and SUNY Oswego.  *Id.* at 197:2-13.  Dr. Breggin has also testified before Congress about psychiatric drugs, specifically, SSRIs including Paxil and their effect on military personnel. *Id.* at 206:4-207:5.

Dr. Breggin opined that Dr. Thomas' conduct "was not anywhere near the standard of care, not even close." *Id.* at 228:9-17; 277:7-13. He also testified that the treatment provided by Mr. Buffton fell below the applicable standard of care. *Id.* at 228:18-23; 246:3-250:6; 277:7-13.

It was Dr. Breggin's opinion that Dr. Thomas' conduct, specifically, prescribing psychiatric medications without knowing any information about the patient, fell below the standard of care. *Id.* at 234:5-236:5; 241:3-242:23. He referred to his acts and omissions as "not even practicing medicine." According to Dr. Breggin, "you can't prescribe that way. These are very powerful drugs, that have important adverse effects, which, at times, have a toxic effect, and they have very important withdrawal effects." *Id.* at 236:10-14. Dr. Breggin testified, consistent with Dr. Thomas' own testimony, that when a doctor starts a patient on Paxil they need to be aware about the risk of suicide and that Paxil is the most likely SSRI to cause a serious adverse reaction. *Id.* at 236:10-25. According to Dr. Breggin, Dr. Thomas should have placed Mr. Barbaros on monitoring, should have started him on a lower dose of Paxil, and at least explained to him the adverse side effects of Paxil. *Id.* at 242:14-23; 244:5. Had Dr. Thomas acted differently, he could have prevented Mr. Barbaros' suicide. *Id.* at 274:13-24. The same holds true for Dr. Breggin's opinion of William Buffton: that is, had Mr. Buffton behaved differently, it would have been less likely that Mr. Barbaros would have committed suicide. *Id.* at 274:25-275:13.

Dr. Breggin also testified about the care Mr. Barbaros received from the medical staff at the MCCF. He opined that "the care and treatment he received, starting at the very beginning, contributed to his suicide." *Id.* at 233:21-234:4; 277:14-19. It was his opinion, to a reasonable degree of medical certainty, that Mr. Barbaros' suicide was preventable and that the first time Mr. Barbaros' death could have been prevented is the night he came into the MCCF. *Id.* at 268:25-271:9. He testified that had Mr. Barbaros promptly received his medications on either March 18 or 19, this could have prevented, and at least would have softened, Mr. Barbaros' withdrawal. Therefore, his suicide could have been prevented. *Id.* at 271:17-22; 272:25-274:14.

Dr. Breggin testified that when a patient like Mr. Barbaros is prescribed medications like Paxil, the need to continue that medication or monitor the patient is a serious medical need. *Id.* at 244:23-245:19. It was his opinion that Dr. Thomas knew there was a risk of suicide when prescribing Mr. Barbaros the Paxil, but nevertheless failed to take any action. *Id.* at 245:20-246:2. Specifically, Dr. Breggin testified that the available literature on Paxil, including warnings from the manufacturer, show that Dr. Thomas should have been aware that restarting Mr. Barbaros on Paxil without monitoring could cause suicide. Sept. 12, 2016 Trial Tr. at 145:23-147:9. He also described several studies linking Paxil to "bizarre" suicides like that of Mr. Barbaros.

Dr. Breggin testified, to a reasonable degree of medical certainty, that Mr. Barbaros was suffering from withdrawal in the days before he first received the Paxil prescribed by Dr.

Thomas.  *Id.* at 256:7-259:24.  It was his opinion that restarting Mr. Barbaros on 30

milligrams of Paxil, after he been without the drug for at least several days and was

exhibiting symptoms of withdrawal, was inappropriate and contributed to his death.  *Id.* at

260:24-261:12; 264:7-268:24; 271:23-24; Sept. 12, 2016 Trial Tr. at 147:10-152:22.

Regardless of whether the Paxil was at a high enough dose to cause him to commit suicide,

Dr. Breggin opined that, at a minimum, Mr. Barbaros should have been monitored due to

the way Paxil is prescribed, his symptoms, and the nature and circumstances of his first

incarceration.  *Id.* at 153:4-14.  He also testified that had Mr. Barbaros received his

Trazodone as scheduled, or been monitored on the night of March 2, it could have

prevented him from committing suicide.  *Id.* at 152:23-153:3.

### 3.    Dr. Lorne Sheren

Dr. Lorne Sheren was offered, and accepted, as Plaintiffs' expert in anesthesiology and

pain and suffering.  Dr. Sheren is an anesthesiologist and currently the Director of Jefferson

Medical Center in Charlestown, West Virginia.  He graduated from State University of New

York Downstate Medical Center and completed his anesthesiology residency at Columbia

Presbyterian Hospital in New York City.  He is Board certified in internal medicine and

anesthesiology and licensed to practice in New York, New Jersey, and West Virginia.  Sept.

9, 2016 Trial Tr. at 160:1-172:4.

Dr. Sheren testified, to a reasonable degree of medical certainty, about the conscious

pain and suffering Mr. Barbaros would have experienced.  Specifically, Dr. Sheren

described death by suffocation in a manner like Mr. Barbaros experienced as something "extremely unpleasant," "painful," "essentially the equivalent of torture," and "undoubtedly . . . took some amount of time." *Id.* at 177:19-182:4. It was his opinion that Mr. Barbaros would have been conscious for approximately five to seven minutes before his death. However, he acknowledged it could have been slightly less or more depending on whether Mr. Barbaros took a breath before ingesting the object and how long it took for the object to completely obstruct his airway. *Id.* at 184:2-15.

### 4.    David Hopkins

Plaintiffs also presented the testimony of David Hopkins, an actuarial economic consultant. Mr. Hopkins received his Bachelor's Degree from the Wharton School of Business at the University of Pennsylvania and a Master's Degree in actuarial science from Temple University. Sept. 12, 2016 Trial Tr. at 200:5-203:6.

Mr. Hopkins provided an expert report calculating what he described as "an appropriate measure of economic loss for an individual in these kinds of circumstances" and testified that "the largest part of a person's economic value is something that we call their earnings capacity." *Id.* at 203:15-18. Earnings capacity, Mr. Hopkins testified, "refers to the amount of earnings that a person could expect to receive, given their background, prior work history, skills, even given their interests, what it is they might choose to do, but it's a measure of their economic value." *Id.* at 203:19-23. Mr. Hopkins testified that, depending on a number

of factors, Mr. Barbaros' lost earnings capacity would in the range of $540,486 to $810,735.[24]  *Id.* at 215:19-217:19.

### 5.  Terry Fillman

The PrimeCare Defendants offered, and the Court admitted, Terry Fillman as an expert in correctional nursing.  Nurse Fillman is a RN and the Health Services Administrator for the San Bernadino County Sherriff's Department.  Kathy Wild, Plaintiffs' correctional nursing expert, served as his boss for 15 years and also hired him for his current job at the San Bernadino County Sheriff's Department.  Nurse Fillman's responsibilities include coordinating the medical and dental care for approximately 6000 inmates and providing daily health care.  His position as Health Services Administrator is defined by the NCCHC as the "responsible health authority" with responsibility for staffing, teaching, updating policies and procedures on an annual basis, and providing medical, dental, and mental health care.  As the Health Services Administrator, he is also responsible for reviewing the CQI process in order to utilize data to evaluate policies and procedures for improvement. He is an educator for the NCCHC, the organization that sets accreditation standards for correctional facilities.  Sept. 12, 2016 Trial Tr. at 227:7-241:4.

---

[24] Plaintiffs also presented testimony from Plaintiff Peter Ponzini, Mr. Barbaros' former lawyer, accountant, and the Co-Administrator of his estate.  Sept. 12, 2016 Trial Tr. at 157:7-192:18.  In that capacity, Mr. Ponzini prepared Mr. Barbaros' tax returns.  *Id.* at 159:15-19.  Mr. Ponzini testified that the Barbaros family earned $43,819 in 2005, *id.* at 169:11-13, $50,660 in 2006, *id.* at 170:18-29, $79,196 in 2007, *id.* at 171:7-8, and $44,992 in 2008, *id.* at 172:2-9.

It was Nurse Fillman's opinion that the PrimeCare Defendants all met the appropriate standard of care and acted in accordance with what a reasonable nurse and prison healthcare provider would do under the circumstances. *Id.* at 245:6-15. He testified the conduct of Nurse James, Nurse Ramos, Nurse Johnson, Nurse Bauer, Wendy Johnson, and Nurse Rowe all met the appropriate standard of care. *Id.* at 277:9-18. He also testified that PrimeCare itself met the appropriate standard of care for the provision of medical care in a prison environment (including its policies and procedures for access to care, suicide screening, and verification of medications). *Id.* at 276:24-277:8. He noted that PrimeCare's access to mental health care policies and procedures satisfied the standard of care because Mr. Barbaros was referred to a mental health worker within 3-4 days of admission and had non-emergent issues. *Id.* at 273:1-274:4. He testified that although a LPN was supervising the nursing staff at the MCCF, the nursing staff was performing functions he would expect them to perform and that were common in a correctional environment. *Id.* at 265:16-24.

On cross-examination, Nurse Fillman acknowledged that NCCHC standards place responsibility on a Health Services Administrator "to ensure that the staff complies with policies and procedures." *Id.* at 279:19-22. He also acknowledged that the purpose of establishing policies and procedures, and following those policies and procedures, is to ensure that patients are treated properly and to keep them as safe as possible. *Id.* at 279:23-280:13. He conceded that when a nurse does not follow policies and procedures

they can potentially be putting their patients at risk.[25]  *Id.*  At trial, Plaintiffs' counsel also read a portion of Mr. Fillman's deposition wherein he admitted that if a nurse does not accurately complete intake documents, it can impact the information available to the health services staff. Specifically, he acknowledged that if something is not properly documented, a nurse could miss a symptom that he or she otherwise would have recognized. *Id*. at 286:20-287:21.

Nurse Fillman acknowledged that PrimeCare's policies and procedures at the MCCF were based on NCCHC standards (which set the minimum acceptable standard of care in a correctional environment).  *Id.* at 288:4-9.   He conceded that Nurse James violated PrimeCare's policies and procedures, and acknowledged that if a patient is taking psychiatric medications it is important to know how long he or she has been on or off the medications.  He agreed that Nurse James' intake form was missing important information. *Id.* at 289:20-292:1.

Nurse Fillman conceded that Nurse Rowe's conduct of performing an assessment on Mr. Barbaros without the benefit of his medical chart violated PrimeCare's policies and procedures.  He noted, however, that it was the responsibility of the night nurse (*i.e.*, Paul James) to collect this information and pass on the sick call slip to ensure the nursing staff has all the available information.  *Id.* at 297:15-299:6.  He testified that if Nurse Rowe's statement that it was "very common" to assess patients without the benefit of their medical

---

[25] Nurse Fillman noted that he was not offering any opinions, nor was he disputing Nurse Wild's opinions, on the acts and omissions of Grace Ramos and Wendy Johnson.  Sept. 12, 2016 Trial Tr. at 282:8-284:14.

47

chart was true, it would be a violation of PrimeCare's policies and procedures, but stated that "whoever is gathering these medical records and not providing the chart they're violating policies and procedures." *Id.* at 299:23-301:12.

Nurse Fillman acknowledged that PrimeCare's policies and procedures in place at the time were "the minimum standard of care, nothing beyond" and conceded that the nursing staff failed to comply with numerous policies and procedures on multiple occasions. *Id.* at 301:13-17. It was his opinion that it was a "combination" of Mr. Barbaros' failure to give accurate and complete information to Nurse James and Mr. Barbaros' failure to provide any information about the dosages which led to the delay in obtaining his medications. *Id.* at 304:19-305:25. When asked if he was aware that Nurse James testified that he never asked for dosage information because PrimeCare's intake form at the MCCF does not ask for it, Nurse Fillman testified "no." *Id.* at 305:22-306:1.

Mr. Fillman conceded that the nursing staff's failure to follow medical orders and take Mr. Barbaros' blood pressure was "not acceptable" because it is incumbent upon the nursing staff to follow medical orders because the reason for the medical order is to protect the patient and ensure he or she receives the care he or she needs. *Id.* at 306:2-307:23. He would not, however, concede that this breaches the standard of care. When asked if the failure to follow medical orders puts a patient at increased risk of harm he testified "not necessarily." *Id.* at 307:2-308:2. However, Nurse Fillman acknowledged that if a medication like Trazodone is prescribed to an inmate, but not given to him, it is not

acceptable nursing care.  *Id* at 308:3-13.  Nurse Fillman also testified that it is incumbent

upon a nurse to make sure he or she is familiar with, and able to provide, all relevant

information to a physician when he or she calls the physician after verification of a patient's

medication.  *Id.* at 312:5-24.  Finally, despite acknowledging the repeated violations of

PrimeCare's policies and procedures, which are based on the minimal acceptable standard

of care, Nurse Fillman testified to a reasonable degree of nursing certainty that all the

PrimeCare Defendants acted within the applicable standard of care.  *Id.* at 313:8-17.

### 6.  Dr. Lawrence Mendel

The PrimeCare Defendants also called Dr. Lawrence Mendel as an expert in the field of

correctional medicine.  Sept. 13, 2016 Trial Tr. at 28:5-35:21.  Dr. Mendel is the Medical

Director of the Leavenworth Detention Center.  *Id.*  He previously worked as an accreditor

surveyor for the NCCHC and is one of twenty fellows at the Society of Correctional

Physicians.  *Id.*  Dr. Mendel has previously been retained by PrimeCare and testified on its

behalf "probably" more than 10 times, "possibly more" than 20 times, but "probably not"

more than 30.  *Id.* at 35:25-40:25.

Dr. Mendel opined, to a reasonable degree of medical certainty, that the access to care

provided by the PrimeCare Defendants to Mr. Barbaros was appropriate and met the

standard of care.  *Id.* at 44:6-9.  He also testified that PrimeCare's policies and procedures

for the verification of medications met the standard of care, *id.* at 48:2-11, and noted that he

was not aware of any national standard that requires an inmate who is potentially going

through withdrawal/SSRI discontinuation syndrome to be monitored, *id.* at 55:10-14. It was his opinion that none of the PrimeCare Defendants breached the duty of care and that their acts and omissions did not increase the risk of harm to Mr. Barbaros or contribute to his suicide. *Id.* at 41:2-48:11.

On cross-examination, Dr. Mendel conceded that when diagnosing a patient a doctor has an obligation to obtain sufficient information in order to decide what treatment is appropriate for a patient. *Id.* at 57:1-59:1. A portion of Dr. Mendel's deposition was also read wherein he testified that the responsibilities of a doctor conducting an examination and prescribing medication over the telephone are no different from a doctor actually sitting in the room with the patient. *Id.* at 60:15-63:13. He acknowledged that in the practice of medicine in a correctional setting it is generally recognized that if something is not written down, then it did not happen. *Id.* at 62:14-20.

Dr. Mendel conceded that failure to complete an intake chart in its entirety could put a patient at risk of harm, and acknowledged that one factor to consider in determining whether a prison healthcare provider has adequate policies and procedures in place is whether there is a failure to follow those policies and procedures. *Id.* at 74:1-75:1. He acknowledged that PrimeCare's policies and procedures were based on the minimum standard of care set forth in the NCCHC. He also testified that if a patient comes into the facility on psychiatric medications, and the medications cannot be verified, a nurse should call the on-call provider. *Id.* at 83:23-83:5. He did not, however, consider any of the individual PrimeCare

Defendants' failure to comply with the policies and procedures in place as breaching the standard of care. Finally, when asked whether LPNs should be supervising LPNs he testified that "ideally" a LPN should not be supervising other LPNs. *Id*. at 91:1-14.

### 7. Dr. Lawrence Guzzardi

Dr. Lawrence Guzzardi also testified on behalf of the PrimeCare Defendants as an expert in medical toxicology. Dr. Guzzardi graduated from Boston College with a degree in chemistry and obtained his medical degree from Jefferson Medical College in Philadelphia. *Id*. at 228:24-231:14. He completed his residency at the University of Kentucky, where he taught and obtained a Master's Degree in toxicology. *Id*. He is the former director of the emergency department at York Hospital in York, Pennsylvania. *Id*.

Dr. Guzzardi testified that the level of Paxil in Mr. Barbaros' blood following his death (130 nanograms) was within the therapeutic range. Therefore, there was Paxil in Mr. Barbaros' system that was not related to the Paxil he received at the MCCF. He opined that it would be impossible to have this amount of Paxil in your bloodstream from a single 30 mg dose. *Id*. at 242:1-17. Based on his review of the medical records he testified that "[i]t would be highly, highly, highly unlikely that [Mr. Barbaros] would have gone through SSRI discontinuation syndrome, given the amount of Paxil that was present in his blood at the time of autopsy." *Id*. at 243:17-24. According to Dr. Guzzardi, Mr. Barbaros' blood work also established that he did not have a toxic level of Paxil in his system at the time of his death. *Id*. at 244:22-25.

On cross-examination, Dr. Guzzardi acknowledged that Dr. Thomas' psychiatry expert, Dr. Susan Rushing, authored a report stating that with a single 30 mg dose of Paxil it was possible to have a up to 147 nanograms in your bloodstream, depending on a person's metabolism. *Id.* at 245:24-248:17. He, however, strongly disagreed with her opinions and conclusions. *Id.* Dr. Guzzardi also made a series of errors in his report and testimony regarding the factual circumstances of this case. *Id.* at 251:1-255:18.

### 8. Dr. Cheryl Wills

The PrimeCare Defendants also presented testimony from Dr. Cheryl Wills, who was offered, and accepted, as an expert in correctional psychiatry. Dr. Wills is the head of Child and Adolescent Forensic Psychiatry at University Hospital Case Medical Center in Cleveland, Ohio. She obtained her undergraduate degree at Barnard College, Columbia University, and her medical degree from State University of New York in Syracuse. *Id.* She completed her residency in general and child psychiatry at the University of Pittsburgh and then completed a fellowship at Case Western Reserve University. She is Board certified in General Psychiatry, Child and Adolescent Psychiatry, and has a subspecialty certification in Forensic Psychiatry. Dr. Wills is licensed to practice in Pennsylvania, Ohio, Louisiana, and New York. She has worked in a correctional facility providing care to patients, and was a former monitor for the United States Department of Justice. In that capacity, she observed correctional facilities and assessed conditions of confinement (including access to mental

healthcare) to determine whether a facility's policies and procedures meet a minimally acceptable standard of care.  Sept. 14, 2016 Trial Tr. at 3:21- 15:14.

Dr. Wills testified, to a reasonable degree of medical certainty, that PrimeCare and Mr. Buffton's treatment of Mr. Barbaros met the appropriate standard of care.  *Id.* at 16:5-18; 29:10-17.  She also opined that PrimeCare's policies and procedures at the MCCF met the appropriate standard of care, highlighting the MCCF's NCCHC certification.  *Id.* at 16:11-15. She testified that the policies and procedures in place at the MCCF were "above and beyond" what "we" ideally would like to see in all jails.  *Id.* at 19:6-10.  As for Mr. Buffton, she testified that his assessment notes were appropriate and suggested that Mr. Barbaros did not need to be monitored.  Specifically, she highlighted that, according to Mr. Buffton's note, Mr. Barbaros became more animated as time went by which "shows that he has the capacity to calm down" and also suggests that Mr. Buffton "made a good effort to engage him" and that Mr. Barbaros was in a better emotional state than when he and Mr. Buffton initially met.  *Id.* at 27:9-15.

It was Dr. Wills' opinion that Mr. Buffton had no reason to suspect Mr. Barbaros was suicidal at the time of the assessment.  She noted that Mr. Barbaros' behavior had changed during the assessment, was future-oriented, and that he was planning to see a psychiatrist the following day.  *Id.* at 29:24-9.  She did not believe simply because an inmate who is incarcerated for the first time has an increased risk of suicide that every first time inmate should be placed on monitoring or suicide watch.  *Id.* at 24:15-25.  It was Dr. Wills' opinion

that Mr. Barbaros committed suicide due to a "number of things," *id.* at 33:1-11, including among other things that "he was incarcerated for the first time in his life . . . the number of charges kept increasing, [and] they were published in the newspaper, which had implications for his business," *id.* at 33:7-34:9. Therefore it was her opinion, to a reasonable degree of medical certainty, that nothing about the care provided to Mr. Barbaros by PrimeCare and Mr. Buffton caused him to commit suicide. *Id.* at 34:10-19.

On cross-examination, Dr. Wills acknowledged that an inmate who is incarcerated for the first time is at an increased risk of suicide. *Id.* at 37:23-25. She also agreed that as part of an initial assessment it is important to find out when a patient last took his or her medication. She testified that the nursing staff had an obligation to investigate when Mr. Barbaros last took his medication. *Id.* at 38:5-39:22. She further acknowledged that withdrawal is a potential side effect if a person abruptly stops taking medications like Paxil, that suicidal ideations have been associated with individuals who abruptly stop taking SSRIs like Paxil, and that this is something the medical staff should be aware of. *Id.* at 40:13-42:19. When asked if Mr. Barbaros' symptoms, including headaches, hypertension, increased pulse, abdominal pain, increased anxiety, and depression could be signs that he was suffering from withdrawal, Dr. Wills testified "That's one possibility, yes." *Id.* at 43:5-11. She conceded that the nursing staff's failure to check Mr. Barbaros' blood pressure was unfortunate and "pretty bad" because without this information they could not assess his medical condition. *Id.* at 43:12-25. For example, without this information they could not

know if his blood pressure continued to increase, decrease, or stay the same, which could have alerted the medical staff to a serious medical issue. *Id.* at 44:5-11.

Dr. Wills acknowledged that Mr. Buffton did not document that he conducted a suicide assessment of Mr. Barbaros and did not ask Mr. Barbaros if he was experiencing any physical symptoms since arriving at the MCCF. *Id.* at 45:3-46:3. She acknowledged, consistent with Mr. Buffton testimony, that if Mr. Buffton had asked about Mr. Barbaros' physical symptoms he should have written it down in his note. *Id.* at 46:3-20. When asked whether, logically, Mr. Buffton's failure to document that he conducted a suicide assessment meant that he failed to conduct a suicide assessment of Mr. Barbaros, Dr. Wills was unsure. *Id.* at 47:19-48:3. She testified that Mr. Buffton's failure to document "any information about lethality, whether he was having thoughts of harming himself or others, it was an oversight on Mr. Buffton's part." *Id.* at 28:5-11. She went on to testify that "a suicide assessment is a requirement for a social worker, but physical symptoms is not . . . so if he went above and beyond, that's great, but that is not what he's required to do." *Id.* at 48:4-13. She conceded that, as a psychologist, he would be aware that physical symptoms can impact the mental state. *Id.* at 48:14-16. When asked whether it would be important to know that a first time detainee who is being assessed for the first time by a mental healthcare worker is experiencing physical symptoms or other aggravating factors she testified that "it would be helpful to know, yes." *Id.* at 48:14.

Throughout her testimony Dr. Wills repeatedly referred to Mr. Buffton as a social worker, but conceded that at the MCCF he was acting as a Master's level psychologist and, as such, NCCHC standards required him to be supervised by a qualified mental health professional.  *Id.* at 49:10-25.  It was her belief that, although Mr. Buffton was not a licensed psychologist, because he had a master's degree he was permitted to "work for someone else, under their supervision."  *Id.* at 17:6-19:2.  She later acknowledged that the person supervising Mr. Buffton was not a psychologist, but also a social worker like Mr. Buffton.  *Id.* at 50:12-16.  Dr. Wills testified that although PrimeCare did not provide Mr. Buffton with any training, including training on suicide prevention, she was "not sure that is required" under the circumstances.  *Id.* at 55:18-22.  She acknowledged that, in her opinion, PrimeCare's actions with respect to Mr. Buffton did not cause Mr. Barbaros' suicide, was "more likely than not" and "roughly 51%."  *Id.* at 59:23-60:4.  In her expert report, part of which was read to the jury, she wrote: "Dr. Breggin's past work on side effects to Selective Serotonin Reuptake Inhibitor SSRI medications, which are used to treat depression and anxiety, and what pharmaceutical companies have disclosed has had important implications for the medical field."  *Id.* at 60:20-61:8.

### 9.  Dr. Susan Rushing

Dr. Thomas presented testimony from one expert, Dr. Susan Rushing, who was offered, and accepted, as an expert in psychiatry.  Sept. 13, 2016 Trial Tr. at 133:14-15.  Dr. Rushing is a psychiatrist in private practice in Haverford, Pennsylvania and holds a clinical

teaching appointment at the University of Pennsylvania.  She teaches residents and medical students in forensic psychiatry.  *Id.* at 112:2-9.  She received her undergraduate degree in neuroscience from the Massachusetts Institute of Technology, her medical degree from the Yale School of Medicine and her Juris Doctorate from Stanford Law School.  *Id.*  She completed an internship in pediatrics at the Children's National Hospital in Washington D.C. and her psychiatry residency at the University of Pennsylvania.  *Id.*  She, like Dr. Breggin, has never worked as a psychiatrist in a correctional facility.  *Id.* at 124:20-127:1.

Dr. Rushing testified that Mr. Barbaros was not suffering from SSRI discontinuation syndrome or withdrawal.  *Id.* at 149:18:24.  She opined that Dr. Thomas' conduct met the standard of care and was appropriate.  According to Dr. Rushing, the standard of care "absolutely" does "not" require Dr. Thomas to speak with Mr. Barbaros prior to prescribing him medication.  *Id.* at 151:19-152:11.  She also testified that the standard of care did not require Dr. Thomas to review Mr. Barbaros' medical records prior to prescribing him psychiatric medication.  *Id.*  It was her opinion that the standard of care also did not require Dr. Thomas to place Mr. Barbaros on monitoring.  *Id.* at 152:12-17.   Nor did Dr. Rushing believe the standard of care required Dr. Thomas to restart Mr. Barbaros on a lower dosage of Paxil.  *Id.* at 153:9-154:4.  It was her opinion, to a reasonable degree of medical certainty, that Dr. Thomas' acts and omissions did not cause Mr. Barbaros to commit suicide.  *Id.* at 160:24-162:24.  Rather, it was her opinion that Mr. Barbaros committed suicide due to a

certain level of distress over his incarceration, including, among other things, recently learning that his charges and bail had been increased. *Id.* at 162:7-21.

On cross-examination, Dr. Rushing acknowledged that if a physician is going to prescribe a patient Paxil, then he or she should be familiar with the potential side effects of the medication. She conceded that some studies suggest that Paxil causes significantly more discontinuation symptoms than other SSRI medications. *Id.* at 177:25-180:23. She also acknowledged that the studies she relied on which formed the basis of her opinions (which found an increase in suicidal ideations in children and adolescents on Paxil, but not adults) were conducted in settings where the individuals being studied were under close observation and monitoring, which she acknowledged is significant when it comes to suicide and suicidal ideation. *Id.* at 194:10-195:1. She testified that it is important for psychiatrists to diagnose a deteriorating mental condition as early as possible because early recognition results in an increased likelihood of avoiding injury to a patient. She conceded that one way for a psychiatrist to accomplish this goal is by having a complete picture of his or her patient and reviewing the patient's medical records. *Id.* at 198:22-199:17.

Dr. Rushing also testified about the distinctions between LPNs and RNs, in terms of both training and education. She acknowledged that LPNs "certainly have less experience" than other medical professionals. *Id.* at 202:15-204:6. Regardless, she testified that it is the responsibility of the doctor to make sure he has all available information about a patient so he can make an informed medical decision when prescribing medications for a patient. *Id.*

at 204:11-19.  Dr. Rushing acknowledged that in her clinical practice she asks patients how long they have been on or off a particular medication when prescribing.  *Id.* at 204:20-205:25.  When asked whether Mr. Barbaros would have been able to commit suicide had he been monitored, she did not answer the question.  Instead, Dr. Rushing testified that such a practice would have been outside the standard of care.  *Id.* at 219:5-220:19.  Consistent with the testimony of the other expert witnesses, she testified that the nature of Mr. Barbaros' suicide was "unusual," "incredibly rare," and "something I have not previously seen."  *Id.* at 222:3-223:8.

## III.    STANDARD OF REVIEW

### A.  Motion For Judgment as a Matter Of Law

Federal Rule of Civil Procedure 50 governs motions for judgment as a matter of law. The rule provides, in relevant part:

(a) Judgment as a Matter of Law.

(1) In General.  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on the issue, the court may:

(A) resolve the issue against the party; and

(B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

(2) Motion.  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

(b) Renewing the Motion After Trial; Alternative Motion for a New Trial. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:

(1) allow judgment on the verdict, if the jury returned a verdict;

(2) order a new trial; or

(3) direct the entry of judgment as a matter of law.

(c) Granting the Renewed Motion; Conditional Ruling on a Motion for a New Trial.

(1) In general. If the Court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed. The court must state the grounds for conditionally granting or denying the motion for a new trial.

(2) Effect of Conditional Ruling. Conditionally granting the motion for a new trial does not affect the judgment's finality; if the judgment is later reversed, the new trial must proceed unless the appellate court orders otherwise. If the motion for a new trial is conditionally denied, the appellee may assert error in that denial; if the judgment is reversed, the case must proceed as the appellate court orders.

Fed. R. Civ. P. 50(a)-(c).

"Entry of judgment as a matter of law is a sparingly invoked remedy." *Marra v.*

*Philadelphia Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal citation and quotation

marks omitted). Because the jury returned a verdict in favor of the Plaintiffs, the Court

"must examine the record in a light most favorable to the plaintiff, giving her the benefit of all reasonable inferences, even though contrary inferences might reasonably be drawn." *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015) (internal citation and quotation marks omitted).

The Court can only address issues raised in a Rule 50(b) motion which were first properly raised in a Rule 50(a) Motion. *See Lightning Lube*, *Inc. v. Witco Corp.*, 4 F.3d 1153, 1172 (3d Cir. 1993) ("In order preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law . . . pursuant to Rule 50(a), and specify the grounds for that motion."). Where issues raised in a Rule 50(b) motion have been properly preserved, the Court may grant the motion "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Id.* at 1166. The Court "may not weigh the evidence, determine the credibility of witnesses, or substitute its version of facts for the jury's version." *Id.* Judgment as of matter of law following return of a jury verdict is only appropriate when "if, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 249 (3d Cir. 2001) (internal citation and quotation marks omitted). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence from which the jury could properly find a verdict for

that party."  *Jaasma v. Shell Oil Co.*, 412 F.3d 501, 503 (3d Cir. 2005) (internal citation and quotation marks omitted).

## B.  Motion For a New Trial; Remittitur

Federal Rule of Civil Procedure 59 governs motions for a new trial.  The Rule provides, in relevant part, "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party. . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court. . . ."  Fed. R. Civ. P. 59(a)(1)(A).  The Court may grant a new trial "purely on a question of law" or to correct a previous ruling "on a matter that initially rested within the discretion of the court, *e.g.* evidentiary rulings . . .  or prejudicial statements made by counsel."  *Klein v. Hollings*, 992 F.2d 1285, 1289-90 (3d Cir. 1993) (internal citation and quotation marks omitted).  The Court may also grant a new trial where it "believes the jury's decision is against the weight of the evidence."  *Id.* at 1290.  However, a Court "should do so only when 'the great weight of the evidence cuts against the verdict and . . . [ ] a miscarriage of justice would result if the verdict were to stand.'"  *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (quoting *Springer v. Henry*, 435 F.3d 268, 274 (3d Cir. 2006)).  "A district court's power to grant a new trial is limited to ensure that it does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury."  *Id.* (internal citation and quotation marks omitted).

"The applicable standard for ordering a new trial where the verdict was against the weight of the evidence differs from the standard for granting a motion" for judgment as a

matter of law.  *Agere Sys.*, *Inc. v. Atmel Corp.*, No. Civ. A 02-CV-864, 2005 WL 2994702, at *15 (E.D. Pa. Aug. 17, 2005).  "A court should only order a new trial when, in its opinion, the verdict is contrary to the 'great weight of the evidence.'"  *Id.* (quoting *Roebuck v. Drexel Univ.*, 852 F.2d 715, 736 (3d Cir. 1988)).  In determining whether a new trial should be granted "a court is permitted to consider the credibility of the witnesses and to weigh the evidence."  *Id.*  Although "a party who fails to move for judgment as a matter of law under Rule 50(a) at the close of all evidence wholly waives the right to mount any post-trial attack on sufficiency of evidence grounds. . . [w]here a challenge is made to the weight of the evidence, as opposed to its sufficiency, a court may exercise its discretion and grant a new trial regardless."  *Id.* at *16 (citing *Greenleaf v. Garlock*, 174 F.3d 352, 365 (3d Cir. 1999)).

   "A court may grant a new trial or a remittitur 'only if the verdict is so grossly excessive as to shock the judicial conscience.'"[26] *Wright v. Cacciutti*, No. 3:12-CV-1682, 2015 WL 3654553, at *20 (M.D. Pa. June 11, 2015) (quoting *Williams v. Martin Marietta Alumina*, *Inc.*, 817 F.2d 1030, 1038 (3d Cir. 1987)).  "The fact that a court finds an award to be extremely generous or would have found the damages to be considerably less is not sufficient to shock the conscience."  *Id.* (internal citation and quotation marks omitted).  Both the Third Circuit and the Pennsylvania Supreme Court have set a high bar for determining what

---

[26] Federal Rule of Civil Procedure 59(e) permits a Court to alter or amend a judgment.  Generally, a "motion to alter or amend judgment must rely on one of three major grounds:  (1) an intervening change in controlling law; (2) the availability of new evidence [not available previously]; [or] (3) the need to correct clear error [of law] or prevent manifest injustice."  *North River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995) (internal citation and quotation marks omitted).

"shocks the judicial conscience."  *See, e.g.*, *Motter v. Everest & Jennings*, *Inc.* 883 F.2d

1223, 1230 (3d Cir. 1989) (in order to disturb a jury verdict "the damages assessed by the

jury must be so unreasonable as to offend the conscience of the Court"); *Haines v. Raven*

*Arms*, 536 Pa. 452, 455, 640 A.2d 367 (1994) ("Judicial reduction of a jury award is

appropriate only when the award is plainly excessive and exorbitant.  The question is

whether the award of damages falls within the uncertain limits of fair and reasonable

compensation or whether the verdict so shocks the sense of justice as to suggest the jury

was influenced by partiality, prejudice, mistake, or corruption.") (citations omitted).  If a

Court reduces a jury award because it believes the amount of the award is inconsistent with

the evidence, "the court must offer a new trial as an alternative to a reduction in the award in

order to avoid depriving the plaintiff of his/her Seventh Amendment right to a jury trial."

*Cortez v. Trans Union*, *LLC*, 617 F.3d 688, 716 (3d Cir. 2010).

## IV.  MOTION FOR JUDGMENT AS A MATTER OF LAW

### A.  42 U.S.C § 1983 – Adequate Medical Care

Plaintiffs pursued claims under 42 U.S.C § 1983, alleging that each of the individual

PrimeCare Defendants and Dr. Thomas violated Mr. Barbaros' Fourteenth Amendment right

to adequate medical care by acting, or failing to act, with deliberate indifference to his

serious medical needs.[27]  The jury found each of these Defendants, with the exception of

---

[27] The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arose under federal law.  The Court exercised supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

Wendy Johnson, liable under section 1983.  Plaintiffs also alleged, and the jury found, that

PrimeCare had a policy, practice, or custom of deliberate indifference to the serious medical

needs of inmates at the MCCF, and that this policy, practice, or custom caused Mr.

Barbaros' suicide.  The jury awarded Plaintiffs $1,057,334 in compensatory damages.

### 1.    The Individual PrimeCare Defendants

The individual PrimeCare Defendants each timely moved for judgment as a matter of

law pursuant to Federal Rule of Civil Procedure 50(a) at the close of Plaintiffs' case-in-chief.

Sept. 13, 2016 Trial Tr. at 9:15-14:3.  The Court deferred ruling on the motions.  At the close

of the evidence the individual PrimeCare Defendants renewed their motions.  Sept. 14,

2016 Trial Tr. at 62:14-17.  The Court again deferred ruling on the motions and submitted

the case to the jury.[28]  The individual PrimeCare Defendants timely renewed their motions

for judgment as matter of law pursuant to Federal Rule of Civil Procedure 50(b). (Doc. 354).

Plaintiffs' theory of deliberate indifference, as reflected in the jury charge, was that each

of the individual PrimeCare Defendants "ignored a diagnosed medical condition that

required Mr. Barbaros to take the medication Paxil, ignored and/or disregarded obvious

symptoms that showed Mr. Barbaros was suffering from medication withdrawal, failed to

ensure proper dosing when restarting Mr. Barbaros' medication, and failed to monitor Mr.

Barbaros."  Jury Charge § 13(B).  The jury was instructed in accordance with the Third

---

[28] "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court later deciding the legal questions raised by the motion."  Fed. R. Civ. P. 50(b).

Circuit's Model Jury Instruction § 4.11.1 (Denial of Adequate Medical Care), with slight

modifications to indicate that because Mr. Barbaros was a pretrial detainee, Plaintiffs'

claimed deprivation of his constitutional right to adequate medical care arose under the

Fourteenth Amendment, not the Eighth Amendment.[29]  After deliberating for a period of

time, the jury submitted a written question to the Court: "Could you provide us with a better

definition of deliberate indifference?"  After discussing the appropriate response with

counsel, the Court referred the jury back to the instructions.  The jury later returned its

verdict.

Plaintiffs' claims arise under 42 U.S.C. § 1983.  Section 1983 is not an independent

source of substantive rights, but merely "provides a remedy for deprivations of rights

established elsewhere in the Constitution or federal laws."  *Kopec v. Tate*, 361 F.3d 772,

---

[29] The jury was *not* instructed in accordance with the Third Circuit's Model Jury Instruction § 4.11.2 (Failure to Protect from Suicidal Action), and no party has raised any claim of error in this respect.  Before trial, Dr. Thomas and the PrimeCare Defendants, but not Plaintiffs, submitted proposed instructions under both 4.11.1 (Denial of Adequate Medical Care) and 4.11.2 (Failure to Protect from Suicidal Action).  (Docs. 303, 306).  No party objected to the jury instructions based on the failure to include an instruction under 4.11.2.  Sept. 14, 2016 Trial Tr. at 67:12-114:6.

Although this is a prison suicide case, in many respects it is not.  Plaintiffs alleged a denial of adequate medical care, and they did not and do not claim that Mr. Barbaros had a "particular vulnerability to suicide."  *Palakovic v. Wetzel*, 854 F.3d 209, 224-25 (3d Cir. 2017) ("We clarify today . . . that the vulnerability to suicide framework applies when a plaintiff seeks to hold prison officials accountable for failing to prevent a prison suicide.  It does not, however, preclude other types of claims, even if those claims also relate to an individual who committed suicide in prison.").  In *Palakovic*, the plaintiffs, like Plaintiffs in this case, pursued a claim "without regard to [decedent's] particular vulnerability (of lack thereof) to suicide, and instead wished to pursue a more general claim under *Estelle* that the [defendants] were deliberately indifferent to [decedent's] serious need for adequate mental healthcare and that this indifference led to the injury in the form of a deterioration of [decedent's] condition ultimately leading to suicide."  *Id.* at 227.  It appears, however, that at least one of Plaintiffs' four theories of deliberate indifference (failure to monitor) may encompass both frameworks.  The Court need not spend time parsing these distinctions because the jury was not instructed in this respect, and, in any event, under either framework there was insufficient evidence to find the individual PrimeCare Defendants or Dr. Thomas liable under section 1983.

775-76 (3d Cir. 2004).  To establish liability under section 1983, a plaintiff must prove by a preponderance of the evidence that: (1) he was deprived of a federal right; and (2) the person who deprived him of that right acted under color of state law.  *Burella v. City of Philadelphia*, 501 F.3d 134, 139 (3d Cir. 2007).

The state action element of Plaintiffs' claim was not in dispute.  The PrimeCare Defendants conceded that, as a corporation contracting with the state to provide constitutionally required medical services to inmates, both the corporation and its employees qualified as state actors for purposes of section 1983.  *See West v. Atkins*, 487 U.S. 55-56, 108 S.Ct. 42, 101 L.Ed.2d 40 (1988) ("It is the physician's function within the state system, not the precise terms of his employment, that determines whether his actions can fairly be attributed to the state."); *see also Donnell v. Corr. Health Servs, Inc.*, 405 F. App'x 617, 621 n.5 (3d Cir. 2010) ("[W]e do not think there is any dispute that the [defendants], though not directly employed by the state, acted under color of state law in providing medical services . . . at the Ocean County Jail.").  The jury was instructed, consistent with the proposed jury instructions submitted by the PrimeCare Defendants, (Doc. 333), that this element of Plaintiffs' claim had been satisfied.  The question for the jury to decide, then, was whether Plaintiffs proved by a preponderance of the evidence that any of the individual PrimeCare Defendants violated Mr. Barbaros' Fourteenth Amendment right to adequate medical care and, if so, whether these acts and omissions caused Mr. Barbaros to commit suicide.

"While the Eighth Amendment prohibits the infliction of cruel and unusual punishment upon prisoners, it applies only 'after [the State] has secured a formal adjudication of guilt in accordance with due process of law.'"  *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)).  Accordingly, because Mr. Barbaros was a pretrial detainee, not a convicted prisoner, his claims arose under the Fourteenth Amendment's due process clause.[30]  *Id.* at 582.  In order to prove a constitutional violation of Mr. Barbaros' Fourteenth Amendment right to adequate medical care, Plaintiffs must show:  "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  *Natale*, 318 F.3d at 582.  The Court will first address whether the evidence was sufficient for a reasonable jury to conclude that Mr. Barbaros had a "serious medical need."

In denying the PrimeCare Defendants' motion for summary judgment, the Court noted that they "do not challenge whether Barbaros had a serious medical need."  (Doc. 175 at n.10).  At trial while moving for judgment as a matter of law pursuant to Rule 50(a), counsel

---

[30] In opposition to the PrimeCare Defendants' motion for summary judgment, Plaintiffs argued that because their claim arises under the Fourteenth Amendment, as opposed to the Eighth Amendment, the constitutional protections available to pre-trial detainees are greater, and, thus, a less stringent standard for liability under section 1983 should apply.  In support, Plaintiffs pointed to the Supreme Court's statement that the due process rights of pretrial detainees "are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *City of Revere*, 463 U.S. at 244.  Although acknowledging that Plaintiffs' "points are well-taken," this Court "declined Plaintiffs invitation to opine on the nature of this standard," as "neither the Supreme Court nor the Third Circuit has 'yet determined the precise standard that applies to medical-treatment claims when brought by pretrial detainees.'"  (Doc. 175, at 16) (citations omitted). Thus, the Court analyzed the motion under the standard set forth in Eighth Amendment jurisprudence, and continued to do so through trial.

for the PrimeCare Defendants stated: "Specifically, in this particular matter, I think, at least, at this point, [it] has to be conceded that Mr. Barbaros had a serious medical condition, he was diagnosed when he came into the prison with anxiety, and he received medications for it. So I think that certainly meets the first prong." Sept. 13, 2016 Trial Tr. at 10:6-10. The PrimeCare Defendants in their brief in support of their post-trial motion, though, attempt to disavow their own counsel's statements:

> Initially, it must be stated that PrimeCare Defendants do not concede Barbaros suffered from a serious medical condition. He was a generally healthy male who received mental health medications from his family physician. There was nothing about his history which indicated he suffered from a serious medical condition or that any of the PrimeCare Defendants should have been subjectively aware of any serious medical condition.

(Doc. 377, at 21). The PrimeCare Defendants not only failed to move for judgment as a matter of law pursuant to Rule 50(a) on the basis that Mr. Barbaros did not have a serious medical need; they explicitly conceded that he did. Under the circumstances, the PrimeCare Defendants have waived this issue and may not now claim in their Rule 50(b) motion that the evidence was insufficient for a reasonable jury to conclude that Mr. Barbaros had a serious medical.[31] The Court need only address then, whether viewing the evidence in the light most favorable to the Plaintiffs, no reasonable jury could conclude that any of the

---

[31] "In order preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law" before the case is submitted to the jury "and specify the grounds for that motion." *Lightning Lube*, 4 F.3d at 1172; *see also Kutner Buick, Inc. v. Am. Motors Corp.*, 868 F.2d 614, 617 (3d Cir. 1989) ("The rule that a post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict . . . is the settled law of this circuit.") (citations omitted).

individual PrimeCare Defendants acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical need.

A prison employee acts with deliberate indifference to an inmate's serious medical need when he or she "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exits, and he must also draw that inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "This requirement of actual knowledge means that 'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001) (quoting *Farmer*, 511 U.S. at 837). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bd. Of Cnty. Comm'rs of Bryan Cnty. Oklahoma v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997).

Plaintiffs, however, "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 511 U.S. at 842. A defendant's knowledge of a substantial risk of serious harm "can be proved indirectly by circumstantial evidence" and a jury may reasonably find that a defendant "knew of a substantial risk from the very fact that risk was obvious." *Beers-Capitol*, 256 F.3d at 131

(internal citation and quotation marks omitted).  In addition, a defendant "who is actually aware of the risk to the prisoner can avert liability by showing that he responded reasonably to the risk, even if the ultimate harm was not avoided."  *Id.* at 132.

It is apparent that "[t]he knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware."  *Id.* at 133. There must, therefore, be sufficient evidence from which a jury could reasonably conclude that each of the individual PrimeCare Defendants "knew or were aware of and disregarded an excessive risk to [Mr. Barbaros'] health and safety, and they can show this by establishing that the risk was obvious."  *Id.* at 135.

The Third Circuit has found acts and omissions amounting to deliberate indifference to a serious medical need in a number of contexts "including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."  *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017) (citations omitted).  It is well-established that evidence that prison medical personnel negligently failed to diagnose or properly treat a medical condition, without more, is insufficient to demonstrate deliberate indifference.  *See, e.g., id.* at 535 ("[T]he mere receipt of inadequate medical care does not itself amount to

deliberate indifference – the defendant must also act with the requisite state of mind when providing the inadequate care."); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference."); *Hartman v. Corr. Med. Servs.*, 366 F. App'x 453, 455 (3d Cir. 2010) ("Allegations of medical negligence do not trigger constitutional protections.") (citing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993)).

"[T]he deliberate indifference standard affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients," and courts must "disavow any attempt to second-guess the propriety or adequacy of [their] particular course of treatment so long as it remains a question of sound professional judgment." *Pearson*, 850 F.3d at 538 (internal citation and quotation marks omitted). Where, as here, "a prisoner has received some amount of medical treatment, it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227 (citing *Durmer*, 991 F.2d at 67). However, "there are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Id.* at 228. For example, prison medical personnel "may not, with deliberate indifference to the serious medical needs of the inmate, opt for an easier and less efficacious treatment of the inmate's condition." *Id.* (internal citation and quotation marks omitted). "Nor may prison authorities deny reasonable requests

for medical treatment . . . [when] such denial exposes the inmate to undue suffering or the threat of tangible residual injury." *Id.* (internal citation and quotation marks omitted).

With this standard in mind, the Court has carefully reviewed the testimony and evidence presented at trial. Having done so, and viewing all of the evidence in the light most favorable to the Plaintiffs and giving them the benefit of every reasonable inference, the Court concludes that no reasonable jury could find that any of individual PrimeCare Defendants acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical needs. Plaintiffs claimed, and the jury instructions provided, four acts and omissions by the individual PrimeCare Defendants that Plaintiffs alleged constituted deliberate indifference to Mr. Barbaros' serious medical needs sufficient to impose liability under section 1983: (1) ignoring a diagnosed medical condition that required Mr. Barbaros to take the medication Paxil; (2) ignoring and/or disregarding obvious symptoms that showed Mr. Barbaros was suffering from withdrawal; (3) failing to ensure proper dosing when restarting Mr. Barbaros' medications; and (4) failing to monitor Mr. Barbaros. Before addressing why the evidence presented in this case, viewed in the light most favorable to the Plaintiffs, was insufficient to find any of the individual PrimeCare Defendants liable, the Court finds it appropriate to highlight counsel for the Plaintiffs' arguments in opposition to the PrimeCare Defendants' Rule 50(a) motion. The Court does so because these arguments present a textbook example of why the evidence presented to the jury, although sufficient for a reasonable jury to find negligence, was insufficient to demonstrate acts and

omissions by the prison nurses sufficient to give rise to a constitutional violation of Mr.

Barbaros' Fourteenth Amendment right to adequate medical care.  In claiming that Plaintiffs

presented sufficient evidence to submit the question of deliberate indifference to the jury,

counsel for the Plaintiffs stated:

> I'm going to do this for all the nurses.  I asked every one of the nurses, they all agreed, there's no dispute that this is a serious medical need.  The question is, were they subjectively aware of the risk of their actions.  I ask Nurse Paul James, he said Yes, I knew that, at the time, when I didn't fill in that document, that that could put him at risk of harm.  So he was subjectively aware.  That means that he was deliberately indifferent or, at least, it's a factual issue.
>
> Nurse Bauer—do you know what?  They all did render care, and that doesn't mean you're not deliberately indifferent.  Nurse Bauer didn't investigate.  She didn't even comply with policies.  She knew of the risk and she ignored it.
>
> Nurse Rowe—I mean, then Nurse Rowe, it's very common not to have the chart with you, in direct violation of the minimum standards.  She knows if she doesn't review the chart, that that's going to not give her necessarily a full picture of her patient and, potentially, failure to investigate, again, puts her patient at risk of harm.  Failure to recognize the symptoms in this case, the constellation of symptoms that Nurse Wild talked about.
>
> Wendy Johnson.  She actually investigated and failed to communicate, even though she knew it was a risk.  She knew it was a risk, and none of them investigated the side effects of Paxil, what it could do, and none of them knew, and they all admitted they had an obligation to investigate.  And that's throughout.
>
> So I would submit, Your Honor, is that there's ample evidence against everyone in this case that there was subjective knowledge of a risk related to that serious medical need.  They failed to investigate, they ignored that risk, that amounts to deliberate indifference or, at a minimum, a factual dispute that properly should be left for the jury at the end of the trial, Your Honor.  Thank you.

Sept. 13, 2016 Trial Tr. at 24:11-25:19.

The Court will now address each of the individual PrimeCare Defendants' acts and omissions and whether there was sufficient evidence for a reasonable jury to find each of these Defendants liable.

### a. Paul James

The evidence presented at trial, viewed in the light most favorable to the Plaintiffs, shows that Paul James acted or failed to act in violation of multiple policies and procedures established by PrimeCare; policies and procedures established for the purpose of ensuring patient health and safety. Nurse James' actions and omissions placed Mr. Barbaros at an increased risk of harm. At the time he conducted Mr. Barbaros' intake, Nurse James spelled Mr. Barbaros' name incorrectly on more than one occasion, wrongly identified his medications as "Prozac" and Trazodone instead of Paxil and Trazodone, and failed to obtain a great deal of information he was required to record on Mr. Barbaros' intake form. His failure to fully and accurately complete these forms, including his failure to obtain critical information about why Mr. Barbaros took his medications, the last time he had taken his medications, or the dosage, placed Mr. Barbaros at an increased risk of harm. Nurse James also did not place Mr. Barbaros on the "psych list," as required by PrimeCare's policies and procedures.

Nurse James did, however, place Mr. Barbaros on a list to see a medical provider after determining that Mr. Barbaros suffered from an ulcer. He also completed a suicide

assessment and determined that Mr. Barbaros did not meet the criteria to be placed on suicide watch.  Plaintiffs did not, and do not, claim that Nurse James' failure to place Mr. Barbaros on suicide watch was negligent, let alone deliberately indifferent to his serious medical need.  Rather, Plaintiffs' theory of the case was that Mr. Barbaros was not suicidal at this time.  Because Nurse James met with Mr. Barbaros at approximately 3:00 a.m., he was unable to verify his medications.  Instead, he obtained and documented information about Mr. Barbaros that was later used by another member of the nursing staff to verify his medications, including: (1) the correct name of his prescribing physician, Dr. Katz; (2) the correct name and location of the pharmacy where he filled his medications, CVS pharmacy in Mountainhome; and (3) his date of birth and social security number.  Nurse James also took Mr. Barbaros' vital signs, which were normal.  He had no interactions with Mr. Barbaros during the course of his incarceration at the MCCF or any involvement in his care and treatment.

Nurse James acknowledged that he was subjectively aware, in 2009, that the many mistakes he made on the intake documents could put a patient at an increased risk of harm. There was no evidence or reasonable inference, however, that at the time he was completing Mr. Barbaros' intake, Nurse James actually knew of, and disregarded, an excessive risk to Mr. Barbaros' health and safety.  Nor was there any evidence from which a jury could reasonably infer Nurse James' knowledge of an *excessive risk* of harm to Mr. Barbaros from the fact that multiple individuals testified that it is important to obtain

complete and accurate information about a patient while conducting an intake and the failure to do so *could* place a patient at risk of harm. Thus, although there was sufficient evidence from which the jury could reasonably infer that Nurse James' acts and omissions breached the standard of care and increased the risk of harm to Mr. Barbaros (and that he was aware that such failures *could* increase the risk of harm to a patient), no reasonable jury could find that Nurse James' negligent handling of Mr. Barbaros' intake constituted acts and omissions in knowing disregard of an excessive risk of harm to Mr. Barbaros' health and safety. Nor could a reasonable jury conclude that Nurse James "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846.

Plaintiffs presented four theories of deliberate indifference: (1) ignoring a diagnosed medical condition that required Mr. Barbaros to take Paxil; (2) ignoring and/or disregarding obvious symptoms that showed Mr. Barbaros was suffering from medication withdrawal; (3) failing to ensure proper dosing when restarting Mr. Barbaros medication; and (4) failing to monitor Mr. Barbaros. The Court will address each in turn.

Viewing the evidence in the light most favorable to the Plaintiffs, there was insufficient evidence from which the jury could reasonably infer that Nurse James ignored a diagnosed medical condition that required Mr. Barbaros to take Paxil. The jury could reasonably conclude that, at the time of the intake, Nurse James was aware that Mr. Barbaros took psychiatric medications and also was aware that it was important to obtain complete and accurate information about a patient because failure to do so could place a patient at an

increased risk of harm.  His acts and omissions, in turn, affected the nursing staff's ability to promptly continue these medications.  The jury could also reasonably have concluded that Nurse James did not place Mr. Barbaros on the list to see a mental health professional, in violation of PrimeCare's policies and procedures, and instead only placed him on the list to see a medical provider.

These actions and omissions, without more, were insufficient for a reasonable jury to conclude that Nurse James acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical needs.  No reasonable jury could infer that Nurse James acted, or failed to act, in conscious disregard of Mr. Barbaros' medical condition that required him to take Paxil.  To the contrary, Nurse James took *some action*, though it was neither complete nor sufficient, to ensure that Mr. Barbaros received his medications and that he would receive further medical care to address his needs.  He placed Mr. Barbaros on a list to see a medical provider.  Nurse James also documented and communicated information about his psychiatric medications, albeit rather sloppily, so that the nurse on the next shift was aware that Mr. Barbaros took psychiatric medications and so she could attempt to verify these medications and provide them to Mr. Barbaros.  His conduct, without more, was not sufficiently culpable to rise to the level of acts and omissions that could reasonably be considered denying or delaying access to medical care for non-medical reasons so as to impose liability for a violation of a constitutional right under section 1983.  Based on these uncontroverted facts, and viewing the evidence in the light most favorable to the Plaintiffs,

no reasonable jury could find Nurse James ignored a diagnosed medical condition that required Mr. Barbaros to take Paxil.

Nor could a reasonable jury find Nurse James liable for "ignoring and/or disregarding obvious symptoms that showed Mr. Barbaros was suffering from medication withdrawal." Neither Plaintiffs' theory of the case, nor the evidence viewed in the light most favorable to them, was sufficient to show that Mr. Barbaros was suffering from withdrawal at the time of intake, let alone exhibiting obvious symptoms of withdrawal that Nurse James consciously disregarded. Plaintiffs did not argue to the contrary and there was no evidence to support this conclusion. For similar reasons, no reasonable jury could find that Nurse James "failed to monitor" Mr. Barbaros in conscious disregard of an excessive risk of harm to his health and safety. Plaintiffs neither alleged, nor presented any evidence from which the jury could reasonably conclude, that at the time of the intake, Mr. Barbaros was suicidal and should have been placed on monitoring. Accordingly, there was no evidence from which the jury could reasonably infer that Nurse James' failure to place Mr. Barbaros on monitoring was negligent, let alone deliberately indifferent to his serious medical needs.

A reasonable jury could also not conclude that Nurse James "intentionally or recklessly failed to ensure proper dosing when restarting Mr. Barbaros' medication." Although Nurse James wrote down "Prozac," instead of "Paxil," and did not obtain any information about the dosage or last time Mr. Barbaros took his medications, among other things, it does not follow that this constitutes intentional or reckless failure to "ensure proper dosing *when*

*restarting*" his medications.  No reasonable jury could conclude that this theory of liability applied to the acts and omissions of Nurse James.[32]  Nurse James had no involvement in the resumption of Mr. Barbaros' medication and had no say in the dosage Dr. Thomas chose to prescribe.  His failure to document the correct dosage (a question that was not identified on the PrimeCare intake forms) coupled with his testimony that he was aware that failure to obtain and document complete and accurate information about a patient and their medications, without more, was insufficient evidence from which the jury could reasonably conclude that at the time Nurse James completed Mr. Barbaros' intake form, Nurse James consciously disregarded a known or obvious excessive risk to Mr. Barbaros' health and safety on this theory.  Viewing all the evidence in the light most favorable to the Plaintiffs, Nurse James' acts and omissions, while negligent, do rise to the level of deliberate indifference.

### b.    Patricia Bauer

Nurse Bauer's involvement in the treatment of Mr. Barbaros was brief, and involved what appear to be two acts and various omissions.  Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could conclude that Nurse Bauer made a single phone call to CVS pharmacy in an attempt to verify Mr. Barbaros' medications based on the information provided to her by Nurse James earlier in the day.  She then wrote on Mr.

---

[32] It appears that this theory of deliberate indifference could apply only to Dr. Thomas, as he was the only individual with the authority to ensure proper dosing and to make the decision to restart Mr. Barbaros on Paxil.  Even if the Court were to consider this theory applied to the nursing staff, it was no doubt limited to the nursing staff who, unlike Paul James, were involved in Mr. Barbaros care *when restarting* his medications.

Barbaros' chart that "CVS denies customer." In violation of PrimeCare's policies and procedures, she made no other attempt to use alternative methods for obtaining the medications. She also did not call the on-call psychiatrist and relay this information that his medications could not be verified, in violation of PrimeCare's policies and procedures. Nurse Bauer also made no attempt to speak with Mr. Barbaros to see if there was any inaccurate information on the intake form which prevented CVS from verifying the medication. Instead, knowing that he claimed to be taking psychiatric medications, Nurse Bauer placed him on the "psych list" so he could be seen by a mental health professional. She did not, however, take any other actions to provide him access to his medications or alert any other member of the staff to his needs. Nurse Bauer testified that she knew, in 2009, that it was important to obtain psychiatric medications for a patient as soon as possible because there is a possibility that patient could suffer withdrawal.

Although the jury could reasonably conclude that, in 2009, Nurse Bauer was subjectively aware that the failure to promptly obtain a similarly situated patient's prescription medications could put that patient at an increased risk of harm, there is no evidence from which a jury could reasonably conclude that, at the time she called CVS and then took no other actions to verify Mr. Barbaros' medications, Nurse Bauer was aware of and disregarded an *excessive risk of harm* to Mr. Barbaros. The testimony presented at trial, viewed in the light most favorable to the Plaintiffs, was that Nurse Bauer was aware that failure to obtain a patient's psychiatric medications "could" or "possibly" cause a patient to

suffer from withdrawal.  Nor was there any evidence from which the jury could reasonably conclude that the risk of a patient going into withdrawal or SSRI discontinuation is an *excessive* or *obvious* risk, which Nurse Bauer disregarded.  In fact, the testimony was to the contrary:  the risk of withdrawal, though not negligible, was neither excessive nor obvious.  Based on the evidence presented at trial and Plaintiffs' theories of deliberate indifference as presented to the jury, no reasonable jury could find Nurse Bauer's negligent acts and omissions violated Mr. Barbaros' constitutional rights.

Nurse Bauer made just one attempt to verify Mr. Barbaros medications.  When that attempt failed, although she could and should have done more, she placed Mr. Barbaros on a list to see a mental health professional, but did not call the on-call psychiatrist as required by PrimeCare's policies and procedures.  She testified that it was her understanding that he would be seen by a mental health provider the following day.  Giving Plaintiffs the benefit of every reasonable inference, there was insufficient evidence from which a reasonable jury could conclude Nurse Bauer knowingly ignored Mr. Barbaros' "condition that required him to take Paxil."  Instead, Nurse Bauer took two steps, albeit inadequate, unsuccessful, and in violation of PrimeCare's policies and procedures, to address Mr. Barbaros' medication needs.  Her negligent acts and omissions were not deliberately indifferent and no reasonable jury could find that she denied or delayed access to treatment for non-medical reasons.  No reasonable jury could conclude that Nurse Bauer's acts and omissions constituted a conscious disregard of an excessive or obvious risk to Mr. Barbaros' health

and safety.  *See Pearson*, 850 F.3d at 539 (plaintiffs "offered no circumstantial evidence suggesting that Nurse Thomas subjectively appreciated the true seriousness of the risk of harm.  Nor did he produce extrinsic evidence that Nurse Thomas's treatment decision regarding the symptoms of which she had awareness was a substantial departure from accepted professional judgment, practice, or standards, such that a reasonable jury could conclude that she actually did not base her decision on such judgment.") (internal citation and quotation marks omitted).  The fact that she could have and should have done more speaks to negligence, not deliberate indifference.

Nor was the evidence such for a reasonable jury to conclude that Nurse Bauer "failed to monitor" Mr. Barbaros in conscious disregard of a known or obvious risk.  Plaintiffs neither alleged, nor presented any evidence, that at the time Nurse Bauer called CVS pharmacy, Mr. Barbaros was either suicidal or suffering from obvious symptoms of withdrawal that she knew of and disregarded.  Instead, Plaintiffs' theory of the case, consistent with the evidence viewed in the light most favorable to them, was that Mr. Barbaros started to exhibit signs of withdrawal the day after Nurse Bauer attempted to verify his medications, withdrawal that could have been prevented, lessened, or diagnosed had she acted different.  And there was no evidence from which the jury could reasonably conclude that Nurse Bauer personally saw Mr. Barbaros on that day.  Viewing the evidence in the light most favorable to the Plaintiffs, Nurse Bauer's acts and omissions could, as the jury found, breach the duty of care and contribute to a further delay of access to Mr. Barbaros' necessary medications

which, in turn, worsened his withdrawal and contributed to his suicide. But this evidence was insufficient for the jury to reasonably conclude that Nurse Bauer "intentionally or recklessly failed to monitor" Mr. Barbaros, in conscious disregard of a known or obvious excessive risk of harm.

For similar reasons, no reasonable jury could find that Nurse Bauer "intentionally or recklessly ignored and/or disregarded obvious symptoms" that Mr. Barbaros was suffering from medication withdrawal. As discussed, neither Plaintiffs' theory of the case, nor the evidence presented at trial, was sufficient to establish that, at this time, Mr. Barbaros was exhibiting obvious symptoms of withdrawal that Nurse Bauer intentionally or recklessly disregarded. Therefore, no reasonable jury could find that Nurse Bauer intentionally or recklessly ignored and/or disregarded Mr. Barbaros' "obvious" symptoms of withdrawal.

Finally, for the reasons discussed as to why no reasonable jury could find that Nurse James acted with deliberate indifference by failing to ensure proper dosing upon resumption of Mr. Barbaros' medication, no reasonable jury could find Nurse Bauer liable under this theory of deliberate indifference.

### c.      Christina Rowe

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that the day after Nurse Bauer attempted, unsuccessfully, to verify Mr. Barbaros' medications, Mr. Barbaros submitted a sick call slip on March 19 and had still not received his medications. Around 10:00 a.m. on March 20 he was assessed by Nurse Rowe. During

the assessment, Nurse Rowe took and documented Mr. Barbaros' vital signs, which

revealed high blood pressure that was clinically significant. She wrote on a form that he

was not taking any medications. Nurse Rowe performed a headache assessment based on

Mr. Barbaros' complaints and documented the results. In violation of PrimeCare's policies

and procedures, however, Nurse Rowe did not review Mr. Barbaros' medical chart prior to

performing her assessment or completely fill out the headache assessment, among other

medical forms. Had Nurse Rowe acted differently, she would have realized that Mr.

Barbaros claimed to be taking psychiatric medication, that CVS denied him as a customer,

and that no further attempts had been made to verify and obtain his medications.

After completing her assessment of Mr. Barbaros, Nurse Rowe obtained and provided

Mr. Barbaros with Tylenol and directed it be taken twice a day to treat his headaches. Later

that day she relayed to the on-call physician's assistant that Mr. Barbaros was suffering

from high blood pressure and obtained from her a prescription for Lopressor to be given to

Mr. Barbaros for thirty days. She also obtained a medical order that Mr. Barbaros' blood

pressure was to be taken daily for the next five days (a medical order that was never carried

out). Nurse Rowe documented this information on his medical chart, and now had the

opportunity to review his chart that she did not have access to at the time of her assessment

hours earlier in the day. If Nurse Rowe had conducted any investigation, a reasonable jury

could conclude that she would have "connected the dots" and realized he was suffering

from withdrawal due to his symptoms and lack of medication. That is, Nurse Rowe would

have been aware that Mr. Barbaros had been off his medications for several days, and this knowledge, coupled with her knowledge that he was exhibiting withdrawal symptoms, would have indicated to her that Mr. Barbaros was suffering from withdrawal.  This, in turn, would have, in accordance with PrimeCare's policies and procedures, required her to place Mr. Barbaros on medical monitoring or, at a minimum, alert a medical provider or member of the nursing staff to these facts.

These facts, viewed in the light most favorable to Plaintiffs, although sufficient for the jury to find Nurse Rowe negligent, are not sufficient to find her liable for deliberate indifference for acting, or failing to act, in conscious disregard of a known or obvious risk to Mr. Barbaros' health and safety.  No reasonable jury could find Nurse Rowe liable for deliberate indifference under any of the theories advanced by Plaintiffs.

No reasonable jury could find that Nurse Rowe, with deliberate indifference, "ignored a diagnosed medical condition that required Mr. Barbaros to take Paxil."  Viewing the evidence in the light most favorable to the Plaintiffs, the jury could reasonably conclude Nurse Rowe knew that Mr. Barbaros was taking Paxil in the hours after conducting her assessment and that his medications had not been verified in two days.  She also knew Mr. Barbaros was experiencing symptoms associated with withdrawal (high blood pressure and a headache).  Although she did not know Mr. Barbaros was taking Paxil at the time of her assessment earlier that day (because she negligently conducted it without the benefit of his medical chart) she would or should have known this hours later after obtaining the order for

Lopressor and daily blood pressure checks when she documented this information in Mr. Barbaros' medical chart. Nevertheless, Nurse Rowe took no steps to ensure Mr. Barbaros received his medications, or that further attempts were made to verify the medications. The medications were verified and prescribed later that evening, after Mr. Barbaros complained in Court that he was not receiving his medications.

Although the jury could reasonably conclude that Nurse Rowe was aware of Mr. Barbaros' medical condition that required him to take Paxil, and did nothing to provide him further access to his medications, this was not a sufficient basis to hold her liable for a deprivation of Mr. Barbaros' constitutional rights based on the evidence presented at trial. There was no evidence from which the jury could reasonably conclude that Nurse Rowe was actually aware of, and disregarded, an excessive risk of harm to Mr. Barbaros by failing to take further actions to obtain his medications. To the contrary, not only was there no evidence that being without Paxil for approximately three days puts a patient at an *excessive risk* of harm, but the evidence showed that Nurse Rowe was not aware of an excessive risk of harm. Nor was there any evidence from which the jury could reasonably infer her knowledge based on the obviousness of the risk. Her acts and omissions, while negligent, do not satisfy the "stringent standard" required to subject her to liability under section 1983 for providing constitutionally inadequate medical care.

Similarly, no reasonable jury could find Nurse Rowe liable on the theory she "ignored and/or disregarded obvious symptoms" that Mr. Barbaros was suffering from withdrawal.

There was no evidence that Nurse Rowe was aware of, and disregarded, obvious symptoms that Mr. Barbaros was suffering from withdrawal, but chose to do nothing. Rather, the evidence viewed in the light most favorable to the Plaintiffs, was that she negligently failed to conduct an investigation sufficient to apprise herself of the facts and circumstances, and that she should have connected the dots but did not. Nor was there any evidence from which the jury could reasonably conclude that Nurse Rowe was aware that Mr. Barbaros was displaying "obvious" symptoms of withdrawal or that Mr. Barbaros' symptoms were so obvious that she had to have known he was in withdrawal. Instead, the evidence at trial was that headaches and high blood pressure *could* be signs of withdrawal, not that they are obvious symptoms. Moreover, there is no dispute that Nurse Rowe promptly provided treatment for both Mr. Barbaros' headache and high blood pressure to address his medical needs. *See Pearson*, 850 F.3d at 538-39 ("[E]ven if a reasonable jury could find that Nurse Thomas was negligent in diagnosing or treating his pain, that would not be enough for the jury to find that Nurse Thomas acted with deliberate indifference . . . it is undisputed that she examined him, diagnosed him with a pulled muscle, and decided not to elevate his condition based on her opinion that it was not severe.").

Nor could a reasonable jury conclude that Nurse Rowe acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical needs by "failing to monitor" him, in conscious disregard of a known risk of excessive harm. There was no evidence that Nurse Rowe knew of, and disregarded, a need to monitor Mr. Barbaros, but nevertheless

consciously disregarded that risk. Rather, the evidence viewed in the light most favorable to the Plaintiffs was that Nurse Rowe's failure to adequately investigate Mr. Barbaros' situation prevented her from obtaining the necessary information that would enable a reasonable nurse to recognize he was experiencing withdrawal symptoms associated with the denial of access to his medications, which, in turn, would have alerted a reasonable nurse that Mr. Barbaros needed to be placed on monitoring or, at a minimum, that she should alert a medical provider. But there is no evidence from which a reasonable jury could conclude that Nurse Rowe actually knew of an excessive risk of harm to Mr. Barbaros and consciously ignored that risk. Nor could a reasonable jury infer Nurse Rowe's knowledge of the risk based on the fact that it was obvious. There was no evidence from which a reasonable jury could infer that the fact that Mr. Barbaros was experiencing a headache, high blood pressure, and abdominal pain, coupled with the lack of Paxil, presented such obvious symptoms of withdrawal that Nurse Rowe had to have known that the failure to place him on monitoring placed Mr. Barbaros at an excessive risk of harm. *See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 (3d Cir. 1991) ("[T]here can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize a high risk of suicide."). Her actions, while negligent, did not violate Mr. Barbaros' constitutional rights.

Finally, no reasonable jury could find that Nurse Rowe "failed to ensure proper dosing" when restarting Mr. Barbaros on his medications. Like Nurse Bauer and Nurse James,

there is no evidence of her personal involvement in the resumption of Mr. Barbaros'

medication, or any conduct that could plausibly be connected to the dosage.

### d. Grace Ramos

A reasonable jury also could not conclude that Nurse Ramos acted, or failed to act, with

deliberate indifference to Mr. Barbaros' serious medical needs. Viewing all the evidence in

the light most favorable to the Plaintiffs, a reasonable jury could conclude that on the

afternoon of March 20, Mr. Barbaros complained to a judge during his arraignment that he

was not receiving his medications. This message was relayed back to the MCCF. Shortly

thereafter, Wendy Johnson called Nurse Ramos and asked her to attempt to verify Mr.

Barbaros' medications with the CVS pharmacy where Nurse Bauer, two days earlier, had

been unable to verify the prescriptions. Around 9 p.m. that evening Nurse Ramos called

CVS pharmacy and successfully verified Mr. Barbaros' medications. Nurse Ramos then

contacted Dr. Thomas, the on-call psychiatrist, and obtained prescriptions for Paxil and

Trazodone in the same dosages as Mr. Barbaros had been prescribed by physician, Dr.

Katz. In violation of PrimeCare's policies and procedures, Nurse Ramos also did not review

Mr. Barbaros' medical chart which, had she done so, would have made her aware that

important information was missing, including when he last took these medications. She also

would or could have realized that Mr. Barbaros was experiencing symptoms associated with

withdrawal. Thus, had Nurse Ramos followed PrimeCare's policies and procedures, she

could or would have recognized that Mr. Barbaros had been without his medications for

approximately three days, was in withdrawal, and placed him on monitoring. At a minimum, she was under an obligation to provide this information to Dr. Thomas or another medical provider.

A reasonable jury could also conclude that Nurse Ramos gave Mr. Barbaros his Trazodone later that evening, but did not give him his Paxil at this time because it is a drug taken in the morning. A reasonable jury could also conclude that on the evening of March 21, hours before Mr. Barbaros committed suicide, Nurse Ramos failed to give Mr. Barbaros his Trazodone, contrary to medical orders and in violation of PrimeCare's policies and procedures. Mr. Barbaros received his Paxil on the morning of March 21.

For reasons similar to those discussed in connection with the other individual PrimeCare Defendants, Nurse Ramos' acts and omissions, without more, were insufficient evidence from which a reasonable jury could conclude that Nurse Ramos acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical need. There was simply no testimony that, at the time of Nurse Ramos' acts and omissions, she was aware of, and consciously disregarded, a risk of harm to Mr. Barbaros, let alone an excessive risk of harm. Nor was the risk of harm of such a nature that the jury could reasonably find the risk "obvious" and therefore infer Nurse Ramos' actual knowledge of the risk.

There was no evidence that Nurse Ramos intentionally or recklessly "ignored a diagnosed medical condition" that required Mr. Barbaros to take Paxil. To the contrary, viewing the evidence in the light most favorable to the Plaintiffs, no reasonable jury could

find that Nurse Ramos intentionally or recklessly ignored Mr. Barbaros' needs in this respect. Within hours after learning of Mr. Barbaros' complaints from Wendy Johnson, Nurse Ramos called CVS and attempted to verify his medications. After she successfully completed this task, she called Dr. Thomas and, as a result, Mr. Barbaros obtained his Trazodone that evening and his Paxil in the morning.[33]

Similarly, no reasonable jury could find Nurse Ramos liable on the theory she: (1) "ignored and/or disregarded obvious symptoms" that Mr. Barbaros was suffering from withdrawal; or (2) "failed to monitor" Mr. Barbaros in conscious disregard of a known risk of harm. There was no evidence from which a reasonable jury could infer that, at the time she was attempting to obtain Mr. Barbaros' medications, Nurse Ramos intentionally or recklessly declined to review Mr. Barbaros' medical chart, in conscious disregard of an excessive risk of harm. Rather, the evidence viewed in the light most favorable to the Plaintiffs shows that, like Nurse Rowe, Nurse Ramos negligently failed to review Mr. Barbaros' medical chart and connect the dots, and that a reasonable nurse in her position would have done so. Nurse Ramos' failure to review Mr. Barbaros' medical chart prevented her from obtaining necessary information that would enable a reasonable nurse to recognize he was experiencing withdrawal symptoms, and a reasonable nurse would have realized this. A reasonable nurse, armed with this information, would have realized that Mr. Barbaros needed to be placed on monitoring, consistent with PrimeCare's policies and

---

[33] There was also no evidence from which the jury could reasonably conclude that Nurse Ramos, with deliberate indifference, failed to give Mr. Barbaros his Trazodone; nor could the jury find that the conduct amounted to anything more than negligence.

procedures on withdrawal.  At a minimum, a reasonable nurse would have realized that this was important information she had an obligation to investigate and relay to Dr. Thomas.

But no reasonable jury could conclude that Nurse Ramos' negligent acts and omissions rose to the level of deliberate indifference to Mr. Barbaros' serious medical needs.  The evidence viewed in the light most favorable to Plaintiffs, was insufficient to show that Nurse Ramos knew of, and disregarded, obvious symptoms that Mr. Barbaros was suffering from withdrawal.  The evidence was also insufficient for a jury to reasonably conclude Nurse Ramos knew of, and disregarded, the need to monitor Mr. Barbaros. In fact, it was Plaintiffs' theory, borne out by the evidence, that Nurse Ramos *should have been* aware that Mr. Barbaros was experiencing signs of withdrawal and *should have* placed him on monitoring or alerted Dr. Thomas who, in turn, should have placed him on monitoring.  These facts, without more, show negligence.  They do not provide a sufficient evidentiary basis for a reasonably jury to find deliberate indifference.  *Colburn*, 946 F.2d at 1025.

Finally, no reasonable jury could find Nurse Ramos liable for deliberate indifference on the theory that she intentionally or recklessly "failed to ensure proper dosing" when restarting Mr. Barbaros' medication.  As an initial matter, the evidence presented to the jury was that ensuring the proper dosage is the prescribing physician's responsibility.  The evidence presented showed that ensuring proper dosing when resuming Paxil is beyond the scope of a LPN's responsibility, and was, instead, Dr. Thomas' responsibility.  But even if that were not the case, Nurse Ramos verified Mr. Barbaros' medications and relayed the

correct information about the names and dosages to Dr. Thomas. From there, it was the responsibility of Dr. Thomas, exercising medical judgment, to prescribe the medications and determine to correct dosages. Viewing all the evidence in the light most favorable to the Plaintiffs, no reasonable jury could conclude Nurse Ramos intentionally or recklessly failed to ensure proper dosing when restarting Mr. Barbaros' medication.

### e. The Individual PrimeCare Defendants Did Not Violate Mr. Barbaros' Constitutional Right to Adequate Medical Care

Each of the individual PrimeCare Defendants provided some medical treatment or affirmatively acted to provide Mr. Barbaros access to care to address his serious medical needs. His prescriptions were verified within 72 hours of his arrival. He received his Trazodone within 72 hours of arriving at the facility and received his Paxil shortly thereafter. There was no evidence that any of the individual PrimeCare Defendants knowingly disregarded any excessive risks to his health and safety. Nor could the risk of harm reasonably be found to be obvious. Where, as in this case, care is provided to a pretrial detainee to address his serious medical needs, "it is difficult to establish deliberate indifference, because prison officials are afforded considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854 F.3d at 227. Although that is not dispositive, the facts and circumstances surrounding the individual PrimeCare Defendants' acts and omissions during their care and treatment of Mr. Barbaros cannot be classified as "circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements." *Id.*

It is well-settled that the "mere receipt of inadequate medical care does not itself amount to deliberate indifference." *Pearson*, 850 F.3d at 535. Allegations that prison medical personnel failed to diagnose or properly treat a medical condition does not demonstrate deliberate indifference. *Id.* at 538. There was insufficient evidence from which a jury could reasonably conclude that the delay in providing Mr. Barbaros his Paxil was the result of deliberate indifference by delaying medical treatment for non-medical reasons. *Cf. Natale*, 318 F.3d at 582-83 ("A reasonable jury could conclude that PHS employees knew that Natale was an insulin-dependent diabetic and that if insulin was not administered as required, he would suffer adverse health consequences. In addition, there was evidence that . . . PHS employees delayed medical treatment for non-medical reasons—the PHS policy that failed to address the immediate medication needs of inmates with serious medical conditions."). None of the individual PrimeCare Defendants' acts and omissions was sufficiently culpable to elevate his or her conduct from negligence to a constitutional violation, including his or her failure to comply with PrimeCare's policies and procedures regarding verification of medication which, had they complied, would have resulted in Mr. Barbaros receiving his medications two days earlier than he did. Plaintiffs were required to prove by a preponderance of the evidence that one or more of the individual PrimeCare Defendants acted "with the requisite state of mind *when providing the inadequate care*." *Pearson*, 850 F.3d at 538 (emphasis added) (citing *Durmer*, 991 F.2d at 69 n.13). Plaintiffs failed to do so, and no reasonable jury could find otherwise.

Viewed in the light most favorable to the Plaintiffs, a reasonable jury could conclude that in 2009 while working at the MCCF, the individual PrimeCare Defendants (all licensed practical nurses) were subjectively aware that the failure to: (1) complete medical charts and obtain full and accurate information about a patient; (2) follow medical orders to take blood pressure and give medications; and (3) review a patient's medical chart and investigate his condition, all increase the risk of harm to a patient. A reasonable jury could also conclude that the individual PrimeCare Defendants knew that delaying or denying a patient access to his medications, among other things, increases the risk of harm to a patient. This knowledge, without more, was insufficient evidence to find deliberate indifference to a serious medical need. No reasonable jury could conclude that, at the time each of the individual PrimeCare Defendants provided care to Mr. Barbaros, that they, (despite their knowledge that these failures *could* increase the risk of harm to a patient), nevertheless knowingly disregarded an *excessive risk* to Mr. Barbaros' health and safety. *See Beers-Capitol*, 256 F.3d at 131 (The "requirement of actual knowledge means that the 'official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (quoting *Farmer*, 511 U.S. at 842). Nor could a reasonable jury conclude that any of the individual PrimeCare Defendants "knew of a substantial risk from the very fact that risk is obvious." *Id.* While, in retrospect, it may be "obvious" to the individual PrimeCare Defendants that their negligent acts and omissions increased the risk of harm to Mr. Barbaros, no reasonable jury could conclude

that any of the individual PrimeCare Defendants had a sufficiently culpable state of mind at the time they provided care to Mr. Barbaros to impose liability.[34]

The uncontroverted evidence presented to the jury, viewed in the light most favorable to the Plaintiffs, was that Mr. Barbaros had access to medical care and received treatment from multiple medical personnel on multiple occasions. Nurse James documented that Mr. Barbaros was taking psychiatric medications, identifying his prescribing physician and the name of the pharmacy he used to fill these prescriptions, among other things. This information was relayed to Nurse Bauer, who attempted to address Mr. Barbaros' needs by calling CVS, but was unable to verify his medications. Nurse Bauer then, rather than ignoring his needs, placed Mr. Barbaros on a list to see a mental health provider. Nurse Ramos, using the same information provided to Nurse Bauer by Nurse James, called CVS and was able to verify his medications. She then called Dr. Thomas to obtain the prescriptions to address Mr. Barbaros' needs. The same is true for the acts and omissions of Nurse Rowe. Nurse Rowe would or should have been aware from reviewing the medical chart that Mr. Barbaros took psychiatric medications and had been without them for several days, but there was no evidence that she knew of, and disregarded, an excessive risk of harm. Nurse Rowe performed an assessment of Mr. Barbaros in response to his sick call

---

[34] The fact that Plaintiffs' correctional nursing expert, Kathy Wild, testified (or attempted to testify) that each of the individual PrimeCare Defendants was "subjectively aware," or "deliberately indifferent" to Mr. Barbaros' serious medical needs does not change the Court's conclusion that no reasonable jury could find Mr. Barbaros liable under section 1983. Sept. 8, 2016 Trial Tr. at 258:25-259:11. The Court sustained counsel for the PrimeCare Defendants' objection, and did not permit Nurse Wild to opine on whether the acts and omissions of the individual PrimeCare Defendants were, in her opinion, deliberately indifferent.

request and provided him with medication to address his headache.  She also informed a physician's assistant that Mr. Barbaros was suffering from high blood pressure and obtained Lopressor and orders for blood pressure checks as a result.

A reasonable jury could find each of the individual PrimeCare Defendants liable in negligence.  But no reasonable jury could impose liability for violations of Mr. Barbaros' constitutional rights based on acts and omissions exhibiting deliberate indifference to his serious medical needs. Viewing the evidence in the light most favorable to the Plaintiffs, there is no doubt that each of the individual PrimeCare Defendants could have and should have acted differently and done more.  Their acts and omissions breached the standard of care and contributed to a situation where Mr. Barbaros was placed at an increased risk of suicide.  But each of the individual PrimeCare Defendants took steps to ensure Mr. Barbaros received care and there was insufficient evidence to conclude that any of them intentionally, knowingly, or recklessly disregarded his needs.  These actions, though inadequate, do not demonstrate intentional or reckless "disregard for Mr. Barbaros' diagnosis that required him to take Paxil," nor do they demonstrate that they "intentionally and recklessly ignored or disregarded obvious symptoms of withdrawal."  No reasonable jury could find intentional or reckless "failure to ensure proper dosing."  Nor could any reasonable jury find that any of the individual PrimeCare Defendants "intentionally or recklessly failed to monitor" Mr. Barbaros.

In sum, the evidence presented to the jury, viewed in the light most favorable to the Plaintiffs, was insufficient for the jury to reasonably conclude that Nurse James, Nurse Bauer, Nurse Rowe, or Nurse Ramos violated Mr. Barbaros' constitutional right to adequate medical care. Accordingly, the jury's verdict cannot stand, and the Court will grant the individual PrimeCare Defendants' renewed motion for judgment as a matter of law.

## 2. Dr. Alex Thomas

Dr. Thomas also renewed his motion for judgment as a matter of law pursuant to Rule 50(b). Before the case was submitted to the jury, Dr. Thomas timely moved for judgment as a matter of law pursuant to Rule 50(a). Sept. 13, 2016 Trial Tr. at 14:23-20:4; Sept. 14, 2016 Trial Tr. at 62:19-20. He did not and does not claim that he was not a state actor for purposes of liability under section 1983. Rather, he claims that there was insufficient evidence from which a jury could reasonably conclude his acts and omissions deprived Mr. Barbaros of his constitutional right under the Fourteenth Amendment to adequate medical care. Like the individual PrimeCare Defendants, whose Rule 50(a) motion only claimed there was insufficient evidence for the jury to reasonably conclude that they acted or failed to act in conscious disregard of Mr. Barbaros' serious medical need, Dr. Thomas' motion also only addressed insufficient state of mind evidence, and did not allege insufficient evidence from which a jury could find that Mr. Barbaros had a serious medical need. Sept. 13, 2016 Trial Tr. at 14:23-20:4. In his Rule 50(b) motion, he nevertheless challenges the sufficiency of the evidence that Mr. Barbaros had a serious medical need. Because Dr.

Thomas did not raise this issue in a Rule 50(a) motion, he has waived his challenge to the

insufficiency of the evidence on this issue, and cannot now raise it for the first time in his

Rule 50(b) motion.[35]

Because Mr. Barbaros had a "serious medical need," Dr. Thomas may be liable if he

acted, or failed to act, with deliberate indifference to that need.[36]  If there was sufficient

evidence from which a reasonable jury could conclude that Dr. Thomas acted, or failed to

---

[35]  In any event, a jury could reasonably conclude that Mr. Barbaros had a serious medical need.   In a memorandum opinion denying Dr. Thomas' motion for summary judgment, the Court noted that Dr. Thomas "does not challenge whether Barbaros had a serious medical need."  (Doc. 177, at 10 n.5).  The Court then concluded that Mr. Barbaros' "medical needs with respect to his mental health and the appropriate management of his psychiatric prescriptions were serious."  *Id.* at 10.   A "serious medical need" is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lazaro*, 834 F.2d 326, 347 (3d Cir. 1987) (citations omitted).  If the delay or denial of adequate medical care results in the unnecessary and wanton infliction of pain, or causes an inmate to suffer a life-long handicap or permanent loss, the medical need is 'serious.'"  *Id.* "[A] mental illness may constitute a serious medical need."  *Torres v. Yocum*, Civil No. 3:11-CV-1582, 2014 WL 2459676, at *5 (M.D. Pa. May 30, 2014) (citations omitted).

Viewing the evidence in the light most favorable to the Plaintiffs, a reasonable jury could conclude that Mr. Barbaros had a serious medical need.  First, Plaintiffs presented evidence that Mr. Barbaros' mental health needs had been diagnosed by a physician as requiring treatment, and that he took medications for those needs.  Second, Plaintiffs presented evidence that Mr. Barbaros' medications were related to his serious medical needs, and that the need to appropriately manage and continue these medications was a serious medical need.  Accordingly, there was sufficient evidence for a reasonable jury to conclude that Mr. Barbaros had a serious medical need.

[36] Although the jury was not instructed in accordance with the "particular vulnerability to suicide" framework, had the jury been instructed in this fashion, there would have been insufficient evidence from which they reasonably could conclude either that Mr. Barbaros had a "particular vulnerability to suicide" or that any of the Defendants were deliberately indifferent to his particular vulnerability.  "In essence, a 'particular vulnerability to suicide' is just one type of 'serious medical need.'"  *Palakovic*, 854 F.3d at 222 (quoting *Colburn*, 946 F.3d at 1023).  No reasonable jury could conclude that: (1) Mr. Barbaros "had a particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility that a suicide would be attempted"; (2) any of the Defendants "knew or should have known of" Mr. Barbaros' "particular vulnerability"; and (3) any of the Defendants "acted with reckless or deliberate indifference, meaning something beyond mere negligence" to Mr. Barbaros' "particular vulnerability." *Id.* at 223-24.

act, with deliberate indifference to Mr. Barbaros' serious medical need, the jury's verdict must stand.

After careful review of the record, and viewing all the evidence in the light most favorable to the Plaintiffs, the Court concludes that there was insufficient evidence from which a reasonable jury could find that Dr. Thomas' acts and omissions with respect to his treatment of Mr. Barbaros constituted deliberate indifference to Mr. Barbaros' serious medical needs. Again, the Court finds instructive counsel for the Plaintiffs' argument in opposition to Dr. Thomas' Rule 50(a) motion:

> With respect to Dr. Thomas, I would direct the Court's attention to the case of *Tillery v. Owens*, 719 F. Supp. 1256, Western District of PA from 1989, and the reason I know about that case is because I had a very similar case not long ago that I tried in the Eastern District, Your Honor, and that was an instruction given to the jury.
>
> And the instruction given to the jury in that case is that a doctor, a medical provider is deliberately indifferent when the medical provider fails to conduct any investigation sufficient to make an informed decision on patient care.
>
> I mean, we all heard the silence in the room when Dr. Thomas started to blame Nurse Ramos and said that she didn't give me the information. Then I said, Well, you didn't ask. He fully admitted that he did not ask. And then I asked him—I asked him and he admitted that the psychiatrist, as the medical doctor, is the ultimate protector here because he's the one with the specialty and knowledge, much more so than the nurse.
>
> So I said, Well, whose fault is it? Is it Nurse Rowe's fault? No. Is it your fault? Yes. It doesn't get more—you don't get more of an admission than what Dr. Thomas said on the stand, which is that he didn't ask a single thing about his patient. I said in my opening, and Mr. Hill took offense to it, that Dr. Thomas acted, basically, as a robotic medical dispenser, but guess what? That's what he admitted on the stand.

He did no investigation, and if he had, he would have known that this man said he had been taking Paxil and Trazodone, hadn't received it in at least three days—and by the way, this goes to the very next point, and it relates to Paul James.

Sept. 13, 2016 Trial Tr. at 25:20-21:15.[37]

Viewing all the evidence in the light most favorable to the Plaintiffs, a reasonable jury could conclude that the extent of Dr. Thomas' involvement in the care and treatment of Mr. Barbaros was approximately one minute or less and took place over the telephone at approximately 10 p.m. on March 20, 2009.  A reasonable jury could conclude that Dr. Thomas did not ask Nurse Ramos for any specific information about Mr. Barbaros.  He did not ask when Mr. Barbaros last took his medications, how long he had been incarcerated, whether he was scheduled to see a mental health provider, or whether he was experiencing any physical symptoms that might indicate withdrawal.  A reasonable jury could conclude that, had he done so, Dr. Thomas would have realized that Mr. Barbaros' symptoms and the length of time he had been off his medications suggested withdrawal and should have ordered him to be monitored (at least until he was scheduled to come into the MCCF two days later). Despite his failure to conduct an adequate investigation of Mr. Barbaros' history and condition, Dr. Thomas prescribed Mr. Barbaros both Paxil and Trazodone in the same dosages he had been previously prescribed by Dr. Katz based on Nurse Ramos' verification.  A reasonable jury could also have found that, consistent with Dr. Thomas' own

_____

[37] Although Plaintiffs insisted on a jury instruction that a prison doctor could be held liable for deliberate indifference when he or she "*fails* to conduct any investigation sufficient to make an informed decision on patient care," the Court disagreed that such a theory of liability would be appropriate on the facts of this case.

testimony, he was aware in 2009 of the importance of obtaining all relevant information prior to prescribing a patient psychiatric medication for the first time. A reasonable jury could also find that Dr. Thomas knew that prescribing a patient Paxil for the first time increases the risk of suicide. This evidence, without more, was insufficient for a reasonable jury to find that Dr. Thomas acted, or failed to act, with deliberate indifference to Mr. Barbaros' serious medical need.

As discussed, Plaintiffs alleged, and the jury was instructed, on four separate theories of deliberate indifference: that Dr. Thomas (1) ignored a diagnosed medical condition that required Mr. Barbaros to take Paxil; (2) ignored and/or disregarded obvious symptoms that showed Mr. Barbaros was suffering from medication withdrawal; (3) failed to ensure proper dosing when restarting Mr. Barbaros' medication; and (4) failed to monitor Mr. Barbaros.

Viewing all the evidence in the light most favorable to the Plaintiffs, no reasonable jury could find that Dr. Thomas ignored Mr. Barbaros' diagnosed medical condition that required him to take Paxil. To the contrary, after Nurse Ramos informed him that she had verified Mr. Barbaros' medications, Dr. Thomas promptly prescribed those very same medications in the same dosages. This does not under any circumstances constitute deliberate indifference to Mr. Barbaros' serious medical needs.

Nor was there sufficient evidence from which the jury could reasonably conclude that Dr. Thomas ignored and/or disregarded "obvious symptoms" that showed Mr. Barbaros was suffering from medication withdrawal. As an initial matter, like Nurse Ramos, Dr. Thomas

did not know Mr. Barbaros was displaying symptoms of withdrawal because he negligently failed to ask for information about his condition. There was no evidence that he knowingly failed to ask this information, or that this conduct was anything other than negligence. Thus, it follows that a jury could not reasonably conclude he was aware of, and disregarded, an excessive risk of harm to Mr. Barbaros. Nor could the jury infer that Dr. Thomas "knew of a substantial risk from the very fact that the risk was obvious." *Beers-Capitol*, 256 F.3d at 131. It is true that Dr. Thomas should have asked for *some* information about Mr. Barbaros prior to prescribing him medication, as Dr. Thomas himself testified. Had he done so, he would have been able to connect-the-dots and appropriately address Mr. Barbaros' needs. But there was simply no evidence from which the jury could reasonably infer that, at the time he prescribed the medications to Mr. Barbaros, Dr. Thomas knowingly failed to ask for any information about Mr. Barbaros, in conscious disregard of an excessive risk of harm to Mr. Barbaros' health and safety. A medical provider's failure to ask for sufficient information which, in turn, makes him unable to engage in the necessary diagnostic analysis, without more, does not show deliberate indifference—let alone "intentionally or recklessly disregarding obvious symptoms" that a patient was suffering from medication withdrawal.

A reasonable jury could also not conclude that Dr. Thomas, with deliberate indifference, "failed to ensure proper dosing" when restarting Mr. Barbaros on Paxil. A reasonable jury could conclude that Dr. Thomas did not conduct any investigation of Mr. Barbaros' medical history or condition prior to prescribing the Paxil, and if he had, he would have realized that

due to the short half-life of Paxil (of which he was aware) the medication would have been out of his system and, thus, he should have started Mr. Barbaros on a lower dose. The jury also could reasonably have concluded that this act, among others, increased the risk of harm and contributed to his suicide. But no reasonable jury could find that, by continuing a patient on medications in the same doses as he had been previously prescribed and was requesting, constituted deliberate indifference to a serious medical need. Allegations that prison medical personnel failed to diagnose or properly treat a medical condition do not demonstrate deliberate indifference. *Pearson*, 850 F.3d at 538. Dr. Thomas testified that, in his medical judgment, he did not believe it was necessary to start Mr. Barbaros on a lower dosage of Paxil because Nurse Ramos had verified he was prescribed 30mg Paxil by another physician. He also testified that his immediate concern was to get Mr. Barbaros access to the same medications he was taking outside of prison. Although Dr. Thomas' medical judgment could have been better informed, these acts and omissions do not constitute deliberate indifference. Viewing the evidence in the light most favorable to the Plaintiffs, no reasonable jury could conclude that Dr. Thomas, with deliberate indifference, failed to ensure proper dosing when restarting Mr. Barbaros on Paxil.

The only way the jury could reasonably find Dr. Thomas liable, then, was if there was sufficient evidence from which they could infer that Dr. Thomas failed to monitor Mr. Barbaros, in conscious disregard of an excessive risk to his health and safety. A reasonable jury could, consistent with Dr. Thomas testimony, find that at the time Dr. Thomas

prescribed Paxil to Mr. Barbaros, he was aware that prescribing Paxil to a patient can increase the risk of suicidal ideations and that a patient resuming Paxil for the first time should be monitored. The jury could also infer that, had Dr. Thomas investigated Mr. Barbaros' condition, he would have known he was exhibiting withdrawal symptoms and connected that with the failure to receive Paxil for at least several days. But no reasonable jury could find that Dr. Thomas failed to monitor Mr. Barbaros, in conscious disregard of an excessive risk of harm to his health and safety.

Although Dr. Thomas testified that he was aware that prescribing a patient Paxil increases the chances that the patient may commit suicide, there was no testimony that the risk of suicide associated with prescribing Paxil was an *excessive risk*. Indeed, Dr. Thomas testified that he was aware there was only some risk, and that it was his understanding this risk was associated with patients who are starting the medication for the first time (which Mr. Barbaros was not). Both Plaintiffs and Defendants' experts, too, presented testimony from which no reasonable juror could conclude that simply prescribing a patient Paxil puts them at an *excessive risk* of suicide. This "excessive risk," then, was neither known to Dr. Thomas nor obvious. Regardless of whether the Court applies the "inadequate medical care" or "particular vulnerability to suicide" framework, Plaintiffs' claim fails. Although consideration of the totality of the facts and circumstances of Mr. Barbaros' case, which Dr. Thomas negligently failed to adequately investigate, should have suggested to him the need to monitor Mr. Barbaros until, at least, he met with him in person two days later, they do not

demonstrate that Dr. Thomas knowingly failed to monitor Mr. Barbaros, in conscious disregard of an excessive risk of harm.

For these reasons, and for the reasons set forth in this opinion granting the individual PrimeCare Defendants' renewed motion for judgment as a matter of law, viewing all of the evidence in the light most favorable to the Plaintiffs, no reasonable jury could find that Dr. Thomas' one minute phone call prescribing Mr. Barbaros the very medication he requested, and the negligent omissions that preceded and followed, violated Mr. Barbaros' constitutional rights under the Fourteenth Amendment. There was insufficient evidence that Dr. Thomas acted, or failed to act, with a sufficiently culpable state of mind to take this case out of the realm of negligence and into the realm of deliberate indifference to a serious medical need. Dr. Thomas' renewed motion for judgment as a matter of law will be granted.

*        *        *

After careful consideration of the evidence presented at trial, and viewing all the evidence in the light most favorable to the Plaintiffs, the record shows that over the course of the approximately four days Mr. Barbaros was a pretrial detainee at the MCCF, he personally met with two members of the nursing staff (Nurse James and Nurse Rowe) and also met with a PrimeCare mental health care provider (William Buffton). Four other members of the medical department employed by, or associated with, PrimeCare, were involved in the treatment of his medical needs (Nurse Bauer, Nurse Ramos, Wendy Johnson, and Dr. Thomas). Although the care he received was, as the jury found, negligent

and a factual cause of his suicide, no reasonable jury could conclude that the acts and omissions of any of the individual Defendants violated Mr. Barbaros' constitutional right to adequate medical care. There was no evidence that any of the individual Defendants denied or delayed treating Mr. Barbaros for non-medical reasons. Rather, any denial or delay in treatment was the result of a series of negligent acts and omissions, not deliberate indifference to Mr. Barbaros' serious medical needs. Nor was there any evidence that any of the individual Defendants knew of Mr. Barbaros' need for medical care, but intentionally refused to provide it. And there was no evidence that any of the individual Defendants, with deliberate indifference, prevented Mr. Barbaros from receiving recommended treatment for his serious medical needs. Viewing all of the evidence in the light most favorable to the Plaintiffs, there was insufficient evidence from which the jury could reasonably infer that any of these individuals knew of, and disregarded, an excessive or obvious risk to Mr. Barbaros' health and safety.

### 3.      PrimeCare Medical, Inc.

At the close of Plaintiffs' case-in-chief, PrimeCare orally moved for judgment as a matter of law on Plaintiffs' § 1983 claim. Sept. 13, 2016 Trial Tr. at 12:7-14:3. PrimeCare now renews its motion, claiming that no reasonable jury could find it liable based on the evidence presented at trial. In support of this assertion, PrimeCare tersely states that because none of the individual Defendants violated Mr. Barbaros' constitutional right to adequate medical care, it necessarily follows that PrimeCare cannot be liable under *City of Los Angeles v.*

*Heller*, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam).  In opposition to PrimeCare's renewed motion, Plaintiffs simply claim that PrimeCare is liable because its employees and agents violated Mr. Barbaros' constitutional rights.  Neither PrimeCare nor Plaintiffs are entirely correct.

In *Heller,* the Supreme Court, in a three page *per curiam* opinion, held that because a jury found a police officer did not use excessive force and absolved him from liability under § 1983, it necessarily followed that the municipality could not be liable under the circumstances. Because the police officer did not inflict a constitutional injury on the plaintiff, the municipality could not be held liable for damages under § 1983.[38]  Despite the well-settled rule that a municipality cannot be liable under § 1983 where there is no underlying constitutional violation, the Third Circuit has repeatedly held that an underlying constitutional violation committed by an employee or agent of a municipality is not a necessary prerequisite to imposing § 1983 liability against a municipality where, as here, Plaintiffs claimed constitutional deprivation arises under the Fourteenth Amendment's substantive due process clause.[39]

---

[38] On numerous occasions the Third Circuit has held that an underlying constitutional violation committed by an individual employee/agent is a necessary prerequisite to holding a municipality liable under § 1983.  *See, e.g., Mulholland v. Govt. Cnty. Of Berks Pennsylvania*, 706 F.3d 231, 238 n.15 (3d Cir. 2013) ("It is well-settled that, if there is no violation in the first place, there can be no derivative municipal claim.") (citing *Heller*, 475 U.S. at 799)); *Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003) (where there is no underlying constitutional violation "*Heller* precludes a finding of municipality against the City.  This conclusion follows naturally from the principle that municipal liability will only lie where municipal action actually caused injury") (citations omitted).

[39] *See, e.g.*, *Brown v. Commonwealth of Pennsylvania Dept. of Health Emergency Med. Servs. Training Institute*, 318 F.3d 473, 482 (3d Cir. 2002) ("It is possible for a municipality to be held

There are other instances where a municipality may be liable for its own conduct even when it is found that its employees or agents did not violate the constitution. *See Thomas v. Cumberland Cnty.*, 749 F.3d 217 (3d Cir. 2014) (reversing grant of summary judgment in favor of county on failure to train theory after jury absolved officers of liability and plaintiffs did not appeal the verdict, instead appealing only grant of summary in favor of county); *Natale*, 318 F.3d at 575 (reversing district court grant of summary judgment to county where plaintiffs did not appeal grant of summary judgment in favor of individual officers and remanding for trial on whether policy or custom of prison healthcare provider deprived plaintiff of right to adequate medical care); *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1063 (3d Cir. 1991) (municipality's liability under section 1983 for suicide of pretrial detainee did not depend upon an individual officer's liability because municipal policymakers, rather than individual officer, were the city actors whose primary liability must be established in order to hold city liable under section 1983 for failure to train). Rather than wade into this thicket, though, for purpose of PrimeCare's Rule 50(b) motion the Court will

---

independently liable for a substantive due process violation even in situations where none of its employees are liable."); *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996) ("The precedent in our circuit requires the district court to review the plaintiffs' municipal liability claims independent of the section 1983 claims against the individual police officers, as the City's liability for a substantive due process violation does not depend on the liability of any police officer."); *Fagan v. City of Vineland*, 22 F.3d 1283, 1292 (3d Cir. 1994) (en banc) ("[W]e do not believe that *Heller* can be applied to a substantive due process claim directly against a municipality. Indeed, the Supreme Court itself drew a line between a claim for Fourth Amendment violations and one for substantive due process violations. . . . We hold that in a substantive due process case arising out of a police pursuit, an underlying constitutional tort can still exist even if no individual police officer violated the Constitution."). *Fagan*'s holding has been strictly confined to police pursuits and is of little use for present purposes. *Kneipp*, 95 F.3d at 1207-08. Unlike a substantive due process claim involving a police pursuit where the standard of liability for the individual police officers and the municipal are different (*i.e.*, shocks the conscience vs. deliberate indifference), here, the standards are the same.

assume that Mr. Barbaros was deprived of his Fourteenth Amendment right to adequate medical care.[40]  Even if the Court assumes there was sufficient evidence for a reasonable jury to find a constitutional deprivation, for the reasons set forth below, no reasonable jury could conclude that PrimeCare had a policy, practice, or custom that caused a violation of Mr. Barbaros' Fourteenth Amendment rights.

### a.    PrimeCare's Policy, Practice, or Custom

A prison healthcare provider like PrimeCare can be liable under § 1983 if the plaintiffs "can provide evidence that there was a relevant . . . policy or custom, and that the policy caused the constitutional violation he alleges."  *Lee v. Abellos*, Civil Action No. 13-0486, 2014 WL 7271363, at *9 (E.D. Pa. Dec. 19, 2014) (citing *Brown*, 520 U.S. at 404); *see also Natale*, 318 F.3d at 583-84.  A policy is an official "statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell v. Dept. of Social Servs. Of City of New York*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).  "A custom is an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'"  *Natale*, 318 F.3d at 583 (quoting *Brown*, 520 U.S. at 404)).  In either case, the plaintiff "must show that an

---

[40] The Court has already found that none of the individual Defendants violated Mr. Barbaros' constitutional right and are entitled to judgment as a matter of law.  It is possible, though unlikely, that Mr. Buffton violated Mr. Barbaros' constitutional rights by, among other things, failing to conduct a suicide assessment or place Mr. Barbaros on monitoring.  Mr. Buffton was dismissed from this case due to insufficient service of process. Because PrimeCare could be liable for Mr. Buffton's acts and omissions under Pennsylvania law on a theory of ostensible agency, he was identified on the special verdict sheet. The jury found him negligent.  The jury was not required, however, to make a finding as to Mr. Buffton's liability under §1983.

official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well settled custom." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) (citations omitted); *see also Kneipp*, 95 F.3d at 1212 ("[A] prerequisite to establishing liability in either situation is a showing that a policymaker was responsible either for the policy or, through acquiescence, for the custom.") (citations omitted). In order to qualify as a "policymaker for § 1983 purposes, an official must have *final* policymaking authority."[41] *LaVerdure v. Cnty. of Montgomery*, 324 F.3d 123, 126 (3d Cir. 2003) (emphasis in original).

There are three scenarios under which PrimeCare could be liable under § 1983. "The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of the policy." *Natale*, 318 F.3d at 584 (internal citation and quotation marks omitted). "The second occurs where no rule has been announced as a policy but federal law has been violated by an act of the policymaker itself." *Id.* "Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in a violation of constitutional rights, that the policymaker can

---

[41] Plaintiffs did not establish a PrimeCare policymaker at trial. However, PrimeCare never raised this issue at trial and from the Court's review of the record it appears PrimeCare has never raised this issue before. Under the circumstances, Plaintiffs' failure to identify a relevant policymaker is of no moment. *See Simmons*, 947 F.2d at 1065-66 (municipality waived argument that plaintiffs failed to identify official with policymaking authority by not raising issue at trial).

reasonably be said to have been deliberately indifferent to that need." *Id.* The jury was instructed in accordance with the third theory of liability and found PrimeCare liable. Specifically, Plaintiffs alleged that: (1) PrimeCare failed to adopt and implement policies, practices, and procedures to ensure inmates receive proper medical care (including follow-up care from medical specialists), and failed to adopt policies to ensure that inmates are placed on a suicide watch when necessary; (2) PrimeCare had a policy or custom of inadequately training the medical staff at the MCCF; and (3) PrimeCare had a policy or custom of failing to supervise the medical staff. The Court will address each in turn.

### i.      Failure to Adopt Needed Policy

Only in a narrow set of circumstances can the failure to adopt a policy be found so obvious that it can properly be characterized as deliberate indifference to the constitutional rights of the persons with whom a municipality's employees or agents come into contact. *See Natale*, 318 F.3d at 575 (failure to adopt policy ensuring diabetic pretrial detainees receive insulin within 72 hours of admission sufficient for a reasonable jury to find deliberate indifference). In *Natale*, the Third Circuit reversed the district court's order granting summary judgment to a prison healthcare provider after concluding that the prison healthcare provider's failure to adopt a needed policy could reasonably be considered "sufficiently obvious as to constitute deliberate indifference to those inmate's medical needs." *Id.* at 584. The Court found the failure to adopt such a policy was a "particularly glaring omission in a program of medical care," which suggested the healthcare provider

"turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Id.* Thus, "[a] reasonably jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs." *Id.* at 585.

The Court has reviewed the record and is unable to locate any policy or procedure that PrimeCare failed to adopt that created such an obvious risk that would be sufficient for the jury to infer deliberate indifference to the constitutional rights of detainees. *Cf. Natale*, 318 F.3d at 584-85. Viewing all the evidence in the light most favorable to the Plaintiffs, no reasonable jury could find PrimeCare liable for failing to adopt a needed policy. Plaintiffs' own correctional nursing expert, Kathy Wild, testified that PrimeCare's policies and procedures were adequate, appropriate, and met the standard of care. Nurse Wild's issue, though, was with PrimeCare's failure to supervise the nursing staff to enforce its adequate policies and procedures. Specifically, Nurse Wild testified: "Well, the policies are fine, I see lots of policies and procedures written based on the standards that are put out by the National Commission and the American Correctional Association, but it's the follow-through, it's whether we're monitoring whether that's happening or not." Sept. 8, 2016 Trial Tr. at 250:12-19.

Nurse Wild's testimony, among other evidence presented at trial, did not provide the jury with a reasonable basis to conclude that PrimeCare failed to adopt a needed policy, let

alone a policy whose need was sufficiently obvious that a failure to adopt it would constitute deliberate indifference to inmate's constitutional rights. There is simply no evidence that PrimeCare "turned a blind eye to an obviously inadequate practice that was likely to result in the violation of constitutional rights." *Natale*, 318 F.3d at 584. Nor was there any evidence or argument addressing a specific policy that PrimeCare failed to adopt that Plaintiffs believed was sufficiently obvious that PrimeCare's failure to do so rose to the level deliberate indifference. Accordingly, no reasonable jury could find PrimeCare liable based on its alleged failure to adopt a needed policy.

### ii. Failure to Train/Supervise

The Court next considers whether there was sufficient evidence for the jury to conclude that PrimeCare failed to train and/or supervise its employees/agents.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of §1983." *Connick v. Thompson*, 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011). However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous when a claim turns on a failure to train" or supervise. *Id.* A failure to train or supervise "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Id.* at 61 (internal citation and quotation marks omitted). "[D]eliberate indifference is a stringent standard of

fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410.

Where, as here, Plaintiffs sought to impose liability against PrimeCare based on its failure to train or supervise, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Brown*, 520 U.S. at 409). "Policymakers' *continued adherence* to an approach that they know or should know failed to prevent tortious conduct by employees may establish the conscious disregard for the consequence of their action – the deliberate indifference – necessary to trigger municipal liability." *Id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* (emphasis added)(internal citation and quotation marks omitted).

Plaintiffs did not present any evidence of a pattern of constitutional violations by PrimeCare employees/agents at the MCCF.[42]  Therefore, in order for PrimeCare to be liable on this theory of liability, PrimeCare's failure to train or supervise must amount to a policy or custom in disregard of an obvious risk that its employees or agents would commit constitutional violations.  Only in the narrowest of circumstances can a failure to train or supervise "said to be so obvious, that failure to do so could properly be characterized as

---

[42] As the Court recognized in a memorandum opinion denying PrimeCare's motion for summary judgment, "Plaintiffs have adduced no evidence in this case that there was a pattern of similar constitutional violations that had occurred at the MCCF prior to Barbaros' incarceration and suicide."  (Doc. 175, at 31). "Plaintiffs, therefore, must show that this case fits the so-termed 'single incident' failure-to-train theory of § 1983 municipal liability."  (Doc. 175, at 31) (citing *Thomas*, 749 F.3d at 223).

deliberate indifference to constitutional rights even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (internal citation and quotation marks omitted). "To determine whether a municipality's alleged failure to train [or supervise] its employees amounted to a deliberate or conscious choice, it must be shown that '(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Doe v. Luzerne Cnty.*, 660 F.3d 169, 179-80 (3d Cir. 2011) (quoting *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir.1999)).

Viewing all the evidence in the light most favorable to Plaintiffs, no reasonable jury could find PrimeCare liable for failure to train or supervise its employees/agents. To impose liability under § 1983, PrimeCare's "failure to train its employees *in a relevant respect* must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact." *Connick*, 563 U.S. at 63 (emphasis added) (internal citation and quotation marks omitted). Plaintiffs were required to: (1) "identify specific training" or supervision "not provided that could reasonably be expected" to avoid the constitutional injury; and (2) "demonstrate that the risk reduction associated with the proposed training" or supervision program "is so great and so obvious that the failure of those responsible for the content of the training" or supervision "program to provide it can reasonably be attributed to

a deliberate indifference" to the constitutional rights of others. *Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 325 (3d Cir. 2005) (internal citation and quotation marks omitted).

Plaintiffs did not present any evidence about an identified deficiency in the training or supervision PrimeCare provided to employees and agents sufficient to impose liability. *See Buoniconti v. City of Philadelphia*, 148 F. Supp. 3d 425, 441 (E.D. Pa. 2015) ("Without an 'identified' deficiency" in a training or supervision program, plaintiffs' failure-to-train claim must necessarily fail) (quoting *City of Canton*, *Ohio v. Harris*, 489 U.S. 378, 391, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). The evidence and arguments Plaintiffs presented attacking PrimeCare's training and supervision of its employees/agents were "as broad and general as they are conclusory." *Woloszyn*, 396 F.3d at 325*; see also Arnold v. City of Philadelphia*, 151 F. Supp. 3d 568, 580 (E.D. Pa. 2015) (plaintiff "has not articulated a policy or custom that led to the violation of her constitutional rights, making only vague assertions about the Philadelphia Police Department's 'historical lack of policies and training' and culture. . .") (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n. 11 (3d Cir. 2010)). Plaintiffs' failure to identify specific deficiencies in PrimeCare's training or supervision provided the jury with no reasonable basis to impose liability against PrimeCare. *Cf. Thomas*, 749 F.3d at 223 ("The relevant policy for the purposes of municipal liability is the County's decision not to provide conflict de-escalation and intervention training as part of the pre-services training for correctional officers.").

Plaintiffs' correctional nursing expert, Kathy Wild, not only did not criticize PrimeCare's policies and procedures *she did not provide any testimony whatsoever regarding PrimeCare's training of its employees and agents, critical or otherwise*. Nor did any other expert or fact witness testify to this effect.[43] Although Nurse Wild testified about PrimeCare's lack of supervision of the nursing staff, highlighting PrimeCare's reliance on a LPN to supervise the LPNs, this was not sufficient to impose liability on PrimeCare.

---

[43] The evidence presented at trial showed that PrimeCare *did* train its nursing staff on a variety of topics, including suicide prevention and withdrawal, among others. Although a reasonable jury could find that PrimeCare could have and should have done more to train the nursing staff, no reasonable jury could conclude that PrimeCare failed to provide any training whatsoever to the nursing staff at the MCCF, let alone failed to provide obvious training necessary to avoid deprivation of constitutional rights. As discussed, Plaintiffs' expert Kathy Wild did not present any evidence that the training PrimeCare provided to the nursing staff was inadequate, or present any evidence on what training should have been provided to avoid constitutional violations. *Cf. Thomas*, 749 F.3d at 225 (plaintiffs' expert opined that "the failure to provide conflict de-escalation and intervention training was a careless and dangerous practice not aligned with prevailing standards"). Nor did Dr. Breggin or any other fact or expert witness at trial provide testimony to this effect. Todd Haskins testified that nursing staff at MCCF received, among other training, NCCHC training, infectious disease training, suicide prevention, psychiatrist emergency training, and training on withdrawal symptoms. Sept. 8, 2016 Trial Tr. at 186:20-187:7. Plaintiffs neither contested nor rebutted Haskin's testimony on this issue. Todd Haskins also testified at his deposition, which was read at trial, that PrimeCare does not train its nurses "regarding what different types of medicines are and what impact they have on the body." Sept. 8, 2016 Trial Tr. at 127:11-23. This passing remark was neither elaborated on nor criticized by any expert. It was not sufficient, without more, to impose § 1983 liability on PrimeCare since it cannot be said to be obvious that the failure to train in this respect would frequently result in deprivations of constitutional rights.

Plaintiffs also failed to present any evidence about PrimeCare's failure to train and supervise Mr. Buffton, other than the mere fact that Mr. Buffton was neither trained nor supervised by PrimeCare. Plaintiffs did not present evidence of the contract between PrimeCare and FCS (or, for that matter, the contract between PrimeCare and Monroe County). Nor did any expert testify that PrimeCare was required to train and supervise Mr. Buffton or suggest any alternative training or supervision necessary. *See Woloszyn*, 396 F.3d at 325 ("However, [plaintiffs' expert] never identified specific training that could reasonably have caused [correctional officer] to assess whether [decedent's] behavior and demeanor indicated that [decedent] posed a risk of suicide."). PrimeCare's expert, Dr. Wills, testified that she did not think any training was necessary due to Mr. Buffton's qualifications and experience as a correctional psychologist working for the State for over a decade. Plaintiffs did not present evidence to the contrary. And Plaintiffs most certainly did not offer any evidence about the specific training or supervision PrimeCare should have provided to Mr. Buffton that would have prevented his negligent failure to recognize that Mr. Barbaros was suffering from withdrawal and/or was suicidal.

Although Nurse Wild's testimony was sufficient for the jury to conclude that there was *some risk of harm* that reliance on a LPN to supervise other LPNs could cause a patient, "[b]ut that is only a generalized showing of risk." *Brown*, 520 U.S. at 410. The fact that inadequate supervision "would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's" failure to train or supervise "produced a specific constitutional violation." *Id.* at 411 (emphasis in original). Section 1983 liability in this context cannot be based on a possibility or "mere probability" that an inadequately supervised employee or agent will inflict constitutional injury. *Id.* Plaintiffs failed to present evidence from which the jury could reasonably infer that a constitutional deprivation was the "plainly obvious consequence" of PrimeCare's failure to adequately train or supervise its employees and agents. *Id.*

Even if the Court were to assume that Plaintiffs presented evidence of specific deficiencies in PrimeCare's training and supervision programs, which they plainly did not, the evidence present was still insufficient to impose liability.[44] "A municipality's deliberately indifferent failure to train" or supervise "is *not* established by (1) presenting evidence of the shortcomings of an individual; (2) proving that an otherwise sound training program

_____

[44] "To determine whether a municipality's alleged failure to train its employees amounted to a deliberate or conscious choice it must be shown that '(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employee mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Doe*, 660 F.3d at 179-80 (quoting *Carter*, 181 F.3d at 357). "Liability in single-incident cases depends on "[t]he likelihood that the situation will recur and that predictability that an officer lacking specific tools to handle that situation will violate citizens' rights.'" *Thomas*, 749 F.3d at 223-24 (quoting *Brown*, 520 U.S. at 409). No reasonable jury could find PrimeCare liable applying these three factors based on the evidence presented at trial.

occasionally was negligently administered; or (3) showing, without more, that better training would have enabled an officer to avoid the injury-causing conduct." *Simmons*, 947 F.2d at 1060. "[S]howing merely that additional training" or supervision "would have been helpful in making a difficult decision does not establish municipal liability. Proving that an injury or accident could have been avoided if an employee had better or more training, sufficient to equip him to avoid the particular injury causing conduct will not suffice." *Connick*, 563 U.S. at 68 (internal citation and quotation marks omitted). "Deliberate indifference is more than simple negligence. It is a deliberate choice to follow a course of action that is made from among various alternatives without regard to the known or obvious consequences."[45] *Pelzer v. City of Philadelphia*, 656 F. Supp. 2d 517, 532 (E.D. Pa. 2009) (internal citation and quotation marks omitted); *see also Crouse v. South Lebanon Twp.*, 668 F. Supp. 2d 664, 676 (M.D. Pa. 2009) ("Even if the department's custom were negligent . . . a *Monell* claim requires more than a 'showing of simple or even heightened negligence.'") (quoting *Brown*, 520 U.S. at 407). "Only where a municipality's failure to train" or supervise "its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983." *City of Canton*, 489 U.S. at 389 (internal citation and quotation marks omitted). The evidence Plaintiffs presented at trial, viewed in the light most favorable to them, makes clear that no

---

[45] *See Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1116 (11th Cir. 2005) ("Whether the failure of [defendant's] employees to identify [decedent] as a suicide risk . . . amounts to negligence on their part is a wholly different question.")

reasonable jury could find PrimeCare liable under § 1983 for failure to adopt a needed policy, or failure to train and supervise its employees and agents.

### b.    Section 1983 Causation

Finally, even if the Court were to assume that the evidence presented at trial permitted a reasonable jury to find PrimeCare's failure to train, supervise, or adopt a needed policy amounted to deliberate indifference to the rights of persons with whom its employees and agents would come into contact, no reasonable jury could find these failures were the direct cause or "moving" force behind Mr. Barbaros' injury.  Where, as here, Plaintiffs claimed injury resulted from a failure to train, supervise, or adopt a needed policy, "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employees." *Brown*, 520 U.S. at 405.  "To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983.  In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city could have done to prevent the unfortunate accident."  *City of Canton*, 489 U.S. at 391-92 (internal citation and quotation marks omitted).  Although the evidence presented at trial was sufficient to establish causation under Pennsylvania negligence law, no reasonable jury could find PrimeCare liable for causing Mr. Barbaros' harm under § 1983.[46]

---

[46] "That is why some courts distinguish between the acts that caused the injury and those that were merely contributing factors."  *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 306 (7th Cir. 2010) (citing *Rodriguez v. Sec'y of Dept. of Corr.*, 508 F.3d 611, 625 (11th Cir. 2007)).

Plaintiffs "must 'prove that the deficiency in training actually caused'" the deprivation of

Mr. Barbaros' constitutional rights. *Doe*, 660 F.3d at 180 (quoting *City of Canton*, 489 U.S. at

391); *see also Brown,* 318 F.3d at 483 (although plaintiffs alleged municipal policies that

caused harm to their son, "[e]ven if we accept everything [plaintiffs] allege as true, they will

have still failed to establish that the City's policies caused *constitutional* harm") (emphasis in

original). "It is not enough that a municipality adopted with deliberate indifference a policy of

inadequately training its officers. There must be a 'direct causal link' between the policy and a

constitutional violation." *Brown*, 318 F.3d at 482 (quoting *City of Canton*, 489 U.S. at 385)).

To "sustain a claim based on a failure to train" or supervise "theory, the identified

deficiency in the training" or supervision "program must be closely related to the ultimate

constitutional injury." *Thomas*, 749 F.3d at 226 (internal citation and quotation marks

omitted). "Liability cannot rest only on a showing that the employees could have been better

trained" or supervised "or that additional training" or supervision "was available that would

have reduced the overall risk of constitutional injury." *Id.* (internal citation and quotation

marks omitted). "Rather, the causation inquiry focuses on whether 'the injury [could] have

been avoided had the employee been trained [or supervised] under a program that was not

deficient in the identified respect.'" *Id.* (quoting *City of Canton*, 489 U.S. at 391).

Plaintiffs were required to present evidence sufficient to "prove that the deficiency in the

training [or supervision] actually caused" the medical staff's "indifference to [plaintiff's]

medical needs." *City of Canton*, 489 U.S. at 391. Put another away, "[w]ould the injury

have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.* Plaintiffs came nowhere close to satisfying this burden. Simply suggesting a policy, training, or supervision that "would have reduced the overall risk of constitutional injury" is not sufficient. *Thomas*, 749 F.3d at 226. For these reasons, and viewing all the evidence in the light most favorable to the Plaintiffs, there was insufficient evidence to support the jury's verdict imposing liability under section 1983 against PrimeCare. A mere scintilla of evidence, without more, will not suffice. Accordingly, PrimeCare's motion for judgment as a matter of law will be granted. [47]

### 4. Conditional Ruling on Motion for New Trial

Both the PrimeCare Defendants and Dr. Thomas moved, in the alternative, for a new trial on Plaintiffs' deliberate indifference claim. Because the Court is granting the PrimeCare Defendants and Dr. Thomas' motions for judgment as a matter of law on Plaintiffs' deliberate indifference claim, and because all of the Defendants alternatively sought a new trial on this basis, the Court must conditionally rule on their motion for a new trial pursuant to Federal Rule 50(c)(1). "When granting a motion for judgment as a matter of law, the district court . . . is required to rule conditionally on any motion for a new trial." *Rhone Poulenc*

---

[47] Following the jury's verdict Plaintiffs also filed a motion for attorneys' fees requesting $621,158.28. (Doc. 348). "A prevailing party in a § 1983 action is entitled to reasonable attorneys' fees and costs under 42 U.S.C. § 1988." *Planned Parenthood of Cent. New Jersey v. Attorney General State of New Jersey*, 297 F.3d 253, 265 n.5 (3d Cir. 2002). However, because the Court is granting the Defendants' motions for judgment as a matter of law with respect to Plaintiffs' deliberate indifference claim, it follows that the Court must deny Plaintiffs' motion for attorneys' fees as moot. *See Galena v. Leone*, 638 F.3d 186, 196 n.6 (3d Cir. 2011) ("Unquestionably, inasmuch as the District Court granted [defendant] judgment as a matter of law, [plaintiff's] motions were moot because the losing party in a section 1983 action is not entitled to attorney's fees and costs.").

*Rorer Pharm., Inc. v. Newman Glass Works*, 112 F.3d 695, 698 (3d Cir. 1997) (citing Fed. R. Civ. P. 50(c)(1)). "The court must determine whether the motion for a new trial should be granted or denied if the judgment is thereafter vacated or reversed." *Id.* "The court also must specify the grounds for its conditional ruling." *Id.*

The Court will conditionally deny the Defendants' motions for a new trial on Plaintiffs' deliberate indifference claim. No errors in the Court's evidentiary rulings or jury instructions warrant a new trial. Although Defendants have requested a new trial because the jury's verdict was against the weight of the evidence, the Court does not believe a new trial would be warranted should the Court of Appeals reverse or vacate this Court's order. In *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1334 (3d Cir. 1991), the Third Circuit overturned a district court's order granting the defendant's motion for judgment as a matter of law and conditional ruling that the defendant would be entitled to a new trial because the verdict was against the weight of the evidence. In doing so, the Court recognized:

> Despite the limited nature of the district court's discretion in granting a new trial because the jury's verdict is against the weight of the evidence, we recognize that considerable deference remains due to that court's determination that a verdict is against the weight of the evidence. The trial judge observes the witnesses and follows the trial in a way that we cannot replicate by reviewing a cold record. Nevertheless, new trials because the verdict is against the weight of the evidence are proper only where the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks the conscience. We cannot read this record as meeting that standard.

*Williamson*, 926 F.2d at 1353 (internal citation and quotation marks omitted). The *Williamson* Court found that "the record does not demonstrate the miscarriage of justice that

would permit the district court to hold the jury's damage verdict was against the weight of the evidence," and concluded that the district court erred in granting the defendant's conditional motion for a new trial under Federal Rule of Civil Procedure 50(c)(1). *Id.*; *see also Motter*, 883 F.2d at 1231-32 (district court abused its discretion in granting conditional motion for new trial and reinstating jury verdict).

For similar reasons, the Court cannot say that it would shock its conscience or result in a miscarriage of justice should the jury's verdict stand. Although the Court has found there was insufficient evidence to support the jury's deliberate indifference verdict, this ruling, if erroneous, does not mean the weight of the evidence was against the verdict entitling the Defendants to a new trial pursuant to Federal Rule of Civil Procedure 59(a). Under the circumstances, and in the interests of finality and judicial economy, should the Court of Appeals reverse or vacate the Court's order granting the Defendants' motions for judgment as a matter of law, the Defendants' motion for a new trial will be conditionally denied and the jury's verdict reinstated.

## B.  Negligence

Plaintiffs also pursued negligence claims against the individual PrimeCare Defendants and Dr. Thomas. They also sought to impose vicarious and direct liability on PrimeCare. The jury found the individual PrimeCare Defendants, Dr. Thomas, and PrimeCare liable and awarded Plaintiffs $2,000,000 under the Wrongful Death Act and $800,000 under the Survival Act.

# 1. The PrimeCare Defendants

The PrimeCare Defendants "renew" their motion for judgment as a matter of law on Plaintiffs' negligence claim pursuant to Federal Rule of Civil Procedure 50(b). According to the PrimeCare Defendants' brief in support of this motion, and without any citation to the record, "[a]t the close of Plaintiffs' case-in-chief, the PrimeCare Defendants moved for judgment as a matter of law" on Plaintiffs' negligence claim. (Doc. 377, at 32). After reviewing the record and finding little, if any, support for the PrimeCare Defendants' representations, the Court issued an Order directing the PrimeCare Defendants to supply citations to the record.[48]

The citations supplied by the PrimeCare Defendants, consistent with the Court's recollection of the proceedings, make clear that each of the PrimeCare Defendants did *not* move for judgment as a matter of law pursuant to Rule 50(a). Specifically, counsel for the PrimeCare Defendants represents to the Court that each and every PrimeCare Defendant (Paul James, Patricia Bauer, Christina Rowe, Wendy Johnson, Grace Ramos, and PrimeCare) moved for judgment as a matter of law on Plaintiffs' negligence claim when he stated after the close of Plaintiffs' case-in-chief:

> Now, relative to the negligence, *I really only have one argument, and that's really for Mr. James. I think, at this point, I have to concede there's been sufficient testimony to keep* Mr. James—*everybody else in the case—but*

---

[48] The Order provided, among other things, that the PrimeCare Defendants "shall submit to the Court citations to the record to support their assertions that . . . (c) each of the PrimeCare Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) with respect to Plaintiffs' negligence claim." (Doc. 395, at 2). The PrimeCare Defendants promptly complied with the Court's Order. (Doc. 397).

*from my perspective, there isn't sufficient testimony for Mr. James*, when the nursing expert says nothing he did delayed the treatment that occurred in this particular case. And without that delay, to me, there really can be nothing linked to him causally as to the suicide.

*So as to Mr. James individually, I would ask that he be dismissed totally from the case. As to the others, I think I have to—I will say on the record I don't believe that the causation testimony was sufficient. However, I am not going to present any additional argument as to that, I just simply want to preserve the record, but I'm not going to belabor the Court with arguments, unless there's questions.* So with that, Your Honor, I have nothing additional to add.

Sept. 13, 2016 Trial Tr. at 14:4-20 (emphasis added).

As the transcript makes clear, the only PrimeCare Defendant to move for judgment as a matter of law prior to the case being submitted to the jury was Paul James (on the theory there was insufficient evidence that his acts and omissions delayed Mr. Barbaros' treatment and therefore he could not be liable in negligence). Equally apparent is that counsel's alleged Rule 50(a) motion as to Patricia Bauer, Christina Rowe, Wendy Johnson, Grace Ramos, and PrimeCare was inadequate and insufficient. These inadequacies are highlighted by the PrimeCare Defendants' brief in support of their "renewed" motions. Specifically, the PrimeCare Defendants' brief exclusively focuses on the jury's finding of corporate negligence against PrimeCare and makes no mention of any of the individual PrimeCare Defendants:

Plaintiffs pursued a theory of corporate negligence against PrimeCare. 'A hospital owes a duty to its patients to: use reasonable care to ensure its facilities and equipment are adequate; select and retain competent physicians; oversee patient care of its employees; and enforce rules and policies to ensure adequate care.' *Thomson v. Nason Hosp.*, 591 A.2d 703, 708 (Pa. 1991). Further, 'for a [corporate entity] to be charged with

negligence, it is necessary to show the [corporate entity] had actual or constructive notice of the defect or procedures which created the harm.' *Id.*

Here, there was no evidence that the PrimeCare medical department at MCCF had inadequate equipment, facilities or non-competent medical providers.  Thus, the inquiry must focus upon whether there was sufficient evidence of deficient oversight of employees and/or enforcement of rules and policies to ensure adequate care.

The evidence was that PrimeCare had policies and procedures which met or exceeded national standards and requirements.  Additionally, the undisputed evidence was that PrimeCare had a CQI process which also met national standards and there was no criticism of how the process was carried out by PrimeCare.  Thus, the undisputed evidence was that PrimeCare's policies and procedures met national standards, and the process to insure employees followed the policies and procedures also met national standards.  At most, the evidence at trial was that there were isolated instances of policy deviations by individual nurses.  Further, none of these minor policy deviations in any way had an impact upon Barbaros choosing to commit suicide and, as such, was not causally related to any harm to Barbaros.  Thus, not only is the evidence insufficient to support a determination of deliberate indifference, it cannot even support a finding of negligence.  Consequently, as a matter of law, PrimeCare Defendants cannot be found to be directly negligent in relation to Barbaros' action of taking his own life.

(Doc. 377, at 32-33).

Although the PrimeCare Defendants' alleged Rule 50(a) motion apparently sought a directed verdict due to insufficient causation evidence as to each Defendant, the arguments set forth in their brief claim instead that there was insufficient evidence that PrimeCare breached the standard of care.  The brief does not address why, as a matter of law, no reasonable jury could find Paul James or any other individual PrimeCare Defendant liable in negligence.

"In order to preserve an issue for judgment pursuant to Rule 50(b), the moving party must timely move for judgment as a matter of law" before the case is submitted to the jury "and specify the grounds for that motion." *Lightning Lube*, 4 F.3d at 1172; *see also Kutner Buick*, 868 F.2d at 617 ("The rule that a post-trial Rule 50 motion can only be made on grounds specifically advanced in a motion for a directed verdict . . . is the settled law of this circuit."); Fed. R. Civ. P. 50 cmt. (2006) ("[T]he Rule 50(b) motion . . . can be granted only on grounds advanced in the preverdict motion.") (citations omitted). "A motion for judgment as a matter of law pursuant to Rule 50(b) must be preceded by a Rule 50(a) motion *sufficiently specific* to afford the party against whom the motion is directed with an opportunity to cure possible defects in proof which otherwise might make its case legally insufficient." *Lightning Lube*, 4 F.3d at 1173 (emphasis in original). Accordingly, "[u]nder normal circumstances, a defendant's failure to raise an issue in a Rule 50(a)(2) motion with sufficient specificity to put the plaintiffs on notice waives the defendant's right to raise the issue in their Rule 50(b) motion." *Williams v. Runyon*, 130 F.3d 568, 571-72 (3d Cir. 1997); *see also Young v. Pleasant Valley Sch. Dist.*, Civil Action No. 3:07-cv-00854, 2013 WL 1856573, at *2 (M.D. Pa. May 2, 2013) ("[A] defendant's failure to raise a sufficiently specific pre-verdict motion for judgment as a matter of law, pursuant to Rule 50(a), results in a waiver of a post-verdict Rule 50(b) motion."). The question thus becomes whether the PrimeCare Defendants' alleged Rule 50(a) motion was sufficiently specific to permit them to "renew" the motion post-verdict.

"To determine whether an issue has been raised, we look to the 'communicative content, specificity and notice-giving function of an assertion . . . judged in context.'" *Holt v. Pennsylvania*, __ F. App'x __, 2017 WL 1048055, at *3 (3d Cir. Mar. 20, 2017) (quoting *Acosta v. Hondor Motor Co., Ltd.*, 717 F.2d 828, 832 (3d Cir. 1983)). Here, the plain language of the PrimeCare Defendants' alleged pre-verdict motion comes nowhere close to articulating with sufficient specificity the judgment sought, and the facts and law entitling each of the PrimeCare Defendants to judgment as a matter of law. *See* Fed. R. Civ. P. 50(a)(2) ("The motion must specify the judgment sought and the law and facts that entitle the movant to judgment."). Considering the communicative content, specificity, and the notice-giving function, judged as a whole, it is clear that the alleged Rule 50(a) motion was insufficient. Thus, Patricia Bauer, Christina Rowe, Wendy Johnson, Grace Ramos, and PrimeCare cannot now attack the sufficiency of the evidence supporting the jury's negligence verdict; they have waived the right to do so. *See Lesende v. Borrero*, 752 F.3d 324, 333 (3d Cir. 2014) ("[T]he City did not move for judgment as a matter of law pursuant to Rule 50(a). Because it did not raise such a motion, it wholly waived the right to mount any post-trial attack on the sufficiency of the evidence.") (internal citation and quotation marks omitted). There are several reasons for the Court's conclusion.

First, nothing in the PrimeCare Defendants' alleged Rule 50(a) motion specified "the judgment sought and the law and the facts that entitle" each of them to judgment. Fed. R. Civ. P. 50(a). Only Paul James' motion identified: (1) the judgment sought (that Mr. James

"individually . . . be dismissed" from the case); (2) the law entitling him to judgment (insufficient causation evidence); and (3) the facts entitling him to judgment (the testimony said nothing he did delayed treatment).  The need for compliance with this rule is readily apparent where, as here, the PrimeCare Defendants each claim entitlement to judgment as a matter of law based on insufficient causation evidence.  Nowhere in the alleged Rule 50(a) motion, or the PrimeCare Defendants' Rule 50(b) motion and brief in support, do they even acknowledge that the causation evidence with respect to each Defendant was different.  And the PrimeCare Defendants certainly made no attempt to acknowledge that PrimeCare itself could be liable on three separate theories of negligence (each based on different causation testimony).[49]

Second, the communicative content and specificity of the oral motion was insufficient. Counsel for the PrimeCare Defendants said:  "relative to the negligence, I really *only have one argument*, and that's really for Mr. James."  Sept. 13, 2016 Trial Tr. at 14:4-6.  He then "conced[ed] there's been sufficient testimony to keep . . . everyone else in the case," and went on to describe the judgment sought with respect to Paul James and the law and facts entitling Paul James to that judgment.  After these concessions, and merely in passing, counsel simply stated "[a]s to the others, I think I have to – I will say on the record I don't

---

[49] As discussed, *infra*, PrimeCare's liability for negligence resulted from: (1) vicarious liability for acts of the individual PrimeCare Defendants; (2) vicarious liability for acts of its independent contractors William Buffton and Dr. Thomas; and (3) direct liability for corporate negligence.  The motions and briefs do not even acknowledge these distinct theories of liability, let alone attempt to highlight why the causation evidence was insufficient as to each individual PrimeCare Defendant, William Buffton, Dr. Thomas, or PrimeCare itself.

believe that the causation testimony was sufficient. However, I am not going to present any

additional argument as to that, I just want to preserve the record, but I'm not going to

belabor the Court with arguments, unless there are any questions."[50] *Id.* at 14:6-20.

Counsel's statements neither requested the judgments sought, nor did he specify any

facts or law entitling Patricia Bauer, Christina Rowe, Grace Ramos, Wendy Johnson, or

PrimeCare to judgment as a matter of law on Plaintiffs' negligence claim. Judged in context,

it is apparent that neither Plaintiffs nor the Court were put on notice as to a potential

deficiency in their case-in-chief and presented with the opportunity to correct it. *Cf.*

*Brokerage Concepts*, *Inc. v. U.S. Healthcare*, *Inc.*, 140 F.3d 494, 519 n.18 (3d Cir. 1998).[51]

Indeed, counsel for the PrimeCare Defendants explicitly acknowledged that he only had

---

[50] At the charge conference the next day, counsel for Dr. Thomas objected to the causation instruction. Specifically, counsel objected on the basis that no expert used the exact words "increased risk of harm" and therefore it was error to charge the jury in this respect. The PrimeCare Defendants joined in Dr. Thomas' objection. The Court informed counsel for the PrimeCare Defendants that it recalled that Dr. Breggin provided causation testimony to this effect. In response, counsel for the PrimeCare Defendants stated: "I agree with that recollection, but I also agree with Mr. Hill's recollection that he was saying it, in terms of factual cause or substantial factor, not increased risk of harm language. *I'm not saying there wasn't sufficient testimony as to causation.*" Sept. 14, 2016 Trial Tr. 99:8-18 (emphasis added).

[51] In *Brokerage Concepts*, the Third Circuit found that a defendant's Rule 50(a) motion, while "far from a model of completeness or clarity," was sufficient to preserve its Rule 50(b) motion. *Brokerage Concepts*, 140 F.3d at 519 n.18. The Rule 50(a) motion stated: "[t]he evidence is insufficient to support a finding or sustain a verdict that U.S. Healthcare's practices constituted an unreasonable restraint on trade in light of the circumstances of this case." *Id.* Although the text of the motion was not sufficiently specific, the "background, as reflected in the record" led the Court to conclude that the defendant had preserved the issue for purposes of its Rule 50(b) motion. *Id.* The Court compared the defendant's Rule 50(a) motion to the one raised in *Fineman v. Armstrong World Indus.*, *Inc.*, 980 F.2d 171 (3d Cir. 1992), where it held "that a general motion for a directed verdict contesting the sufficiency of the evidence with respect to 'coercion' preserved defendant's challenge to the sufficiency of the evidence with respect to the tortious interference claim, because 'plaintiffs' counsel was clearly on notice of the legal rubric under which [defendants] planned to proceed.'" *Brokerage Concepts*, 140 F.3d at 519 n.18 (quoting *Fineman*, 980 F.2d at 184)). That is not the case here.

"one argument" with respect to "negligence" and had to "concede" that the testimony was sufficient with respect to the "others."  The PrimeCare Defendants' failure to move under Rule 50(a) with sufficient specificity waived their right to attack the sufficiency of evidence supporting the jury's negligence verdict under Rule 50(b); there was simply no motion for them to "renew."  *See DCK/TTEC, LLC v. Postel Indus., Inc.*, Civil Action No. 11-1198, 2014 WL 11485573, at *2 (W.D. Pa. Jan. 6, 2014) (noting that the defendant "did not make a motion for judgment as a matter of law (either in writing or orally) at any time before the case was submitted to the jury" thus the defendant "may not make (much less renew) the motion now").

Third, even if the Court were to assume that counsel's statements (after conceding there was sufficient evidence to submit to the jury the negligence claim with respect to all of the PrimeCare Defendants except Paul James) were sufficient to preserve the argument that there was insufficient causation evidence to find Patricia Bauer, Christina Rowe, Grace Ramos, Wendy Johnson, and PrimeCare liable for negligence, the PrimeCare Defendants' brief in support merely sets forth arguments, without any citation to record, that there was insufficient evidence that PrimeCare itself breached its duty of care, and, accordingly PrimeCare cannot be directly liable under a corporate negligence theory.[52]  The only other

---

[52] There can be no question that the PrimeCare Defendants' alleged Rule 50(a) motion made no argument that the evidence presented at trial was insufficient for a reasonable jury to find that PrimeCare breached its duty of care.  Not only is this argument belied by the record, but, more importantly, Plaintiffs were certainly not put on notice as to this specific alleged deficiency in their case and, if necessary, given the opportunity to cure the alleged defect.  *See Carroll v. Clifford Twp.*, Civil Action No. 3:12-0553, 2014 WL 3734761, at ** 1-2 (M.D. Pa. July 28, 2014) (where defendant moved for judgment as a matter of law

argument set forth in the brief is: "none of these policy deviations in any way had an impact upon Barbaros choosing to commit suicide and, as such, was not causally related to any harm against Mr. Barbaros. . . Consequently, as a matter of law, PrimeCare Defendants cannot be found to be directly negligent in relation to Barbaros' action of taking his own life." (Doc. 377, at 32-33).

The PrimeCare Defendants' brief makes no reference whatsoever to Paul James, Patricia Bauer, Christina Rowe, Grace Ramos, or Wendy Johnson and why the evidence presented at trial was insufficient for a reasonable jury to find any of them liable in negligence. Nor does the PrimeCare Defendants' brief or motion even acknowledge liability based on the actions and omissions of Dr. Thomas and William Buffton. Instead, the PrimeCare Defendants' brief only claims that there was insufficient evidence that PrimeCare itself could be liable under a theory of corporate negligence, and notably does not cite to the record in support thereof. Under the circumstances, the PrimeCare Defendants' failure to brief the negligence issue leads the Court to conclude each of the PrimeCare Defendants, including Paul James, have abandoned this issue by failure to brief it.[53] *See State Farm*

---

"on the grounds that the defendants are entitled to qualified immunity and that plaintiff failed to demonstrate causation", its Rule 50(b) motion raising an argument that there was insufficient evidence as to *Monell* liability was not preserved as it "was not a ground for relief raised when defendants moved for judgment as a matter of law at trial"); *see also United Nat'l Ins. Co. v. AON Ltd.*, Civ. No. 04-539, 2009 WL 22445373, at *5 (E.D. Pa. July 24, 2009) (defendants failed to raise argument in Rule 50(a) motion that there was insufficient evidence to support jury's finding of causation as the record citations "are in support of its argument on whether [it] bore any duty to [the plaintiff], a different issue" than causation).

[53] "Both waiver and abandonment, although technically different, reflect the legal doctrine that a party must assert a legal position in a timely and substantive matter. Here, first, because [of] Defendants' insufficient Rule 50 motion at trial, all issues relating to the sufficiency of evidence aside from RICO

*Mutual Auto. Ins. Co. v. Lincow*, 444 F. App'x 617, 620 (3d Cir. 2011) (district court did not

err in concluding that issue properly raised in Rule 50(a) motion was abandoned when in

brief in support of Rule 50(b) motion the defendant "did not argue the issue in his later

briefs" and thus "abandoned the . . . argument").  That the PrimeCare Defendants have

abandoned this issue altogether is, again, highlighted by their failure to address the different

causation evidence presented or the different theories of liability.

The Court's conclusion that the PrimeCare Defendants have both waived and

abandoned these issues is a straight forward application of a well-settled rule of civil

procedure and the law in this Circuit.[54]  If the Court were to find that each of the PrimeCare

Defendants properly preserved their Rule 50(b) motions, then Rule 50(a) would fail to serve

its purpose of providing notice to the non-moving party and an opportunity to cure defects in

its proof. *Lightening Lube*, at 1173. It would also encourage and reward counsel who make

vague and ambiguous statements for strategic purposes, and penalize plaintiffs who are the

intended beneficiaries of Rule 50(a)(2).  And it would unduly burden the Court, who has

already spent a great deal of time and effort researching Pennsylvania case law and

---

distinctiveness, are waived.  Second, because Defendants have failed to fully brief certain arguments that
were tersely addressed in their motion, those arguments will be deemed abandoned." *State Farm Mutual
Auto. Ins. Co. v. Lincow*, 715 F. Supp. 2d 617, 629 (E.D. Pa. 2010), *aff'd*, 444 F. App'x 617.

[54] The Advisory Committee notes to Rule 50 explicitly state that the purpose of revising Rule 50(a) to
require a motion to state the judgment sought and the law and facts entitling the movant to judgment was to
address "the result in cases in which courts have used various techniques to avoid the requirement that a
motion for a directed verdict be made as a predicate to a motion for judgment notwithstanding the
verdict."  Fed. R. Civ. P. 50, Advisory Committee Notes 1991 (citing *Bernson v. Allphin*, 788 F.2d 268 (7th
Cir. 1986) ("This circuit has allowed something less than a formal motion for directed verdict to preserve a
party's right to move for judgment notwithstanding the verdict.")).

reviewing the entire record on multiple occasions – neither of which the PrimeCare

Defendants bothered to cite in support of their "renewed" Rule 50(b) motion.[55] *See Villara*

*v. City of Yonkers Police Dept.*, No. 95 CIV. 10654, 1997 WL 399660, at *1 (S.D.N.Y. July

15, 1997) ("[B]asic principles of judicial economy require a party to raise issues of this kind

in a Rule 50(a) motion, before a case is submitted to the jury.").  The plain language of Rule

50(a)(2), judged in context, clearly shows that the PrimeCare Defendants, with the

exception of Paul James, waived their ability to challenge the sufficiency of the evidence

supporting the jury's negligence verdict.  It is also apparent that all of the individual

PrimeCare Defendants, including Paul James, have abandoned this issue due to their

failure to brief it.[56]  Any other conclusion would be unfair, unwise, and inconsistent with

---

[55] The Court admonishes counsel for both the PrimeCare Defendants and Dr. Thomas for their repeated misrepresentations throughout their post-trial submissions.  Counsel's repeated misrepresentations and failure to provide citations to the record utterly fail to advance their clients' cause, and seek to have the Court do counsel's work for them.  "Judges are not like pigs, hunting for truffles buried in the record."  *Doebler's Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (internal citation and quotation marks omitted).

[56] Even though Paul James preserved the right to renew his motion pursuant to Rule 50(b), the PrimeCare Defendants do not present any argument in their brief in support.  They certainly make no argument that the evidence was insufficient to find Paul James liable for negligence.  Merely arguing that the evidence was insufficient to find Paul James liable for deliberate indifference does not address whether, under Pennsylvania law, no reasonable jury could conclude that Paul James could be liable for negligence. Having failed to do so, the Court considers Paul James to have abandoned this issue and will not address it, except in connection with his motion for a new trial as set forth below.  *See Lincow*, 444 F. App'x at 620; *see also Lesende*, 752 F.3d 324, 334 (3d Cir. 2014) (recognizing that where a party's brief "failed to set forth any argument that the first jury's verdict on liability was against the clear weight of the evidence . . . [t]he absence of such argument strongly indicates that the [defendant] did not intend to seek and never actually sought a new trial on liability from the District Court"); *United States v. Healy*, Criminal No. 1:CF-09-319, 2013 WL 1624310, at *1 (M.D. Pa. Apr. 15, 2013) ("In addition, issues not briefed are deemed waived.") (citing *Nat'l R.R. Passenger Corp. v. Pennsylvania Pub. Utility Comm'n*, 342 F.3d 242 (3d Cir. 2003)); *Kohn v. Sch. Dist. of City of Harrisburg*, Civil No. 1:11-CV-109, 2012 WL 3560822, at *1 (M.D. Pa. Aug. 2012) (declining to rule on an issue "because the parties had not briefed it"); *Hollman v. United* States, 783 F. Supp. 221, 222 n.1 (M.D. Pa. 1992) ("This issue was not briefed . . . and we consider it

Federal Rule of Civil Procedure 1. *See* Fed. R. Civ. P. 1 (the Federal Rules of Civil Procedure "should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding").

In sum, after consideration of the communicative content, specificity, and notice giving function of Rule 50(a), the only reasonable and logical determination is a finding of waiver and abandonment.[57] The Court will nevertheless address the evidence presented against the PrimeCare Defendants in connection with their motion for a new trial on the theory that the jury's negligence verdict was against the weight of the evidence, *infra*.

### 2. Dr. Alex Thomas

The Court will next address Dr. Thomas' Rule 50(b) motion. In his motion, but nowhere in his brief in support thereof, Dr. Thomas alleges that the evidence was insufficient for a reasonable jury to find him liable in negligence. The motion alleges, erroneously, that both

---

abandoned."); *Weiss v. York Hosp.*, 524 F. Supp. 433, 440 (M.D. Pa. 1981) (where an issue is not properly briefed, "the Court is of the opinion that this legal issue is not now properly before it"); *Envirex, Inc. v. Ecological Recovery Assocs., Inc.*, 454 F. Supp. 1329, 1332 (M.D. Pa. 1978) (defendant "has not briefed all the grounds set forth in its motion for a new trial and the Court will not deal with grounds not briefed").

[57] Rather than argue that the PrimeCare Defendants waived the right to attack the sufficiency of the evidence in a Rule 50(b) motion by failing to move under Rule 50(a) with sufficient specificity, Plaintiffs instead briefly address the PrimeCare Defendants' arguments on their merits. In *Runyon*, the Third Circuit found that the plaintiff waived her right to assert on appeal that the defendant waived an issue that was addressed in its Rule 50(b) motion, but not preceded with a sufficiently specific Rule 50(a) motion, because plaintiff "did not raise her waiver objection to the defendants' Rule 50(b) motion before the district court" but instead attacked the Rule 50(b) on its merits. *Runyon*, 130 F.3d at 572. *Runyon* stands for the proposition that a *party* opposing a Rule 50(b) motion, who did not raise the issue before the district court that an insufficient Rule 50(a) motion waived the movant's right to relief under Rule 50(b), cannot for the first time claim waiver on appeal. It does not, however, stand for the proposition that because Plaintiffs did not specifically raise the issue of waiver in their brief in opposition to the PrimeCare Defendants' Rule 50(b) motion, the Court is precluded from finding waiver when it is clear that waiver has occurred. Moreover, the facts of *Runyon* were quite unique and could not be more different than the present case.

at the close of Plaintiffs' case-in-chief and at the close of evidence, Dr. Thomas moved for judgment as a matter of law on Plaintiffs' negligence claim pursuant to Rule 50(a).[58] (Doc. 354, at ¶¶ 26-29). A review of the record shows that Dr. Thomas, like the PrimeCare Defendants, did *not* move for judgment as a matter of law on Plaintiffs' negligence claim prior to the case being submitted to the jury. Sept. 13, 2016 Trial Tr. at 14:23-20:4. In fact, after moving for judgment as a matter of law on Plaintiffs' deliberate indifference claim, counsel for Dr. Thomas readily acknowledged that "[i]f anything, it rises to – like I said – claims of negligence but nothing beyond that." *Id.* at 20:2-4. Consistent with this statement, Dr. Thomas has abandoned this argument, as nowhere in his brief in support does he claim entitlement to judgment as a matter of law on Plaintiffs' negligence claim. Nevertheless, in response to the Court's Order directing that he provide citations to the record, Dr. Thomas claims he moved for judgment as a matter of law pursuant to Rule 50(a) on two occasions. (Doc. 398 at 2). Dr. Thomas' arguments are utterly without merit.

First, Dr. Thomas claims that he moved for judgment as a matter of law "[a]t the close of Defendants' case-in-chief on Day 7 of the trial (N.T. 9/14/16 at 62:19-21)." (*Id.*). Second, Dr. Thomas alleges he moved for judgment as a matter of law "at the close of trial (after the jury returned with a Plaintiffs' verdict as to both negligence and deliberate indifference) on Day 8 of the Trial." (*Id.*). The Court will address each in turn.

---

[58] Upon reviewing Dr. Thomas' representations, the Court issued an Order directing Dr. Thomas to "submit to the Court citations to the record to support his assertion that he moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) with respect to Plaintiffs' negligence claim." (Doc. 396, at 1). Dr. Thomas promptly complied. (Doc. 398).

Following the close of the evidence, counsel for the PrimeCare Defendants renewed his motion "pursuant to Rule 50, without further argument."  Sept. 14, 2016 Trial Tr. at 62:14-17. Counsel for Dr. Thomas then stated "I join, as well, on behalf of Dr. Thomas Your Honor." *Id.* at 62:19-20.  According to Dr. Thomas, these 11 words constituted a Rule 50(a) motion that was sufficiently specific to preserve his Rule 50(b) motion because he "did join in the argument timely asserted by counsel for PrimeCare Medical as to Plaintiffs' failure to establish causation."  (Doc. 398, at 2).  But, as discussed, the only PrimeCare Defendant that moved for judgment as a matter of law on this issue was Paul James.  It simply defies logic, then, that Dr. Thomas could somehow preserve his Rule 50(b) by incorporating a co-defendant's insufficient Rule 50(a) motion.  Simply stating "I join" does not specify the judgment sought or the law and facts entitling Dr. Thomas to the judgment.  Even if each of the PrimeCare Defendants properly moved under Rule 50(a) on the theory that the causation evidence was insufficient, which they did not, counsel for Dr. Thomas stating "I join" is not and cannot be sufficient to preserve his Rule 50(b) motion.  The causation evidence presented against Dr. Thomas and the PrimeCare Defendants was not the same evidence.  If there were any doubt, Dr. Thomas' response to the Court's order conceding that he "did not expressly reference the negligence claim during the initial argument moving for judgment as a matter of law" and his failure to brief this issue puts any doubt to rest. (Doc. 398, at 2).

Dr. Thomas' second argument that a post-verdict motion was sufficient to preserve this issue also fails. The plain language of Rule 50(a) makes apparent that such a motion must be raised before the jury returns its verdict. *See* Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time *before the case is submitted to the jury*….") (emphasis added); *see also Wolski v. City of Erie*, 900 F. Supp. 2d 553, 561 (W.D. Pa. 2012) ("A motion for relief under Rule 50(a) may be made at any time before the case is submitted to the jury.").

Dr. Thomas has waived his right to move for judgment as a matter of law on Plaintiffs' negligence claim by failing to properly raise this issue with a sufficiently specific Rule 50(a) motion.[59] He has also abandoned this issue by failing to brief or set forth any argument why, viewing the evidence in the light most favorable to the Plaintiffs, the causation evidence was insufficient to support the jury's negligence verdict. Dr. Thomas' motion will be thus denied.[60] The Court will nevertheless briefly address the evidence presented against Dr. Thomas in connection with his motion for new trial, *infra*.

---

[59] To the extent Dr. Thomas may argue his motion for summary judgment on Plaintiffs' negligence claim was sufficient to preserve his arguments, such argument lacks merit. *See Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177,185 (3d Cir. 2015) ("[I]t has become apparent that when, as in this instance, a summary judgment motion does not present a pure issue of law and the issues it does present have not been raised and renewed by proper motions for judgment as a matter of law under Rule 50, those issues are not reviewable on appeal."). Dr. Thomas' motion for summary judgment alleged insufficient causation evidence based on the report of an expert who did not testify at trial. It certainly did not present a "pure issue of law." *Id.* The same holds true for the PrimeCare Defendants' motion for summary judgment.

[60] Even if Dr. Thomas or the PrimeCare Defendants did not waive their right to raise a Rule 50(b) motion on the negligence claim, the Court would nevertheless deny their motions on the merits.

### C. Punitive Damages

The jury imposed $8,000,000 in punitive damages solely against PrimeCare. PrimeCare now moves pursuant to Rule 50(b) alleging there was insufficient evidence from which a jury could find that its acts and omissions warranted the imposition of punitive damages. PrimeCare, again without any citations to the record, alleges it moved for judgment as a matter of law pursuant to Rule 50(a) prior to the case being submitted to the jury. The Court issued an Order directing the PrimeCare Defendants to provide it with citations to the record in support of this assertion. (Doc. 395). In response, the PrimeCare Defendants directed the Court to approximately nine lines from the trial transcript occurring two days after the close of Plaintiffs' case-in-chief and one day after the close of evidence and the charge conference. (Doc. 397 at 1-2). The PrimeCare Defendants also note that, before trial, they filed a motion *in limine* "to Preclude Argument that Plaintiffs May Recover Punitive Damages", (Doc. 215), and that the Court denied the Motion (Doc. 274). The question thus becomes whether PrimeCare raised the issue of its entitlement to judgment as a matter of law with a sufficiently specific Rule 50(a) motion such that the issue of punitive damages is properly preserved for purposes of its Rule 50(b) motion.

As an initial matter, the Court rejects PrimeCare's argument that simply filing a pretrial motion *in limine* requesting that the Court preclude "any argument" that Plaintiffs are entitled to punitive damages weeks before any evidence was presented to the jury is the equivalent of a Rule 50(a) motion. *See Botey v. Green*, No. 3:12-CV-1520, 2017 WL 2536397, at *2

(M.D. Pa. June 9, 2017) (defendants moved *in limine* with respect to punitive damages arguing "that the Plaintiff 'has not presented evidence of intentional, willful, wanton, or reckless conduct to support punitive damages.' This is an argument that is premature and is appropriate to be made in accordance with Federal Rule of Civil Procedure 50(a). But it is not an argument that can be properly addressed in a motion in limine prior to trial"); *see also Welch v. United Parcel Serv., Inc.*, 871 F. Supp. 2d 164, 170 (E.D.N.Y. 2012) ("Here, the Court finds that pursuant to the letter of Fed.R.Civ.P. 50(b) and the relevant case law, because the Defendant only raised the issue . . . at a pretrial conference and again in the middle of jury deliberations . . . but did not raise the issue in its Rule 50(a) motion, the present Rule 50(b) motion is procedurally improper. . . . It is an unfair result and contravenes the purposes of Rule 50 to allow the Defendant to raise an issue before the Plaintiff has even put on his case, and then not renew that contention regarding the sufficiency of the evidence after the Plaintiff has actually presented his proof. Such a finding would undermine the requirement that a Defendant identify the specific element that is unsupported and question the sufficiency of the evidence that was presented; and then afford the Plaintiff an opportunity to remedy any defect."). Accordingly, PrimeCare's pretrial motion *in limine* asking the Court to preclude "any argument" that Plaintiffs may recover punitive damages does not constitute a Rule 50(a) motion and cannot preserve this issue for purposes of Rule 50(b).

The Court next considers whether PrimeCare properly raised the issue of punitive damages in a Rule 50(a) motion at trial. PrimeCare did not move for judgment as a matter of law on Plaintiffs' claim for punitive damages at either the close of Plaintiffs' case-in-chief or at the close of the evidence. Sept. 13, 2016 TT at 9:13-14:20; Sept. 14, 2016 TT at 62:14-17. However, one day after the charge conference and mere minutes before closing arguments, counsel for PrimeCare said, "[t]he only thing I want to state Your Honor, is I just want to make sure I'm on the record that I've asked that the punitive damages claim be dismissed, even at this point, because I don't think there's sufficient evidence." Sept. 15, 2016 Trial Tr. at 7:16-19. Although far from a model of clarity and timing, the Court cannot say that PrimeCare's Rule 50(a) motion was untimely. See Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made *at any time before the case is submitted to the jury*.") (emphasis added). Although the motion made no mention of Rule 50(a) and certainly could have been more specific, it identified the judgment sought (dismissal of punitive damages claim) and the reasons for the judgment (the facts and evidence presented by plaintiffs were insufficient to impose punitive damages). The Court will therefore consider the merits of PrimeCare's Rule 50(b) motion.

The Court deferred ruling on PrimeCare's Rule 50(a) motion and instructed the jury in accordance with the standard punitive damages instruction contained in the Pennsylvania Standard Jury Instructions. The jury was instructed as follows:

> Punitive damages may only be awarded for willful or wanton conduct or reckless indifference.

Reckless indifference is an intentional act or failure to act in disregard of a risk of harm to others that is known or should be known to be highly probable and with a conscious indifference to the consequences. Reckless conduct is also acting or failing to act when existing danger is actually known and when an awareness that harm is highly probable.

In assessing punitive damages, you may consider the character of the health-care provider's act or failure to act, the nature and extent of harm that the health-care provider caused or intended to cause to the patient, and the wealth of the health-care provider.

PrimeCare did not object to this instruction. Based on this instruction, the jury imposed $8,000,000 in punitive damages against PrimeCare only.[61]

The Court must consider whether the evidence presented, viewed in the light most favorable to Plaintiffs, was sufficient to impose punitive damages against PrimeCare.[62] Under Pennsylvania law, "a punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Hutchison ex rel. Hutchinson v. Luddy*, 582 Pa. 114,

---

[61] Plaintiffs initially sought to recover punitive damages against all of the Defendants on both the § 1983 claim and the negligence claim. However, before the case was submitted to the jury, Plaintiffs withdrew their claim for punitive damages under § 1983 against all of the Defendants and withdrew their claim for punitive damages on their negligence claim against all of the Defendants with the exception of PrimeCare. Sept. 15, 2016 Trial Tr. at 2:3-12; 6:19-7:7.

[62] Where, as here, punitive damages were awarded on a state law negligence claim, "the propriety of an award of punitive damages for the conduct in question, and the factors the jury may consider in determining their amount, are question of state law." *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). "Federal law, however, will control on those issues involving the proper review of the jury award by a federal district court and court of appeals." *Id.* at 278-79.

124, 870 A.2d 114 (2005) (citations omitted).   Similarly, section 1303.505(a) of

Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE Act")

provides that "[p]unitive damages may be awarded for conduct that is the result of the health

care provider's willful or wanton conduct or reckless indifference to the rights of others.  In

assessing punitive damages, the trier of fact can properly consider the character of the

health care provider's act, the nature and extent of the harm to the patient that the health

care provider caused or intended to cause and the wealth of the health care provider."  40

P.S. § 1303.505(a).  "[A] showing of mere negligence, or even gross negligence, will not

suffice to establish that punitive damages should be imposed.  Rather, the plaintiff must

adduce evidence which goes beyond a showing of negligence, evidence sufficient to

establish that the defendant's acts amounted to intentional, willful, wanton or reckless

conduct."  *Hall v. Episcopal Long Term Care*, 54 A.3d 391, 395, 2012 PA Super 205 (Pa.

Super. 2012); *accord* 40 P.S. § 1303.505(b) (gross negligence insufficient to impose

punitive damages under Pennsylvania law).

There was no evidence that PrimeCare's acts or omissions were intentional, willful, or

wanton.  The question thus becomes whether, viewing the evidence in the light most

favorable to the Plaintiffs, a reasonable jury could find PrimeCare's acts and omissions were

recklessly indifferent to the rights of others such that punitive damages were permissible.

Because the Court has already found that the PrimeCare Defendants are entitled to

judgment as a matter of law with respect to Plaintiffs' deliberate indifference claim, it

appears to logically follow that there was insufficient evidence to support the jury's award of punitive damages.  Indeed, the PrimeCare Defendants argue as much.  (Doc. 393, at 18) ("Plaintiffs are not entitled to punitive damages for the same reasons they cannot establish deliberate indifference.").

The Third Circuit appears to treat the terms "deliberate indifference" and "reckless indifference" interchangeably, and has declined several opportunities to elaborate on the distinctions, if any, between the two terms.  *See, e.g.*, *Palakovic*, 854 F.3d at 224 n.15 ("In *Colburn* II, we did not precisely define the terms 'deliberate indifference' or 'reckless indifference,' concluding that, whichever formulation is employed, it indicates a level of culpability beyond mere negligence.  We once again do not find it necessary to parse these phrases to determine whether there is some distinction between them."); *Colburn*, 946 F.2d at 1024 ("In *Colburn I*, we referred to 'reckless indifference' as the standard for judging the defendant's conduct. . . In *Williams*, we referred to deliberate indifference. . . Both panels expressly declined to distinguish or precisely define these two concepts.  We find it unnecessary to do so in this case.  It will suffice for present purposes to note that a level of culpability higher than a negligent failure to protect from self-inflicted harm is required.").  This Court, too, need not elaborate on any distinction.  The Court notes that simply because PrimeCare's acts and omissions did not violate the Constitution, it does not necessarily follow that PrimeCare cannot be held liable for punitive damages under Pennsylvania law.  However, the similarities between the two standards gives the Court pause and strongly

suggests that because PrimeCare cannot be held liable for violating Mr. Barbaros'

constitutional rights, PrimeCare, on the evidence presented, likewise cannot be held liable

for punitive damages under Pennsylvania law.

Pennsylvania has adopted Section 908(2) of the Restatement (Second) of Torts. *Feld v.*

*Merriam*, 506 Pa. 383, 485 A.2d 742 (1984). The Restatement provides:

> (2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended cause and the wealth of the defendant.

Restatement (Second) of Torts § 908(2). Elaborating on the concept of reckless

indifference, the Pennsylvania Supreme Court has found reckless indifference sufficient to

support an award of punitive damages "where the actor knows, or has reason to know . . . of

facts which create a high degree of risk of physical harm to another, and deliberately

proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk." *SHV*

*Coal*, *Inc. v. Continental Grain Co.*, 526 Pa. 489, 494, 587 A.2d 702 (1991) (internal citation

and quotation marks omitted). By way of comparison, the Pennsylvania Supreme Court has

indicated what type of conduct would *not* constitute reckless indifference sufficient to

impose punitive damages: that is, "where the actor has such knowledge, or reason to know,

of the facts, but does not realize or appreciate the high degree of risk involved, although a

reasonable man in his position would do so." *Id.* (internal citation and quotation marks

omitted).

In Pennsylvania, "punitive damages are an extreme remedy available in only the most exceptional matters." *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439 (2005) (internal citation and quotation marks omitted). "Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others." *Id.* at 188-89 (internal citation and quotation marks omitted). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless, or malicious." *Feld*, 485 A.2d at 748. As discussed, where, as here, punitive damages are imposed based on a defendant's reckless indifference to the rights of others, the plaintiff must present sufficient evidence from which a reasonable jury could find that PrimeCare "(1) had a subjective appreciation of the risk of harm to which the plaintiff was exposed, and (2) acted, or failed to act . . . in conscious disregard of that risk." *Hutchinson*, 582 Pa. at 114.

The Court has carefully considered the evidence and testimony presented at trial. Viewing all the evidence in the light most favorable to the Plaintiffs, no reasonable jury could find PrimeCare's conduct sufficiently recklessly indifferent so as to warrant punitive damages under Pennsylvania law. The Court will therefore grant PrimeCare's Rule 50(b) motion for judgment as a matter of law because no reasonable jury could impose punitive damages against PrimeCare based on the evidence presented at trial. Several reasons lead the Court to this conclusion.

First, the Court has already extensively detailed PrimeCare's acts and omissions and need not repeat them here.  Suffice it to say that there was insufficient evidence from which a jury could reasonably conclude that PrimeCare "(1) had a subjective appreciation of the risk of harm to which the plaintiff was exposed, and (2) acted, or failed to act . . . in conscious disregard of that risk."  *Hutchinson*, 582 Pa. at 114.  There was simply no evidence that PrimeCare's acts and omissions created "an unreasonable risk of physical harm" to Barbaros or the inmates at the MCCF which was "substantially greater" than negligent conduct and that PrimeCare acted, or failed to act, in conscious disregard of that risk.  *Cricket Lighters*, 584 Pa. at 188.

Second, no reasonable jury could find PrimeCare's acts and omissions rose to the level of gross negligence.  Acts and omissions constituting gross negligence would be insufficient to impose punitive damages against PrimeCare.  Section 1303.505(b) of the MCARE Act provides that "[a] showing of gross negligence is insufficient to support an award of punitive damages."  40 P.S. § 1303.505(b).  The Pennsylvania Supreme Court has never defined "gross negligence" in the context of MCARE's punitive damages provisions.  The Court has, however, provided a definition of gross negligence in a somewhat similar context.  Gross negligence is "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference."  *Albright v. Abington Memorial Hosp.*, 548 Pa. 268, 278, 696 A.2d 1159 (1997) (internal citation and quotation marks omitted).  "The behavior of the defendant must be flagrant, grossly deviating from the ordinary

standard of care." *Id.* "While the behavior must be more than simple negligence, it need

not reach the level of wanton conduct." *DeJesus v. United States Dept. of Veterans Affairs*,

479 F.3d 271, 286 (3d Cir. 2007). "Negligence consists of inattention or inadvertence,

whereas wantonness exists where the danger to the plaintiff, though realized, is so

recklessly disregarded that, even though there be no actual intent, there is at least a

willingness to inflict injury, a conscious indifference to the perpetration of the wrong." *Id.*

(internal citation and quotation marks omitted). "Gross negligence lies somewhere in

between." *Id.* The failure to access and review medical records and "the failure to evaluate

adequately [decedent's] suicidality does not constitute gross negligence." *Cohen v. Kids

Peace Nat'l Centrs., Inc.*, 256 F. App'x 490, 492-93 (3d Cir. 2007) (citing *Doby v.

DeCrescenzo*, 171 F.3d 858, 876 (3d Cir. 1999)); *see also Downey v. Crozer-Chester

Medical Ctr.*, 817 A.2d 517, 526-529, 2003 PA Super 51 (Pa. Super. 2003). The Court's

review of the record reveals there was no evidence presented to the jury that could

establish that PrimeCare's acts and omissions were "substantially more" than ordinary

negligence or rising to the level of reckless indifference. *Albright*, 548 Pa. at 278.

Third, there was no expert testimony that PrimeCare's acts and omissions were

outrageous and in reckless disregard of Mr. Barbaros' rights. *Cf. Klinger v. State Farm Mut.

Auto. Ins. Co.*, 115 F.3d 230, 235 (3d Cir. 1997) (concluding that defendant's conduct

warranted punitive damages and noting, among other things, "[t]here was testimony from

plaintiffs' expert that [defendant's] conduct was in reckless disregard of the plaintiffs' rights"

and "stated that, in his opinion, this conduct was outrageous. This testimony provided the jury a sufficient basis to award punitive damages.").

Finally, the Court's review of Pennsylvania case law permitting the imposition of punitive damages against a healthcare provider based on corporate negligence leads it to conclude that a jury could not reasonably conclude that PrimeCare's conduct was sufficiently outrageous to warrant the imposition of punitive damages under Pennsylvania law. *See, e.g.*, *Dubose v. Quinlan*, 125 A.3d 1231, 1240-41, 2015 PA Super 223 (Pa. Super. 2015) (issue of whether punitive damages were warranted against nursing home was for the jury); *Hall*, 54 A.3d at 396-97 (issue of punitive damages was for jury where "the record was replete with evidence that the nursing home was chronically understaffed and complaints from the staff went unheeded. The Estate presented evidence [defendant's] employees were not only aware of understaffing, which led to improper patient care, but they deliberately increased staff during times of state inspections and then reduced such after the inspection concluded. . . . Furthermore, the Estate presented evidence that nurses falsified care logs, thus indicating the deceased had received care at the nursing home when, in fact, the deceased was admitted into the hospital."); *Scampone v. Grante Healthcare Co.*, 11 A.3d 967, 2010 PA Super 124 (Pa. Super. 2010) (issue of punitive damages was for jury when "[t]he record was replete with evidence that the facility was chronically understaffed and complaints from staff continually went unheeded. [Defendants'] employees not only were aware of the understaffing that was leading to

improper patient care, they deliberately altered records to hide the substandard care by altering ADLs that actually established certain care was not rendered."), *aff'd on other grounds*, 618 Pa. 363, 57 A.3d 582; *Stroud v. Abington Memorial Hosp.*, 546 F. Supp. 2d 238, 257 (E.D. Pa. 2008) (plaintiff stated claim for punitive damages against corporate healthcare provider where he alleged the defendant "was aware that Decedent was suffering from an emergent and life threatening condition . . . and that they nevertheless failed to take any actions to remedy the condition or avert the demise," and defendants "failing to take any action on critical test results . . . showing an emergent and life threatening condition was outrageous and shocking to the conscience") (internal citation and quotation marks omitted).  In each of these cases, there was evidence from which a reasonable jury could infer that the corporation was subjectively aware of a substantial risk of harm to which the decedent was exposed and acted, or failed to act, in conscious disregard of that risk.[63]  No such evidence was presented to the jury in this case.  Moreover, the evidence in *Scampone*, *Hall*, and *Dubose* suggested conduct that was far more culpable and blameworthy than PrimeCare's acts and omissions, including, among other things, intentional acts to deceive regulatory authorities and intentional alteration of patient care records.

---

[63] "[A]lthough state intermediate appellate decisions are not automatically controlling where the highest court of the state has not spoken," the Court "must give serious consideration to the decisions of intermediate appellate courts in ascertaining and applying state law."  *Robinson v. Jiffy Executive Limousine Co.*, 4 F.3d 237, 242 (3d Cir. 1993).

Viewing all the evidence in the light most favorable to the Plaintiffs, no reasonable jury could find that PrimeCare's acts and omissions were sufficiently culpable to warrant the imposition of punitive damages under Pennsylvania law. There was insufficient evidence from which the jury could reasonably infer that PrimeCare "(1) had a subjective appreciation of the risk of harm to which the plaintiff was exposed, and (2) acted, or failed to act . . . in conscious disregard of that risk." *Hutchinson*, 582 Pa. at 114. Rather, PrimeCare's acts and omissions were negligent, not recklessly indifferent or even grossly negligent. This is simply not the type of case where the "extreme remedy" of punitive damages can be imposed. Accordingly, the Court will grant PrimeCare's renewed motion for judgment as a matter of law. As set forth *supra*, should the Court of Appeals reverse or vacate the Court's entry of judgment as a matter of law the Court conditionally denies PrimeCare's motion for a new trial on the issue of punitive damages.

## V.    MOTION FOR NEW TRIAL

### A.    The PrimeCare Defendants

The PrimeCare Defendants have also moved for a new trial pursuant to Federal Rule of Civil Procedure 59. They seek a new trial due to: (1) alleged erroneous jury instructions; (2) alleged various erroneous evidentiary rulings; and (3) the verdict was against the weight of the evidence.

Before addressing the PrimeCare Defendants' arguments, the Court notes that the PrimeCare Defendants' motion, but not their brief in support, raises a scattershot list of

perceived errors entitling them to a new trial.  (Doc. 366).  For example, the PrimeCare

Defendants' motion alleges:

> (1) "[t]he Court prejudicially erred by charging the jury on increased risk of harm when there was no expert testimony offered by Plaintiffs that negligent conduct by any of the Defendants increased the risk of harm to Mr. Barbaros," (*Id.* at ¶ 63(A)(3));  (2) "[t]he Court prejudicially erred by charging the jury on both causation and increased risk of harm," (*Id.* at ¶ 63(A)(4)); (3) "[t]he Court prejudicially erred by charging the jury on damages in such a manner as to invite a double recovery," (*Id.* at ¶ 63(A)(5)); (4) "[t]he Court prejudicially erred by charging the jury on both deliberate indifference (an intentional act) and negligence (an unintentional act) since both causes of action are internally inconsistent thereby resulting in an inconsistent verdict," (*Id.* at ¶ 63(A)(6)); (5) "[t]he Court prejudicially erred by charging the jury on both deliberate indifference (an intentional act) and negligence (an unintentional act) since both causes of action are internally inconsistent which would confuse and mislead the jury," (*Id.* at ¶ 63(A)(7)); and (6) "[t]he Court prejudicially erred by failing to charge the jury as to vicarious liability relative to punitive damages," (*Id.* at ¶ 63(A)(8)).

*Id.*  However, the PrimeCare Defendants set forth no arguments with respect to these

alleged errors in their brief.  "'Merely reciting the Rule 59(a) standard and then tossing the

motion into the court's lap is not enough.'"  *Lesende*, 752 F.3d at 334 (quoting *Willis v.

Lepine*, 687 F.3d 826, 836 (7th Cir. 2012)).  The PrimeCare Defendants' failure to brief

these issues leads the Court to conclude that the PrimeCare Defendants have abandoned

these issues.

In addition, the PrimeCare Defendants also claim in their motion that several of the

Court's evidentiary rulings were erroneous and warrant a new trial.  (Doc. 366, at ¶¶

63(B)(1)-(10)).  However, the PrimeCare Defendants have only briefed the Court's alleged

errors regarding four of the ten evidentiary rulings.  With respect to the six other alleged

errors raised in their motion, which the PrimeCare Defendants have not briefed, the Court considers these arguments as abandoned.

Finally, the PrimeCare Defendants allege in their motion that the Court erred by: (1) failing to strike an unidentified juror for cause, (Doc. 366. at ¶ 63(D)); and (2) granting Correctional Officer Jesse Cleare's Motion for Judgment on the Pleadings. (*Id.* at ¶ 63(E)). Defendants did not brief either of these issues. Therefore, again, the Court considers these arguments abandoned for failure to brief. Nevertheless, to the extent these raise legal issues the Court will address them below.

Like the PrimeCare Defendants, Dr. Thomas' motion also claims entitlement to a new trial based on a variety of perceived errors, but fails to present any evidence or argument in his brief in support.[64] (Doc. 354, at ¶¶ 39-40). To the extent Dr. Thomas and the

---

[64] Because Dr. Thomas has not advanced any argument in his brief in support with respect to the vast majority of these alleged errors, the Court considers them abandoned. In addition to those arguments raised by the PrimeCare Defendants, Dr. Thomas claims he is entitled to a new trial because:

(a)  The Court prejudicially erred by denying Dr. Thomas' Motion to Dismiss;

(b)  The Court prejudicially erred by denying Dr. Thomas' Motion for Summary Judgment;

(e)  The Court prejudicially erred and abused its discretion by allowing Plaintiffs to introduce autopsy photographs of Mumun Barbaros;

(h)  The Court prejudicially erred and abused its discretion by permitting Mr. Barbaros' wife and daughter to testify as to the 'grief' and mental anguish they suffered as a result of Mr. Barbaros' death;

(k)  The Court prejudicially erred and abused its discretion in permitting Plaintiffs' liability expert, Dr. Peter Breggin, to testify as to the standard of care when he was not board certified and otherwise failed to meet the requirements of Section 512 of the MCARE Act, 40 P.S. § 1303.512, regarding the admission of expert testimony.

(n)  The Court prejudicially erred by charging the jury on damages in such a manner so as to invite a double recovery.

(o)  The Court prejudicially erred by failing to include on the verdict slip a question as to whether Dr. Thomas was the 'agent' of PrimeCare Medical;

PrimeCare Defendants claim error in the same respects, the Court will address them together below.

A Court should only grant a new trial "when 'the great weight of the evidence cuts against the verdict and . . . a miscarriage of justice would result if the verdict were to stand.'" *Leonard*, 834 F.3d at 386 (quoting *Springer*, 435 F.3d at 274). "Where evidence is in conflict and subject to two interpretations, the trial judge should be reluctant to grant a new trial." *Klein*, 992 F.2d at 1295. "Absent a showing of substantial injustice or prejudicial error, a new trial is not warranted and it is the court's duty to respect a plausible jury verdict." *Montgomery Cnty. v. MicroVote Corp.*, 152 F. Supp. 2d 784, 795 (E.D. Pa. 2001) (internal citation and quotation marks omitted). "The decision to grant or deny a new trial is left almost entirely to the discretion of the district court." *Radwan v. Carteret Bd. of Educ.*, 62 F. App'x 34, 37 (3d Cir. 2003) (citing *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Blancha v. Raymark Indus.*, 972 F.2d 507, 512 (3d Cir. 1992)).

---

(p) The Court prejudicially erred and abused its discretion by failing not to strike 'for cause' a prospective juror who stated that she had an unfortunate outcome from two healthcare providers; that she did not generally trust doctors; and that she did not typically seek treatment from them.

(Doc. 354, at ¶¶ 39-40).

The Court will not address Dr. Thomas' claim of entitlement to a new trial based on: (1) denial of his motion to dismiss; (2) denial of his motion for summary judgment; and (3) granting Defendant Cleare's motion for judgment on the pleadings. Dr. Thomas has not only abandoned these arguments but they utterly lack merit for the reasons set forth in previous memorandum opinions. (Docs. 64, 175, 177). Moreover, even if these constituted errors, Dr. Thomas failed to demonstrate any prejudice warranting a new trial. For the same reasons, the PrimeCare Defendants are not entitled to a new trial based on the Court's alleged error in granting Defendant Cleare's motion for judgment on the pleadings.

### 1. Jury Instructions

When a motion for a new trial is based on the court's jury instructions, a new trial is warranted only if the instruction, taken as a whole, "fails to fairly and adequately present the issues in the case without confusing or misleading the jury." *Donlin v. Phillips Lighting N. Am. Corp.*, 581 F.3d 73, 79 (3d Cir. 2009) (internal citation and quotation marks omitted). "It is well settled that a trial judge has substantial discretion to select the language to be used in instructing the jury on the law so long as the judge's instructions are correct and do not omit essentials." *United States v. Tiller*, 302 F.3d 98, 104 (3d Cir. 2002) (citations omitted).

### a. Negligence *Per Se* Jury Instruction and Argument

The PrimeCare Defendants seek a new trial alleging the Court erred "in permitting questioning and argument concerning Pennsylvania nursing law and where the Court provided a negligence *per se* charge concerning Pennsylvania nursing law where Plaintiffs provided no expert testimony that PrimeCare violated Pennsylvania nursing law." (Doc. 377, at 39). At the charge conference, Plaintiffs requested a negligence *per se* instruction based on PrimeCare's alleged violation of Pennsylvania Nursing Regulations and the Psychology Act. Sept. 14, 2016 Trial Tr. at 83:7-12. Counsel for the PrimeCare Defendants objected to the requested charge. *Id.* at 83:17-84:7. The Court then stated:

> Here's the first difficulty I have. The setting out of the Pennsylvania Code, 49 PA Code, and then apparently the reference to the statute, with regard to the Psychology Act, that's one thing, but I don't think after, well, I guess seven and a half days of testimony, six and a half days of testimony, that it would be appropriate for me to say that these laws dictate the duty of care required of someone in the same situation as Defendants Paul James, et al.

I mean, I don't think anybody—first of all, I don't think any expert gave that opinion. And secondly, all of the testimony has been directed, it seems to me, at either showing that HC—I'm sorry—NCCHC standards or PrimeCare's own policies were violated or met or did not meet the standard of care.

I mean, I don't think Mr. Chacker, I can stretch these two sections—one of the PA code and one of the statute—stretch them to the point where I would instruct the jury that these laws dictate the duty of care required. I just don't think that's appropriate.

*Id.* at 84:12-85:5. The Court again emphasized that "you're asking me, in effect, to take these two excerpts from a regulation in one case and the statute in another and swallow up this case, that these laws dictate the duty of care—I'm not going to do that." *Id.* at 87:17-21. The Court continued: "[i]f you want me to put into these instructions that this is the law in Pennsylvania, I don't know where I would put it, so as to allow you to argue what it is you want to argue, I can probably get that far, but in no way am I going to say that these laws dictate the duty of care required of the Defendants." *Id.* at 87:24-88:4.

Consistent with its statements, the Court instructed the jury based on a significantly modified version of Pennsylvania's Suggested Standard Jury Instructions 13.100 which read as follows:

Violation of Statute – Negligence *Per Se*

A Pennsylvania law in effect at the time this alleged harm occurred, The Practical Nursing Law, defines the "Practice of Practice Nursing" as "[t]he performance of selected nursing acts in the care of the ill, injured or infirm under the direction of a licensed professional nurse [or] a licensed physician . . . which do not require the specialized skill, judgment and knowledge required in professional nursing." 49 Pa. Code § 21.141.

This was the entirety of the alleged negligence *per se* instruction that the PrimeCare

Defendants claim entitle them to a new trial.  By way of comparison, Pennsylvania's

Suggested Standard Jury Instructions 13.100 provides:

> Violation of Statute – Negligence *Per Se*
>
> [A] [An] [*insert regulation or standard*] in effect at the time the accident occurred provided:
>
> [*quote relevant regulatory provisions*]
>
> [*name of plaintiff*] claims that [*name of defendant*] violated this [regulation] [standard].
>
> If you find that [*name of the defendant*] violated the [regulation] [standard], then [*name of defendant*]'s violation of this [regulation] [standard] is evidence you must consider, along with all other evidence, in deciding whether [*name of defendant*] was negligent.

It is apparent that the Court did *not* charge the jury in accordance with a negligence *per*

*se* instruction (despite the label of the instruction stating "Negligence *Per Se*-Violation of

Statute").[65]  *See Walters v. UPMC Presbyterian Shadyside*, 144 A.3d 104, 121, 2016 PA

Super 160 (Pa. Super. 2016) ("Negligence *per se* is defined as conduct, whether of action

or omission, which may be declared and treated as negligence without any argument or

proof as to the particular surrounding circumstances.") (internal citation and quotation marks

omitted).  Instead, the Court merely provided the jury with forty-one words from a

Pennsylvania Nursing Regulation, which was entirely consistent with the evidence

---

[65] To the extent the Court erred by labeling this particular instruction "Negligence *Per Se – Violation of Statute*," any error was not sufficiently prejudicial to entitle the PrimeCare Defendants to a new trial for the reasons set out more fully below.

presented at trial and which the PrimeCare Defendants did not and do not dispute contained the appropriate definition of the practice of practical nursing.[66]  As the Court stated on the record, Plaintiffs requested a negligence *per se* instruction on two grounds, but the Court declined to give that instruction.  Instead, the Court, upon Plaintiffs' request, directed the jury to an uncontroversial definition contained in Pennsylvania's statutes and nursing regulations.  This was neither erroneous nor prejudicial and does not entitle the PrimeCare Defendants to a new trial.

In *Prum v. Crisante*, Civil Action No. 14-4829, 2016 WL 7201233 (E.D. Pa. Apr. 29, 2016), the plaintiffs claimed they were entitled to a new trial based on the Court's failure to provide the negligence *per se* instruction they requested.  The plaintiffs requested that the Court deliver the standard Pennsylvania jury instruction on Violation of Statute – Negligence *Per Se* based on alleged violations of the Pennsylvania Motor Vehicle Code and included additional language.  The Court declined the instruction as proposed, but instead instructed the jury:

> Now, a Pennsylvania statute provides that one, 'No person shall move a vehicle which is stopped, standing or parked unless and until the movement can be made safely.'
>
> Another Pennsylvania statute also provides 'Upon a roadway no person shall turn a vehicle or move from one traffic lane to another or enter the traffic stream from a parked position unless and until the movement can be made

---

[66] The definition of the "practice of practical nursing" is also contained in Purdon's Pennsylvania Statutes and contains the same definition provided to the jury.  The statute defines the practice of practical nursing as "the performance of selected nursing acts in the care of the ill, injured or infirm under the direction of a licensed practical nurse, a licensed physician or a licensed dentist which do not require the specialized skill, judgment and knowledge required in professional nursing."  63 P.S. § 652(1).

with reasonable safety nor without giving an appropriate signal in the manner provided in this section.'

Mr. Prum claims that the defendant, Mr. Crisante, violated these laws. In turn, Mr. Crisante claims that Mr. Prum violated these laws. If you find that either party violated the law, you may consider this evidence in determining whether either party was negligent in this case.

*Id.* at *1 n.1. The Court held that the failure to include the instruction requested by the plaintiff did not entitle him to new trial. *See Prum*, 2016 WL 7201233 at *1 n.1 ("This instruction, which repeats the language of [the statutes] verbatim, does not warrant a new trial, because it was not erroneous and did not prejudice Plaintiffs . . . the language of the statutory provisions at issue do not warrant the pattern negligence *per se* instruction").

There can be no doubt that this Court's inclusion in the jury instruction of a definition contained in Pennsylvania Practical Nursing Law, 49 Pa. Code § 21.141, was not erroneous and did not confuse or mislead the jury. Nevertheless, even if providing the jury with these 41 words (which appeared on page 27 of a 34 page instruction) was in error, it was not prejudicial error and does not entitle the PrimeCare Defendants to a new trial.

First, the Court did not instruct the jury that a violation of the nursing regulations required them to find the PrimeCare Defendants negligent.

Second, the PrimeCare Defendants do not claim that the Court apprised the jury of a definition that inaccurately stated the law. Nor do they claim, as they did at trial, that the nursing regulations do not apply to a corporate prison healthcare provider and its nursing

staff.[67]  Nor could they make such an argument, as the Court's review of the scope of the

regulations clearly demonstrates their applicability to LPNs providing nursing services in

Pennsylvania, such as the individual PrimeCare Defendants.  *See Stephens v.

Pennsylvania State Bd. of Nursing*, 657 A.2d 71 (Pa. Cmwlth. 1995) (Practical Nurse Law

applies to LPN practicing in Pennsylvania); *see also* 63 P.S. § 651 *et seq.*  Despite the

PrimeCare Defendants' suggestions to the contrary at trial, the Court is unaware of any

regulation or statute that exempts LPNs licensed by the Commonwealth of Pennsylvania, or

their employers, from compliance with the provisions of the Act simply because they are

providing healthcare in a prison environment.[68]  Lest there be any doubt, the Court has

located a Third Circuit non-precedential opinion where PrimeCare, arguing that its nursing

staff could not be liable to the plaintiff, directed the Circuit to Pennsylvania's Nursing

Regulations to support its assertions.  *See Boomer v. Lewis*, 541 F. App'x 186, 192 n.6 (3d

---

[67] At trial, Mr. Haskins testified that in the prison medical context "there are no state statutes.  The one thing that regulates jails and prisons in the State of Pennsylvania is Title 37.  It is not like a hospital or a nursing home, where joint commission or a state licensure, there are no licenses, other than the license that I hold and the other professionals that work for us, there are no licensures in the State of Pennsylvania."  Sept. 8, 2016 Trial Tr. at 141:13-144:2.  At a sidebar conference, counsel for the PrimeCare Defendants acknowledged that he was not sure if this was the case, and said the extent of his knowledge on this subject was what Mr. Haskins had just testified to.  *Id.* at 144:3-13.

[68] Such a rule makes obvious sense.  The State no doubt has an interest in ensuring qualified, competent, and licensed nursing personnel providing services to citizens of the Commonwealth, including pretrial detainees and convicted prisoners, have sufficient qualifications and are properly supervised.  Moreover, throughout this case, including in post-trial motions, PrimeCare repeatedly seeks the protections provided to healthcare providers under Pennsylvania's MCARE Act.  Yet at the same time, PrimeCare disclaims any applicability to it of Pennsylvania's nursing rules and regulations.

The Court also notes PrimeCare's status as a healthcare employer within the Commonwealth.  *See PrimeCare Med., Inc. v. Unemployment Comp. Bd. of Review*, 760 A.2d 483 (Pa. Cmwlth. 2000) (rejecting PrimeCare appeal for review of order granting former employee unemployment compensation benefits).

Cir. 2013) (noting that PrimeCare's nurses "point out in their brief, there is a limit to what treatment they are allowed to provide under Pennsylvania's Professional Nursing Law, 63 P.S. § 211 *et seq.  See, e.g.*, 63 P.S. § 212(1) (disallowing 'medical diagnosis or prescription of medical therapeutic or corrective measures'")).

Third, the definition of the "practice of practical nursing" contained in the regulation is entirely consistent with the testimony at trial about the distinctions between a LPN and RN and the requirement that a LPN be supervised by an RN or doctor.  Nurse Wild and Todd Haskins, among others, recognized as such.  Considering the jury instructions as a whole, the Court concludes that the jury was properly instructed.

The same holds true with the PrimeCare Defendants' arguments that they are entitled to a new trial due to improper questioning and argument about the definition of the practice of practical nursing because Plaintiffs did not present any expert testimony on this subject. According to the PrimeCare Defendants:

> There was no testimony elicited from Plaintiffs' experts, or any other witnesses, that Pennsylvania law was violated . . . [y]et the jury was permitted to speculate, with no evidence in the record and no guidance from an appropriately trained professional, as to the applicability of the nursing regulations, whether there was negligence per se based upon the nursing regulations and whether the negligence per se was a causal factor in Barbaros' intentional act of taking his own life.

(Doc. 377, at 42).  This argument is unsupported by the record.

PrimeCare Defendants' arguments that the Court erred by permitting argument on the regulation because no expert testified that PrimeCare violated the regulation, or even

established that the regulation applied to PrimeCare have no merit.[69]  No expert testified that the specific Pennsylvania regulation at issue was violated by PrimeCare or that the specific provision applied to PrimeCare. The PrimeCare Defendants, neither at trial nor at present, point to any provision in the Pennsylvania Code that exempts its nurses who are, without question, licensed to practice in the Commonwealth, from the regulations at issue, or relaxes the licensure and supervision requirements for nurses in a prison health care facility.  Plaintiffs' correctional nursing expert, Kathy Wild, and PrimeCare's nursing expert, Terry Fillman, provided testimony on these distinctions between LPNs and RNs. PrimeCare's expert, Dr. Mendel, also discussed the distinctions between LPNs and RNs, testifying that "ideally" LPNs should not be supervising LPNs.  Their testimony, among that of others, was entirely consistent with the definition provided to the jury, that: (1) LPNs do not have the same "specialized skill, judgment and knowledge" as an RN; and (2) LPNs perform selected nursing acts under the direction of an RN or doctor.  PrimeCare does not take any issue with those two propositions embedded in the definition.

Further, Todd Haskins, PrimeCare's Vice President of Operations and an RN in Pennsylvania, testified that he was aware of the existence of the Pennsylvania Department of State Board of Nursing and agreed its role is to protect the health and safety of the

---

[69] It cannot be said that the law required Plaintiffs to present expert testimony on the definition contained in Pennsylvania Practical Nursing Code that was provided to the jury.  *See Hartle v. FirstEnergy Generation Corp.*, Civil Action Nos. 08-1019, 08-1025, 08-130, 2014 WL 1117930, at *3 (W.D. Pa. Mar. 20, 2014) ("Expert testimony explaining a statute or regulation *may be* helpful to the jury under certain circumstances.") (emphasis added).

citizens of Pennsylvania through licensure, certification and regulation of the practice of professional and practical nursing by registered nurses, practical nurses, certified nurse practitioners, clinical nurse specialists, and graduate students. Sept. 8, 2016 Trial Tr. at 148:7-21. He also testified that he was aware that the responsibilities of an RN are different from those of an LPN.[70] *Id.* at 149:6-153:14. When presented with the language of the Pennsylvania regulation defining the duties of an RN, he testified that not only had he seen the document before, he acknowledged that it governs the responsibilities of RNs, and that he was "obviously familiar" with the regulation. *Id.* at 150:5-11. He also agreed that in order to become an RN, more training and education is required than that of an LPN. *Id.* at 153:23-154:6. When presented with the definition of the practice of practical nursing (the same definition provided to the jury), Mr. Haskins agreed with the definition. *Id.* at 155:9-158:8. He acknowledged that, consistent with the testimony at trial, if an individual provides nursing care as an LPN, then that individual is required to be supervised by either an RN, licensed physician, dentist, or psychiatrist. *Id.* 160:14-18. Thus, Mr. Haskins' testimony establishes that the definition provided to the jury was entirely accurate and in no way

---

[70] For example, when asked by counsel for the PrimeCare Defendants about his understanding about supervision of LPNs by other individuals he testified: "The LPNs are—they certainly have practice limitations that they cannot do that I can do as an RN. They are certainly not able to supervise people who—the physicians and psychiatrists and that, those specialties have their own layer of supervision that they have available. We do utilize, in some of our locations, LPNs" as Health Services Administrators in charge of supervising LPNs and have "had literally zero licensure issues in any of the states that we provide services." Sept. 8, 2016 Trial Tr. at 180:17-181:5.

prejudicial.[71]  Under the circumstances, the Court cannot say that either providing the

definition of the practice of practical nursing to the jury (which was not a negligence *per se*

instruction) or permitting Plaintiffs to argue that PrimeCare failed to comply with the

regulation, was in error.

### b.  Direct Causation and Increased Risk of Harm

Next, the PrimeCare Defendants' motion, but not their brief in support, alleges error in

the jury instruction regarding direct causation and increased risk of harm.  Dr. Thomas,

however, has briefed this issue and the Court will therefore address it here.  At the charge

conference, counsel for Dr. Thomas objected to the proposed jury instruction on increased

risk of harm. Sept. 14, 2016 Trial Tr. at 96:25-97:14. Counsel for the PrimeCare Defendants

joined in the objection.  *Id*. at 99:7.  The jury charge on increased risk of harm comes from

Pennsylvania's Suggested Standard Civil Jury Instruction 14.20 entitled "Medical

Malpractice – Factual Cause."  The instruction contains two parts: first, an instruction on

direct causation and, second, an instruction on increased risk of harm.  The Court provided

the jury with both instructions.  The increased risk of harm charge read as follows:

> When a defendant physician or other health-care personnel negligently fails
> to act or negligently delays in taking indicated diagnostic or therapeutic steps,

---

[71] The Court ruled that Mr. Haskins' testimony on this issue would be permitted on a question-by-question basis.  Although counsel for PrimeCare Defendants certainly objected at times, the jury heard a great deal of testimony on this issue from Mr. Haskins, without objection, suggesting he was well-aware of the regulations and their applicability.  *See Agere Sys.*, 2005 WL 2994702, at *2 (E.D. Pa. Aug. 17, 2005) (court's ruling permitting questioning on a question-by-question basis "were not sufficiently final to excuse [party's] obligation to properly bring its objection to the Court's attention and to provide the Court an opportunity to resolve those issues").

and his or her negligence is a factual cause of injuries to the plaintiff, the negligent defendant physician and/or health-care personnel is responsible for the injuries caused.

When the plaintiff presents expert testimony that the failure to act or delay on the part of the defendant physician and/or health-care personnel has increased the risk of harm to the plaintiff, this testimony, if found credible, provides a sufficient basis from which you may find that the negligence was a factual cause of the injuries sustained.

If there is any significant possibility of avoiding injuries and the defendant has destroyed that possibility, he or she may be liable to the plaintiff.

It is rarely possible to demonstrate to an absolute certainty what would have happened under circumstances that the wrongdoer did not allow to come to pass.

According to Dr. Thomas, he is entitled to a new trial because the Court erroneously charged the jury on increased risk of harm because Plaintiffs failed to present any expert testimony that his acts or omissions specifically "increased the risk of harm" to Mr. Barbaros. He also suggests that factual cause and increased risk of harm are mutually exclusive and it was error to instruct the jury with respect to both.

Dr. Thomas' argument that there was no expert testimony that his acts and omissions increased the risk of harm and caused Mr. Barbaros' suicide, ignores the substantial testimony of Plaintiffs' expert, Dr. Peter Breggin, that Dr. Thomas' acts or omissions increased the risk of harm to Mr. Barbaros and was a factual cause in Mr. Barbaros' committing suicide. Sept. 9, 2016 Trial Tr. at 233:21-234:4; 277:14-19. The same holds true for the PrimeCare Defendants, as Dr. Breggin and Nurse Wild testified to this effect with respect to each of the PrimeCare Defendants. Nevertheless, even if Plaintiffs' experts

did not testify that the Defendants' acts and omissions "increased the risk of harm", which the experts certainly did, Pennsylvania law is quite clear that even if an expert "did not use the words 'increased the risk of harm,'" the expert's testimony "taken as a whole" can satisfy the requisite standard because Pennsylvania law does "not require experts to use 'the magic words' when testifying." *Mitzelfelt v. Kamrin*, 526 Pa. 54, 66, 584 A.2d 888 (1990) (internal citation and quotation marks omitted). Dr. Breggin and Nurse Wild's testimony taken as a whole, among others, plainly satisfied this standard.[72]

Next, Dr. Thomas claims that the Court erred by instructing the jury on both factual causation and increased risk of harm because these two theories are mutually exclusive and it was error to provide both instructions. Neither Dr. Thomas nor the PrimeCare Defendants raised this specific objection at trial. In support of his argument, Dr. Thomas directs the Court to what he misrepresents is a Third Circuit decision called *Sucharski v. Patel*, Civil Action No. 12-3298, 2014 WL 80699 (E.D. Pa. Jan. 8, 2014). In that decision, a Magistrate Judge held that "[u]nder Pennsylvania law, [the plaintiff] cannot proceed on both direct causation and an increased risk of harm theories because they are mutually exclusive. An action that allegedly increased the risk of harm cannot have directly caused the harm." *Id.* at *1. The Court finds that Dr. Thomas' arguments and the arguments set

---

[72] Counsel objected on the basis that no expert used the exact words "increased the risk of harm." The Court then informed counsel for the PrimeCare Defendants that it recalled that Dr. Breggin provided causation testimony to this effect. In response, counsel for the PrimeCare Defendants stated: "I agree with that recollection, but I also agree with Mr. Hill's recollection that he was saying it, in terms of factual cause or substantial factor, not increased risk of harm language. I'm not saying there wasn't sufficient testimony as to causation." Sept. 14, 2016 Trial Tr. at 99:8-18.

forth in *Sucharski* are unavailing and do not entitle the PrimeCare Defendants or Dr. Thomas to a new trial.

First, the Court cannot say that the Magistrate Judge's decision in *Sucharski* conclusively established that it was error to instruct the jury with respect to both direct causation and increased risk of harm. In the decision, the Magistrate Judge recognized that "[t]he Pennsylvania Supreme Court has not addressed whether a plaintiff may proceed simultaneously under both direct causation and an increased risk of harm theory," but noted that the Superior Court has "interpreted a Pennsylvania Supreme Court case as allowing a plaintiff to present evidence of direct causation, without being precluded from also receiving an increased risk harm instruction." *Id.* at *2. The Court's review of *Sucharski* leads it to conclude that it was not error to instruct the jury on both increased risk of harm and direct causation. *Sucharski* has never been cited by any Court since it was decided over three and a half years ago. If there were any doubt that it was permissible to instruct the jury on both, decisions of the Pennsylvania Superior Court puts any doubt to rest. *See Klein v. Aronchick*, 85 A.3d 487, 494, 2014 PA Super 3 (Pa. Super. 2014) ("However, a close study of *controlling* precedent reveals that direct causation and increased risk of harm are not mutually exclusively, but simply alternative theories of recovery which, depending on the facts and the expert testimony, may both apply in a given case.") (emphasis in original). Although not controlling, the Court finds *Klein* instructive and is of the opinion that the Pennsylvania Supreme Court would adopt a similar position.

Second, although Dr. Thomas objected to the increased risk of harm instruction, his sole objection was that no expert testified that his acts and omissions increased the risk of harm to Mr. Barbaros.  At no point did Dr. Thomas, or the PrimeCare Defendants, claim before the Court that an instruction on direct causation and increased risk of harm are mutually exclusive and improper.  *See Lesende*, 752 F.3d at 335-36 (although defendant "raised some concern" about the jury's instruction, its "objection was not clear and cogent . . . was not sufficiently specific . . . and failed to state the grounds upon which it rested"); *see also Cooney v. Booth*, 28 F. App'x 148, 151 (3d Cir. 2002) ("The purpose of Rule 51, however, is to ensure 'that the district court is made aware of and given an opportunity to correct any alleged error in the charge before the jury begins its deliberations.'") (quoting *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 276 (3d Cir. 2002)).

Third, Dr. Thomas' proposed points for charge included a request for an instruction under Section 14.20, which includes both direct causation and increased risk of harm.  (Doc. 306, at 2).  Finally, Dr. Thomas and the PrimeCare Defendants have not argued how they were unfairly prejudiced by the Court's instruction.  A charge of increased risk of harm was entirely appropriate given the circumstances of this case and the testimony presented.  Accordingly, the Court finds that no error, let alone prejudicial error, entitles the PrimeCare Defendants and Dr. Thomas to a new trial based on any alleged error in the jury instructions.

### c. Unpreserved Claims of Error

Dr. Thomas and the PrimeCare Defendants' motions raise two additional issues with the jury instructions: (1) charging the jury on both deliberate indifference and negligence was error and led to inconsistent verdicts; and (2) the instructions permitted a double recovery. The PrimeCare Defendants also claim that the Court erred by failing to charge the jury with respect to vicarious liability for punitive damages. Once again, the PrimeCare Defendants and Dr. Thomas failed to address these issues in their supporting briefs.

The Court considers each of these arguments waived and abandoned. At no point did the PrimeCare Defendants or Dr. Thomas object to the jury instruction on these specific grounds, nor did they submit proposed jury instructions to this effect. Fed. R. Civ. P. 51. They have also abandoned these issues by failing to address them in their briefs. The Court will nevertheless briefly address them.[73]

---

[73] Both the PrimeCare Defendants' and Dr. Thomas' motions, but not their briefs in support, also claim they are entitled to a new trial because the Court erroneously denied their motion to strike an unidentified juror for cause. Dr. Thomas and the PrimeCare Defendants have abandoned this argument for failure to brief. In any event, the Court's ruling was not erroneous and, even if it were, this does not entitle Dr. Thomas and the PrimeCare Defendants to a new trial. Because the Defendants make no attempt to identify this juror, the Court has reviewed the record which suggests they take issue with the Court's denial of their motion to strike Juror number 12. Sept. 6, 2016 Trial Tr. at 67:20-73:20. Defendants moved to strike juror number 12 for cause after she expressed unfortunate outcomes with doctors in the past and said that she generally avoids doctors. She, however, explicitly stated that she does not have any hostility towards doctors and that her decision to avoid doctors was "not necessarily the doctors, it's me. Something always goes wrong." *Id.* at 70:10-12. Juror number 12 then answered affirmatively when asked if she could be fair and impartial. In denying Defendants' motion, the Court stated: "We all know, really, when a person says they can be fair and impartial doesn't mean they can be, and that is sufficient grounds for me to deny a challenge. But she has indicated that her view—her experiences have been unfortunate and she likes to avoid doctors. But I asked her whether she has any hostility towards them, she said, No. I don't think it's enough for me to strike her for cause." *Id.* at 72:19-73:5.

### i. Inconsistent Verdicts

Both Dr. Thomas and the PrimeCare Defendants claim in their motions that the Court erred by instructing the jury on both "deliberate indifference (an intentional act) and negligence (an unintentional) act."  (Doc. 354, at ¶¶ 39(n)-(o)).  According to the Defendants' motions, instructing the jury on both causes of action was erroneous because they are "internally inconsistent," would "confuse and mislead the jury," and resulted in an "inconsistent verdict."  *Id.*  As previously stated, Defendants failed to brief these issues. Regardless, Defendants' unsupported assertions utterly lack merit.

---

"[D]istrict courts have been awarded ample discretion in determining how to best conduct the voir dire." *Kirk v. Raymark Indus. Inc.*, 61 F.3d 147, 153 (3d Cir. 1995) (internal citation and quotation marks omitted). "In determining whether a particular juror should be excused for cause, [the Court's] main concern is whether the juror holds a particular belief or opinion that will prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  *Id.* (internal citation and quotation marks omitted).  Although a juror's claims of impartiality may not be accepted blindly, particularly if "other facts of record indicate to the contrary," this is not one of those rare instances where the circumstances require a new trial.  *Id.*  The Court stands by its ruling and, even if in error, neither Dr. Thomas nor the PrimeCare Defendants make any arguments as to why this alleged error was so prejudicial that they are entitled to a new trial. Notably, they could have exercised their peremptory challenges, but chose not to.  Here, "[e]ach of the potential jury members answered that there was nothing that would prevent them from being a fair and impartial juror and each agreed to decide the case according to the law, based upon the evidence received."  *Ellis v. Labella*, No. 14-cv-0004, 2015 WL 1608635, at *3 (W.D. Pa. Apr. 10, 2015). Each of the jurors also swore an oath to this effect. Accordingly, it was not error to deny Defendants' motion to strike juror number 12 for cause and, even if error, this error does not entitle the Defendants to a new trial.  *See id.* at *3; *see also Lawler v. Richardson,* Civil Action No. 10-196, 2012 WL 2362383, at *5 (E.D. Pa. June 20, 2012) (denying motion for new trial and noting "[i]n this case, Jurors 4 and 5 made assurances they would be fair in applying the law and following the instructions of the Court.  Other than their original answers to Plaintiffs' voir dire, the Court had no reason to question the jurors' representations that they could be impartial in following the Court's instructions"); *Wood v. Rendell*, Civ. A. No. 94-1489, 1997 WL 109654, at *4 (E.D. Pa. Mar. 4, 1997) (denying motion for new trial and noting "[t]he Court encountered no indication that these jurors could not lay aside any previously formed impression or opinion as to the merits of the case . . . and render a verdict based on the evidence presented to the court . . . and therefore found no reason to dismiss them for cause.")(internal citation and quotation marks omitted).

First, the Defendants abandoned this argument by failing to brief the issue and merely listing it among a list of perceived errors in their motions. Second, they also did not object at any time to the jury instruction on the theory that it was error to instruct on both causes of action and have thus waived their right to object. Fed. R. Civ. P. 51(c)(1). Third, had there been any error, this would have been an invited error, as both Dr. Thomas and the PrimeCare Defendants submitted proposed points for charge which included requested instructions for both the deliberate indifference and negligence claims. (Docs. 303, 306).

Most importantly, though, there is nothing "internally inconsistent," "confusing," or "misleading" about instructing the jury on both causes of action. These are two separate causes of actions, addressing separate harms, which seek to vindicate separate rights. To the Court's knowledge, no Court has found an instruction on both deliberate indifference and negligence "internally inconsistent," let alone so internally inconsistent as to warrant a new trial. *See, e.g.*, *Cash v. Cnty. of Erie*, 654 F.3d 324, 342-44 (2d Cir. 2011) (recognizing instructing the jury on both deliberate indifference and negligence was not internally inconsistent and holding that the jury's verdict finding municipal defendants liable for deliberate indifference was not "irreconcilably inconsistent" with its finding the sheriff not negligent and did not warrant new trial); *Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir. 1986) (affirming jury verdict finding defendants liable both in negligence and for deliberate indifference); *Simmons v. City of Philadelphia*, 728 F. Supp. 352 (E.D. Pa. 1990) (holding that jury verdict finding a defendant correctional officer not liable to the estate under § 1983

for suicide of pretrial detainee was not inconsistent with portion of the verdict in which jury found that officer was negligent), *aff'd* 947 F.2d 1042 (3d Cir. 1991).

As these cases make clear, there was nothing erroneous about instructing the jury with respect to both negligence and deliberate indifference and the jury's verdict was in no way an "inconsistent verdict." The jury found that each of the Defendants was negligent and also found that each of the Defendants, with the exception of Wendy Johnson, was deliberately indifferent to Mr. Barbaros' serious medical need. There is nothing inconsistent about such a verdict. *See Simmons*, 728 F. Supp. at 357 ("Rather than being inconsistent, the jury's verdict demonstrates a full understanding of the facts and the law. Rather than finding all defendants liable on all counts, the jury recognized that [one of the defendant's] behavior was negligent without rising to the level of deliberate indifference. We find no inconsistency at all."). Accordingly, there was no inconsistency whatsoever in the instructions to the jury, let alone an inconsistency that was so prejudicial as to warrant a new trial under the plain error standard. *Cf. Acumed, LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199 (3d Cir. 2009).

### ii.  Double Recovery

Although the Defendants assert that the jury instructions "invited" a double recovery, without the benefit of any briefing or arguments as to how the Court's instruction do so, the Court is left merely to speculate. In recognizing that the Defendants have not only waived, but abandoned this argument, the Court notes that its review of the record reveals that this

assertion is wholly disingenuous, as instructing on both a deliberate indifference and negligence claim does not invite a double recovery. Nor did anything in verdict sheet "invite" a double recovery.

After the Court submitted to the parties a proposed verdict sheet, which contained detailed provisions for the jury to list the specific damages recoverable under the wrongful death and survival actions, as well as for the deliberate indifference claim, the parties asked the Court instead to consider their *joint* proposed verdict sheet. After reviewing the parties' proposed verdict sheet the Court itself raised the issue of potential double recovery. Specifically, the Court informed the parties that because their joint proposed verdict sheet contained only a single space for the jury to award a lump-sum amount of damages, it would be impossible to know if the jury impermissibly awarded a double recovery. Sept. 14, 2016 Trial Tr. at 99:25-108:9. Counsel for the Plaintiffs insisted, despite the Court's concern, that a single lump sum award was necessary and appropriate. After the Court again raised its concerns, counsel for the PrimeCare Defendants agreed with the Court that there should be separate amounts and not a single lump sum award. Sept. 14, 2016 Trial Tr. at 104:10-18. Counsel for Dr. Thomas also agreed, telling the Court "obviously, you were thinking about this issue at that time and we didn't put our thinking caps on and try to figure this riddle out, so we apologize." *Id.* at 106:5-7. The Court then again reiterated that, while it would prefer the parties to agree to a joint verdict sheet, "I think it is a significant problem, in the event liability is found on both the 1983 claim as well as the negligence

claim. . . because whatever the outcome here, if the outcome is one where there's liability on both claims and there's a motion from anyone here as to whether the jury gave a double recovery, I'm not sure how that can be resolved, absent something in the verdict slip to indicate what they did." *Id.* at 106:8-107:3.  The Court thereafter dismissed the jury for the remainder of the afternoon and permitted the parties to spend the "rest of the afternoon getting this special verdict done." *Id.* at 108:4-9.  The parties agreed to jointly revise the verdict sheet accordingly and the verdict sheet ultimately provided to the jury was the joint verdict sheet created, and agreed to, by Plaintiffs and Defendants.  At no time did any of the Defendants raise an objection to the instructions or verdict sheet on the basis that they "invited" a double recovery.  Their failure to do so waives their right to raise to this issue now.  See Fed. R. Civ. P. 51(c).

### iii.  Vicarious Liability - Punitive Damages

Finally, the Court will address the PrimeCare Defendants' argument set forth in their motion that "[t]he Court prejudicially erred by failing to charge the jury as to vicarious liability relative to punitive damages." (Doc. 366, at ¶ 63(A)(8)).  Specifically, it is the PrimeCare Defendants' position that the Court's instruction should have been in accordance with Pennsylvania's MCARE statute governing punitive damages for vicarious liability, 40 P.S. § 1303.505(c), and that the Court's failure to instruct the jury as such entitles them to a new trial on punitive damages.

The MCARE statute governing punitive damages provides:

> (a) Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others.  In assessing punitive damages, the trier of fact can properly consider the character of the health care provider's act, the nature and extent of the harm to the patient that the health care provider caused or intended to cause and the wealth of the health care provider.
>
> (b) A showing of gross negligence is insufficient to support an award of punitive damages.

40 P.S. § 1303.505(a)-(b).  This language is in all respects materially identical to the Pennsylvania standard jury instructions governing punitive damages in medical negligence cases that was provided to the jury.  *See Scampone*, 11 A.3d at 992 (recognizing that the language in 40 P.S. § 1303.505(a)-(b) "tracks the test for punitive damages discussed in the case law"); *see also Wagner v. Onofrey*, No. 03 CV 403, 2006 WL 3704801, at *4 (Pa. Ct. Com. Pl. Nov. 30, 2006) (recognizing that "Sections 505(a) and (b) of the MCARE Act are consistent with well-established Pennsylvania case law").  Thus, it comes as no surprise that the PrimeCare Defendants do not claim that the Court's punitive damage instruction was either erroneous or prejudicial, as they repeatedly cite this provision in support of their post-trial motions as providing the applicable standard.  (Doc. 377, at 27).

However, PrimeCare claims it is entitled to a new trial because the Court did not instruct the jury in accordance with the specific subsection governing vicarious liability for punitive damages.  The subsection provides:

> (c)  Punitive damages shall not be awarded against a health care provider who is *only* vicarious liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the

party knew of and allowed the conduct by its agents that resulted in the award of punitive damages.

40 P.S. § 1303.505(c) (emphasis added).  Subsection (c) "creates a vicarious liability standard which is more demanding than that set forth in the common law."  *Wagner*, 2006 WL 3704801, at *4.  "Thus, by virtue of this statutory provision and its injection of a *scienter* element into the *respondeat superior* equation, a health care provider may not be vicariously liable for exemplary damages unless it had actual knowledge of the wrongful conduct of its agent and nevertheless allowed it to occur."  *Id.* (internal citation and quotation marks omitted).

A review of the proposed jury instructions submitted by the PrimeCare Defendants make clear that it never requested an instruction in accordance with 40 P.S. § 1303.505(c).  (Doc. 303).  The charge conference transcript also contains no reference to either a request for this specific instruction or an objection to the Court's failure to include such an instruction.  Sept. 14, 2016 Trial Tr. at 67:12-114:6.  Rather, the PrimeCare Defendants only claimed that the evidence presented was insufficient to submit the question of punitive damages to the jury.  Because the PrimeCare Defendants neither requested an instruction incorporating the standard set forth in 40 P.S. § 1303.505(c), nor objected to the Court's punitive damages jury instruction on this basis, they may not now claim error, unless the Court's failure to include the instruction constituted a plain error affecting PrimeCare's substantial rights.  Fed. R. Civ. P. 51(d).

Under the plain error standard, the Court must consider "the obviousness of the error, the significance of the interests involved, and the reputation of judicial proceedings if the error stands uncorrected." *Franklin Prescriptions*, *Inc. v. New York Times*, *Co.*, 424 F.3d 336, 340 (3d Cir. 2005) (internal citation and quotation marks omitted). Put another way, plain error exists if the error is "(1) fundamental and highly prejudicial or if the instructions are such that the jury is without adequate guidance on a fundamental question and (2) [the] failure to consider the error would result in a miscarriage of justice." *Alexander v. Riga*, 208 F.3d 419, 426-27 (3d Cir. 2000). Having reviewed the record and case law, the Court concludes that the failure to instruct the jury with respect to vicarious liability for punitive damages was not error and, even if it was error, did not constitute plain error affecting the PrimeCare Defendants' substantial rights. As an initial matter, the Court has already found that PrimeCare is entitled to judgment as a matter of law on Plaintiffs' claim for punitive damages.

First, any error in failing to instruct the jury in accordance with 40 P.S. § 1303.505(c) cannot be said to be obvious. Throughout the over six years of this litigation, no party has appeared to ever cite this subsection before, and certainly no party raised this issue at the charge conference, in the proposed jury instructions, or in their jointly proposed verdict sheet. In fact, in their pretrial motion *in limine* "[t]o Preclude Argument That Plaintiffs' May Recover Punitive Damages" and brief in support, the PrimeCare Defendants reference only 40 P.S. §§ 1303.505(a), but make no reference to vicariously liability under 40 P.S. §

1303.505(c).  (Doc. 215, at ¶ 7; Doc. 218 at 4-5).  The argument presented by the

PrimeCare Defendants in their pretrial brief and motion was that Plaintiffs "have not

presented sufficient evidence to establish that any of the Medical Defendants had a

subjective appreciation of the risk of harm to which Plaintiff was exposed and acted, or

failed to act, in conscious disregard of that risk."  (Doc. 218, at 4).  That is the standard

under which the Court instructed the jury and which the jury found warranted imposition of

punitive damages against PrimeCare.

In any event, any alleged error cannot be considered obvious when one considers the

dearth of case law addressing MCARE's punitive damages subsection on vicarious liability.

A Westlaw search reveals only 25 opinions in which a Court has cited to MCARE's punitive

damages provision at all.  Limiting this search to include opinions that cite to subsection (c)

on vicarious liability, the number shrinks to just 10.[74]  Although the statute appears to have

been in effect since 2002, the lack of case law suggests that any error was not obvious.

Second, the Court considers the significance of the interests involved and whether the

instructions were such that the jury was without adequate guidance on a fundamental

question.  "A jury instruction, taken as a whole, must inform the jury of the correct legal

standard."  *Harvey v. Plains Twp. Police Dept.*, 635 F.3d 606, 612 (3d Cir. 2011).  "When a

jury instruction is erroneous, a new trial is warranted unless such error is harmless."  *Id.*  "An

---

[74] Two of the ten opinions involved PrimeCare as a defendant where it was represented by the same
trial counsel as in this case.  Both of those opinions were issued nearly a year before trial in this case. *See*
*Shelton v. Cnty. of Chester*, Civil Action No. 13-4667, 2015 WL 5729268, at *1 (E.D.Pa. Sept. 30, 2015)*;
*Shelton v. Cnty. of Chester*, Civil Action No. 13-4667, 2015 WL 5460623, at *2 (E.D.Pa. Sept. 16; 2015).

error is harmless if it is highly probable that the error did not contribute to the judgment." *Id.* (internal citation and quotation marks omitted). The Court finds that any error in the jury instructions in this respect was entirely harmless beyond a reasonable a doubt.

Finally, the Court considers the reputation of judicial proceedings if the error stands uncorrected and whether the failure would result in a miscarriage of justice. The Court finds that there would be no impact whatsoever to the reputation of judicial proceedings if the alleged error were to stand uncorrected. Nor does the Court believe a miscarriage of justice would result from the failure to correct the error. The instructions, taken as a whole, make clear that punitive damages could be imposed against PrimeCare based on its own acts and omissions, and nothing in the instructions permitted the jury to impose punitive damages against PrimeCare for the acts and omissions of its agents.

In sum, because the PrimeCare Defendants failed to object to the punitive damages instruction punitive on this basis, and did not request such an instruction, they can only be entitled to a new trial if the Court's failure to include an instruction under 40 P.S. § 1303.505(c) constituted plain error that affected the PrimeCare Defendants' substantial rights. The punitive damages instruction was clear and correctly stated the law, and the PrimeCare Defendants do not argue to the contrary. There is simply no reasonable possibility that the jury impermissibly awarded punitive damages against PrimeCare based on the acts and omissions of its agents. Accordingly, the failure to include such an instruction was not erroneous, but were it so, the error was harmless beyond doubt.

## 2. Evidentiary Rulings

The PrimeCare Defendants next claim they are entitled to a new trial as a result of several erroneous evidentiary rulings. Because Dr. Thomas raises many of the same issues, the Court will consider them together. Specifically, the PrimeCare Defendants and Dr. Thomas claim they are entitled to a new trial based on the following evidentiary errors: (1) precluding evidence of Mr. Barbaros' criminal charges; (2) prohibiting the introduction of evidence in the form of a statement allegedly made by Mr. Barbaros to a correctional officer; (3) permitting evidence of the misspelling of Mr. Barbaros' first name; and (4) permitting Mr. Barbaros' daughter to testify at trial. (Doc. 377, at 43-50). They also allege several additional errors in their motions, but fail to address these alleged errors in their briefs in support. The Court will address each in turn.

A district court's "latitude on a new trial motion is broad when the reason for interfering with the jury verdict is a ruling on a matter that initially rested within the discretion of the court, *e.g.*, evidentiary rulings." *Klein*, 992 F.2d at 1289-90 (citations omitted); *see also Lawler v. Richardson*, Civil Action No. 10-196, 2012 WL 2362383, at *3 (E.D. Pa. June 20, 2012) ("The trial court has broad discretion to exclude evidence under Rule 403.") (citing *Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 806 (3d Cir. 1987)).

### a. The Criminal Charges Filed Against Mr. Barbaros

Before trial, the PrimeCare Defendants and Dr. Thomas filed a motion *in limine* to "Permit Evidence Concerning or Reasonably Relating to the Criminal Charges Issued

Against Plaintiffs' Decedent, Mumun Barbaros." (Doc. 203). Plaintiffs filed a somewhat similar motion to "Preclude from Trial any Reference to Specific Crimes Decedent Mumun Barbaros was Alleged to Have Committed, His Religious Faith of Islamic Muslim, and the Impact any Speculative Conviction Could Have on Plaintiffs' Damages." (Doc. 228).

According to the Defendants' motion *in limine*, evidence of the criminal charges was relevant for two reasons. First, evidence of the charges filed against Mr. Barbaros "will offer insight into Mr. Barbaros' state of mind leading up to his suicide." (Doc. 203, at 2-3). They note that Dr. Thomas' expert, Dr. Susan Rushing, opined that it was the severity of the criminal charges against Mr. Barbaros, and not the acts and omissions of Dr. Thomas or the PrimeCare Defendants, that caused Mr. Barbaros to commit suicide. *Id.* Second, the PrimeCare Defendants argued that the criminal charges were relevant to the cross-examination of Plaintiffs' economics expert, David L. Hopkins, in relation to Mr. Barbaros' future lost earning capacity. Specifically, Defendants alleged that:

> Mr. Barbaros' alleged motivations in vandalizing multiple competing businesses is probative of the health of his own business and whether the future projections of business loss and/or profit are reasonable and based upon reliable facts. Moreover, Mr. Barbaros' charges were made public, covered by local news channels and it certainly could be argued that the charges themselves would have had a chilling effect on his business. Additionally, Mr. Barbaros would not have been available to run his own business while incarcerated as a pretrial detainee and, as such, argument could certainly be made that his profits would have either been non-existent or severely diminished.

(Doc. 246, at 3).

Throughout their pretrial submissions, the Defendants repeatedly emphasized that the purpose of introducing evidence concerning the nature and extent of the criminal charges filed against Mr. Barbaros "is not to place the decedent, Mumun Barbaros, in an unfavorable light in front of the jury nor is the purpose to inflame the passions of the jury or to taint the jury. Rather, the purpose of presenting such evidence is for its probative value."  (Doc. 204, at 4).

The Court granted Plaintiffs' motion *in limine* and denied Defendants' motion *in limine*, concluding that evidence concerning or reasonably relating to the crimes that Mr. Barbaros was charged with was irrelevant to the issues in this litigation.[75]  (Doc. 271, at 3).  The Court further found that "even if such evidence were minimally relevant . . . its probative value would be substantially outweighed by the danger of unfair prejudice."  (*Id.*).  The Court ruling was not erroneous.  The nature and extent of the specific charges Mr. Barbaros was charged with, but never convicted of, had little, if any, relevance to actual issues in this litigation.  And even if the criminal charges were relevant, the Court reasonably concluded that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice to the Plaintiffs.

"A trial court is afforded substantial discretion when striking a Rule 403 balance with respect to proffered evidence."  *Mckenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (internal citation and quotation marks omitted); *see also Bhaya v. Westinghouse Elec.*

---

[75] The Order did not deny the motion with prejudice.  (Doc. 272).

*Corp.*, 922 F.2d 184, 188 (3d Cir. 1990) ("[A] trial judge's decision to admit or exclude

evidence under Fed. R. Evid. 403 may not be reversed unless it is arbitrary and irrational.")

(internal citation and quotation marks omitted).  Unfair prejudice may arise if evidence

"influence[s] a jury to return a verdict based on a desire to punish for . . . other wrongs."

*Bhaya*, 922 F.3d at 188.  Here, the Court, in exercising its discretion, concluded that

Plaintiffs sufficiently demonstrated to the Court's satisfaction that evidence of the nature and

extent of the specific charges could "cloud [] impartial scrutiny and reasoned evaluation of

the facts, [and] which inhibit[s] neutral application of principles of law to the facts as found."

*Ansell v. Green Acres Contracting Co., Inc.*, 347 F.3d 515, 525 (3d Cir. 2003) (internal

citation and quotation marks omitted).  Thus, exclusion under Rule 403 was warranted.[76]

Even if the Court's ruling was in error, for the reasons that follow it was not such prejudicial

error as to warrant a new trial.

First, to the extent the Defendants maintain that the charges against Mr. Barbaros were

relevant to his state of mind leading up to his suicide, and that the Court's ruling precluding

evidence of the nature and extent of the charges unfairly prejudiced them, it is important to

---

[76] There can be no doubt that substantial prejudice could have resulted if the jury had heard that Mr. Barbaros was charged with, for example, "nearly forty" crimes including, among others, "causing catastrophe."  Further, Defendants were not precluded from presenting evidence "reasonably relating" to the charges against Mr. Barbaros.  The Defendants were able to present to the jury evidence from which it reasonably could infer that the criminal charges, and not any of the Defendants' acts and omissions, caused Mr. Barbaros to commit suicide.  The jury was well aware that Mr. Barbaros committed suicide shortly after his arraignment, at which both his bail and the charges were increased.  The jury, instead, chose not to believe Defendants' theory of the case.

recognize that none of the Defendants were precluded from eliciting testimony to this effect.

For example, Dr. Thomas' psychiatric expert, Dr. Susan Rushing, testified as follows:

> Mr. Hill: Without being specific, with regard to Mr. Barbaros and the charges, was that significant to you, in view of this case, with regard to Mr. Barbaros and his suicide?
>
> Dr. Rushing: In terms of the timing that he had just been in a courthouse, where he learned about his charges and where his bail was increased.
>
> Mr. Hill: What is your opinion as to why he committed suicide?
>
> Dr. Rushing: I believe he felt a certain level of distress over being in jail and incarcerated and being uncertain about his future.

She also raised this issue several additional times in her testimony. *See* Sept. 13, 2017 Trial Tr. at 162:7-21; 196:23-197:3 (testifying that Paxil can cause insomnia "for some individuals, but so can someone's legal situation and stress related to their legal situation"); 207:16-208:12 ("It could also be adjustment disorder to being incarcerated and having criminal charges.").

The PrimeCare Defendants' correctional psychiatry expert, Dr. Cheryl Wills, also presented similar testimony:

> Mr. Ninsoky: Why do you believe that Mr. Barbaros committed suicide?
>
> Dr. Wills: There were a number of things going on. He was incarcerated for the first time in his life. His charges—the number of charges kept increasing, they were published in the newspaper, which had implications for his business
>
> Mr. Chacker: Objection, Your Honor. Move to strike the last comment. That's pure speculation.

Mr. Ninsoky:   I think we have already had testimony from Mr. Ponzini on that point.

The Court:   We absolutely have. Overruled.

Dr. Wills:   So in terms of his income, that was a stressor because he's the primary provider for his family.  He also had told his wife that he was going to be out the following week and be back at work. But if your bond increases and you have all these other confining stressors, and you can't bring yourself to tell your wife that you might need more money to get out of prison, and your customer base may be declining, that's tremendous stress. That's a perception that you're not the success you were, before you entered the facility.  That's a lot to introduce into a marriage and into yourself, your perceptions of yourself.   So things are going downhill fast.

Mr. Ninsoky:   Is that what you believe was what would cause the impulse of suicide?

Dr. Wills:   Yes, I think those are huge stressors, especially, when you're left in a room to contemplate what's going on in your life, and you're doing that at night, you have—you're tormented by it.

Sept. 14, 2016 Trial Tr. at 33:7-34:9.  Despite the Court's denial of their motion, Defendants

were no doubt permitted to present evidence "reasonably relating" to the charges against

Mr. Barbaros – the very relief they sought in their motion.[77]

Evidence of the nature and extent of the criminal charges filed against Mr. Barbaros also

had little, if any, relevance to Defendants' ability to challenge Plaintiffs' future lost earnings

capacity and the probative value, if any, was substantially outweighed by the risk of unfair

_____

[77] Counsel for both the PrimeCare Defendants and Dr. Thomas also extensively presented this theory of the case (*i.e.*, the criminal charges were why he committed suicide) during closing arguments.

prejudice.  Defendants merely speculate that it "could be argued that the charges themselves would have had a chilling effect on his business" or "his profits would have either been non-existent or severely diminished."[78]  (Doc. 246, at 3).  But the speculative nature of such evidence and argument, when weighed against the potential prejudicial effect, did not warrant admission of the evidence concerning the nature and extent of the criminal charges.

Finally, the Defendants argue that evidence of the nature and extent of the criminal charges "was particularly relevant to counter Plaintiffs' efforts to paint the picture of a successful business and family man, when the additional charges were directly related to Barbaros' effort to burn down his competitor's business due to a failing business.  The jury was provided a fictitious picture of reality without the Defendants being able to challenge that picture with evidence which was directly contradictory."  (Doc. 377, at 45).  A review of the record, however, reveals that the PrimeCare Defendants and Dr. Thomas were permitted to, and did, cross-examine Plaintiff Peter Ponzini regarding the publicity surrounding the charges and the effect the charges could have had on Mr. Barbaros' business and reputation in the community, and the jury was free to take this into account when weighing the evidence without getting into the specific nature of the charges.  Sept. 12, 2016 Trial Tr. at 176:1-190:24.

---

[78] Defendants were permitted to, and did, cross-examine Mr. Hopkins regarding his calculations, noting that they were based on a "mythical person" and were not "based upon any of the hard numbers that were actually for Mr. Barbaros."  Sept. 12, 2016 Trial Tr. at 218:11-223:25.  Neither the PrimeCare Defendants nor Dr. Thomas presented expert testimony to contradict Mr. Hopkins' calculations.

Defendants were still able to present their theory of the case without getting into the specifics of the nature and extent of the criminal charges; charges for which Mr. Barbaros was presumed innocent under the law and was never convicted of by a court of law.  The Court's error, if any, was harmless.  *See* Fed. R. Civ. P. 61 ("Unless justice requires otherwise, no error in admitting or excluding evidence - or any other error by the court or a party - is ground for granting a new trial, for setting a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order.  At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights.").  The Defendant must show that any error committed by the Court "was prejudicial."  *Forrest v. Beloit Corp.*, 424 F.3d 344, 349 (3d Cir. 2005).  In sum, evidence of the nature and extent of the specific crimes Mr. Barbaros was charged with, but never convicted of, were irrelevant to the issues of this case.  Even if the nature and extent of the criminal charges were relevant, the Court correctly exercised its discretion under Federal Rule of Evidence 403 to preclude such evidence.  Accordingly, the PrimeCare Defendants and Dr. Thomas are not entitled to a new trial on this ground.

### b.  Preclusion of Alleged Statement to Correctional Officer Ryan

Next, the PrimeCare Defendants and Dr. Thomas claim they are entitled to a new trial based on the Court's erroneous preclusion of evidence in the form of statements allegedly made by Mr. Barbaros to correctional officers at the MCCF.  Before trial, Plaintiffs filed a motion *in limine* asking the Court to preclude any references to alleged statements made by

Mr. Barbaros to correctional officers on the basis that such statements are inadmissible hearsay. (Doc. 230). The only statement at issue concerned the testimony of correctional officer Jonathan K. Ryan who testified at his deposition that Mr. Barbaros "promised to make him a pizza" once he was released from prison "because Mr. Ryan was a good guy." (Doc. 275, at 5). The PrimeCare Defendants opposed Plaintiffs' motion, claiming that the statement was admissible under Federal Rule of Evidence 801(d)(2) as an admission by a party-opponent. Alternatively, they claimed the statement was admissible under the residual exception to the hearsay rule found in Federal Rule of Evidence 807. (Doc. 246 at 9-10).

The Court granted Plaintiffs' motion and precluded evidence that Mr. Barbaros allegedly told Mr. Ryan that he "promised to make him a pizza" once he was released from prison "because Mr. Ryan was a good guy."[79] (Doc. 276). Addressing the PrimeCare Defendants' argument that the statement was admissible as an admission by a party-opponent, the Court found that the "statement at issue does not fall within the ambit of Rule 801(d)(2)" and was not admissible under the Rule as claimed by the PrimeCare Defendants. (Doc. 275, at 7). The Court further found that the statement failed to satisfy Rule 807's residual hearsay exception, concluding that the Rule applies "only in exceptional circumstances." (*Id.*).

---

[79] The Court granted Plaintiffs' motion "with the caveat that the Court's decision pertains *only* to the statement identified by Plaintiffs concerning Mr. Barbaros' statement to correctional officer Ryan that he would make him a pizza when he got out of prison." (Doc. 275, at 9-10). The Court reserved decision "on any other hearsay statements Mr. Barbaros is alleged to have made to correctional officers that Defendants may seek to introduce." *Id.* Defendants did not seek to introduce any other statement.

The Defendants now claim, for the first time, that the Court's ruling was erroneous because the statement was admissible under Federal Rule of Evidence 803(3). A review of the PrimeCare Defendants' brief in opposition to Plaintiffs' motion *in limine*, however, shows they never previously advanced such an argument before the Court. (Doc. 246, at 9-10). Rather, the PrimeCare Defendants only claimed that the statement was admissible as an admission by a party-opponent pursuant to Federal Rule of Evidence 801(d)(2) and under the residual hearsay exception in Rule 807. Although Dr. Thomas filed a brief in opposition to Plaintiffs' motion in limine on August 24, 2016 where he presented these arguments (Doc. 280), it was untimely under the Local Rules and was filed *after* the Court ruled on Plaintiffs' motion.[80] Contrary to counsel's misrepresentations, the Court *did not* "specifically reject[] the Defendants' contention that Barbaros' statement went to his present state of mind and, therefore, was exempt from the rule against hearsay." (Doc. 391, at 38-39). Rather, the Court did not rule on this basis because the brief was untimely and counsel for Dr. Thomas or the PrimeCare Defendants never raised this issue again, either before or during trial.[81]

---

[80] Local Rule 7.6 provides, among other things, that "[a]ny party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . *Any party who fails to comply with this rule shall be deemed not to oppose such motion.*" M.D. Pa. L.R. 7.6 (emphasis added). Dr. Thomas did not file a brief in opposition within fourteen days. Notably, Dr. Thomas' untimely brief was one of approximately seventy briefs and motions filed by the parties in the month before trial. (Docs. 201-267, 278, 280-289).

[81] "Thus, a party who unsuccessfully opposes an *in limine* motion to exclude certain evidence can appeal that ruling without an offer of proof at trial if the district court was fully informed and made a pretrial ruling with no suggestion that it would reconsider that ruling at trial." *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 519 (3d Cir. 1997) (emphasis in original). "Concomitantly, where a district court makes a

The PrimeCare Defendants are not entitled to a new trial based on the Court's preclusion of Mr. Barbaros' alleged statement to Mr. Ryan because, for the reasons set forth in the Court's memorandum opinion, (Doc. 275), the statement was not admissible under either Federal Rule of Evidence 801(d)(2) or Rule 807—the two specific Rules that the PrimeCare Defendants advanced in support of admission. The PrimeCare Defendants do not argue otherwise in their motion or brief in support thereof. To the extent that the statement was not hearsay and/or admissible pursuant to Rule 803(3), Dr. Thomas did not timely advance these arguments by filing a timely brief in opposition prior to the Court's ruling. And, notably, at no time during trial did he ask the Court to reconsider its decision by raising the admissibility of the statement under Rule 803(3).

Even if the Court were to assume that the statement was admissible pursuant to Federal Rule of Evidence 803(3), and that the Court erred in precluding the evidence of Mr. Barbaros' statement to Mr. Ryan, the Defendants have not and cannot demonstrate any prejudice from the Court's exclusion of the evidence. Any error in the Court's failure to admit the statement under Rule 803(3) was invited error because the PrimeCare Defendants only argued that the statements were admissible under Rules 801(d)(2) and 807, and never claimed it was admissible under Rule 803(3). *See Lima v. Newark Police Dept.*, 658 F.3d 324, 333 n.2 (3d Cir. 2011) ("The doctrine of invited error refers to an error that a party cannot complain of . . . because the party, through conduct, encouraged or

---

*tentative in limine ruling* excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial." *Id.* (emphasis in original).

prompted the trial court to make the erroneous ruling.") (internal citation and quotation marks omitted). Dr. Thomas only advanced such an argument after the Court had already ruled, and did not raise this issue at any time during the trial.

Finally, the PrimeCare Defendants and Dr. Thomas make little, if any, effort to argue exactly how they were prejudiced by the Court's ruling. Notably, Mr. Ryan was not precluded from testifying at trial. He testified, without getting into the specifics of the conversation, that he spoke to Mr. Barbaros in the hours before he committed suicide and, based on his interactions, Mr. Barbaros did not appear to be suicidal. Dr. Rushing also echoed Mr. Ryan's testimony, testifying that "at no time did Barbaros give him a reason to believe that he was going to commit suicide. Ryan stated that Barbaros was quiet and didn't give him any problems." Sept. 13, 2016 Trial Tr. at 226:8-227:7. When asked whether the correctional officers monitoring Mr. Barbaros on the night of his suicide saw anything that they needed to relay to the Medical Department that was of concern, Dr. Wills testified "absolutely not." Sept. 14, 2016 Trial Tr. at 30:18-31:20. Defendants were not precluded from arguing that Mr. Ryan's alleged interactions with Mr. Barbaros gave no indication of suicide – the very reason they sought to introduce the statement. Under the circumstances, the PrimeCare Defendants and Dr. Thomas cannot and have not demonstrated prejudicial error warranting a new trial.

### c. Permitting Evidence of the Misspelling of Mr. Barbaros' First Name

The PrimeCare Defendants also seek a new trial due to the Court's alleged error in permitting evidence of the misspelling of Mr. Barbaros' first name. The entirety of the PrimeCare Defendants' argument is as follows:

> PrimeCare Defendants filed a Motion to Preclude Evidence and/or Testimony of the Misspelling of Decedent's Name as Being the Source and Cause of Failure to Verify Medications. (Doc. 217). This Court denied the Motion through Order (Doc. 276) and Memorandum Opinion (Doc. 275). This Court abused its discretion in denying the Motion. PrimeCare Defendants incorporate by reference their argument in Section A(1)(a) above.

(Doc. 377, at 48-49). The arguments set forth in Section A(1)(a) concern Defendant Paul James' alleged entitlement to judgment as a matter of law on Plaintiffs' deliberate indifference claim. The Court finds that the PrimeCare Defendants' arguments lack merit.

In a pretrial motion *in limine*, the PrimeCare Defendants moved to preclude "evidence and/or testimony of the misspelling of decedent's name as being the source and cause of failure to verify medicines." (Doc. 217). The PrimeCare Defendants argued that any testimony from Plaintiffs' expert Kathy Wild concerning the Defendants' "careless" completion of screening documents fails *Daubert*'s reliability requirement because it is "not based in fact or evidence." (*Id.* at 2-3). Specifically, the PrimeCare Defendants' arguments focused exclusively on the fact that Mr. Barbaros was identified by several different names both at CVS pharmacy and by his own family physician. (Doc. 218, at 5-6). Thus, they argued to allow testimony that the misspellings contributed to a delay is "erroneous" and to "allow Plaintiffs' expert to draw conclusions about PrimeCare's record-keeping and to opine

that any delay was due to the 'careless' record-keeping of the Defendant is not based in fact or evidence."  (*Id.* at 6).

Plaintiffs set forth three arguments in response to Defendants' motion *in limine*: (1) "there is evidence in the record which shows Mr. Barbaros' name being misspelled several times[; t]hese misspellings were relied on by the defendant nurses in attempting to verify the medications"; (2) "the numerous misspellings of Mr. Barbaros' name support Ms. Wild's opinion that the intake was the beginning of a downward spiral of carelessness displayed by the defendants that led to Mr. Barbaros' ultimate demise"; and (3)"defendants never asked Mr. Barbaros during his intake or at any time during his detention whether he used any other name or nickname that could be used to verify his medications; something that reasonably and easily could and should have been done."  (Doc. 254, at 2-3).

The Court denied the PrimeCare Defendants' motion, (Doc. 276), and rejected the argument that Nurse Wild's opinion failed *Daubert*'s reliability requirement because it was not based in fact or evidence, concluding that:

> It is for the jury to determine whether Defendants' misspelling of decedent's name contributed to a delay in treatment and was causally connected to his death.  Moreover, the Court is not convinced by Defendants' arguments that Nurse Wild's proposed testimony with respect to the careless completion of screening documents and the misspelling of decedent's name are 'not based in fact or evidence' such that *Daubert*'s reliability requirement requires the exclusion of her testimony on this issue.  Accordingly, Defendants' Motion will be denied.

(Doc. 275, at 4).  The Court stands by this ruling and the PrimeCare Defendants are not entitled to a new trial based on the denial of their motion and the Court's decision permitting

testimony about the misspelling of Mr. Barbaros' name.  In seeking to preclude the opinion

of Nurse Wild, the PrimeCare Defendants relied on the fact that Mr. Barbaros used

nicknames at CVS and with his family physician.  They made no attempt to argue then, and

do not attempt to argue now, exactly how Nurse Wild's opinion did not satisfy *Daubert*'s

reliability requirement and was not based in facts or evidence.[82]  Accordingly, the Court

finds that permitting Nurse Wild to testify in this respect was not erroneous and, even if it

were erroneous, the PrimeCare Defendants are not entitled to a new trial as a result.

First, the Court did not deny the PrimeCare's motion with prejudice, and it does not

appear that they ever asked the Court to reconsider its ruling.

Second, the PrimeCare Defendants were able to, and did, present testimony that Mr.

Barbaros used the name "Martin" at CVS, arguing to the jury that these different names,

rather than the PrimeCare Defendants' conduct, contributed to a delay in the verification of

medication.  These facts, like the fact that Mr. Barbaros' name was misspelled multiple

times on the intake forms and the resulting delay in verifying his medications, were facts in

evidence for the jury to consider.  It did not make Nurse Wild's testimony so unreliable as to

---

[82] *Daubert*'s reliability analysis requires a Court to consider, among other things: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the methods have been put."  *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 n.8 (3d Cir. 1994).  The testimony must also "'fit,' in that it must assist the trier of fact."  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000).  "This standard is not intended to be a high one. . ."  *Id.*  The Court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used."  *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 153 (3d Cir. 1999).

warrant exclusion under *Daubert*. Both at trial and at the time the motion was decided, it was readily apparent that Nurse Wild's testimony "could reliably flow from the facts known to the expert and the methodology used." *Heller*, 167 F.3d at 153. Nurse Wild was amply qualified to testify, extensively reviewed the documents in this case, and her opinion was based on facts in the record and her knowledge. The PrimeCare Defendants' argument that Mr. Barbaros' name was spelled differently at CVS does not establish that Nurse Wild's opinion could not reliably flow from the facts known and the methodology used.

Third, Nurse Wild was precluded from offering testimony that any of the PrimeCare Defendants' conduct was a factual cause of Mr. Barbaros' suicide. She was, however, permitted to offer an opinion that their acts and omissions increased the risk of harm to Mr. Barbaros. To the extent the Defendants complain that Nurse Wild was permitted to testify that Mr. James' misspelling of Mr. Barbaros' name was the factual cause of him committing suicide, she was not so permitted. Moreover, Nurse Wild conceded on cross-examination that Mr. James' misspellings did not delay the verification process for Mr. Barbaros. Sept. 8, 2016 Trial Tr. at 261:15-263:3. In any event, PrimeCare's arguments about Nurse Wild's opinion go to weight, not to admissibility, of her testimony. *See In re Tylenol (Acetaminophen) Mktg., Sales Practice, & Prods. Liab. Litig.*, Civil Action No. 2:12-cv-07263, 2016 WL 4039286, at *6 (E.D. Pa. July 28, 2016) (finding "nothing inappropriate" about expert's "calculations . . . given their purpose and the context within which they [were] used" and noting that defendant's arguments "go to weight, not admissibility"); *see also*

*Hartle v. FirstEnergy Generation Corp.*, 7 F. Supp. 3d 510, 516 (W.D. Pa. 2014) ("To the extent that the other field observations are inconsistent with [the expert's] predictions, that evidence goes to weight, not admissibility."). The PrimeCare Defendants were able to cross-examine Nurse Wild and undermine her opinion. Her testimony satisfied *Daubert*'s reliability requirement and did not warrant wholesale exclusion.

Finally, even assuming it was error to permit Nurse Wild to testify in this respect, the PrimeCare Defendants "must also show that the error was prejudicial." *Forrest*, 424 F.3d at 349. They make no argument whatsoever in their post-trial brief as to how the Court's ruling, if error, was prejudicial error. Under the circumstances, the PrimeCare Defendants are not entitled to a new trial on this basis.

### d. Permitting Mumtaz Barbaros to Testify

The PrimeCare Defendants and Dr. Thomas also request a new trial based on the Court's alleged error in permitting Mr. Barbaros' daughter, Mumtaz Barbaros, to testify. Prior to trial, the PrimeCare Defendants and Dr. Thomas filed a motion *in limine* to "Preclude Testimony of Decedent's Children." (Doc. 221). Plaintiffs represented to the Court that they did not intend to present decedent's children as witnesses at trial because they were currently living in Bulgaria and would be unable to travel to the United States. (Doc. 248). Accordingly, the Court denied the Defendants' motion as moot. (Doc. 268).

At the conclusion of the second day of trial, counsel for the Plaintiffs informed the Court that Mr. Barbaros' 15-year-old daughter Mumtaz was presently in the United States and that

"he would like to call her as a damages witness only, maybe, for 10 minutes." Sept. 7, 2016

Trial Tr. at 215:12-14. Six days before informing the Court, Plaintiffs' counsel informed

Defendants' counsel of Mumtaz's presence in the United States and of his intention to call

her to testify at trial. He also offered to make her available for a deposition prior to trial. *Id.*

at 215:15-20. Counsel for the Defendants objected to calling Mr. Barbaros' daughter to

testify because: (1) she was never identified as a witness; and (2) it was not feasible to

depose her prior to or during the trial.[83] *Id.* at 215:23-216:9. The Court reserved final ruling

on the issue. *Id.* at 218:7.

The issue of the testimony of Mr. Barbaros' daughter was again raised on September

12, 2016, the fifth day of trial. Counsel for the Defendants again asserted their objections to

the testimony based on the failure to identify Mumtaz on the witness lists and also claimed

that Mumtaz's testimony was unnecessary because both Mrs. Barbaros and Peter Ponzini

testified to "the issue of guidance and tutelage." Thus, the PrimeCare Defendants and Dr.

Thomas claimed precluding Mumtaz from testifying would not prejudice the Plaintiffs. Sept.

12, 2016 Trial Tr. at 193:13-194:1. The Court then stated:

---

[83] In raising their objections, the Defendants "stood by" their pre-trial motion *in limine*, which the Court had denied as moot based on Plaintiffs' counsel's representations that he did not intend to call either of Mr. Barbaros' daughters to testify because they were not in the United States. (Doc. 221). The Defendants sought preclusion of the children's testimony as they alleged it would "have no relevance to the underlying wrongful death and survival action as they would not be able to provide testimony as to the value of services, comfort, companionship, guidance and/or tutelage." (*Id.* at ¶ 7). Thus, they maintained that the "children's testimony could only be limited to emotional trauma as a result of the suicide," and that "[t]his type of testimony is improper, irrelevant, and highly prejudicial" and would "do nothing more than inflame the passion of the jury in an effort to garner sympathy for the Plaintiffs' case." (*Id.* at ¶¶ 8-9).

Well, gentlemen, I have looked at the case law on this and, in particular, the decision of our circuit in *Konstantopoulous v. Westvaco Corporation*, 112 F.3d 710, which, in turn, relies on a decision cited by Mr. Chacker in his memorandum which is *Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894, and these cases talk about the circumstances under which a District Court should exclude testimony.

And these cases repeat the basic proposition—and I'm quoting right now—that quote 'The exclusion of critical evidence is an extreme sanction not normally to be imposed absent a showing of willful deception or flagrant disregard of a Court Order by the proponent of the evidence.'

In this particular instance, I find no flagrant disregard of a Court Order nor do I find willful deception in this particular instance. In response to your motion in limine, to preclude the children from testifying, Mr. Chacker reported that the children, both daughters, were in Bulgaria, and that, therefore, they would not be expected to testify, since they wouldn't be in the United States.

He subsequently learned that, at least one of the daughters would be able to testify and so notified us. So I see no disregard of rules, I see no bad faith here whatsoever, either on the part of the Barbaros daughter or on the part of Mr. Chacker.

So I think, in this particular instance, that it's my obligation to allow the daughter to testify because, again, as we all know, I'll be instructing the jury one of the components in this case, should the jury find liability, would be the losses that flow to Mr. Barbaros' daughter by virtue of his death. And it seems inappropriate for me, at a minimum, to preclude her from testifying about the losses that she's suffered that are personal to her, as a result of her father's death.

Now, I know that, among the considerations that I have to pay attention to in something like this is whether there's any prejudice to the parties who oppose this testimony or surprise. In my view, the kind of testimony Mr. Chacker has represented that Mumtaz Barbaros would present should be of no surprise, given the nature of her relationship with the decedent. Number one.

Number two, to the extent that you wish I will require Mumtaz Barbaros to submit to a deposition, and we will work the particulars out of when, but I would require her to do so should you want to.

> Thirdly, I don't think it's going to disrupt the orderly and efficient trial of this case, we seem to be moving along rather smoothly here, and given what I think would be the relatively short testimony she would offer, I don't think there's any issue with respect to disruption. And, again, there's no bad faith here that I'm able to discern and no willful disregard, as well.
>
> So gentlemen, I think I'm bound to allow Mumtaz Barbaros to testify in this case. The only question is whether you wish to depose her prior to her testimony.

*Id.* at 194:2-196-7. The Court noted, however, that it would not permit Mumtaz to testify without counsel for the Defendants having an opportunity to depose Mumtaz Barbaros prior to her testimony at trial. However, counsel for the Defendants chose to decline the Court's invitation. *Id.* at 197:8-198:6.

Defendants seek a new trial based on the Court's decision to permit Mumtaz Barbaros to testify. According to the PrimeCare Defendants, the Court erred by permitting the testimony because: (1) Mumtaz was not identified as a trial witness; (2) Plaintiffs never opposed Defendants' motion *in limine*; and (3) Mumtaz's testimony unfairly prejudiced them. The Court will address each in turn.

First, it is undisputed that Mumtaz was not identified on Plaintiffs' witness list in accordance with Federal Rule of Civil Procedure 26(a)(3)(A). It does not follow, however, this required the *per se* exclusion of her testimony. Federal Rule of Civil Procedure 37(c)(1) provides that where, as here, a party fails to identify a witness in accordance with Rule 26(a), "the party is not allowed to use the information or witness to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

In considering whether a failure to disclose a witness is harmless, Courts must consider: (1) "the prejudice or surprise of the party against whom the excluded evidence would have been admitted; (2) the ability of the party to cure that prejudice; (3) the extent to which allowing the evidence would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or willfulness in failing to comply with a court order or discovery obligation." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 148 (3d Cir. 2000) (citing *Konstantopoulous*, 112 F.3d at 719)). Considering the facts and these four factors, the Court concluded that Plaintiffs' failure to identify Mumtaz as a witness was harmless and permitted her to testify, subject to Defendants' counsel having the opportunity to depose her. The Court stands by its ruling.[84]

Second, Defendants allege that the Court's ruling unfairly prejudiced them. Although they recognize that the Court's ruling permitting Mumtaz to testify was contingent on requiring her to sit for a deposition prior to testifying at trial, they represented that:

> It is not feasible to conduct any sort of discovery into what Mumtaz Barbaros was going to say when she was not identified until trial. It is simply not enough to take a deposition to elicit what testimony may be. It is also necessary to have time to obtain evidence to potentially impeach the testimony. The late disclosure of this witness prejudiced the Defendants."

---

[84] Defendants also claim that the Court erred in permitting Mumtaz to testify because Plaintiffs did not oppose Defendants' motion. Plaintiffs filed a response to Defendants' motion indicating that they did not oppose the motion and requesting the motion be denied as moot. (Doc. 248). The Court denied Defendants' motion as moot. (Doc. 268). Defendants do not cite any authority for the proposition that Plaintiffs' indication that they did not oppose the motion and the Court's subsequent denial of the motion as moot, would thereafter preclude them from seeking reconsideration of the ruling based on changed circumstances.

(Doc. 377, at 49-50).[85]

Defendants only claim of unfair prejudice set forth in their briefs is the late disclosure, not the content itself, of Mumtaz's testimony, likening the Court's ruling to a "trial by ambush."  (Doc. 391, at 43).

The Court finds that the late disclosure of Mumtaz as a witness did not prejudice the Defendants, for substantially the reasons set forth on the record.  The Defendants' argument that they lacked sufficient time to obtain evidence to impeach her testimony is unavailing. On Thursday, September 1, 2016, Plaintiffs' counsel first notified counsel for the Defendants that he intended to call Mumtaz as a witness.  This trial was scheduled to commence five days later on Tuesday, September 6.  However, Mumtaz did not testify at trial until September 13, 2016. This gave counsel for the Defendants approximately two weeks to assemble sufficient "impeachment" evidence.  This was ample time to prepare and certainly does not constitute such unfair prejudice as to warrant a new trial.  Defendants do not suggest what type of "impeachment" evidence they hoped to have obtained, but were unable to, because of the purported time constraints.  Finally, it is worth noting that the PrimeCare Defendants and Dr. Thomas not only declined the opportunity to take Mumtaz's deposition, but also declined to cross-examine her at trial.[86]  Sept. 13, 2016 Trial Tr. at 8:24-9:2.  The PrimeCare Defendants and Dr. Thomas are not entitled to a new trial on this ground.

---

[85] Defendants requested, and received, a formal offer of proof.  Sept. 12, 2016 Trial Tr. at 198:1-19.

[86] Mumtaz's testimony at trial was brief; ten minutes at most.  Sept. 13, 2016 Trial Tr. at 3:15-8:22.

### e. Preclusion of Testimony Regarding Alleged Misconduct of Correctional Officer Jesse Cleare

The PrimeCare Defendants and Dr. Thomas next claim that the Court's preclusion of testimony concerning the alleged misconduct of former MCCF Correctional Officer Jesse Cleare was in error.[87]  This assertion lacks merit.  Before trial, Defendant Monroe County filed an omnibus motion *in limine* asking the Court to preclude, among other things, "misconduct by former MCCF Correctional Officer Jesse Cleare."  (Doc. 201).  None of the parties, including Dr. Thomas and the PrimeCare Defendants, filed a brief in opposition to the motion.

Local Rule 7.6 provides, in relevant part, that "[a]ny party opposing any motion, other than a motion for summary judgment, shall file a brief in opposition within fourteen (14) days after service of the movant's brief . . . *Any party who fails to comply with this rule shall be deemed not to oppose such motion.*"  M.D.Pa. L.R. 7.6 (emphasis added).  Because no party, including the PrimeCare Defendants and Dr. Thomas, filed a brief opposing the motion, they were deemed not to oppose the motion.  Accordingly, the Court granted the motion and precluded evidence of the alleged misconduct. (Doc. 279). At no time thereafter, either before or at trial, did any party ask the Court to reconsider its order granting Defendant Monroe County's motion as unopposed.  Under these circumstances, the

---

[87] The PrimeCare Defendants, unlike Dr. Thomas, do not brief this issue.  As a result, the PrimeCare Defendants have abandoned this argument.

PrimeCare Defendants and Dr. Thomas' claims of prejudicial error warranting a new trial are entirely without merit.[88]

### f.   Unpreserved Claims of Error

Finally, Dr. Thomas and the PrimeCare Defendants claim in their motions that the Court made several additional erroneous evidentiary rulings entitling them to a new trial. Specifically, the Court purportedly erred by: (1) permitting testimony from Mr. Barbaros' wife and daughter about their "grief and anguish" suffered as a result of his death; (2) permitting introduction of autopsy photographs; and (3) denying the PrimeCare Defendants' motion to preclude evidence concerning the negligence of William Buffton.  Neither Dr. Thomas nor the PrimeCare Defendants set forth any argument on these issues in their supporting briefs.

First, the Court did not err in granting in part and denying in part Defendants' motion to "preclude Plaintiffs from asserting a claim for solatium damages."  (Doc. 274).  The Court made no error, let alone prejudicial error entitling Defendants to a new trial, for substantially the reasons set forth in the memorandum opinion granting in part and denying in part Defendants' motion.  (Doc. 273 at 1-4).  As the Court noted: "because there can be no recovery for grief and mental anguish as a result of decedent's death" under the Wrongful Death Act, "Plaintiffs will be precluded from 'asserting a claim for solatium damages'"—the

---

[88] "Thus, a party who unsuccessfully opposes an *in limine* motion to exclude certain evidence can appeal that ruling without an offer of proof at trial if the district court was fully informed and made a pretrial ruling with no suggestion that it would reconsider that ruling at trial."  *Walde*n, 126 F.3d at 519. "Concomitantly, where a district court makes a *tentative in limine ruling* excluding evidence, the exclusion of that evidence may only be challenged on appeal if the aggrieved party attempts to offer such evidence at trial."  *Id.* (emphasis in original).

very relief Defendants sought in their motion.  (*Id.* at 4).  However, the Court was "not

inclined . . . to preclude Mrs. Barbaros from testifying with respect to her grief as it relates to

the loss of decedent's services, society and comfort . . . because Pennsylvania's Wrongful

Death Act provides that losses of society and comfort are compensable and encompassed

within the term 'services.'  These damages are independent of any solatium damages for

her grief and bereavement."  (*Id.*).  Notably, the Defendants did not object to Mrs. Barbaros'

or Mumtaz's testimony at trial on these grounds.  Accordingly the Court did not err in

granting in part and denying in part Defendants' motion and the Defendants are not entitled

to a new trial on these grounds.

Second, the Court did not err in permitting the introduction of a limited number of

autopsy photographs.  In denying the Defendants' motion to preclude the autopsy

photographs, the Court, after reviewing the photographs in question, found the photographs

to be "relevant to the manner of Mr. Barbaros' death, as well as the pain and suffering

Plaintiffs allege he endured."[89]  (Doc. 269, at 2).  The Court further found that the

photographs in question "were relied on by multiple expert witnesses in forming their

opinions that they intend to present to the jury." (*Id.*).  Specifically, the photographs Plaintiffs

sought to introduce consisted of a photograph of the object Mr. Barbaros used to commit

suicide next to a photo of what appeared to be his trachea, among other things.  As the

---

[89] The Court denied the motion, but reserved "ruling on whether introduction of all of the photographs (many of which are graphically similar) should be excluded to the extent that they are so cumulative that their probative value is diminished by their repetitive representations."  (Doc. 270, at 1-2).  Defendants did not object at trial to the introduction of any photographs on this basis or any other basis.

Court previously stated when declining to exclude the photographs under Federal Rule of Evidence 403, the "photographs in question are not so gruesome, shocking or inflammatory as to warrant exclusion under Federal Rule of Evidence 403." (*Id.*). Moreover, the Defendants make no attempt to argue unfair prejudice and, as such, they are not entitled to a new trial on this basis.

Finally, the PrimeCare Defendants claim the Court erred in denying their motion "to preclude testimony as it relates to any criticisms, conclusions, or opinions as to the sufficiency and adequacy of William Buffton's treatment of the decedent Mumun Barbaros." (Doc. 216). The Court denied the PrimeCare Defendants' motion, (Doc. 292, at 2), concluding that merely because Mr. Buffton was dismissed as a defendant in this case based on improper service, it did not follow that there could be no criticism of his acts and omissions, especially where, as here, PrimeCare could still be held vicariously liable for his conduct. The PrimeCare Defendants are therefore not entitled to a new trial.

### 3.    Weight of the Evidence

Finally, the PrimeCare Defendants seek a new trial on the theory that the jury's verdict was against the weight of the evidence. The entirety of the PrimeCare Defendants' argument, which contains no citations to case law or to the record, is as follows:

> The jury's verdict was against the weight of the evidence as articulated in Section A of this Brief. The arguments asserted in Section A are incorporated by reference. Therefore, if this Court does not enter judgment as a matter of law, the Court should order a new trial, because the jury's verdict was against the weight of the evidence.

(Doc. 377, at 43).

The arguments asserted in Section A of Defendants' brief address why the PrimeCare Defendants are entitled to judgment as a matter of law on Plaintiffs' deliberate indifference claim. The Court has already found that the PrimeCare Defendants are entitled to judgment as a matter of law on Plaintiffs' deliberate indifference claim and we therefore need not address this issue with respect to deliberate indifference any further here.

The PrimeCare Defendants' post-trial motion and brief do not advance any argument that the jury's negligence finding was against the weight of the evidence, thus requiring a new trial. Their failure to brief this issue leads the Court to conclude that the PrimeCare Defendants have abandoned this argument. *Lincow*, 715 F. Supp. 2d at 629 ("Defendants have failed to fully brief certain arguments that were tersely addressed in their motion, those arguments will be deemed abandoned."), *aff'd*, 444 F. App'x 617. However, solely for purposes of a developing a full and complete record, the Court will address whether the PrimeCare Defendants are entitled to a new trial on the basis that the jury's negligence verdict was against the weight of the evidence.

"Unlike a sufficiency of the evidence claim, when a court evaluates a challenge to the weight of the evidence, it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Marra*, 497 F.3d at 309 n.18 (citing *Greenleaf*, 174 F.3d at 365; 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 2806 (2d ed. 1995)). "[N]ew trials

because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson*, 926 F.2d at 1353. The party seeking a new trial must meet a high threshold in order to obtain this "extraordinary relief." *Marra*, 497 F.3d at 409 n.18.

### a. The Individual PrimeCare Defendants

Under Pennsylvania law, "[f]or a party to prevail in a negligence action, ordinary or professional, the elements are identical: the plaintiff must establish [1] the defendant owed a duty of care to the plaintiff, [2] that duty was breached, [3] the breach resulted in the plaintiff's injury, and [4] the plaintiff suffered an actual loss or damages." *Merlini ex rel. Merlini v. Gallitzin Water Auth.*, 602 Pa. 346, 354, 980 A.2d 346 (2009) (citations omitted). A medical negligence claim is further defined as an "unwarranted departure from generally accepted standards of medical practice resulting in injury to a patient, including all liability-producing conduct arising from the rendition of professional medical services." *Id.* (internal citation and quotation marks omitted).

"It is the plaintiff's burden to prove that the harm suffered was due to the conduct of the defendant." *Hamil v. Bashline*, 481 Pa. 256, 265, 392 A.2d 1280 (1978). "Whether in a particular case that standard has been met with respect to the element of causation is normally a question of fact for the jury; the question is to be removed from the jury's consideration only where it is clear that reasonable minds could not differ on the issue." *Id.*

at 266 (citations omitted). "Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm."[90]  *Id.* at 269.  "[I]t is not necessary that the plaintiff introduce medical evidence in addition to that already adduced to prove conduct increased the risk of harm to establish that the negligence asserted resulted in a plaintiff's injury."  *Id.* at 273.  "Rather, once the jury is apprised of the likelihood that defendant's conduct resulted in plaintiff's harm," it is up to the jury to "balanc[e] probabilities."  *Id.*; *see also Gradel v. Inoyue,* 491 Pa. 534, 542, 421 A.2d 674 (1980) (recognizing that *Hamil* "relaxes the degree of certainty ordinarily required of a plaintiff's evidence to provide a basis upon which the jury may find causation").

Pennsylvania law does not require expert witnesses to use "the magic words," such as "increased risk of harm" as long as the expert's testimony, taken as a whole, satisfies the standard.  *Mitzelfelt,* 526 Pa. at 66; *accord Redland Soccer Club, Inc. v. Dept. of Army of United States,* 55 F.3d 827, 852 (3d Cir.1995) ("Pennsylvania case law on causation does

---

[90] The Pennsylvania Supreme Court has repeatedly reaffirmed *Hamil*'s holding.  *See, e.g.*,  *Mitzelfelt,* 526 Pa. at 64 (plaintiffs presented sufficient evidence that the acts of the defendants increased the risk of harm to plaintiffs and, as a result, "there were sufficient facts from which the jury could have determined that it did"); *Gradel,* 491 Pa. at 542 ("Accordingly, medical opinion need only demonstrate, with a reasonable degree of medical certainty, that a defendant's conduct increased the risk that the harm sustained by plaintiff would occur.  The jury, not the medical expert, then has the duty to balance probabilities and decide whether defendant's negligence was a substantial factor in bringing about the harm.").  Courts have applied *Hamil*'s causation standard in negligence claims pursued against prison healthcare providers.  *See, e.g., Navedo v. PrimeCare Med., Inc.*, No. 1:12-cv-00888, 2013 WL 6451159 (M.D. Pa. Dec. 9, 2013) (applying *Hamil* to medical negligence case against prison medical provider based on detainee suicide).

not require that expert testimony include any 'magic words' such as 'caused by,' rather than 'related to.'"); *Vogelsberger v. Magee-Womens Hosp. of UMPC Health Sys.*, 903 A.2d 540, 545, 2006 PA Super 146 (Pa. Super. 2006) (noting that an expert "need not use the magic words or phrases such as increased risk of harm; rather, we examine the testimony as a whole, and the substance of the testimony, to determine if it meets this standard") (internal citation and quotation marks omitted). "To the extent that 'magic words' have any significance in the Pennsylvania cases, they seem merely to reflect Pennsylvania's sensible requirement that the expert speak 'with a reasonable degree of medical certainty.'"[91] *Redland Soccer Club*, 55 F.3d at 852 (quoting *Gradel*, 491 Pa. at 538).

The Court will first address whether the jury's verdict against any of the individual PrimeCare Defendants was against the weight of the evidence. There was ample testimony that Paul James' acts and omissions breached the duty of care, increased the risk of harm to Mr. Barbaros, and contributed to his suicide. Sept. 8, 2016 Trial Tr. at 227:6-230:12; 258:4-10; 266:24-268:2. Nurse Wild and Dr. Breggin presented testimony, to a reasonable degree of medical and nursing certainty, that Paul James' acts and omissions increased the

---

[91] In considering whether there was sufficient evidence for a reasonable jury to find causation, a Court must consider whether the expert was able to testify "to a reasonable degree of medical certainty that the acts or omissions complained of could cause the type of harm that the [plaintiff] suffered." *Mitzelfelt*, 526 Pa. at 67. If so, the next step requires a determination of "whether the acts complained of caused the actual harm suffered by" the plaintiff. *Id.* At the second step, there is a "relaxed standard" and it is sufficient that an expert testifies that he or she believed "to a reasonable degree of medical certainty that it *could have* caused the harm." *Id.* (emphasis added).

risk of harm to Mr. Barbaros and contributed to his suicide[92]. *Id.* at 219:21-223:13; 229:22-230:12; 253:7-12; Sept. 9, 2016 Trial Tr. at 233:21-234:3; 268:25-273:3; 277:14-19. For example, Nurse Wild opined that Nurse James' acts and omissions, including his failure to obtain information about the last time Mr. Barbaros took his medications, placed him "at risk." Sept. 8, 2016 Trial Tr. at 228:11-229:7. She also testified that Nurse James' completion of Mr. Barbaros' intake form was the first event in a series of negligent events and stated that "one of my opinions was that the information collected during the receiving screening by Nurse James was not sufficient or it was not complete, which led to, I think, some confusion further on, primarily, when he didn't follow through and answer the questions about when was the last time Mr. Barbaros took his medications, that was left incomplete." *Id.* at 227:19-25. Nurse James' acts and omissions "just set the stage, if you will," for the care Mr. Barbaros received throughout his stay at the MCCF. *Id.* at 229:22-230:1. Dr. Breggin's testimony further supports the jury's verdict. Dr. Breggin testified that the first time Mr. Barbaros' suicide could have been prevented was during his first and only interaction with Nurse James, highlighting the importance of Nurse James' failure to obtain

---

[92] Contrary to the PrimeCare Defendants assertions at trial, Nurse Wild was *not* precluded from presenting causation testimony. Rather, the Court sustained objections when counsel for the Plaintiffs asked whether it was her opinion that the PrimeCare Defendants' acts and omissions were the "factual cause" of Mr. Barbaros' suicide. She was not prohibited from testifying that the acts and omissions increased the risk of harm to Mr. Barbaros, and testified as such.

any information about the last time Mr. Barbaros took his medications.[93]  Sept. 9, 2016 Trial

Tr. at 268:25-269:23-277:19.

Testimony from PrimeCare's correctional nursing expert, Terry Fillman, also supports

the jury's verdict against Nurse James.  Nurse Fillman acknowledged that PrimeCare's

policies and procedures at the MCCF set the minimally acceptable standard of care in a

correctional environment.  *Id.* at 288:4-9.  He conceded that by not completing the medical

chart Nurse James violated PrimeCare's policies and procedures.  He also testified that if a

patient is taking psychiatric medications it is important to know the last they time took it and

the reasons why.  *Id.* at 289:20-292:1.  When commenting on Nurse Rowe's assessment of

Mr. Barbaros without the benefit of his medical chart, he acknowledged her conduct violated

policies and procedures.  In doing so, Nurse Fillman testified that it is the responsibility of

the night nurse (*i.e.*, Paul James) to collect and pass on this information in order to ensure

the nursing staff has all the information available to review before providing an assessment.

*Id.* at 297:15-299:6.   He testified that if Nurse Rowe's statement that it was "very common"

to perform assessments without the benefit of a patient's medical chart was true, the person

to blame was "whoever is gathering these medical records and not providing the chart[;]

they're violating policies and procedures."  *Id.* at 299:23-301:12.  It was his opinion that it

was a "combination" of Mr. Barbaros' failure to give accurate and complete information to

---

[93] In fact, nearly every fact and expert witness testified to the critical importance of obtaining information about the last time an inmate on psychiatric medications like Mr. Barbaros last took their medication, including Nurse James himself.

Nurse James, as well as any information about the dosage, which led to a delay in Mr. Barbaros obtaining his medications.[94]  *Id.* at 304:19-305:25.

Further, the PrimeCare Defendants incorrectly claim there was no evidence that Nurse James breached the standard of care or increased the risk of harm to Mr. Barbaros. Despite the PrimeCare Defendants' assertions that Nurse Wild conceded on cross-examination that Nurse James' acts and omissions did not cause a delay in treatment of Mr. Barbaros, Sept. 8, 2016 Trial Tr. at 261:15-263:3, it does not necessarily lead to the conclusions that, as such, no reasonable jury could find Paul James liable in negligence and that the great weight of the evidence was against the jury's verdict.[95]  There was credible testimony from Nurse Wild that Paul James' failure to completely and accurately fill out the intake form, in violation of PrimeCare's policies and procedures, breached the standard of care.  Nurse Fillman's testimony also suggested as much.  Nurse Wild and Dr. Breggin also testified that Nurse James' acts and omissions increased the risk of harm to Mr. Barbaros and contributed to his suicide.  *See Vogelsberger*, 903 A.2d at 564 (expert testimony was sufficient to find causation and noting the expert "also opined that the nursing care was not properly coordinated, documentation and charting was incomplete or misleading, and

_____

[94] When asked if he was aware that Nurse James testified that he never asked for dosage information because PrimeCare's intake form at the MCCF does not ask for it, Nurse Fillman stated "no."  Sept. 9, 2016 Trial Tr. at 305:22-306:1.

[95] Nurse Wild conceded on cross-examination that Nurse James' misspelling of Mr. Barbaros' name and listing his medication as Prozac, instead of Paxil, did not contribute to the delay in Mr. Barbaros receiving his medications.  Nurse James obtained the correct name of Mr. Barbaros' pharmacy, prescribing physician, date of birth and social security number.  While Nurse Bauer could not verify Mr. Barbaros' medications using this information, Nurse Ramos did so.

nurses failed to properly monitor" the plaintiff). The testimony presented at trial established that knowing when a patient last took a psychiatric medication is extremely important and the failure to obtain this information puts a patient at an increased risk of harm. The Court's review of the record does not lead it to believe that the jury's negligence verdict against Nurse James was so against the weight of the evidence that a miscarriage of justice would result should the verdict stand. Nor does the verdict shock the Court's conscience. Accordingly, Nurse James' motion for a new trial will be denied.

The Court next considers the evidence presented against the other individual PrimeCare Defendants. Both Nurse Wild and Dr. Breggin, among others, testified that the acts and omissions of Nurse Rowe, Wendy Johnson, Nurse Ramos, and Nurse Bauer, breached the standard of care. There was also testimony that these acts and omissions increased the risk of harm and contributed to Mr. Barbaros' suicide. Sept. 8, 2016 Trial Tr. at 230:13-247:17; Sept. 9, 2016 Trial Tr. at 233:21-234:4; 271:17-277:19.

Plaintiffs' experts testified that at the time Nurse Rowe assessed Mr. Barbaros he was exhibiting signs of withdrawal. Had Nurse Rowe not breached the standard of care by neglecting to review Mr. Barbaros' medical chart prior to performing the assessment, she would have realized that Mr. Barbaros' medications had not been verified and he had therefore been without his medications for a number of days and she could have recognized he was suffering from withdrawal. At a minimum, had Nurse Rowe reviewed the medical chart, she would have had an obligation to raise the failure to verify Mr. Barbaros'

medications with a medical provider who, in turn, could have placed Mr. Barbaros on monitoring. Her conduct not only breached the standard of care but placed Mr. Barbaros at an increased risk of harm.

There was also testimony that Wendy Johnson's acts and omissions breached the standard of care, increased the risk of harm to Mr. Barbaros, and contributed to his suicide. Had Wendy Johnson reviewed Mr. Barbaros' medical chart, as she testified she did, she would have realized that he had been without his medications for days and was exhibiting symptoms of withdrawal. She could have placed him on monitoring and raised these issues with a medical provider. At the very least, Wendy Johnson had an obligation to pass this information along to Nurse Ramos and/or speak to Mr. Barbaros to gather more facts; especially considering that he went to such lengths to complain to a Judge that he was not receiving his medications.

Plaintiffs also presented testimony that Nurse Ramos' acts and omissions breached the standard of care, increased the risk of harm to Mr. Barbaros, and contributed to his suicide. Nurse Ramos neither reviewed Mr. Barbaros' medical chart nor informed Dr. Thomas about Mr. Barbaros' physical symptoms or the length time that he had been off his medications. Had she done so, appropriate action to place Mr. Barbaros on monitoring could have been taken.[96]

---

[96] The PrimeCare Defendants' correctional nursing expert, Terry Fillman, testified that he was not opining on the acts and omissions of Wendy Johnson and Grace Ramos, nor was he disputing Nurse Wild's opinions that their acts and omissions breached the standard of care and increased the risk of harm to Mr. Barbaros. Sept. 12, 2016 Trial Tr. at 282:8-284:14.

Finally, Plaintiffs presented testimony that Nurse Bauer's acts and omissions breached the standard of care, placed Mr. Barbaros at an increased the risk of harm, and contributed to his suicide.  Specifically, Nurse Bauer made little effort to verify Mr. Barbaros' medications and failed to engage in any appropriate follow up (other than placing him on a list to see a mental health professional, whom he was able to see three days later).  Nurse Wild testified that after Nurse Bauer could not verify the medications, she had an obligation to either call a medical provider or reach out to Mr. Barbaros to obtain additional information.  Todd Haskins, PrimeCare's VP of Operations, also testified that Nurse Bauer's actions were insufficient and violated PrimeCare's policies and procedures.[97]  When asked if Nurse Bauer's acts and omissions placed Mr. Barbaros at risk of harm, Nurse Wild testified "[v]ery much so."  Sept. 8, 2016 Trial Tr. at 231:7-232:1.  In addition, Dr. Breggin testified that if Mr. Barbaros promptly received his medications on March 18 – the same day he came into the MCCF and Nurse Bauer attempted to verify his medications – it could have prevented and, at a minimum, would have softened his withdrawal.

In sum, Plaintiffs presented testimony, to a reasonable degree of medical and nursing certainty, that Nurse James, Nurse Rowe, Wendy Johnson, Nurse Bauer, and Nurse Ramos' acts and omissions breached the standard of care, placed Mr. Barbaros at an

---

[97] Nurse Wild also testified that, after failing to verify his medications, Nurse Bauer had an obligation to research any potential side effects or issues regarding Mr. Barbaros' medications or raise this with a medical provider.  Sept. 8, 2016 Trial Tr. at 231:15-232:1.

increased risk of harm, and contributed to his suicide.[98]  "Once there is sufficient testimony to establish that (1) the [defendant] failed to exercise reasonable care, that (2) such failure increased the risk of physical harm to the plaintiff, and (3) such harm did in fact occur, then it is a question properly left to the jury to decide whether the acts or omission were the proximate cause of the injury."  *Mitzelfelt*, 526 Pa. at 68; *see also Vogelsberger*, 903 A.2d at 563-65 ("If the expert can opine to a reasonable degree of certainty that the acts or omissions *could have* caused the harm, then it becomes a question for the jury with regard to whether they believe it caused the harm.") (emphasis in original).  Although Defendants presented some evidence to the contrary, the jury was free to weigh the evidence and accept or reject Defendants' experts' testimony.  Unlike Plaintiffs' experts, both Nurse Fillman and Dr. Mendel previously testified on behalf of PrimeCare.  Dr. Mendel previously testified for PrimeCare "probably" more than 10 times, "possibly more" than 20 times, but "probably not" more than 30.  Sept. 13, 2016 Trial Tr. at 35:25-40:25.  Nurse Fillman and Dr. Mendel's testimony at trial was also not consistent with their deposition testimony.  *Id.* at 105:12-107:19.

Nurse Fillman and Dr. Mendel both acknowledged that many of the acts and omissions of the individual PrimeCare Defendants were inappropriate and failed to comply with applicable policies and procedures.  Nurse Fillman conceded that the nursing staff's failure

---

[98] Moreover, a reasonable jury could infer that had Mr. Barbaros been placed on monitoring "he would not have had the opportunity to commit suicide."  *Francis ex rel. Estate of Francis v. Northumberland Cnty.*, 636 F. Supp. 2d 368, 391 (M.D. Pa. 2009).

to follow medical orders and take Mr. Barbaros' blood pressure was "not acceptable" because it is incumbent on the nursing staff to follow medical orders in order to protect the patient and ensure he or she receives the care they need.  Sept. 12, 2016 Trial Tr. at 306:2-307:23.  He also acknowledged that if a medication like Trazodone is prescribed to a patient, but not given, it is not acceptable nursing care.  *Id* at 308:3-13.  Nurse Fillman testified that it is incumbent upon a nurse to make sure he or she is familiar with, and able to provide, all relevant information to a physician when obtaining orders for a prescription and to be as complete as possible.  *Id.* at 312:5-24.  He also conceded that failure to follow policies and procedures places a patient at an increased risk of harm.

Dr. Mendel acknowledged that if a nurse cannot verify a psychiatric medication by 5:00 p.m. on the day after the patient enters a facility, he/she should call the on-call provider, which did not happen here.  Sept. 13, 2016 Trial Tr. at 82:23-83:5.  He also acknowledged that if medical orders are given, they should be followed, and that he could consider this in determining whether there is a breach of the standard of care.  *Id.* at 84:6-88:18.

PrimeCare's correctional psychiatry expert, Dr. Cheryl Wills, agreed that as part of an initial assessment it is important to find out when the patient last took their medication.  She testified that the nursing staff had an obligation to investigate when Mr. Barbaros last took his medication.  Sept. 14, 2016 Trial Tr. at 37:23-39:22.  Dr. Wills acknowledged that withdrawal is a potential side effect for persons who abruptly stop taking SSRIs like Paxil, and conceded that suicidal thoughts have been associated with individuals who abruptly

stopped taking SSRIs like Paxil, and that this was something of which the medical staff should be aware. *Id.* at 40:13-42:19. When asked if Mr. Barbaros' headache, hypertension, increased pulse, stomach problems, increased anxiety, and depression could be signs that he was suffering from withdrawal, Dr. Wills testified "That's one possibility, yes." *Id.* at 43:5-11. She also testified that the nursing staff's failure to check Mr. Barbaros' blood pressure was unfortunate and "pretty bad" because they were unable to assess his medical status. *Id.* at 43:12-45:11.

This testimony, among others, provided the jury with a sufficient and reasonable basis to find that Nurse James, Nurse Bauer, Nurse Ramos, Nurse Rowe, and Wendy Johnson breached the standard of care, that their acts and omissions increased the risk of harm to Mr. Barbaros, and that Mr. Barbaros committed suicide as a result of that harm. It was for the jury to determine "whether or not that increased risk was a substantial factor in producing the harm." *Hamil*, 481 Pa. at 269. The Court's review of the record leads it to conclude that the jury's negligence verdict, finding each of the individual PrimeCare Defendants liable, was not so against the weight of the evidence that a miscarriage of justice would result should the verdict stand. Nor does the verdict shock the Court's conscience. The individual PrimeCare Defendants' motion for a new trial on the basis that the jury's verdict was against the weight of the evidence will thus be denied.

### b. William Buffton

A review of the record also leads the Court to conclude that the jury's negligence verdict finding William Buffton liable was not against the weight of the evidence. There was ample evidence from which the jury could reasonably conclude that Mr. Buffton breached the standard of care. Sept. 9, 2016 Trial Tr. at 228:18-23; 246:3-250:6; 277:7-13. Mr. Buffton was the first and only mental health provider who met with Mr. Barbaros during his time at the MCCF. He testified that he was performing psychological services to inmates at the MCCF without appropriate supervision. He did not conduct a suicide assessment or ask Mr. Barbaros about his physical symptoms. His notes and recollection of the meeting portray Mr. Barbaros as "very, very fearful" and like a "cornered rat," among other things. Mr. Buffton conceded that Mr. Barbaros' conduct suggested he could be suicidal, but he testified that Mr. Barbaros' actions could also be normal behavior for a person from Eastern Europe whose first language is not English. Despite having authority to place an inmate on suicide watch or monitoring, he did not do so, and he received no training from PrimeCare on suicide prevention or its policies and procedures for monitoring or suicide watch. Furthermore, Mr. Buffton testified at his deposition, which was read to the jury, that he was not sure if he would admit under oath if he made a mistake in his care and treatment of Mr. Barbaros, Sept. 9, 2016 Trial Tr. at 84:11-85:12, which impacted his credibility at trial.

Dr. Breggin's testimony, among others, also established a reasonable basis for the jury to conclude that Mr. Buffton's acts and omissions increased the risk of harm to Mr. Barbaros

and caused his suicide.  *Id.* at 228:9-234:4; 260:24-266:4; 271:23- 277:19; Sept. 12, 2016

Trial Tr. at 145:23-153:14.  PrimeCare's own correctional psychiatry expert supported Dr.

Breggin's opinions in many respects.  Dr. Wills conceded that Mr. Buffton forgot to

document that he conducted a suicide assessment and did not ask Mr. Barbaros whether

he was experiencing any physical symptoms since arriving at the MCCF.  Sept. 14, 2016

Trial Tr. at 45:3-46:3.  When asked whether it would be important for a person conducting a

mental health evaluation on a first time detainee to know if the patient is experiencing any

aggravating factors, like physical symptoms, she testified "it would be helpful to know,

yes."[99]  *Id.* at 48:14-23.  Dr. Wills testified that her opinion that PrimeCare's and Mr.

Buffton's acts and omissions did not cause Mr. Barbaros' suicide, was only "more likely than

not" and "roughly 51%."  *Id.* at 59:23-60:4.  In her expert report, part of which was read to

the jury, she stated that "Dr. Breggin's past work on side effects to Selective Serotonin

Reuptake Inhibitor SSRI medications, which are used to treat depression and anxiety, and

---

[99] Dr. Wills acknowledged, as did Mr. Buffton, that if Mr. Buffton had asked Mr. Barbaros about physical symptoms, he should have written it in his note.  Sept. 14, 2016 Trial Tr. at 46:3-20.  When asked whether, logically, that meant that Mr. Buffton failed to conduct a suicide assessment of Mr. Barbaros because it was not documented, Dr. Wills could not say.  *Id.* at 47:19-48:3.  She did say, however, that "a suicide assessment is a requirement for a social worker, but physical symptoms is not . . . so if he went above and beyond, that's great, but that is not what he's required to do."  *Id.* at 48:4-13.  She conceded that, as a psychologist, he would know that physical symptoms can impact a person's mental state.  *Id.* at 48:14-16.  Although Dr. Wills repeatedly referred to Mr. Buffton as a social worker, she conceded that at the MCCF he was acting as a psychologist and, as such, NCCHC standards required him to be supervised.  *Id.* at 49:10-25.  She also conceded that the woman supervising Mr. Buffton was not a psychologist, but a social worker.  *Id.* at 50:12-16.  Dr. Wills acknowledged that PrimeCare did not provide Mr. Buffton with any training, including training on suicide prevention.  She was not sure, however, "that is required."  *Id.* at 55:18-22.

what pharmaceutical companies have disclosed has had important implications for the medical field." *Id.* at 60:20-61:8.

For the foregoing reasons, the jury's negligence verdict finding William Buffton liable was reasonably supported by the evidence. The Court's weighing of the evidence does not suggest otherwise. The verdict does not shock the Court's conscience and in no way constitutes a miscarriage of justice.

### c. PrimeCare Medical, Inc.

Finally, the Court considers whether the weight of the evidence supports the jury verdict finding PrimeCare negligent. A review of the record demonstrates that there was ample evidence for a reasonable jury to find PrimeCare directly and vicariously liable in negligence.

> To prove negligence, a plaintiff may proceed against a defendant on theories of direct and vicarious liability, asserted either concomitantly or alternatively. Liability for negligent injury is direct where the plaintiff seeks to hold the defendant responsible for harm the defendant caused by the breach of a duty owing directly to the plaintiff. By comparison, vicarious liability is a policy-based allocation of risk. Vicarious liability, sometimes referred to as imputed negligence, means in its simplest form that, by reason of some relation existing between A and B, the negligence of A is to be charged against B although B has played no part in it, has done nothing whatever to aid or encourage it, or indeed has done all that he possibly can to prevent it.

*Scampone v. Highland Park Care Cent.*, *LLC*, 618 Pa. 363, 388-89, 57 A.3d 582 (2012) (internal citation and quotation marks omitted). "The direct and vicarious theories of liability are grounded in distinct policies and serve complementary purposes in the law of torts, with the goal of fully compensating a victim of negligence in an appropriate case." *Id.* at 390.

### i.  Respondeat Superior

The jury was instructed, without any objection and consistent with Pennsylvania law, that because all of the individual PrimeCare Defendants were employees acting within the scope of their employment, if the jury found any of those defendants liable in negligence, then PrimeCare was also vicariously liable.  "Once the requisite relationship (*i.e.*, employment, agency) is demonstrated," *id.* at 389, the employer may properly be held liable for its employee's negligence.

As discussed, there was sufficient evidence for a reasonable jury to find Paul James, Patricia Bauer, Christina Rowe, Grace Ramos, and Wendy Johnson liable in negligence. The weight of the evidence does not suggest otherwise.  Because there was evidence that each of the individual PrimeCare Defendants were negligent and were employees of PrimeCare acting within the scope of their duties, the jury could reasonably find PrimeCare vicarious liability for their negligence.

### ii.  Liability for Negligence of Independent Contractors

There was also ample evidence from which the jury could find PrimeCare liable based on the acts and omissions of William Buffton.  Mr. Buffton was an employee of an independent contractor providing mental services to inmates at the MCCF on behalf of PrimeCare.  The jury instructions, based on the standard Pennsylvania instructions addressing a healthcare provider's liability for the negligence of its independent contractors, permitted the jury to hold PrimeCare liable for Mr. Buffton's negligence if the Plaintiffs

proved one of the following: (1) a reasonably prudent person in Mr. Barbaros' position would be justified in believing that the care in question was provided by PrimeCare or its agents; or (2) the care in question was advertised or otherwise represented to the patient as being provided by PrimeCare.[100]  Put another way, PrimeCare could be liable for the negligence of Mr. Buffton "where (1) the patient looked to the institution, rather than the individual physician, for care, or (2) the hospital held out the physician as its employee."  *Green v. Pennsylvania Hosp.*, 633 Pa. 18, 29, 123 A.3d 310 (2015); *accord Capan v. Divine Providence Hosp.*, 287 Pa. Super. 364, 368, 430 A.2d 647 (1980) (citing Restatement (Second) of Torts § 429 (1965)).

This theory of liability, known as the doctrine of ostensible agency, has been codified by the Pennsylvania legislature in section 1303.516 of the MCARE Act.  The statute provides, in relevant part:

> (a) Vicarious Liability – A hospital may be held vicariously liable for the acts of another health care provider through principles of ostensible agency only if the evidence shows that:
>
> (1) a reasonably prudent person in the patient's position would be justified in believing that the care in question was being rendered by the hospital or its agents; or
>
> (2) the care in question was advertised or otherwise represented to the patient as care being rendered by the hospital or its agents.

40 P.S. § 1303.516(a).  The Pennsylvania Supreme Court has recognized that the statute is "substantially the same as the requirement for establishing ostensible agency under Section

---

[100] No party objected to the jury instructions in this respect.

429 of the Restatement (Second) of Torts." *Green*, 633 Pa. at 38 (citing 40 P.S. §

1303.516(a)). Applying the standards as set forth in either 40 P.S. § 1303.516(a)(1) or (2),

there was sufficient evidence from which the jury could find PrimeCare liable and the weight

of the evidence supports the jury's verdict.

First, there was sufficient evidence from which the jury reasonably could conclude that a

reasonably prudent person in Mr. Barbaros' position would be justified in believing that Mr.

Buffton's mental health services were being provided by PrimeCare or its agents. *See*

*Capan*, 287 Pa. Super. at 370 (jury could reasonably conclude that hospital was liable for

negligence of independent contractor where plaintiff "entered the hospital through the

emergency room," was treated by an independent contractor "in his capacity as house

physician, not as [plaintiff's] personal physician [and t]hus, the jury could have concluded

that [plaintiff] relied upon the hospital rather than [the independent contractor] himself for

treatment"). Several forms in PrimeCare's intake packet inform detainees that "PrimeCare

Medical, Inc. provides the medical care for this facility." Sept. 7, 2016 Trial Tr. at

32:20:33:18. Mr. Barbaros was not only provided with these forms, but signed them,

acknowledging that he understood that medical services were available and being provided

by PrimeCare. *Id.* at 69:2-10. As in *Capan*, a reasonable jury could have concluded that

Mr. Barbaros "looked to" and relied on PrimeCare, rather than Mr. Buffton, to provide treatment.[101]

Second, a jury could reasonably conclude that PrimeCare advertised or represented the care being provided by Mr. Buffton as its own. In addition to the language contained on the intake forms informing Mr. Barbaros that all of the medical care at the MCCF was provided by PrimeCare, Todd Haskins, PrimeCare's Vice President of Operations, acknowledged that PrimeCare's current website, which would been the same or similar as in 2009, represents that PrimeCare's "Psychiatrists, Psychologists, and mental health professionals specialize in acute psychiatric inpatient care, crisis management, and suicide prevention programs in collaboration with local justice systems." Sept. 8, 2016 Trial Tr. at 94:13-96:20. This evidence was sufficient to impose liability under § 1303.516(a)(2). *See Capan*, 287 Pa. Super. at 370) ("Additionally, the jury could have found that [principal] held out [independent contractor] as its employee by providing his services for dealing with emergencies within the hospital," and the hospital "does not contend that it informed [plaintiff] of Dr. Pollice's independent contractor status nor does it cite any reason why [plaintiff] should have been on notice of that status."); *see also Parker*, 803 A.2d at 749 (reasonable person in plaintiff's position who was not informed by principal of provider's independent contractor status could

---

[101] "[I]t would be absurd to require" Mr. Barbaros, a pretrial detainee at the MCCF whose access to medical and mental health treatment was exclusively controlled by PrimeCare, "to inquire of each person who treated him whether he is an employee of" PrimeCare or an independent contractor. *Capan*, 287 Pa. Super at 368; *accord Parker v. Freilich*, 803 A.2d 738, 748, 2002 PA Super 188 (Pa. Super. 2002) (recognizing that "it would be absurd to require such a patient to be familiar with the law of *respondeat superior* and so to inquire of each person who treated him whether he is an employee . . . or an independent contractor") (internal citation and quotation marks omitted).

reasonably believe independent contractor was an employee).  The weight of the evidence no doubt strongly supports PrimeCare's liability for Mr. Buffton's negligence.

The same holds true with respect to PrimeCare's liability for the negligence of Dr. Thomas.  Dr. Thomas was an independent contractor who PrimeCare contracted with to provide psychiatric services to inmates at the MCCF.  Although the Court has yet to address whether the weight of the evidence supported the jury's negligence verdict against Dr. Thomas, as discussed *infra*, there was ample evidence that Dr. Thomas' acts and omissions breached the duty of care, increased the risk of harm to Mr. Barbaros, and contributed to his suicide.  PrimeCare may therefore be held liable for Dr. Thomas' acts and omissions if: (1) a reasonably prudent person in Mr. Barbaros' position would be justified in believing that the care in question was provided by PrimeCare or its agents; or (2) the care in question was advertised or otherwise represented to the patient as being provided by PrimeCare.

Although Mr. Barbaros did not have any personal interactions with Dr. Thomas, the jury could reasonably conclude that a reasonably prudent person in Mr. Barbaros' position would be justified in believing that his prescription medications were being provided by PrimeCare and/or its agents.  *See Thomson v. Nason Hosp.*, 370 Pa. Super. 115, 119, 535 A.2d 1177 (1988) (reversing trial court's failure to instruct jury in accordance with Restatement (Second) of Torts § 429 which "provided an exception to the general rule that an employer is not liable for torts committed by an independent contractor in his employ"), *aff'd* 527 Pa.

330, 591 A.2d 703 (1991).  In *Thompson*, the Superior Court concluded that the trial court erred in removing the question of ostensible agency from the jury's consideration where, among other things: (1) the independent contractor treated the patient in the hospital emergency room and subsequently arranged for her admission; and (2) "arranged for diagnostic tests and consultations during her hospitalization."  *Id.* at 120.  The only way Mr. Barbaros could obtain his medications was through acts of PrimeCare employees.  When Mr. Barbaros' medications were first identified at intake, and then again when he complained to the Judge about not receiving his medications, he "sought attention from" PrimeCare and "not directly from" Dr. Thomas.  *Id.*  His actions therefore "raised an inference that" he "looked to the institution for" care, and not to Dr. Thomas.  *Id.*  A reasonable jury could therefore conclude that a reasonably prudent person in Mr. Barbaros' position would be justified in believing that his prescription medications and related "care" were provided by PrimeCare or its agents.

There was also evidence from which the jury could reasonably conclude that PrimeCare held Dr. Thomas out as its employee.  In addition to language contained on PrimeCare's intake forms discussed above, PrimeCare's website represents that *its* medical, dental, and psychiatric professionals are well trained and "oversee all aspects of our correctional health care contract."  Sept. 8, 2016 Trial Tr. at 94:13-96:20.

Having considered and weighed the evidence, it is clear that the jury's negligence verdict was well-supported.  It does not shock the Court's conscience and would certainly

not constitute a miscarriage of justice for PrimeCare to be held vicariously liable for the acts and omissions of the individual PrimeCare Defendants, William Buffton and/or Dr. Thomas.

### iii. Corporate Negligence

Finally, the Court considers whether the weight of the evidence supported the jury's verdict finding PrimeCare directly liable for its own corporate negligence.[102] "Corporate negligence is a doctrine under which the [healthcare provider] is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being." *Thompson v. Nason Hosp.*, 527 Pa. 330, 339, 591 A.2d 703 (1991). "A cause of action under corporate liability is based on the breach of non-delegable duties" that a healthcare provider "owes directly to its patients, and is independent of the negligence of the [healthcare provider's] employees or ostensible agents." *Moser v. Heistand*, 545 Pa. 554, 560, 681 A.2d 1322 (1996). The Pennsylvania Supreme Court has held that healthcare providers owe non-delegable duties directly to the patient that include: "(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment; (2) a duty to select and retain only competent physicians; (3) a duty to oversee all persons who practice medicine within its walls as to patient care; and (4) a duty to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients." *Thompson*, 527 Pa. at 339-40 (internal citation and quotation marks omitted).

---

[102] "To state the obvious, merely because an entity can be held vicariously liable for the negligence of its employees does not obviate its liability for corporate negligence based upon its failure to formulate, adopt, and enforce adequate rules and policies to ensure quality care for patients." *Scampone*, 11 A.3d at 977.

In order for the evidence to support the jury's corporate negligence verdict, Plaintiffs must have presented sufficient evidence to show PrimeCare: (1) "acted in deviation from the standard of care"; (2) "had actual or constructive notice of the defects or procedures which created the harm"; and (3) "that the conduct was a substantial factor in bringing about the harm." *Brodowski v. Ryave*, 885 A.2d 1045, 1057, 2005 PA Super 354 (Pa. Super. 2005) (internal citation and quotation marks omitted). Unless PrimeCare's "negligence is obvious, a plaintiff must produce expert testimony to establish that [PrimeCare] deviated from an accepted standard of care and that the deviation was a substantial factor in causing the harm to the plaintiff." *Welsh v. Burger*, 548 Pa. 504, 514, 698 A.2d 581 (1997). Pennsylvania law does not "require experts to use magic words when expressing their opinions." *Id.* Instead, the substance of the expert's testimony must be considered as a whole.

Considering the first of the three elements necessary to support the jury's corporate negligence verdict, the Court first finds there was sufficient credible testimony that PrimeCare breached its duties under *Thompson* to: (1) oversee all persons who practice within its walls as to patient care; and (2) enforce adequate rules and policies to ensure quality care for patients.[103] Nurse Wild's testimony in particular was sufficient for the jury to

---

[103] The Pennsylvania Supreme Court has never considered whether a prison healthcare provider like PrimeCare can be liable for corporate negligence. This Court predicts that the Pennsylvania Supreme Court would impose such a duty on PrimeCare. The Court finds persuasive Judge Rambo's opinion in *Finney v. Palakovich*, Civ. No. 4:09-1751, 2010 WL 2902731 (M.D. Pa. July 23, 2010). In *Finney*, MHM Correctional Services, a prison healthcare provider like PrimeCare, claimed it could not be liable for corporate negligence because it owed no duty to the decedent. Judge Rambo rejected that argument, noting "there is no difference between the services provided by a hospital and the services provided by health care institutions in prisons, except that the prisoner cannot choose which institution provides the

conclude that PrimeCare breached its duty to oversee its medical staff and failed to enforce its rules and policies to ensure quality care for patients. Nurse Wild testified, to a reasonable degree of nursing certainty, that PrimeCare breached its duty of care. She pointed to, among other things, Nurse Rowe's testimony that it was "very common" to assess patients without the benefit of their medical chart and highlighted the nursing staff's failure to follow through on medical orders, including failing to take Mr. Barbaros' blood pressure and provide him with Trazodone on the evening before he committed suicide. Dr. Breggin provided additional supporting testimony. This testimony provided a reasonable basis for the jury to conclude that PrimeCare breached its duties to oversee its medical staff and to enforce its rules and policies to ensure patient care. *See Brodowski*, 885 A.2d at

---

services. As such, to conclude that the same duty of care is not owed to a prisoner as would be owed to any other patient is illogical." *Id.* at *6 (citations omitted). The Court agrees and, consistent with other federal district courts in this Circuit, predicts that the Pennsylvania Supreme Court would recognize a cause of action in corporate negligence against a prison healthcare provider like PrimeCare. *See, e.g., Boynes v. Cnty. of Lawrence*, Civil Action No. 15-139, 2015 WL 8992556, at *7 (W.D. Pa. Dec. 16, 2015) (rejecting PrimeCare's argument that it cannot be liable for corporate negligence); *Davis v. Corizon Health, Inc.,* Civil Action No. 14-1490, 2015 WL 518263, at *4 (E.D. Pa. Feb. 9, 2015) ("A corporation, like Corizon, which provides the exclusive and comprehensive medical services to prison inmates may be held liable under a theory of corporate negligence.") (citations omitted); *Fox v. Horn*, No. Civ. A 98-5279, 2000 WL 49374, at *8 (E.D. Pa. Jan. 21, 2000) (rejecting prison healthcare provider's argument that it could not be liable for corporate negligence and noting that prisoner "had no meaningful choice in his health care" and that the "control over" prisoner's healthcare warrants imposition of a duty). In addition, consideration of: (1) the relationship between a prisoner and the prison healthcare provider; (2) the social utility of the prison healthcare provider's conduct; (3) the nature of the risk imposed and foreseeability of the harm; (4) the consequences of imposing a duty upon the prisoner healthcare provider; and (5) the public interest, all lead the Court to predict that the Pennsylvania Supreme Court would extend the doctrine of corporate negligence to prison healthcare providers like PrimeCare. *Sokolsky v. Eidelman*, 93 A.3d 858, 870 (Pa. Super. 2014) (citing *Althaus v. Cohen*, 562 Pa. 547, 548 (2000)). In any event, PrimeCare did not object to the corporate negligence jury instruction and did not claim it owed no duty to Mr. Barbaros.

1059 (expert testimony detailing "chain of missteps" in care of patient is sufficient to establish breach).

Not only did the testimony support a finding of breach, but expert testimony may not have even been required for that finding. "Expert testimony is not required where the matter under investigation is so simple, and the lack of skill or want of care is so obvious, as to be within the range of ordinary experience and comprehension of even nonprofessional persons." *Welsh*, 548 Pa. at 514 n.11 (internal citation and quotation marks omitted). For example, PrimeCare's failure to oversee the medical staff and enforce adequate rules and policies was in many ways obvious. *See Cangemi v. Cone*, 774 A.2d 1262, 1266, 2001 PA Super 119 (Pa. Super. 2001) (holding expert testimony was not required to prove breach of duty to formulate and adopt policies where medical staff failed to deliver/communicate patient's x-rays and radiologists reports "because the issue is simple and the want of care is so obvious"). Here, medical orders to provide anti-anxiety medications and blood pressure readings, among others, were not complied with. These can be considered obvious breaches of the standard of care, wherein expert testimony would not be necessary in order for a jury to find PrimeCare negligent.

Second, there was sufficient evidence from which the jury could conclude that PrimeCare had actual or constructive knowledge of the breach. A reasonable jury could conclude that PrimeCare had actual knowledge of the breach based on Wendy Johnson's involvement in Mr. Barbaros' care. PrimeCare charged Wendy Johnson with the

supervision and training of the nursing staff, as well as quality control.  Wendy Johnson

testified that she reviewed Mr. Barbaros' chart and realized he had been without his

medications for days and also that he had significantly elevated vital signs.  She, however,

did nothing to pass this information along to the staff or a medical provider.

At a minimum, PrimeCare can rightly be charged with constructive notice.  As the

Pennsylvania Supreme Court has recognized:

> It is well established that a hospital staff member or employee has a duty to
> recognize and report abnormalities in the treatment and condition of its
> patients.  If the attending physician fails to act after being informed of such
> abnormalities, it is then incumbent upon the hospital staff member or
> employee to so advise the hospital authorities so that appropriate action
> might be taken.  When there is a failure to report changes in a patient's
> condition and/or to question a physician's order which is not in accord with
> standard medical practice and the patient is injured as a result, the hospital
> will be liable for such negligence.

*Thompson*, 527 Pa. at 342 (internal citation and quotation marks omitted).  A healthcare

provider "is properly charged with constructive notice when it should have known of the

patient's condition."  *Rauch v. Mike-Mayer*, 783 A.2d 815, 828, 2001 PA Super 270 (Pa.

Super. 2001) (internal citation and quotation marks omitted); *see also Brodowski*, 885 A.2d

at 1057 (holding that healthcare provider "will be charged with constructive notice when its

nurses should have known about a patient's adverse condition, but failed to act.").

"Furthermore, constructive notice must be imposed when the failure to receive actual notice

is caused by the absence of supervision."  *Rauch*, 783 A.2d at 828.  A healthcare provider's

"systematic negligence" also serves as a proper basis for finding constructive notice.

*Whittington v. Episcopal Hosp.*, 768 A.2d 1144, 1154 (Pa. Super. 2001). Despite PrimeCare's conclusory assertions to the contrary, which lack any citation to the record or to case law, the evidence presented at trial was sufficient for a reasonable jury to find that PrimeCare had actual or constructive notice of a defect in its procedures which created the risk of harm.

Finally, the evidence presented to the jury was sufficient to conclude that PrimeCare's acts and omissions were a substantial factor in causing the harm to Mr. Barbaros.[104] Nurse Wild and Dr. Breggin both testified that PrimeCare's acts and omissions increased the risk of harm to Mr. Barbaros and contributed to his suicide. This testimony was sufficient to permit a jury to find PrimeCare's acts and omissions were a substantial factor in Mr. Barbaros' death. *See Sutherland v. Monogahela Valley Hosp.*, 856 A.2d 55, 60, 2004 PA Super 245 (Pa. Super. 2004) ("In order for the Plaintiff to place before the jury the question of whether that increased risk was a substantial factor in producing the plaintiff's injury, a plaintiff must only introduce evidence that a defendant's negligent act or omission increased the risk of harm and that the harm was in fact sustained.") (citing *Hamil*, 392 A.2d at 1286); *see also Thompson*, 527 Pa. at 340 (citing to Restatement (Second) of Torts § 323 as basis for imposing corporate negligence liability); *Rauch*, 783 A.2d at 828 (expert report alleging hospital's conduct exposed plaintiff "to increased risk of harm and that the patient's risk

---

[104] The jury found that PrimeCare's acts and omissions were a substantial factor in bringing about the harm to Mr. Barbaros, as evidenced by their conclusion that 55% of the total causal negligence was attributable to PrimeCare itself.

would have been reduced to a significant degree" had the hospital acted differently was sufficient for jury to find hospital's breach was substantial factor in causing harm).

In sum, after reviewing the record the Court concludes that the weight of the evidence supports the jury's verdict finding PrimeCare liable for negligence – both vicariously and directly.[105] The jury's verdict does not shock the Court's conscience and no substantial injustice would result by upholding the jury's verdict. For these reasons, the PrimeCare Defendants' motion for a new trial will be denied in its entirety.

## B.    Dr. Alex Thomas

In his motion for a new trial, Dr. Thomas claims he is entitled to a new trial because: (1) there were erroneous evidentiary rulings; (2) there were errors in the jury instructions; and

---

[105] Although PrimeCare presented testimony that it did not breach its duty of care or cause harm to Mr. Barbaros, a reasonable jury could disagree with their experts' conclusions and agree with the Plaintiffs. There were significant credibility issues with PrimeCare's experts which the jury could have taken into consideration when weighing the evidence. Nurse Fillman had previously been retained as an expert on behalf of PrimeCare and his trial testimony varied significantly from his deposition testimony. Sept. 12, 2016 Trial Tr. at 227:7-237:13. Dr. Mendel, the PrimeCare Defendants' expert in correctional medicine, had previously testified for PrimeCare "probably" more than 10 times, "possibly more" than 20 times, and "probably not" more than 30. Sept. 13, 2016 Trial Tr. at 35:25-40:25. His testimony at trial was also not consistent with his testimony at his deposition. *Id.* at 105:12-107:19. Similarly, the jury was free to disbelieve the testimony of Dr. Guzzardi, the PrimeCare Defendants' toxicology expert, who testified that it was impossible based on Mr. Barbaros' blood levels that he was going through withdrawal because he had Paxil in his system unrelated to the 30 mg dose. He testified that in the past three years he had been retained by attorneys at PrimeCare's counsel's firm on behalf of PrimeCare on numerous occasions. He also acknowledged that in every case he never said he was unable to help or provide an opinion. *Id.* at 233:9-234:8. The jury was also apprised of significant errors in Dr. Guzzardi's expert report regarding the most basic of factual circumstances of this case, as well as Dr. Thomas' expert, Dr. Susan Rushing's, disagreement with his opinions and conclusions. *Id.* at 251:1-255:18. Dr. Guzzardi's report stated that Mr. Barbaros saw a medical provider on March 19, 2009, at 2 p.m. and that Mr. Barbaros also received a "psychiatric evaluation" the following day. Neither of those things happened. *Id.* The jury could also discount the testimony of Dr. Cheryl Wills who, although amply qualified and credible, has been retained as an expert approximately five times by counsel for the PrimeCare Defendants on behalf of PrimeCare. *Id.* at 13:1-19.

(3) the jury's verdict was against the weight of the evidence.  The Court has already addressed most of these issues, *supra,* in connection with the PrimeCare Defendants' motion for a new trial.  With respect to those issues not addressed, the Court considers them below.

## 1.    Permitting Dr. Breggin to Testify

Dr. Thomas states in his motion that the Court erred in permitting Dr. Breggin to testify in violation of Pennsylvania's MCARE Act.  According to a single sentence in Dr. Thomas' motion, he is entitled to a new trial because "the Court prejudicially erred and abused its discretion in permitting Plaintiffs' liability expert, Dr. Peter Breggin, to testify as to the standard of care when he was not board certified and otherwise failed to meet the requirements of Section 512 of the MCARE Act, 40 P.S. § 1303.512, regarding the admission of expert testimony."  (Doc. 354, at ¶ 354(k)).  Consistent with the Defendants' carelessness and failure to brief numerous post-trial issues raised in their motions, Dr. Thomas does not mention, or set forth any arguments on, this issue in his supporting brief. Under the circumstances, the Court considers this argument abandoned.  Nevertheless, the Court will briefly address the merits of his claimed error.

Before trial, Dr. Thomas and the PrimeCare Defendants filed a joint motion asking the Court to "Preclude Testimony of Plaintiffs 'Rebuttal' Expert, Dr. Peter Breggin."  (Doc. 262). The motion asked the Court to preclude Dr. Breggin from testifying pursuant to Federal Rule of Evidence 403 on the theory that Plaintiffs intended to call both Dr. Breggin and Dr. Erik

Roskes as experts in psychiatry and therefore Dr. Breggin's testimony would be unnecessarily cumulative. The motion made no reference to Dr. Breggin's alleged incompetency to testify under MCARE. The Court denied Defendants' motion "without prejudice to the extent that Defendants may raise objections to Dr. Breggin's testimony at trial on the basis that it is unnecessarily cumulative in light of the testimony of Dr. Roskes." (Doc. 296).

At trial, Dr. Roskes did not testify. Dr. Breggin, however, was called as Plaintiffs' psychiatry expert. After Dr. Breggin testified regarding his qualifications, Dr. Thomas, joined by the PrimeCare Defendants, moved to disqualify Dr. Breggin. Defendants moved to disqualify Dr. Breggin on the theory that, because Dr. Thomas is Board certified in psychiatry, and Dr. Breggin is not, section 1303.512(c) of Pennsylvania's MCARE Act prohibited him from testifying as to the standard of care. Sept. 9, 2016 at 222:7-19. Neither Dr. Thomas nor the PrimeCare Defendants objected to Dr. Breggin's competency to testify as to causation, nor sought his disqualification on this basis.[106]

The Court denied the motion. The Court stated:

> It is true, as Mr. Hill has pointed out, that there is a requirement that in 512, that the physician who is about to testify be Board certified, if the Defendant/Physician is himself or herself Board certified.
>
> But it is equally true that, in subsection (e) of this statute, which is, specifically 40 Purdon's Statute 1303.512, it is equally true that subsection (e) does provide, quote 'A Court may waive the same specialty or Board certification

---

[106] *See Lesende*, 752 F.3d at 335-36 (finding waiver where, although defendant "raised some concerns" about an issue, its "objection was not clear and cogent . . . was not sufficiently specific . . . and failed to state the grounds upon which it rested").

requirement for an expert testifying as to the standard of care, if the Court determines that the expert possess sufficient training, experience and knowledge to provide testimony as a result of active involvement in or full-time teaching of medicine in the applicable subspecialty or related field of medicine within the previous five-year period.

Dr. Breggin gave us a detailed history of his professional and educational experience, beginning with his Harvard education, his Case Western medical degree, continuing with his Internship at Upstate Medical Center, his Residency at Harvard, and, again, his Residency at Upstate Medical. He has been in private practice from 1968 to November of 2002, he was in private practice as a psychiatrist in Maryland, thereafter, from that date until November 2002—pardon me—he moved from Maryland in November 2002, and thereafter, he has been in private practice in Ithaca, New York.

He has outlined the conferences in which he has talked about how to evaluate patients, how to make proper diagnoses, how to evaluate psychiatric drugs. While these are not medical schools, as far as I can recall his testimony, he did teach at University of Maryland and SUNY Oswego, but, again, they were not medical schools.

It looks like, as we continue on, he has published 20 to 25 books in psychiatry, at least three of which dealt exclusively with Paxil, while others, according to his testimony, had sections devoted to Paxil and anti-depressant drugs, in general. He continues to maintain the practice, as we speak today. He has been writing books since 1992 with respect to both Prozac and Paxil.

He detailed—he gave, in some detail, his writings. In particular—and he has indicated he testified in front of Congress, with respect to the use by the military of anti-depressant drugs and the effects of that on members of the military and incidents related thereto. He specifically testified that he has treated patients with Paxil, that he has published books on Paxil, as I said a moment ago, and he testified, without contradiction, that he's still seeing patients clinically, while he's reduced his hours, he sees patients between 12 and 20 hours a week, some on a weekly basis, others as needed, and he continues to do research in the field of psychiatry and has prescribed Paxil, in connection with his practice, and he's explained it.

He's been disqualified in 6 out of 85 cases, but gentleman, I don't think that you've given me enough to say that he's not competent to offer an opinion,

either under the MCARE Act or under Section 701 of the Rules of Evidence. It clearly seems to me that he is qualified, by both experience, knowledge, skill and experience to offer an opinion that will help the trier of fact in this case. So I understand your objection, but it's overruled.

*Id.* at 223:10-225:19.

"In 2002, Pennsylvania passed the Medical Care Availability and Reduction of Error Act, commonly known as MCARE. The statute created a Patient Safety Authority, mandated the keeping of records with respect to medical errors, and established both the substantive standards and procedures for the resolution of medical negligence claims." *Estate of Goldberg v. Nimoityn*, 193 F. Supp. 3d 482, 487 (E.D. Pa. 2016). "In plain terms, section 512 of MCARE is a rule of witness competency rather than a rule of expert qualifications."[107] *Miville v. Abington Memorial Hosp.*, 377 F. Supp. 2d 488, 493 (E.D. Pa. 2005) (citations omitted). *Id.* Where, as here, Pennsylvania law supplies the rule of decision, a physician expert witness testifying in federal court regarding the standard of care in a medical negligence action must: (1) be substantially familiar with the standard of care for the specific care at issue at the time of the alleged breach; (2) practice in the same subspecialty as the defendant physician (or in a subspecialty which has a substantially similar standard of care for the specific care at issue); and (3) if the defendant physician is Board certified, the testifying expert must also be Board certified in the same or similar field. 40 P.S. § 1303.512(c)(1)-(3). Each of the three requirements set forth in section 512(c) are

---

[107] The statute applies in the instant action pursuant to Federal Rule of Evidence 601. *See* Fed. R. Evid. 601 ("Every person is competent to be a witness unless these rules provide otherwise. But in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision.").

"mandatory." *Anderson v. McAfoos*, 618 Pa. 478, 490, 57 A.3d 1141 (2012) (citations omitted).

Dr. Breggin testified he was familiar with the standard of care applicable in the field of psychiatry sufficient to satisfy § 1303.512(c)(1)'s requirements. Indeed, Dr. Thomas did not seek to disqualify him on the theory he was not substantially familiar with the applicable standard of care for the specific care at issue – prescribing psychiatric medications. Dr. Breggin also satisfied the requirement under § 1303.512(c)(2) as both he and Dr. Thomas are psychiatrists. However, because Dr. Thomas is Board certified, and Dr. Breggin is not, § 1303.512(c)(3)'s requirements were not satisfied. Thus, the only means by which Dr. Breggin could competently testify against Dr. Thomas regarding the standard of care is through the application of subsection (e) of the statute. *See Miville*, 377 F. Supp. 2d at 494 ("Thus, section 512(c)(3)'s same board-certification requirement can only be waived under section 512(e) . . .").

The MCARE statute "creates a safe harbor in subparagraph (e)" and permits "qualified experts to testify even in the absence of board certification in the defendant's specialty if the court is satisfied that the expert 'possesses sufficient training, experience and knowledge' as a result of activity in teaching or the practice of medicine in a related field." *Estate of Goldberg*, 193 F. Supp. 3d at 489. Specifically, the statute permits a Court to waive section 512(c)(3)'s Board certification requirement if the Court "determines that the expert possesses sufficient training, experience and knowledge to provide testimony as a result of

active involvement in or full-time teaching of medicine in the applicable subspecialty or a related field of medicine within the previous five-years." 40 P.S. § 1303.512(e). Thus, through application of subsection (e), a testifying expert need not be Board certified in any field of medicine, consistent with the Pennsylvania legislature's "clear[] inten[t] to avoid disqualification of experts over technical defects in credentials that do not bear upon a physician's actual expertise." *Estate of Goldberg*, 193 F. Supp. 3d at 490-91.

After counsel for the Defendants raised their objections, the Court concluded that although Dr. Breggin is not Board certified, he possessed "sufficient training, experience and knowledge to provide testimony as a result of active involvement in . . . the applicable subspecialty . . . within the previous five years" and thus waived the requirements of Section 1303.512(c). *Id.* The Court's ruling permitting Dr. Breggin to testify about the standard of care was not erroneous. It is undisputed that Dr. Breggin and Dr. Thomas are both psychiatrists. Furthermore, there can be no serious dispute that Dr. Breggin is substantially familiar with the applicable standard of care in psychiatry and possesses sufficient training, experience, and knowledge to provide competent testimony.[108] Nor can it be disputed that he has been actively involved in the practice of psychiatry within the past five years. Dr. Breggin maintains a private psychiatry practice where he treats patients and prescribes medications and he also continues to research and write books and articles on topics that

---

[108] The fact that Dr. Breggin has not practiced psychiatry in a correctional did not affect his competency to testify at trial, nor do Defendants argue otherwise. *See Estate of Goldberg*, 193 F. Supp. 3d at 491 ("The extent of his expertise in a hospital setting will certainly be an appropriate focus of cross-examination, but he possesses the qualifications to render the opinions set forth in his report.").

were germane to issues in this litigation.  Defendants do not and did not argue otherwise, instead only objecting to his ability to testify as to the standard of care because he lacked Board certification.[109]   Accordingly, the Court's conclusion that Dr. Breggin was competent to testify pursuant to 40 P.S. § 1303.512(e) was not in error.  Furthermore, Defendants make no attempt to show how they were prejudiced by the Court exercising its discretion to waive the board certification requirement in this case.

## 2.    Failure to Include Agency Question on Verdict Sheet

Dr. Thomas' motion also seeks a new trial as a result of the Court's failure to include a question on the verdict sheet addressing whether Dr. Thomas was an agent of PrimeCare. However, Dr. Thomas does not address this issue in his supporting brief.  Dr. Thomas has thus abandoned this claim of error by failing to present any argument in support of his claim. Nevertheless, the Court will briefly address this alleged error.

Dr. Thomas makes no claim that the jury instruction misstated the law applicable to determining whether he was an agent of PrimeCare.  Nor could Dr. Thomas make such an argument, as the jury was appropriately instructed in accordance with Pennsylvania's standard jury instructions regarding a healthcare provider's liability for the negligence of its independent contractors.  He nevertheless takes issue with the verdict sheet, which did not contain a specific question requiring the jury to answer whether Dr. Thomas was an agent of PrimeCare.  Dr. Thomas' argument lacks merit.

---

[109] Nether Dr. Thomas nor the PrimeCare Defendants moved, either before or during trial, to exclude Dr. Breggin's testimony on the theory that he was not qualified or his opinions were not reliable in accordance with Federal Rule of Evidence 702.

As discussed, due to the parties' failure to submit a proposed verdict sheet as set forth in the Court's pretrial order, the Court prepared a proposed verdict sheet for the parties' consideration. After reviewing the verdict sheet, the parties sought changes and *jointly* prepared a revised verdict sheet. The parties' jointly proposed verdict sheet did not contain a question requiring the jury to explicitly find whether Dr. Thomas was an agent of PrimeCare. There was no objection to the verdict sheet on this basis.[110] *Franklin Prescriptions*, 424 F.3d at 340 (party's "failure to object to either the court's instruction or the verdict sheet constitutes a failure to preserve its . . . objection") (citing Fed. R. Civ. P. 51(c)(1)). Although the verdict sheet was not erroneous, even if it was, Dr. Thomas cannot now claim he is entitled to a new trial where he invited the very error of which he now complains. *See Lima*, 658 F.3d at 333 n.2 ("The doctrine of invited error refers to an error that a party cannot complain of . . . because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling."). Under these circumstances, Dr. Thomas is not entitled to a new trial on this basis.

---

[110] Even if the Court were to apply Federal Rule of Civil Procedure 51(d)'s plain error standard, Dr. Thomas fares no better. Plain error is an error which is "fundamental and highly prejudicial." *Alexander*, 208 F.3d at 426-27. For example, Courts have found plain error where the "instructions are such that the jury is without adequate guidance on a fundamental question" and the "failure to consider the error would result in a miscarriage of justice." *Id.* The verdict sheet and instructions did not leave the jury "without guidance on a fundamental question." *Id.* Rather, the jury was instructed that Dr. Thomas was an independent contractor, not an agent of PrimeCare. The jury was also instructed using Pennsylvania's standard jury instructions regarding the liability of a healthcare provider for the negligent acts of its independent contractors that accurately stated Pennsylvania law, and to which no party objected. Under the circumstances, the verdict sheet's failure to contain a question on whether Dr. Thomas was an agent of PrimeCare was not error, let alone plain error resulting in a miscarriage of justice.

### 3.   Weight of the Evidence

Dr. Thomas also seeks a new trial on the theory that the jury's negligence verdict was against the weight of the evidence.  The entirety of Dr. Thomas' argument in support of this claim is as follows:

> The jury's verdict was against the weight of the evidence as articulated in Section A of this Brief.  The arguments asserted in Section A are incorporated by reference.  Therefore, if this Court does not enter Judgment as a Matter of Law, the Court should order a new trial, because the jury's verdict was against the weight of the evidence.

(Doc. 391, at 45).  The arguments asserted in Section A only address why Dr. Thomas is entitled to judgment as a matter of law on Plaintiffs' deliberate indifference claim.  The Court has already found that Dr. Thomas is entitled to judgment as a matter of law on Plaintiffs' deliberate indifference claim.

Dr. Thomas neither claims nor advances any arguments that the jury's negligence verdict was against the weight of the evidence.  He has neither briefed this issue, nor raised a sufficiently specific Rule 50(a) motion attacking the sufficiency of the evidence before the case was submitted to the jury.  He has thus both waived and abandoned any argument that the weight of the evidence did not support the jury's negligence verdict.  Nevertheless, for the sole purpose of developing a full and complete record, the Court will briefly address why it is apparent that not only was the evidence sufficient to find Dr. Thomas liable in negligence, but that the weight of the evidence also supports this conclusion.

"Unlike a sufficiency of the evidence claim, when a court evaluates a challenge to the weight of the evidence it does not view the evidence in the light most favorable to the verdict winner, but instead exercises its own judgment in assessing the evidence." *Marra*, 497 F.3d at 309 n.18 (citations omitted). "[N]ew trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson*, 926 F.2d at 1353. The party seeking a new trial must meet a high threshold in order to obtain this "extraordinary relief." *Marra*, 497 F.3d at 409 n.18.

The Court's review of the record reveals that there was ample evidence supporting the verdict finding Dr. Thomas liable in negligence and the weight of the evidence does not suggest otherwise. Dr. Breggin's testimony, among others, provided a basis for the jury to conclude that Dr. Thomas' acts and omissions breached the duty of care. He testified that prescribing a patient psychiatric medication without knowing any information about the patient, including when the patient last took the medication or whether the patient was exhibiting symptoms of withdrawal, among other things, "was not anywhere near the standard of care," referring to such conduct as "not even practicing medicine." Sept. 9, 2016 Trial Tr. at 228:9-277:13. Dr. Thomas himself conceded this much at trial, repeatedly acknowledging that he should have acted differently and that he usually asks for this type of information prior to prescribing medications. Additional testimony also supported the jury's conclusion that prescribing a patient psychiatric medications without knowing how long the

patient had been on or off the medication, among other things, did not comport with the applicable standard of care. Moreover, a portion of the deposition of the PrimeCare Defendants' correctional medicine expert, Dr. Mendel, was read at trial wherein he testified that the responsibilities of a doctor conducting an examination and prescribing medication over the telephone are no different from those of a doctor actually sitting in the room with the patient. *Id.* at 60:15-63:13.

Dr. Breggin's testimony also provided a sufficient basis for the jury to conclude that Dr. Thomas' breach increased the risk of harm to Mr. Barbaros and was a factual cause of his suicide. He opined that, had Dr. Thomas not breached his duty of care by prescribing psychiatric medications to a patient without knowing any information about the patient, he could have prevented Mr. Barbaros from committing suicide by either starting Mr. Barbaros on a lower dosage of Paxil or by ordering him to be monitored. *Id.* at 233:21-277:19. Although Dr. Thomas presented testimony from Dr. Rushing that he did not breach the duty of care or cause Mr. Barbaros' suicide, Sept. 13, 2016 Trial Tr. at 151:19-162:21, the jury was free to disbelieve her testimony and credit the testimony of Dr. Breggin.

The Court's review of the record does not demonstrate that the jury's verdict was so against the weight of the evidence that the jury's negligence verdict against Dr. Thomas resulted in a miscarriage of justice. Nor is the verdict shocking to the Court's conscience. Accordingly, the jury's verdict was not against the weight of the evidence and Dr. Thomas has failed to meet the "high threshold" warranting a new trial.

## VI.  MOTION FOR A NEW TRIAL ON DAMAGES/REMITTITUR

Both the PrimeCare Defendants and Defendant Dr. Thomas also seek a new trial on damages only or, in the alternative, remittitur.  "The grant of a partial new trial is appropriate only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue."  *Elcock v. Kmart Corp.*, 233 F.3d 734, 758 (3d Cir. 2000) (internal citation and quotation marks omitted).  "[A] District Court in reviewing a jury verdict has an obligation . . . to uphold the jury's award if there exists a reasonable basis to do so."  *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 351 (3d Cir. 2001) (internal citation and quotation marks omitted).  Courts must be "deferential to a jury's damages verdict" which "may be disturbed only if it is so grossly excessive that it shocks the judicial conscience . . . or if it is unconstitutionally excessive because it was predicated on an impermissible basis."  *Leonard*, 834 F.3d at 391-92.

"Under Rule 59(e), a party may seek alteration or amendment of the verdict."  *Borrell v. Bloomsburg Univ.*, 207 F. Supp. 3d 454, 471 (M.D. Pa. 2016).  "The rationalization for, and use of, the remittitur is well established as a device employed when the trial judge finds that a decision of the jury is clearly unsupported and/or excessive."  *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1202 (3d Cir. 1986) (citations omitted).  "The use of remittitur is committed to the sound discretion of the district court judge."  *Hall v. Pennsylvania Dept. of Corrs.*, No. 3:CV-02-1255, 2006 WL 2772551, at *20 (M.D. Pa. Sept. 25, 2006) (citing *Evans*, 273 F.3d at 354).  "[W]hen considering and fixing a remittitur, the

court is to 'consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being mindful that the determination of that amount may not be precisely calculated.'"[111] *Borrell*, 207 F. Supp. 3d at 471 (quoting *Evans*, 273 F.3d at 352).

The jury awarded Plaintiffs a total of $2,800,000 in compensatory damages on their negligence claim: $2,000,000 pursuant to Pennsylvania's Wrongful Death Act, and $800,000 under Pennsylvania's Survival statute. Defendants allege that this amount is grossly excessive and unsupported by the evidence.

"In general, the determination of compensatory damages is within the province of the jury and is entitled to great deference." *Spence*, 806 F.2d at 1204 (citations omitted). "It is the province of the jury to assess the worth of the testimony and to accept or reject the estimates given by the witnesses. If the verdict bears a reasonable resemblance to the

---

[111] Although the parties do not direct the Court's attention to this provision, a subsection of Pennsylvania's MCARE Act contains a provision governing remittitur of damages in medical negligence cases. The statute provides, in relevant part:

> (a) **General rule –** In any case in which a defendant health care provider challenges a verdict on grounds of excessiveness, the trial court shall, in deciding a motion for remittitur, consider evidence of the impact, if any, upon availability or access to health care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury.

> (b) **Factors and Evidence –** A trial court denying a motion for remittitur shall specifically set forth the factors and evidence it considered with respect to the impact of the verdict upon availability or access to health care in the community.

> (c) **Abuse of Discretion –** An appellate court reviewing a lower court's denial of remittitur may find an abuse of discretion if evidence of the impact of paying the verdict upon availability and access to health care in the community has not been adequately considered by the lower court.

40 P.S. § 1303.515(a)-(c).

proven damages, it is not the function of the court to substitute its judgment for the jury's." *Kiser v. Schulte*, 538 Pa. 219, 225, 648 A.2d 1 (1994).

The Pennsylvania Supreme Court has held that "[j]udicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant. The question is whether the award of damages falls within the uncertain limits of fair and reasonable compensation or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Haines*, 536 Pa. at 455, *opinion supplemented by Haines v. Raven Arms*, 539 Pa. 401, 652 A.2d 1280 (1995). "[O]ur judicial system is grounded in a basic trust of our juries, and we largely leave the assessment of damages in their hands." *Paves v. Corson*, 569 Pa. 171, 177, 801 A.2d 546 (2002).

"Compensatory damages are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The fact that a Court may find such an award to be "extremely generous" or "would have found the damages to be considerably less" is not sufficient to shock the judicial conscience. *Williams*, 817 F.2d at 1038 (internal citation and quotation marks omitted).

### A. Wrongful Death Damages

Defendants first claim that the jury's $2,000,000 compensatory damages award on Plaintiffs' wrongful death action was grossly excessive and unsupported by the evidence. Specifically, Defendants allege:

[T]he evidence at trial was that Barbaros' business was not producing much income as evidenced on the business tax returns. In addition, Barbaros' children were educated in Bulgaria and as such, spent much of their time away from him since he primarily resided in the United States. Mrs. Barbaros spent anywhere from five to seven months per year in Bulgaria as well. Thus, the amount of time Barbaros would have been able to provide guidance, tutelage, support, etc. for his family was limited. Additionally, the financial support he was providing to his family was also limited as demonstrated by the tax returns. The loss of a spouse and father is certainly tragic. However, the jury's award of $2 million for the loss of a father who spent most of his time away from his wife and children and whose financial support was modest, at best, is grossly excessive.

(Doc. 377, at 52-53). The Court disagrees and concludes that the evidence presented at trial reasonably supports the jury's compensatory damages award. There is no evidence that the verdict is "grossly excessive" and there is no suggestion whatsoever the jury's award was influenced by partiality, prejudice, mistake or corruption.

An action under Pennsylvania's Wrongful Death Act is:

one which is created for and is held by statutorily specified survivors and is intended to compensate them for the pecuniary losses suffered because of the decedent's death. Put another way, the action remedies the loss sustained by the survivors who are deprived of the decedent's earnings, companionship, etc.

*Miller v. Philadelphia Geriatric Ctr.*, 463 F.3d 266, 271 (3d Cir. 2006); *see also Kiser*, 538 Pa. at 226 ("Wrongful death damages are established for the purpose of compensating the spouse, children, or parents of a deceased for pecuniary losses they have sustained as a result of the death of the decedent."). Under the statute, statutorily specified survivors "may recover not only for medical, funeral, and estate administration expenses, but also for the value of [decedent's] services, including society and comfort." *Rettger v. UPMC Shadyside*,

991 A.2d 915, 932, 2010 PA Super 41 (Pa. Super. 2010); *accord Spangler v. Helm's New York-Pittsburgh Motor Exp.*, 396 Pa. 482, 484-85, 153 A.2d 490 (1959). Pennsylvania Courts have held that the term "services" as found in the statute "clearly extends to the profound emotional and psychological loss suffered upon the death of a parent or a child when the evidence establishes the negligence of another as its cause." *Rettger*, 991 A.2d at 933.

The Court has reviewed the record and finds that Plaintiffs presented sufficient evidence from which the jury reasonably could have awarded $2,000,000 under the Wrongful Death Act. This award is not grossly excessive, does not offend the Court's conscience, and nothing about the award suggests partiality, prejudice, mistake or corruption warranting a new trial or remittitur.

Defendants take issue with the jury award, highlighting the tax returns presented at trial which they suggest prove Mr. Barbaros' business was not producing much income and therefore his support to his family was limited. Although it is true that Peter Ponzini testified about the Barbaros' S Corporation's tax returns, which revealed negative amounts for several years, Mr. Ponzini also testified that, despite these numbers, both Mr. and Mrs. Barbaros were drawing salaries as officers of the corporation and would have earned income as a result (despite the negative numbers on the tax returns).[112]

---

[112] Mr. Ponzini prepared Mr. Barbaros' tax returns and testified that the Barbaros family would have earned $43,819 in 2005, $50,660 in 2006, $79,196 in 2007, and $44,992 in 2008. Sept. 12, 2016 Trial Tr. at 157:7-192:18.

Second, Plaintiffs presented testimony from their economic expert, David Hopkins. Mr. Hopkins is an actuarial economic consultant and provided an expert report that calculated Mr. Barbaros' lost earnings capacity. He concluded that, depending on a number of factors, Mr. Barbaros' lost earnings capacity would be in the range of $540,486 to $810,735. Sept. 12, 2016 Trial Tr. at 215:19-25. Mr. Hopkins' testimony was uncontroverted. Neither the PrimeCare Defendants nor Dr. Thomas called any expert on this subject.[113] Reducing the uncontroverted lost earnings capacity figures presented by Mr. Hopkins from the total amount of compensatory damages awarded by the jury for the wrongful death claim, it appears the jury awarded Plaintiffs noneconomic damages in the approximate range of $1,200,000 to $1,450,000.

The jury's noneconomic damage award on Plaintiffs' wrongful death action was not "grossly excessive" on the facts of this case or under Pennsylvania law. Defendants merely speculate that because Mr. Barbaros' children were "educated in Bulgaria," and his wife Miryem also spent a portion of the year there, that it must follow that the amount of time he would have been able "to provide guidance, tutelage, support, etc. for his family was limited" and therefore the award was grossly excessive. The Court does not agree. A reasonable jury could find otherwise based on the testimony of several witnesses, including Miryem and Mumtaz Barbaros.

---

[113] Dr. Thomas did retain an economic expert who he was prepared to call at trial, but chose not to.

"If the verdict bears a reasonable resemblance to proven damages, it is not the function of the court to substitute its judgment for the jury's." *Kiser*, 538 Pa. at 224. For this reason, Courts applying Pennsylvania law routinely reject a defendant's request to disturb a jury's compensatory damage award under the statute. *See, e.g. Conlon v. Trans Nat'l Trucking, LLC*, 506 F. App'x 185, 193 (3d Cir. 2012) ("Furthermore, the $2,223,289.000 awarded to [decedent's] family by the jury under Pennsylvania Wrongful Death Act does not shock our conscience."); *Hatwood v. Hosp. of Univ. of Pennsylvania*, 55 A.3d 1229, 2012 PA Super 217 (Pa. Super. 2010) (jury award of $1,500,000 for noneconomic damages to parents of deceased child not excessive); *Hyrcza v. West Penn Allegheny Health Sys., Inc.*, 978 A.2d 961, 979-81, 2009 PA Super 119 (Pa. Super. 2009) (evidence supported $7,213,200 jury award under wrongful death and survival statutes); *Tindall v. Friedman*, 970 A.2d 1159, 1177, 2009 PA Super 50 (Pa. Super. 2009) (recognizing that "damages for loss of consortium have no market value, and the amount awarded for loss of consortium is left to the sound judgment and common sense of the fact-finder") (internal citation and quotation marks omitted); *McManamon v. Washko*, 906 A.2d 1259, 2006 PA Super 245 (Pa. Super. 2006) (affirming $10,000,000 noneconomic damages award on negligence claim). Neither the PrimeCare Defendants nor Dr. Thomas have satisfied their burden to show that the evidence presented at trial was insufficient to justify the $2,000,000 award. Under the circumstances, the Court sees no basis with which to grant the Defendants' request for

remittitur.  The award was based on competent evidence and is neither grossly excessive nor conscience shocking.

### B. Survival Action Damages

Defendants next claim that the damages awarded by the jury under the survival statute were grossly excessive and unsupported by the evidence.  The jury awarded Plaintiffs $800,000 under Pennsylvania's Survival Act, 42 Pa.C.S. § 8302.  A survival action:

> is brought by the administrator of the decedent's estate in order to recover the loss to the estate of the decedent resulting from the tort.  The measure of damages awarded in a survival action include the decedent's pain and suffering, the loss of gross earning power from the date of injury until death, and the loss of his earning power-less personal maintenance expenses, from the time of death through his estimated working life span.

*Kiser*, 538 Pa. at 226-27 (internal citations omitted).

Defendants argue that "the evidence at trial was Barbaros would have been unconscious within four to seven minutes after consuming the remnants of his shredded shirt" and, therefore, "[a]ny conscious pain and suffering his actions caused would have ended in a short timeframe."  (Doc. 377, at 53). They further claim that "[t]o substantiate the award, the jury would have had to award between $100,000 and $200,000 for every minute of self-induced conscious pain and suffering."  *Id.*

As an initial matter, the Court notes that the jury did not award damages to the estate to compensate for Mr. Barbaros' "self-induced conscious pain and suffering."  *Id.*  Rather, the jury awarded damages to the estate after reasonably concluding that the Defendants' acts and omissions caused these damages.

To determine whether a jury's pain and suffering award is excessive, courts should consider: "1) the severity of the injury; 2) whether the injury is demonstrated by objective physical evidence; 3) whether the injury is permanent; 4) the plaintiff's ability to continue employment; 5) disparity between the amount of out of pocket expenses and the amount of the verdict; and 6) the amount demanded in the original complaint." *Haines*, 536 Pa. at 457. The injury suffered by Mr. Barbaros was permanent, demonstrated by objective physical evidence, and resulted in his death. Plaintiffs presented uncontroverted evidence from Dr. Loreen Sheren, an anesthesiologist and pain and suffering expert, who testified to a reasonable degree of medical certainty as to the conscious pain and suffering Mr. Barbaros would have experienced as a result of suffocation from ingesting the t-shirt. Sept. 9, 2016 Trial Tr. at 172:7-190:12. His testimony presented a rather horrific and painful experience. Defendants did not present their own anesthesiologist or pain and suffering expert to refute this testimony, nor do they suggest what would constitute a more reasonable approximation of damages.

The Court cannot say the jury's award had no evidentiary support or is so grossly excessive as to shock the Court's conscience. Courts applying Pennsylvania law routinely decline to disturb jury's pain and suffering verdicts except in the most exceptional of circumstances not present here. *See, e.g.*, *Haines*, 536 Pa. at 457-58 (affirming reduction of pain and suffering damages from $8 million to $5 million); *Tillery v. Children's Hosp. of Philadelphia*, 156 A.3d 1233, 1247, 2017 PA Super 50 (Pa. Super. 2017) (denying request

for remittitur of $7.5 million noneconomic damage award); *Petrasovits v. Kleiner*, 719 A.2d 799 (Pa. Super. 1998) (holding $908,000 pain and suffering damages awarded to patient for back injury in medical malpractice action not excessive); *Krysmalski by Krysmalski v. Tarasovich*, 424 Pa. Super. 121, 622 A.2d 298 (1993) ($7,000,000 pain and suffering award for loss of leg and attendant pain and suffering not excessive).

Mindful of the Pennsylvania Supreme Court's instruction that if a jury verdict "bears a reasonable relationship to the proven damages, it is not the function of the court to substitute its judgment for the jury's," *Kiser,* 539 Pa. at 225, and that judicial reduction of a jury award is "appropriate only when the award is plainly excessive and exorbitant," *Haines*, 536 Pa. at 455, the Court concludes that the jury's verdict awarding damages under the wrongful death and survival statutes was not "plainly excessive and exorbitant" and bears a reasonable relationship to the damages proven at trial. Accordingly, the Court will deny Defendants' request for remittitur.[114]

---

[114] To the extent the Court "must consider evidence of the impact, if any, upon availability or access to health care in the community if the defendant health care provider is required to satisfy the verdict rendered by the jury," 40 P.S. § 1303.515(a), the Court notes that PrimeCare has submitted neither evidence nor argument that, if it is required to satisfy the $2,800,000 compensatory damage award, there would be any impact upon the availability or access to health care in the community. *See Vogelsberger,* 903 A.2d at 553 ("[T]he defendants in the instant case have not argued or provided any evidence with regard to any impact on the availability or accessibility of health care if they were made to satisfy the jury's verdict. Their argument in favor of remittitur is premised on [plaintiff's] lack of trial evidence to support the noneconomic damages award . . . Accordingly, section 1303.515 is not really pertinent herein."); *see also Lombardo v. Gardner*, 2007 WL 2450347, at *254-55 (Pa. Ct. Cm. Pl. 2007) ("The defendant has not provided the court with any facts or verification of facts for consideration  Therefore, the court is going to affirm the jury award because defendant has not come forth with any evidence to support his claim.")  The same holds true here. None of the defendants have presented evidence as to any effect upon availability or access to health care in the community if they were required to satisfy the jury's verdict.  The fact that PrimeCare has posted a supersedeas bond in the amount of $13,303,505, without arguing for a reduced bond on the theory that it

### C.    New Trial – Compensatory Damages

The Court will also deny Defendants' request for a new trial limited to compensatory damages for substantially the same reasons set forth above.  The jury's compensatory damage awards were rational and supported by competent evidence.  The award was neither grossly excessive nor conscience shocking.  Nor is there any evidence to suggest that the jury's compensatory damage awards were the result of passion, prejudice, mistake, or corruption.  Accordingly, the Court will deny Defendants' motion for a new trial limited to compensatory damages.

## VII.    MOTION FOR DELAY DAMAGES

Finally, the Court will consider Plaintiffs' motion for delay damages.[115]  (Doc. 346).  Plaintiffs ask the Court to mold the compensatory damages verdict from $2,800,000 to $3,266,488.04 to reflect an award of delay damages in the amount of $466,488.04.  (*Id.* at 3).  This represents delay damages from April 26, 2012 (one year after service of process of the original complaint) through March 23, 2016 (the eighth day after the trial originally was

---

would have a devastating effect on its business and operations, suggests that requiring satisfaction of the $2,800,000 compensatory damages verdict would not in any way adversely impact the availability or access to health care in the community.  In addition, the relevant community (*i.e.,* state and county prison facilities) is constitutionally required to provide access to healthcare, so it is unclear how, if at all, requiring Defendants to satisfy the award would have an impact on availability or access to health care.  Accordingly, the Court finds that requiring Defendants to pay $2,800,000 in compensatory damages would not have any impact on the availability or access to health care in the community.

[115] The Court treats Plaintiffs' motion "as a Rule 59(e) motion."  *Rosen v. Rucker*, 905 F.2d 702, 706 (3d Cir. 1990).  This is so even if where, as here, the motion "did not specify which Federal Rule of Civil Procedure it was brought under."  *Id.* at 705.

set to begin).  (*Id.* at 2).  Both the PrimeCare Defendants and Dr. Thomas oppose Plaintiffs'

motion.  (Docs. 350, 359).

The PrimeCare Defendants do not object to the formula used by Plaintiffs to calculate

delay damages or contest the date on which Plaintiffs assert delay damages began to

accrue – April 26, 2012.  Rather, they argue that the accrual date for delay damages ended

on February 16, 2016, which represents the date the Court granted Plaintiffs' motion for

continuance and continued the trial.  (Doc. 350 at 3).  Alternatively, the PrimeCare

Defendants, though "conced[ing] that the current state of law in the Third Circuit permits

Plaintiffs to pursue a claim for delay damages under Pennsylvania law," (*id.* at 2),

nevertheless claim that imposing delay damages is "arguably in violation of the *Erie*

Doctrine."  (*Id.).*

Dr. Thomas objects to Plaintiffs' request for delay damages, incorporating by reference

"the issues, arguments and contentions asserted" by the PrimeCare Defendants in their

brief.  (Doc. 360 at 1).  He also claims that until the Court rules on the pending post-trial

motions "molding the jury verdict to reflect delay damages would be premature."  (*Id.*).

Pennsylvania Rule of Civil Procedure 238 provides for delay damages in actions

involving bodily injury, death, or property damage.  "Under Pennsylvania Rule of Civil

Procedure 238, a prevailing plaintiff in a Pennsylvania tort action may receive what amounts

to prejudgment interest on a compensatory damages award."  *Weber v. GAF Corp.*, 15 F.3d

35, 36 (3d Cir. 1994).  "[T]he unambiguous language of Rule 238(a)(1) requires that, 'in all

civil cases wherein the plaintiff seeks monetary relief for bodily injury, delay damages shall be added to compensatory damages awarded to the plaintiff against each defendant found to be liable by the jury.'" *Tillery*, 156 A.3d at 1249 (quoting Pa.R.C.P. 238(a)(1)). Delay damages are not available, however, for any period of time "during which the plaintiff caused delay of the trial." Pa. R. Civ. P. 238(b)(1)(ii).

The PrimeCare Defendants first argue that awarding delay damages is impermissible because imposing such an award is "arguably in violation" of *Erie R.Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938). The PrimeCare Defendants do not cite any case to support this proposition (other than *Erie* itself). The Third Circuit "has determined that for purposes of the *Erie* doctrine [Rule 238] is substantive and thus applies in federal courts sitting in diversity." *Rosen*, 905 F.2d at 705 (citing *Fauber v. Kem Transp. & Equip. Co.*, 876 F.2d 327, 328 (3d Cir. 1989)). Although this is not a diversity case, the Court has exercised supplemental jurisdiction over Plaintiffs' negligence claim and Pennsylvania law controls the rules of decision. *See Chin v. Chrysler LLC*, 538 F.3d 272, 278 (3d Cir. 2008) ("When a district court's jurisdiction is predicated on diversity of the parties, or when the court hears a state-law claim based on its supplemental jurisdiction . . . the court must determine whether under *Erie* . . . a matter is substantive or procedural.") (citations omitted). Because Third Circuit case law compels a finding that Rule 238 is substantive, not procedural, the Court finds no merit to the PrimeCare Defendants' argument that awarding delay damages on Plaintiffs' negligence claim violates the *Erie* doctrine.

Next, the PrimeCare Defendants argue that, even if delay damages are permissible, 45 days must be excluded from the award based on Plaintiffs' delay, resulting in a reduction of $12,082.56. These days must be excluded, according to the PrimeCare Defendants, because Plaintiffs "erroneously calculate the accrual date to end on March 23, 2016, which was the original end date for the conclusion of trial." (Doc. 351, at 3). Although trial for this case was scheduled to commence on March 14, 2016, a month before trial, Plaintiffs' counsel requested a continuance based on what the Court found to be "legitimate and compelling personal and family concerns." (Doc. 198). Accordingly, the Court granted the request and trial was postponed until September 6, 2016. However, Plaintiffs only seek delay damages through March 23, 2016, which the parties agree "was the original end date for the conclusion of trial." (Doc. 351, at 3).

Under Rule 238, it is Defendants' burden to prove that Plaintiffs are not entitled to delay damages. *Rosen*, 905 F.2d at 707 (citing Pa. R. Civ. P. 238 (Explanatory Comment)); *see also, Sopko v. Murray*, 947 A.2d 1256, 1258, 2008 PA Super 87 (Pa. Super. 2008) ("It is the defendant who bears the burden of proof when opposing the imposition of delay damages and may do so by establishing that (1) the requisite offer has been made or (2) the plaintiff was responsible for specified periods of delay."). "The Explanatory Comment to Rule 238 states that 'not every procedural delay is relevant to the issue of delay damages, but only such occurrences as actually cause delay of the trial." *Rosen*, 905 F.2d at 708 (quoting Pa. R. Civ. P. 238 (Explanatory Comment)). Here, the PrimeCare Defendants have not cited a

single case, nor advanced any argument, as to why the accrual date should have ended on February 16, 2016 "which would have been the date the Order was entered continuing said trial." (Doc. 351, at 4).

It is apparent that, had Plaintiffs requested delay damages through the date of the judgment, in September 16, 2016, those damages would have been improper because, but for Plaintiffs' request for a continuance, the parties agree that trial would have been completed on March 23, 2016. *See Wirth v. Miller*, 398 Pa. Super. 244, 254, 580 A.2d 1154 (1990) (recognizing that granting a "request for a continuance conclusively caused a delay of trial"). But what is less clear is the date on which the damages stopped accruing—the date of the Order postponing trial, as the PrimeCare Defendants claim, or the date the original trial was scheduled to be completed, as Plaintiffs argue.[116] The Third Circuit has recognized that Rule 238 "limits the type of delay caused by a plaintiff for which a defendant may avoid delay damages to delay of the trial – a term that the explanatory comments suggest will be construed relatively narrowly." *Knight v. Tape, Inc.*, 935 F.2d 617, 625 (3d Cir. 1991) (internal citation and quotation marks omitted). Because of this relatively narrow construction, and recognizing that the PrimeCare Defendants have the burden to prove that the reduction is appropriate, the Court finds that March 23, 2016, not February 16, 2016, is the appropriate end date for the accrual of delay damages. Therefore, because the PrimeCare Defendants have set forth no argument as to why delay damages stopped

---

[116] None of the parties have argued that the delay damages should have stopped accruing on March 14, 2016 – the original date that the trial was scheduled to begin.

accruing on the date of the Court's Order granting Plaintiffs' request for a continuance, they cannot satisfy their burden to demonstrate that a $12,082.56 reduction in delay damages is appropriate.

Lastly, Dr. Thomas argues that, in addition to the PrimeCare Defendants' arguments that the Court has already considered and rejected, *supra*, an award of delay damages is premature until the Court disposes of the post-trial motions. Dr. Thomas does not cite a single case to support this proposition. In any event, this argument is without merit. First, this memorandum opinion and the Court's accompanying Orders resolve all post-trial motions and uphold the jury's compensatory damage award of $2,800,000 on Plaintiffs' negligence claim. Second, Courts in this Circuit routinely resolve motions for delay damages and post-trial defense motions at the same time. *See, e.g.*, *Boernert v. Respet*, No. 3:06-cv-362, 2009 WL 1743741 (M.D. Pa. June 18, 2009); *Calgon Carbon Corp. v. Potomac Capital Inv. Corp.*, Civil Action No. 98-0072, 2007 WL 2907865 (W.D. Pa. Sept. 30, 2007); *St. Paul Fire & Marine Ins. Co. v. Nolen Grp., Inc.*, Civil Action No. 02-8601, 2007 WL 2571524 (E.D. Pa. Aug. 31, 2007).

In sum, the Court will grant Plaintiffs' motion for delay damages and will mold the verdict to reflect the addition of $466,488.04 in delay damages on the jury's compensatory damage award of $2,800,000, bringing the total amount to $3,266,488.04.

*     *     *

To summarize:

(1) The Court will grant the individual PrimeCare Defendants and Dr. Thomas' motions for judgment as a matter of law on Plaintiffs' § 1983 claim. Viewing the evidence in the light most favorable to the Plaintiffs, no reasonable jury could conclude that any of the individual Defendants violated Mr. Barbaros' Fourteenth Amendment rights by acts or omissions exhibiting deliberate indifference to his serious medical needs. Should the Court of Appeals reverse this Court's decision granting judgment as a matter of law on this claim, the individual Defendants would not be conditionally entitled to a new trial on Plaintiffs' § 1983 claim and the jury's verdict would be upheld.

(2) PrimeCare's motion for judgment as a matter of law on Plaintiffs' § 1983 claim will also be granted. Viewing all the evidence in the light most favorable to the Plaintiffs, the Plaintiffs presented insufficient evidence from which a reasonable jury could find PrimeCare liable under *Monell*. Should the Court of Appeals reverse this Court's decision on this issue, PrimeCare would not be conditionally entitled to a new trial on Plaintiffs' § 1983 claim and the jury's verdict would be upheld.

(3) Because the Court is granting Defendants' motions for judgment as a matter of law on the § 1983 claims, it follows that Plaintiffs' motion for attorneys' fees and costs must be denied. Such denial is without prejudice to the right to raise this issue again should the Court of Appeals reverse or vacate this Court's entry of judgment as a matter of law on the § 1983 claims.

(4) The Court will deny the PrimeCare Defendants and Dr. Thomas' motions for judgment as a matter of law on Plaintiffs' negligence claim. Both the PrimeCare Defendants and Dr. Thomas waived these issues by failing to raise the issues in a sufficiently specific Rule 50(a) motion and/or abandoned the issues for failing to brief the issues in support of their post-trial motions. As such, the Defendants cannot now "renew" the issues in Rule 50(b) motions.

(5) The Court will grant PrimeCare's motion for judgment as a matter of law on Plaintiffs' claim for punitive damages. Viewing the evidence in the light most favorable to the Plaintiffs, no reasonable jury could conclude that PrimeCare's acts and omissions were sufficiently outrageous and exhibited reckless disregard for the rights of others to warrant punitive damages under Pennsylvania law. Should the Court of Appeals reverse this Court's decision on this issue, PrimeCare would not be conditionally entitled to a new trial on punitive damages and the jury's verdict would be upheld.

(6) The PrimeCare Defendants and Dr. Thomas' motions for a new trial on Plaintiffs' negligence claim will be denied.

(7) The PrimeCare Defendants and Dr. Thomas' motions for a new trial and/or remittitur with respect to the jury's $2,800,000 compensatory damages award under the Wrongful Death and Survival Act will be denied.

(8) Plaintiffs' motion for delay damages will be granted.

## VIII.    CONCLUSION

For the foregoing reasons, the PrimeCare Defendants and Dr. Alex Thomas' motions

(Docs. 354, 366) will be granted in part and denied in part. Plaintiffs' motion for attorneys'

fees (Doc. 348) will be denied without prejudice. Plaintiffs' motion for delay damages (Doc.

346) will be granted.  A separate Order follows.


Robert D. Mariani
United States District Judge